## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

**Nadine Gazzola**, individually, and as co-owner,
President, and as BATFE Federal Firearms Licensee
Responsible Person for **Zero Tolerance
Manufacturing, Inc.**;

**Seth Gazzola**, individually, and as co-owner, Vice
President, and as BATFE FFL Responsible Person for
**Zero Tolerance Manufacturing, Inc.**;

**John A. Hanusik**, individually, and as owner and as
BATFE FFL Responsible Person for d/b/a
**"AGA Sales"**;

**Jim Ingerick**, individually, and as owner and as BATFE
FFL Responsible Person for **Ingerick's, LLC,** d/b/a
**"Avon Gun & Hunting Supply"**;

**Christopher Martello**, individually, and as owner and
as BATFE FFL Responsible Person for **Performance
Paintball, Inc.**, d/b/a **"Ikkin Arms,"**;

**Michael Mastrogiovanni**, individually, and as owner
and as BATFE FFL Responsible Person for **"Spur
Shooters Supply"**;

**Robert Owens**, individually, and as owner and as
BATFE FFL Responsible Person for **"Thousand
Islands Armory"**;

**Craig Serafini**, individually, and as owner and as
BATFE FFL Responsible Person for **Upstate Guns and
Ammo, LLC**; and,

**Nick Affronti**, individually, and as BATFE FFL
Responsible Person for **"East Side Traders LLC"**; and,

**Empire State Arms Collectors, Inc.**;

      **Plaintiffs**

   _v._

**KATHLEEN HOCHUL**, in her Official Capacity as
Governor of the State of New York;

Civ. No.: 1:22-cv-1134 (GTS/CFH)

Hon. _____

**STEVEN A. NIGRELLI**, in his Official Capacity as the
Acting Superintendent of the New York State Police;

**ROSSANA ROSADO**, in her Official Capacity as the
Commissioner of the Department of Criminal Justice
Services of the New York State Police; and,

**LETICIA JAMES**, in her Official Capacity as the
Attorney General of the State of New York,

     **Defendants**

_____

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

COME NOW **Nadine Gazzola, Seth Gazzola, Zero Tolerance Manufacturing, Inc.;**

**John A. Hanusik, "AGA Sales"; Jim Ingerick, Ingerick's, LLC, d/b/a "Avon Gun &**

**Hunting Supply"; Christopher Martello, Performance Paintball, Inc., d/b/a "Ikkin Arms";**

**Michael Mastrogiovanni, "Spur Shooters Supply"; Robert Owens, "Thousand Islands**

**Armory"; Craig Serafini, Upstate Guns and Ammo, LLC; Nick Affronti; and, Empire**

**State Arms Collectors, Inc.** ("Plaintiffs"), by and through the undersigned Counsel, to allege as

follows:

1.    This lawsuit challenges thirty-one (31) inter-connected statutes that contain a multitude of

    new mandates impacting Plaintiffs as individuals and businesses engaged in lawful

    commerce in firearms and in gun shows, as enacted by Defendants in New York between

    May 30, 2022 and July 1, 2022, which laws are being implemented in an on-going and

    open-ended manner, with express animus against Plaintiffs as part of a class of persons and

    businesses seeking to exercise their rights under the Second Amendment of the

U.S. Constitution and under the June 23, 2022 Decision of the United States Supreme Court in *New York State Rifle & Pistol Association v. Bruen,* 597 U.S. _____ (herein "*NYSRPA v. Bruen*"). The provisions complained of herein began taking effect on June 20, 2022. The next wave of such provisions will take effect December 5, 2022. Plaintiffs seek a declaration that these new laws are unconstitutional or otherwise illegal and/or pre-empted by federal law, including relief in the form of a temporary restraining order, enjoining, suspending and/or preventing implementation of and enforcement of these statutes and provisions thereof. Plaintiffs bring this lawsuit under 42 U.S.C. §§1983, 1985(2), and 1988 for violations of their rights under the Second, Fifth, and Fourteenth Amendments to the U.S. Constitution. The Plaintiffs also assert that certain of the new laws are void under 18 U.S.C. §§926 and 927 and/or the Supremacy Clause; that other of the laws are Void-for-Vagueness under the Fifth Amendment; and, that others fail as a matter of Constitutional-Regulatory analysis for constituting overburden.

## I. JURISDICTION

2.   This Court has subject matter jurisdiction over Plaintiffs' claim(s) under 28 U.S.C. §§1331 and 1343.

3.   Plaintiffs seek remedies through and under 28 U.S.C. §§1651, 2201, 2202; 42 U.S.C. §§1983, 1985, and 1988; and/or Federal Rules of Civil Procedure Nos. 57 and 65.

4.   This lawsuit is authorized by law to redress deprivations under color of state law of rights, privileges, and immunities secured by the Second, Fifth, and Fourteenth Amendments to

the United States Constitution, and for declaratory and injunctive relief in relation to the same.

## II.  VENUE

5.   Venue is proper in this Court under 28 U.S.C. §1391(b) and/or (c) as the various acts complained of occurred and will imminently occur and various of the Plaintiffs are located within the Northern District of New York, and the events giving rise to Plaintiffs' causes of action arose or exist in this District.

## III.  PARTIES
### III.(A.)  Plaintiffs as Individuals and as Business Owners/Employees.

6.   Plaintiffs **Nadine Gazzola** and **Seth Gazzola** are natural persons, are citizens of the United States and of the State of New York, and reside in Hudson, Columbia County, NY.  They own the New York corporation "**Zero Tolerance Manufacturing, Inc**." with business premises[1] in Ghent, Columbia County, New York ("NY").  It is a domestic corporation, incorporated under the laws of New York.

7.   Plaintiff **John A. Hanusik** is a natural person, is a citizen of the United States and of the State of New York, and resides in Catskill, Greene County, NY.  He does business as

---

[1] The term "business premises" is used throughout as defined at 27 CFR §478.11, "The property on which the manufacturing or importing of firearms or ammunition or the dealing in firearms is or will be conducted."

"**AGA Sales**," a Sole Proprietorship with business premises also located in Catskill, Greene County, NY.

8.   Plaintiff **Jim Ingerick** is a natural person, is a citizen of the United States and of the State of New York, and resides in Avon, Livingston County, NY.  He owns Ingerick's LLC, d/b/a "**Avon Gun and Hunting Supply**," with business premises also located in Avon, Livingston County, NY.  It is a domestic corporation, incorporated under the laws of NY.

9.   Plaintiff **Christopher Martello** is a natural person, is a citizen of the United States and of the State of New York, and resides in Livingston County, NY.  He owns Performance Paintball, Inc., d/b/a "**Ikkin Arms**," with business premises located in Rochester, Monroe County, NY.  It is a domestic corporation, incorporated under the laws of NY.

10.  Plaintiff **Michael Mastrogiovanni** is a natural person, is a citizen of the United States and of the State of New York, and resides in Syracuse, Onondaga County, NY.  He does business as "**Spur Shooters Supply**," a Sole Proprietorship, with business premises also located in Syracuse, Onondaga County, NY.

11.  Plaintiff **Robert Owens** is a natural person, is a citizen of the United States and of the State of New York, and resides in LaFargeville, Jefferson County, NY.  He does business as "**Thousand Islands Armory**," a Sole Proprietorship, with business premises also located in LaFargeville, Jefferson County, NY.

12.  Plaintiff **Craig Serafini** is a natural person, is a citizen of the United States and of the State of New York, and resides in Rotterdam, Schenectady County, NY.  He owns single member

**Upstate Guns and Ammo, LLC**, with business premises in Schenectady, which is also Schenectady County, NY.  It is a domestic corporation, incorporated under the laws of NY.

13. Plaintiff **Nick Affronti** is a natural person, is a citizen of the United States and of the State of New York, and resides in Macedon, Wayne County, NY.  He works for "East Side Traders LLC" in the Town of Ontario, Wayne County, NY.

14. Plaintiff **Empire State Arms Collectors Association, Inc**. ("ESAC") is a domestic not-for-profit corporation, located in Rochester, Monroe County, NY.  It is a domestic corporation, incorporated under the laws of NY in 1967.  Plaintiff Jim Ingerick serves as the President of the corporation and is authorized to participate on its behalf for purposes of this litigation. ESAC does not have a federal or state firearms license.  It does not engage in the buying or selling of firearms or ammunition.  The primary function of ESAC is hosting of "The Original Rochester Gun Show," now in its 55th year, bringing in, until recently, approximately 4,000 attendees over the course of a two-day show, featuring approximately 200 FFLs.  ESAC is comprised of nearly 3,000 members from across NY, including FFLs and individuals.  ESAC has an interest in this case because the new laws at issue herein violate the constitutional rights of the corporation and its many members engaged in commerce as FFLs and otherwise wishing to exercise their individual Second Amendment rights.  Plaintiff Jim Ingerick is a member and officer of ESAC.  His business, Avon Gun & Hunting Supply, is also a member of ESAC.

### III.(B.)  Plaintiffs as Federal Firearms Licensees,
### Responsible Persons, and NY Licensees

15.  Plaintiffs are also business owners, employers, and employees, who hold various United States and New York State licenses to engage in lawful commerce involving firearms. [2] Only one Plaintiff, Empire State Arms Collectors ("ESAC"), does not hold either federal or state firearms licenses.

16.  Plaintiffs, except ESAC, hold current Federal Firearms Licenses of Type 01 – dealer in firearms other than destructive devices/gunsmith (herein "FFL-01"); Type 02 – pawnbroker in firearms other than destructive devices (herein "FFL-02" where needing to be distinguished from the FFL-01); and Type 07 – manufacturer of firearms (herein "FFL-07").  Plaintiffs are thus also collectively referred to herein as "FFLs."

17.  Plaintiffs, except ESAC, are herein collectively referred to as "dealers in firearms," as this term is defined at 18 U.S.C. §921(a)(11)(A), meaning "any person engaged in the business of selling firearms at wholesale or retail."[3]

    a.  As used herein, the Plaintiffs can be said to be "engaged in the business," as this term is defined under 18 U.S.C. §921(21)(C), meaning "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with

---

[2] The term "firearm," as used herein, is as defined under 18 U.S.C. §921(3)(A)-(B) and 27 CFR §478.11, meaning "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon."  Plaintiff FFLs do not sell any firearm muffler or silencer, nor do they sell destructive devices.  "Firearm," as used herein, is intended to include "shotguns" as defined under 18 U.S.C. §921(5) and 27 CFR §478.11; "Rifles" as defined under 18 U.S.C. §921(7) and 27 CFR §478.11; and, "Handgun" as defined under 18 U.S.C. §921(29) and 27 CFR §478.11.

[3] See, also, 27 CFR §478.11 for this and all other forms of federal licenses held by Plaintiffs.

the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."

b.  Plaintiffs are Federal Firearms Licensees ("FFLs"), authorized by the federal government through the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE" or "ATF") to engage in the business of buying and selling firearms under various license types.  Each federal license is counter-signed by one or more Plaintiffs as "Responsible Persons," having completed the "Responsible Person Questionnaire," supplied photograph, and supplied fingerprints, and undergone background checks.[4]

c.  Plaintiff **Nick Affronti** is distinguished for holding his federal FFL-02 license as a "pawnbroker," as this term is defined at 18 U.S.C. §921(a)(12), meaning "any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money."[5]  This Plaintiff also holds a corresponding license from NYS, conferred through the Wayne County Clerk's Office.

d.  Plaintiffs **Seth Gazzola, Christopher Martello, Michael Mastrogiovanni,** and **Craig Serafini** are distinguished for also holding NY gunsmithing licenses.  At federal law, gunsmithing is part of the FFL-01 license.  New York confers it as a

---

[4] "Responsible Person" is defined by BATFE on Form 7, "Definitions," as "In addition to a Sole Proprietor, a Responsible Person is, in the case of a Corporation, Partnership, or Association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms."

[5] For ease of this document and case, the term "dealers in firearms" is intended to mean also Mr. Affronti. Where there is distinction at law or in practice, the same will be drawn to the attention of the reader.

separate license.  Gunsmithing is generally considered by the industry to be a specialized craft and skill.  These Plaintiffs hold these licenses as conferred through Columbia, Monroe, Onondaga, and Schenectady Counties, respectfully.

e.   In addition to holding FFL-01 licenses, Plaintiffs **Nadine Gazzola, Seth Gazzola, Christopher Martello** also hold federal FFL-07 licenses as "manufacturers," as this term is defined at 18 U.S.C. §921(a)(10), meaning "any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution."  These Plaintiffs hold these licenses as conferred through Columbia and Monroe Counties, respectfully.

f.   Plaintiff **Zero Tolerance Firearms Manufacturing** is conferred an additional federal license through BATFE as a Special Occupational Taxpayer, Class 2 (herein, an "FFL-07/Class 2 SOT").

18.   Plaintiffs received their FFLs in accordance with 18 U.S.C. §923,[6] meaning in general: having completed and submitted ATF Form 7 with photographs and fingerprints; being over the age of twenty-one years; not being a disqualified or prohibited persons under 18 U.S.C. §922(g); having a physical premises where business is conducted; and, having made any additional certifications required thereunder.  Plaintiffs are required to renew their federal licenses every three years, including ATF Form 8. 27 CFR §478.49 and §478.45.  A background check is conducted of Plaintiffs upon each license application or renewal submission. 27 CFR §478.47.

---

[6] See, also, for more detailed regulations 27 CFR §478.41, *et seq.*

19. The Plaintiffs also hold various current NYS licenses relevant to commerce in firearms, applied for and conferred through their respective county of business premises. NY Pen Law §400.00. These must be renewed every three years. An investigation with background check is conducted of Plaintiffs upon each license application or renewal submission. NY Pen Law §400.00(4). [7]

20. Plaintiffs, as individuals, own personal firearms that are legally unrelated to any inventory owned by their businesses. A federal NICS background check [8] was conducted of Plaintiffs prior to the purchase of each firearm.

    a. Plaintiffs will be required to present a current concealed carry permit for future purchases of handguns.

    b. They will be required to present semi-automatic licenses for future purchases of SARs, but are currently unable to either present such a license or conduct such a purchase due to the unavailability of an SAR license in their county of residence, or, upon information and belief, throughout the State.

21. In addition, Plaintiffs have current NYS concealed carry permits, conferred prior to September 1, 2022, through their counties of residence. Applications, training, and

---

[7] No distinction is made in this case for additional or different requirements for dealer, gunsmith, pawnbroker, manufacturer, or gun show in Nassau, Suffolk, and Westchester Counties, or for New York City.

[8] The "NICS background check" is defined at 28 CFR §25.1 as "NICS means the National Instant Criminal Background Check System, which an FFL must, with limited exceptions, contact for information on whether receipt of a firearm by a person who is not licensed under 18 U.S.C. §923 would violate Federal or state law." Title 28 CFR establishes policies and procedures implementing the Brady Handgun Violence Prevent Act, discussed further herein.

references were supplied to obtain the licenses, and background checks were conducted of these Plaintiffs for the original application and subsequent renewals.

a.  Plaintiffs will be unable to renew their concealed carry permits due to the unavailability of mandatory training now required to renew concealed carry permits throughout the State.

### III.(C.)  Defendants

22. Defendant **Kathleen Hochul**, is sued in her official capacity as Governor of the State of New York.  She has the general powers and duties, *inter alia,* to enforce state laws, approve or veto bills passed by the Legislature, and to convene the Legislature.  In this instance, Defendant Gov. Hochul has been responsible for, caused, or created the circumstances under which the laws complained of herein were drafted into Bills and passed by the Legislature to receive her signature to commit into law.  Defendant Gov. Hochul is also responsible for the nomination and appointment of Co-Defendants Superintendent of the NYS Police, Commissioner of the NYS Department of Criminal Justice Services, and Secretary of State.  Defendant Gov. Hochul oversees and supervises all Co-Defendants, and, as such, is responsible to ensure that their delegated responsibilities are fulfilled, including those responsibilities relevant to the Plaintiffs' state-issued licenses as firearms dealers and the parameters of operation of their businesses.  Defendant Gov. Hochul is an attorney licensed by the State of New York.  She ascended to the position of Governor on August 24, 2021, following the resignation of former NYS Gov. Andrew Cuomo.  Defendant Gov. Hochul may be served through her office at the New York State Capitol Building, Albany, New York 12224.

23. Defendant **Steven A. Nigrelli** is sued in his official capacity as the Acting Superintendent of the NYS Police, commanding more than 5,000 law enforcement officers with statewide jurisdiction.[9] He is generally responsible for executing and enforcing NY's laws and regulations. He has designated responsibility for background checks and oversight of the Plaintiffs' state-issued licenses and permits, as well as execution and enforcement of the laws, rules, and regulations impacting the operation of the Plaintiffs' businesses. Defendant Nigrelli is responsible for what appears to be the first arrest under the new laws, a fact broadcast via NYSP Press Release on October 25, 2022.[10] Under the new laws complained of herein, he has express responsibilities to design and establish numerous rules, regulations, curriculum, testing, certificates, processes, and other written products and processes, which directly impact the operation of the Plaintiffs' businesses. He serves at the pleasure of the Defendant Gov. Hochul, having been appointed by her on October 7, 2022. NY Exec Art. 11. Defendant NYS Police Acting Superintendent Nigrelli may be served through his office at New York State Police, 1220 Washington Avenue, Building 22, Albany, New York 12226.

24. Defendant **Rossana Rosado** is sued in her official capacity as the Commissioner of the Division of Criminal Justice Services ("DCJS"). She has designated responsibility for the promulgation of rules and regulations complained of herein, including those necessary to the lawful operation of the Plaintiffs' businesses. She was nominated by the Defendant Gov. Hochul on November 4, 2021 and serves at the pleasure of the Governor. NY

---

[9] Official website of the NYS Police at https://troopers.ny.gov/steven-nigrelli.

[10] Official website of the NYS Police at https://www.nyspnews.com/keeseville-ny-male-arretsed-for-failure-to-safely-store-firearms.htm.

Exec Art. 35. Her division is part of NYS Police. Defendant Commissioner Rosado may be served through her office at New York State Division of Criminal Justice Services, Alfred E. Smith State Office Building, 80 South Swan Street, Albany, New York 12210.

25.  Defendant **Letitia James** is sued in her official capacity as the Attorney General of the State of New York. She is the State's chief legal officer and heads the NYS Department of Law. She is responsible, *inter alia,* "to prosecute and defend all actions and proceedings in which the state is interested," as well as to "have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel." NY Exec §63. She interprets laws, selects charges, and prosecutes defendants. She is an attorney, licensed in NY. Defendant A.G. James may be served in person through her Office of the Attorney General, Empire State Plaza, Justice Building, 2nd Floor, Albany, New York 12224.

26.  The Defendants acted in concert, including, but not limited to traveling throughout the state, making joint public appearances, speaking, responding to questions from the public and the media, including at venues in Syracuse, New York, as well as publishing through their official New York State websites positions on the new laws, "Frequently Asked Questions," downloadable PDF documents, and other instructions in the form of memoranda, such sites including Defendant Hochul through https://www.governor.ny.gov/, Defendant NYS Police through https://troopers.ny.gov/, Defendant DCJS through https://www.criminaljustice.ny.gov/, and Defendant NY Attorney General through https://ag.ny.gov/.

## IV.  THE "NEW" NEW YORK LAWS AT ISSUE HEREIN:
### IDENTIFIED AND SUMMARIZED.

27.   The term "the new laws" as used herein are defined by this section.

28.   The following thirty-one (31) statutory provisions, requested to be struck down, originated in four (4) Bills, signed into law between May 30, 2022 and July 1, 2022, as follows:

   a.   Bill S.9407-B – signed May 30, 2022 (eff. June 30, 2022[11]);

   b.   Bill S.9458 – signed May 30, 2022 (eff. August 30, 2022);

   c.   Bill S.4970-A – signed June 6, 2022 (eff., generally, June 30, 2022); and,

   d.   Bill 51001 – signed July 1, 2022 (eff., generally, September 1, 2022).

29.   Copies of the Bills are attached to this pleading.

30.   The new laws collectively impair and impede the ability of the Plaintiffs to engage in the lawful commerce of firearms and to host a gun show, and to serve as a conduit for those seeking to exercise their fundamental Second and Fourteenth Amendment rights, including themselves as individuals.  The new laws also violate the Fifth Amendment rights of the Plaintiffs, including the right against self-incrimination.

31.   Each statute or provision complained of herein is summarily listed below with its originating Bill number, effective date, implementation date (if different from effective

---

[11] *N.B.*:  S.4970-A effective date, found on p. 7, §5, creates the possibility of immediate, but undefined and unlimited additional actions without assigning authority or deadline, providing: "Effective immediately, the addition, amendment and/or repeal of any rule or regulation necessary for the implementation of this act on its effective date are authorized to be made and completed on or before such effective date." Plaintiffs are unable to determine what this changed or when.

date), and/or triggering event (if effectiveness is contingent upon further Executive Branch office or agency action). The list is alphabetical by statute.

a. **NY Exec §228** – the transfer of the federal NICS background check to the Defendant NYS Police as the "Point of Contact," creation of a new division within the NYS Police to perform background checks, as a forced intermediary between the licensed dealer and the current, federal NICS background check system[12]. Originates in S.51001, pp. 15-17. Takes effect July 21, 2023.[13]

b. **NY Gen Bus §875-b(1)** – the "security plan," including a "safe," "vault," or "secured and locked area on the dealer's business premises" and the separate storage of ammunition. Originates in S.4970-A, p. 3. Takes effect on December 5, 2022.

c. **NY Gen Bus §875-b(2)** – a "security alarm system," including installation and maintenance by a third party vendor, as well as specified placement of cameras with video recording devices with feed storage. Originates in S.4970-A, p. 3. Takes effect on December 5, 2022.[14]

---

[12] For definition of the term "NICS background check system," see, generally, 28 CFR §25.2, *et seq.* Additional detail and citations are also provided herein.

[13] The actual effective date of this provision is contingent upon the certification by the Defendant NYS Police that the firearms and the ammunitions purchase background check system is "established" (undefined), and thus may not be July 2023 or thereafter. See S.51001 for NY Pen §400.02(2): "…certifies that the statewide license and record database [is] established…" Earlier in the same bill section §7 at new NY Pen §400.02(2), it references that the new ammunition "license and record database specific for ammunition sales" shall "be" "no later than thirty days upon designating the division of state police as the point of contact to perform both firearms and ammunition background checks." Any reference to an "ammunition license" is read by Plaintiffs as a legislative error, as they are unaware of any provision requiring an individual to present an "ammunition license" for the purchase of ammunition, either now or at a future date.

[14] This effective date is contingent upon the Defendant NYS Police establishing "standards for such security alarm system." See S.4970-A for NY Gen Bus §875-b(2), second sentence. It appears in the

d. **NY Gen Bus §875-c** – the prohibition of entry of persons under eighteen years of age without a parent or legal guardian.  Originates S.4970-A, p. 4.  Takes effect on December 5, 2022.

e. **NY Gen Bus §875-e** – mandatory annual employee training and records demonstrating such training.  Originates S.4970-A, p. 4.  Takes effect on December 5, 2022.[15,16]

f. **NY Gen Bus §875-e(3)** – restriction against employees under the age of twenty-one years.  Originates S.4970-A, p. 4.  Takes effect on December 5, 2022.

g. **NY Gen Bus §875-f** – mandatory submission semi-annually of the Book of Acquisitions and Dispositions (herein "A&D Book") to the Defendant NYS Police.  Originates S.4970-A, pp. 4-5.  Takes effect on December 5, 2022.[17,18]

---

next (third) sentence that, in the alternative, "Such security alarm systems may be developed by a federal or state agency, a not-for-profit organization, or another entity specializing in security alarm standards approved by the superintendent for the purposes of this act."

[15] This provision is contingent upon Defendant NYS Police providing "training developed by the superintendent" to all dealers in firearms.  See S.4970-A for NY Gen Bus §875-e(1).  It is the next section that states "The superintendent shall develop and make available to each dealer a training course in the conduct of firearm, rifle, and shotgun transfers including…" and the basic course topics. See S.4970-A for NY Gen Bus §875-e(2).

[16] This provision is contingent upon Defendant NYS Police promulgating "regulations setting forth minimum requirements for the maintenance of records of such training." See S.4970-A for NY Gen Bus §875-e(3).

[17] This provision is contingent upon Defendant NYS Police setting forth "such form" and "such period" for the copy of such records. See S.4970-A for NY Gen Bus §875-f.

[18] *N.B.*:  Because the statute effective date is December 5, 2022 and the semi-annual submission of records is defined as "April and October," Plaintiffs read the implementation date of this provision to be a first deadline of April 30, 2023.

h. **NY Gen Bus §§875-f(1), (2), (3), and (4)** – records storage requirements with electronic record back-up.  Originates S.4970-A, pp. 4-5.  <u>Takes effect on December 5, 2022</u>.

i. **NY Gen Bus §875-f(2)** – mandatory monthly creation of firearms inventory reconciliation reports by firearms dealers to the Defendant NYS Police.  Originates S.4970-A, p. 5.  <u>Takes effect on December 5, 2022</u>.[19]

j. **NY Gen Bus §875-f(3)** – forced access to inventory records "at any time" by "law enforcement agencies and to the manufacturer of the weapon or its designee."  Originates S.4970-A, p. 5.  <u>Takes effect on December 5, 2022</u>.

k. **NY Gen Bus §875-g(b)(1)** – mandatory submission by firearms dealers of an annual certification of compliance to the Defendant NYS Police.  Originates S.4970-A, p. 5.  <u>Takes effect on December 5, 2022</u>.[20,21]

---

[19] *N.B.*:  Because the statute effective date is December 5, 2022 and the inventory reconciliation data is defined as "monthly," Plaintiffs read the implementation date of this provision to be a first report creation deadline of December 31, 2022.  Plaintiffs read this provision to be without a submission deadline.

[20] This provision is contingent upon the Defendant NYS Police "by regulation [determining] the form and content of such annual certification." See S.4970-A for NY Gen Bus §875-g.

[21] *N.B.:*  This provision is dependent upon the Defendant NYS Police setting "the form and content" of the annual certification.  Because of this condition precedent plus the effective date of December 6, 2022, Plaintiffs do not know if this provision will be effective with responsibility for filing as of December 31, 2022 or not until December 31, 2023.

l. **NY Gen Bus §875-g(2)** – periodic inspections with "full access" to dealer premises no less than once every three years. Originates S.4970-A, p. 5. <u>Takes effect on December 5, 2022</u>.[22]

m. **NY Gen Bus §875-h** – authorization to the Defendant Superintendent of the NYS Police to "…promulgate such additional rules and regulations as the superintendent shall deem necessary to prevent firearms, rifles, and shotguns from being diverted from the legal stream of commerce." Originates S.4970-A, p. 5. <u>Takes effect on December 5, 2022</u>.

n. **NY Pen §270.22**, to be read with **NY Exec §144-a** – restriction against the sale of body vests, with exempted professions and persons upon declaration by the NYS Police. Originated in S.9407-B, p. 2. Eff. June 30, 2022.[23]

o. **NY Pen §400.00(1) and §400.00(19)**, to be read with **NY Exec §837(23)(a) and NY Pen §265.20(3-a)** – establishing new, standardized, classroom and live-fire course and test necessary for concealed carry handgun permits (§400.00(2)(f) [24]) and

---

[22] This provision is contingent upon the Defendant NYSP "…promulgating] regulations requiring period inspections…" See S.4970-A for NY Gen Bus §875-g(2)(a).

[23] This provision includes exception for "eligible provisions." This term is undefined in S.9407-B as passed. It is contingent upon the NYS Defendant Secretary of State "…promulgating rules and regulations to establish criteria for eligible professions" and the process through which they may "request" that "the profession in which they engage be added to the list of eligible professions." See S.9407-B for NY Exec §144-a. Plaintiffs are unaware of whether or where this exemptions list is or will be published.

[24] NY Pen §100.00(2), Types of licenses, specifically (2)(f) "have and carry concealed, without regard to employment or place of possession subject to the restrictions of state and federal law, by any person." Herein, as commonly used, "concealed carry permit."

for semi-automatic rifle licenses (§400.00(2)).  Originated in S.51001, pp. 1, 20, 8,

10-11, respectively.  Eff. September 1, 2022.[25]

p. **NY Pen §§§400.00(2), 400.00(3) 400.00(6), 400.00(7), 400.00(8), 400.00(9), and**

**400.00(14)** – restriction against the purchase of a semi-automatic rifle without a

license (not valid within the city of New York with certain exceptions), in a form

approved by the NYS Police and issued and amended by the county licensing officer.

Originated in S.9458, pp. 1-5.  Eff. September 4, 2022.

q. **NY Pen §§400.02(2)** – requirement of an ammunition background check.  Originated

in S.51001, pp. 11-12.  Eff. September 1, 2022.[26]

r. **NY Pen §400.03(2)** – mandatory record-keeping requirements for ammunition sales.

Originated in S.51001, pp. 11-12.  Eff. September 1, 2022.[27]

32. These thirty-one (31) new laws complained of herein include a multitude of mandates

applicable to the Plaintiffs, their businesses, their employees, and their licenses.

---

[25] *N.B.:*  As detailed further in this Complaint, the Defendants NYS Police and DCJS are, as a condition
precedent, required to "…promulgate policies and procedures with regard to standardization of
firearms safety training required…" and are required to "…[approve] course materials and the
promulgation of proficiency standards for live fire training."  It is the position of Plaintiffs that this
(these) statewide, regulatory events have not occurred.

[26] As with NY Exec §228, the actual effective date of this provision is contingent upon the certification by
the Defendant NYS Police that the firearms and ammunitions purchase background check system is
"established" (undefined), and thus may not be until July 2023 or thereafter.  *See, also,* footnote 6,
herein.

[27] The effective date is dependent upon the Defendant NYS Police establishing the "form" of specified
data to be collected by any dealer of firearms or "seller of ammunition" (as defined by

33. The pleading space necessary to set forth the new laws complained of and to try to specify the Bill effective date, the contingencies, and the status illustrates well that the new laws effecting lawful commerce in firearms are a minefield, designed to trip-up the Plaintiffs to commit errors that will result in serious, misdemeanor and felony criminal charges, monetary fines, the loss of their federal and state licenses, and the closure of their businesses.

## V.  THE SECOND AMENDMENT GUARANTEES THE FUNDAMENTAL RIGHT OF THE INDIVIDUAL TO KEEP ARMS, MEANING TO PURCHASE AND POSSESS ARMS.

34. Among the Civil Rights belonging to the Plaintiffs is the Second Amendment to the U.S. Constitution, which provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."[28]

35. The June 23, 2022 decision of the United States Supreme Court in *New York State Rifle & Pistol Association v. Bruen,* 597 U.S. _____ (2022), completed the incorporation of the Bill of Rights to the nation and its states.  It incorporated the Second Amendment through the Fourteenth Amendment.  ("Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment not the Second." *Id.,* at p. 28.)  The Bill of Rights thus became a fully integrated whole, applicable equally to Americans as national citizens as to New Yorkers as state citizens.  No longer can any state deny the

---

[28] The plain fact that NY Civ. Rights Law, art. II ("Bill of Rights), §4 provides that "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed" is not overlooked by the Plaintiffs as supportive of their case.

Plaintiffs or any other person of any of their individual rights, as enshrined in the Bill of Rights and the Fourteenth Amendment.

36. The Decision in *NYSRPA v. Bruen* was the culmination of a trilogy: *Heller-McDonald-NYSRPA.* This reference is to the Decisions of *District of Columbia v. Heller,* 554 U.S. 570 (2008) (herein *"Heller I"*), *McDonald v. City of Chicago,* 561 U.S. 742 (2010), and *NYSRPA v. Bruen, supra.* The *Heller-McDonald-NYSRPA* trilogy established the right of the individual to keep and bear arms for purposes of self-defense in and beyond the front door of the home, whether as a "U.S. citizen" or as a "state citizen." *NYSRPA, supra,* p. 1.

37. In *NYSRPA,* the Court confirmed the textual analysis used in *Heller* that the operative clause – "the right of the people to keep and bear Arms shall not be infringed" – "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Supra,* pp. 10-11, citing *Heller, supra,* at 576-577, 578 (reiterated in *NYSRPA* at p. 23).

38. Justice Thomas hinted in the *NYSRPA* Opinion that there is yet another body of law to be found in the definition of "to keep," when he singled out "Although individuals often "keep" firearms in their home, at the ready for self-defense, most do not "bear" (i.e., carry) them in the home beyond moments of actual confrontation." (pp. 23-24) Justice Thomas looks at the two verbs in the operative clause and, it appears, will allow each to stand for its own principles.

39. The *Heller* and *NYSRPA* Opinions drilled down into the definition of "to bear," including "The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense." (p. 24) Also, "The constitutional

right to bear arms in public for self-defense is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."" (p. 62, citing *McDonald*).   The text of the decisions by Justices Scalia and Thomas repeats the verb "to bear" with intention.

40.   Now, this watershed case will define and establish the black letter of the second verb within the operative clause of the Second Amendment – "to keep" – meaning to own or possess a firearm by the citizen – and the unique relationship of the Federal Firearms Licensee to the exercise of this fundamental right of the individual.

41.   As stated in <u>Black's Law Dictionary</u>:

> "Keep, *v.* To continue.  [citation omitted]  To have or retain in one's power or possession; not to lose or part with; to preserve or retain."[29]

42.   This definition is not dissimilar to that found in <u>Webster's Dictionary</u>:

> "Keep, *vt.*  4.  To have or hold; specifically (a.) to have or hold for future use or for a long time; (b.) to have usually in stock for sale."[30]

43.   Without the verb "to keep," the separate verb "to bear" would not have the same meaning. "To bear" without "to keep" could be interpreted as narrowly as to mean only those arms provided by the government, such government-supplied arms thus being subjected to revocation by the government.  Instead, the verb "to keep" signifies the right of the citizen to own or possess his or her own firearm, to remain in their hands, for use against all

---

[29] <u>Black's Law Dictionary, 5th Edition</u> (1979), p. 780.

[30] <u>Webster's New Twentieth Century Dictionary, Unabridged Second Edition</u> (1970), p. 997.

threats, whether foreign or domestic, and most particularly including a threat to the person or property, known commonly as "self-defense."

44.   From the first draft of the Second Amendment by James Madison, through the Congressional debates and edits, the lynchpin phrase "to keep and bear arms" was ratified without revision.

45.   The *Heller* Court commented that the phrase "keep arms" favored an interpretation "…as an individual right unconnected with militia service." *Supra,* at 582.

46.   It is through this lawsuit that the guarantees provided for under the "to keep" provision of the Second Amendment should take its place next to the protections guaranteed by "to bear."  It should, in equal measure, be used to prohibit state infringement of the lawful commerce in firearms.

47.   The *NYSRPA v. Bruen* analysis is simple and readily applied: "…when the Second Amendment's plain text covers and individual's conduct, the Constitution presumptively protects that conduct."  The burden of proof to support the regulation then shifts to the government to demonstrate the regulation is consistent with this Nation's historical tradition of firearm regulation. *Supra,* at pp. 8 and 15.

48.   As applied to compliance regulations for commerce in firearms, the analysis could be referred to as "constitutional-regulatory law."  No other product is protected within the Bill of Rights or the Fourteenth Amendment.  No other "thing" is fundamental to the scheme of ordered liberty.

## VI.   THE DEALER IN FIREARMS OPERATES AS AN EXTENSION OF THE INDIVIDUAL, OCCUPYING A UNIQUE INTERSECTION OF CONSTITUTIONAL AND REGULATORY LAW.

49.   The law is now established of the individual and his right "to bear" arms.  What arms, is the natural, next question.  The answer is arms that a person individually owns or possesses.  Arms a person "keeps."  The Second Amendment does not limit the use of arms to those that may be supplied by the government and rescinded or recalled when the limited issuance is concluded.

50.   The Second Amendment is the only civil right that references a thing, an object external to the person.  It is that object, the firearm, upon which the exercise of the fundamental right of self-defense depends.  It is that object – the firearm – that makes the FFL dealer of firearms, the gunsmith, the pawnbroker, the manufacturer, and the gun show, as important as the individual to the exercise of this fundamental right.

51.   There is a unique relationship between the Second Amendment, the individual, and the FFL, including the gun show.  The Plaintiffs' rights to participate as FFLs and gun shows in the lawful stream of commerce are indispensable to the individual seeking to exercise his or her Second Amendment rights.

52.   Plaintiffs' businesses should not be thought of as just another retail store or home-based business in the stream of commerce.  The Plaintiffs' firearms-related businesses should be equally as important as the individual seeking to use a firearm for a constitutionally-protected purpose, the exercise of which he or she cannot accomplish unless he or she can first procure a firearm that they can "keep."

53.   As a top line, the Plaintiffs, individually, as Federal Firearms Licensees, and as business owners and employees, assert that they are entitled to the protections afforded them at federal law under the Second Fifth, and Fourteenth Amendments.

54.   Plaintiffs have fundamental rights both to "keep and bear arms" for lawful purposes, and also to engage in commerce as dealers in firearms, pawnbrokers, gunsmiths, manufacturers, and gun shows.

55.   Taken as a whole, if this lawsuit is unsuccessful, the new laws will fatally burden the Plaintiffs to shut down their businesses in firearms, to surrender or to lose their federal and/or state licenses required to engage in lawful commerce in firearms, to face criminal charges and fines, to suffer the loss of their incomes and livelihoods, to suffer the financial loss or degradation of the values of their business inventories, to cause them to lay-off one or more employees, and to, themselves, individually, be unable to purchase firearms and/or ammunition as convicted criminals are disqualified persons.

56.   The Court must keep in mind during this analysis that, as a matter of federal law, only a U.S. citizen,[31] in person,[32] in their "state of residence"[33] can purchase a firearm in person

---

[31] *Cf.,* the "nonimmigrant alien lawfully admitted to the United States without a visa, as that term is defined in section 101(a)(26) of the INA (8 U.S.C. 1101(a)(26))" and the ATF Final Rule on "Firearms Disabilities for Certain Nonimmigrant Aliens" (2001R-332P), 77 Federal Register 33625-33634 (June 7, 2012). For the sake of simplicity for this case, we use the word "citizen" and acknowledge this narrow distinction from the otherwise disqualifying factors found at 18 U.S.C. §922(g)(5) and (7).

[32] Any exception is not generally relevant to the bulk of firearms purchases.

[33] 27 CFR §478.11.

at an FFL, unless an inter-state FFL-to-FFL transfer is arranged back to the person's state of residence. 18 U.S.C. §922(a)(3) and §922(b)(3); 27 CFR §478.29.

    a.  Inter-state commerce is governed by the federal requirement that an out-of-state FFL must ship a firearm purchased by a non-resident to an FFL in the residential state of the customer in accordance with the laws of the customer's residence. The destination FFL is further required at federal law to verify his/her current BATFE FFL license to the shipping FFL by furnishing a certified copy of the license prior to the transfer of the firearm or using "FFL eZ Check." Such data then becomes part of the FFL A&D Book entries. 27 CFR §478.122, §478.123, or §478.125, as applicable.

57.  If the Defendants succeed at shutting down the Plaintiffs and other FFLs across the State, none (zero) of New York State's 20 million residents[34] will be able – as a matter of federal law – to purchase any firearm requiring a license through the lawful stream of commerce either in New York or in all other states and U.S. territories.

    a.  It is correct that an individual may purchase a long gun at an out-of-state FFL, but the individual remains responsible for state law compliance, even if he or she passes a federal NICS background check.

    b.  It is also correct that a New York resident would be able to travel out-of-state to purchase ammunition.

---

[34] New York State population 20,201,249 taken from the April 1, 2020 Census at https://www.census.gov/quickfacts/NY.

c. These out-of-state scenarios assume the financial resources to attempt to engage in lawful interstate firearms commerce, which converts a fundamental right into one belonging only to the privileged.

58. In short, without FFL dealers in firearms operating at meaningful geographic intervals across the State of New York, neither Plaintiffs nor their customers will be able to enjoy their fundamental rights under the Second Amendment.

59. The acquisition of firearms is a "fundamental prerequisite to legal gun ownership" *IL Ass'n of Firearm Retailers v. City of Chicago,* 961 F.Supp.2d 928, 938, N.D. Ill. 2014. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use…" *Ezell v. City of Chicago,* 651 F.3d 684, 701 (7th Cir. 2011). Further, "the right to possess a firearm for self-defense implies a corresponding right to acquire the ammunition necessary to use them for self-defense" (*Jackson v. City & County of San Francisco,* 746 F.3d 953, 967, 9th Cir. 2014).

60. The average citizen is incapable of building a firearm, let alone procuring steel and forging a barrel. Without the Plaintiffs and all other type of FFLs, the Second Amendment has no meaning or effect. There would be no arms "to keep."

### VI. (A.) For More than 100 Years, the Federal Government has Balanced the Second Amendment Rights of the Individual with FFLs, Defining "Lawful Stream of Commerce in Firearms"

61. Prior to 1934, firearms were sold at common locations like general stores and gas stations. The firearm was used for a range of activities, including hunting, sporting, collecting, and defense of self, family, and property.

62.   This case does not address questions that arise from the *NYSRPA v. Bruen* Decision of any
      federal restrictions on FFLs can be rethought or restructured in a pre-1934/post-1934
      analysis.  The Plaintiffs herein are experiencing pressing constitutional, legal, and financial
      pressures as a direct result of the new laws.  This case should not be read to or act as a
      debarkation point against any future case with the ability to delve into broader, systemic
      issues and analysis.

63.   For purposes of this case, 1934 is selected as the point that Congress took its first step
      towards the "regulation" of commerce in firearms in a retail sense.  It passed the National
      Firearms Act[35] (herein "NFA"), largely to impose a manufacturing tax and a transfer tax on
      a list of specific firearms, like the machine gun.  The NFA also required manufacturers,
      importers, and dealers in possession of NFA firearms to register with the Secretary of the
      Treasury.[36]  Essentially, the NFA assigned the dealer, manufacturer, importer/exporter of
      NFA firearms the ancillary duty of tax collector.

64.   In 1968, a U.S. Supreme Court Decision found the federal government requirement to
      register an NFA firearm violated the owner's Fifth Amendment rights.[37]  The Opinion of
      the Court expressly did not reach a question on whether a dealer could be required to
      register. [38]

---

[35] Currently codified and amended as Internal Revenue Code ch. 53 §§5801 and 5802.

[36] See, ATF E-Publication 5320.8, rev. 04/2009, "ATF: National Firearms Act Handbook" at
     https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.

[37] *Haynes v. U.S.,* 390 U.S. 85 (1968).

[38] Plaintiffs echo the Opinion of the Court in *Hayes:*  "At the outset, it must be emphasized that the issue
     in this case is not whether Congress has authority under the Constitution to regulate the manufacture,
     transfer, or possession of firearms; nor is it whether Congress may tax activities which are, wholly or
     in part, unlawful.  Rather, we are required to resolve only the narrow issue of whether enforcement

65. That same year, 1968, Congress passed the "Gun Control Act" ("GCA"), creating the "federal firearms licensee," which would be responsible for the background check against the sale of a firearm to a "disqualified person." [39]  It was also the birth of ATF Form 4473, still in use today.

66. Section 101 of the GCA expressed the intention of Congress that there be no unnecessary or unreasonable statutory or regulatory obstruction along the pathway between an individual and the "acquisition…of firearms," as follows:

> "…it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." (emphasis added)

67. Also relevant to this case, the 1993 Brady Handgun Violence Prevention Act ("the Brady Act") created the modern NICS background check system. [40]  The Brady Act contained a five-year construction period for the NICS system, which did not go live until November 29, 1998.

---

of §5851 against petitioner, despite his assertion of the privilege against self-incrimination, is constitutionally permissible."

[39] Gun Control Act, Pub.L. 90-618 (1968), find at 18 U.S.C. ch. 44 §921 *et seq.*

[40] Brady Handgun Violence Prevention Act, Pub.L. 103-59 (1993), find at 18 U.S.C. §§921-922.

68. Since 1934, federal law surrounding the manufacture, export/import, gunsmithing, buying/selling, and collecting of firearms evolved ahead of the recent, selected incorporation of the Second Amendment. Since the GCA in 1968 (sixty years before *Heller*), the federal system of licensing and oversight of, *inter alia,* commerce in firearms evolved organically through federal legislation and the creation in 1972 of a dedicated federal agency, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("BATFE" or "ATF").

### VI. (B.)  For More Than 50 of Those 100 Years, Plaintiffs Have Developed and Engaged in Active Relationships with Federal ATF and FBI Agencies to Protect and Facilitate Lawful Commerce in Firearms.

69. The objective of the federal FFL system, which is shared by the Plaintiffs and BATFE, is the lawful sale of the firearm to the non-disqualified U.S. citizen.

70. As of FY2020, the ATF had 5,082 employees, including 2,653 special agents, 760 industry operations investigators, and roughly 2,500 additional staff. Its FY2021 enacted budget was $1.484 billion. Its FY2022 budget request went in at over $1.5 billion.[41]

71. The mission and goals of the BATFE include regulating lawful commerce in firearms, while protecting the public from crimes involving firearms. Its number one "Strategic Goals and Objectives" for FY2017-2022 is to deter "illegal firearms trafficking" and violent

---

[41] BATFE, "Fiscal Year 2022 Congressional Budget Submission," p. 6, find at https://www.justice.gov/jmd/page/file/1399371/download#:~:text=The%20ATF's%20FY%202022%20budget,%2Dtime%20equivalents%20(FTE).

gun crime.[42]   It does so through working partnerships, including with FFLs, like the

Plaintiffs.

72.     The FFL-01 (dealer, gunsmith) and FFL-02 (pawnshop) play a greater role even than state

and local law enforcement relative to commerce in firearms.   These FFL Plaintiffs are the

entities that assure that firearms are sold only to persons who are not "disqualified."

18 U.S.C. §922(t); the term "disqualified" being defined at 18 U.S.C. §922(g).   See, also,

27 CFR §478.124.

    a.   It is the FFL owner or employee who personally makes the preliminary assessment of

       the customer across the counter.   The FFL that collects the personal information for

       the background check on the ATF Form 4473 and checks the valid identification

       document[43].   The ATF Form 4473 has 37 data fields for the Transferee (buyer) to

       complete.   There are an additional 35 data fields to be completed by the FFL.[44]

    b.   The FFL that says the words "denied" or "delayed,"[45] and is face-to-face with the

       man or woman who won't be leaving the store with the selected firearm.

    c.   The FFL is also the storefront with a federally-protected right to decline to complete a

       sale to an individual, even if the background check comes back "Proceed."

---

[42] BATFE website, see "ATF Strategic Plan FY 2017-2022," downloadable at https://www.atf.gov/about-atf/budget-performance

[43] Please refer to 27 CFR §478.11 for the definition of "identification document."

[44] See 27 CFR §478.124 pertaining to elements of the "firearms transaction record."

[45] Please refer to 28 CFR §25.2 for definitions of "Delayed," "Denied," and "Proceed" and 28 CFR §25.6 for use of these terms in the NICS background check system operations in relation to the FFL.

73.  Across the State of New York, for the past ten years, on average, approximately 1,700 FFL-01s have operated as dealers in firearms.[46] The "dealer in firearms" and the "gunsmith" are "FFL Type 01" (herein, also, as "FFL-01").[47] Per the most recent ATF report available (December 10, 2021), there were 1,782 FFL-01s in NY. There were only nine of the FFL-02, the pawnbroker. And there were 329 of FFL-07s, manufacturing firearms, excluding explosive devices.[48]

74.  For calendar year 2021, in New York, there were 464,575 NICS background checks run at the request of FFLs.[49] As of September 30, 2022, year-to-date, NICS checks run in New York numbered 345,234.[50]

75.  For more than fifty years, Plaintiffs have been part of this process. Both on the sides of facilitating the exercise of Second Amendment rights of themselves and individuals, and, also, in keeping firearms out of the hands of disqualified persons and assisting with firearms trace requests. For fifty-five years, "The Original Gun Show," run by ESAC has brought together FFLs. The Plaintiffs, including ESAC (voluntarily), has worked steadily throughout these years with the ATF and the FBI to ensure federal firearms compliance.

---

[46] BATFE, "Report of Active Firearms Licenses – License Type by State Statistics," downloadable for years 2014 through 2021, as well as for partial year 2022 at https://www.atf.gov/firearms/listing-federal-firearms-licensees

[47] For an explanation of FFL types, please refer to BATFE website at https://www.atf.gov/resource-center/fact-sheet/fact-sheet-federal-firearms-and-explosives-licenses-types

[48] BATFE, "Report of Active Firearms Licenses – License Type by State Statistics" (dated December 10, 2021) at https://www.atf.gov/firearms/docs/undefined/ffltypebystate12-10-2021pdf/download.

[49] Federal Bureau of Investigation, "NICS Firearm Background Checks: Month/Year by State – Year 2021" (p. 3). Find 1998 through September 2022 report at https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year_by_state.pdf/view.

[50] *Id.*

76. The Plaintiffs perform a specific and critical role in the lawful stream of commerce of firearms in support of the Second Amendment. They take their role seriously. They have families, are active in their local communities, and are Veterans of the Armed Forces of the United States. They intend to protect themselves, their families, and their communities in the exercise of their individual Second Amendment rights, as well. And, they share the BATFE goals and objectives to be the "pro-active" part of commerce in firearms, which is out front ahead of the "reactive" law enforcement role.

77. Even as Plaintiffs file this lawsuit, they are fighting to stay in business. Their shops are community gathering places, where regular customers include local, county, and state law enforcement officers. Where conversations are going on, including county-level elected officials and employees, on what the new laws mean. They are engaged in public speaking. They are answering questions from the media. They are serving their existing customers, as well as trying to professionally answer questions from new customers – all of whom are frustrated and confused by what is going on.

78. Plaintiffs and their role in lawful commerce in firearms in New York is under attack by the Defendants and is at risk of immediate and irreparable injury. As detailed herein, the new laws, if allowed to stand, could prove a fatal blow to Plaintiffs, specifically and to lawful commerce in firearms in New York, in general – an outcome that would directly infringe the Second Amendment rights of Plaintiffs and any other individuals with their primary residence in New York, wishing to exercise their rights.

### VI. (C.)  Plaintiffs and County-Level Officials are Doing Their Best, But the New Laws are Too Burdensome and Too Confusing to Comply with Confidence.
### It is Not Just Plaintiffs Who are Complaining.

79. Plaintiff FFLs, specifically, and the firearms industry, generally, make enormous efforts to remain abreast of bills drafted, movement of bills in committee, bills passed, statutes on the books, how statutes are being enforced around the state and locally, particularly through on-going conversations with county clerks, county law enforcement officers, local police, and District Attorneys and defense counsel.  Plaintiffs are active members of local rod and gun clubs, statewide organizations like the NYS Conservation Council, NYS Rifle & Pistol, National Rifle Association, the Second Amendment Foundation, SCOPE, and more. Plaintiffs' retail shops are hubs of information, discussion, and grassroots activism, including, but not limited to, invitations for state legislators to speak and do meet-and-greets, and calls for citizens to reach out to legislators to express their thoughts on various bills in draft.

80. The actions of the Defendants have created a host of legal problems across the State, impacting, not only the Plaintiffs.  The New York State Sheriff's Association, which represents all 58 Sheriffs across the State published a statement in opposition to Defendant Gov. Hochul as quickly as July 6, 2022, and many of its member Sheriffs continue to speak out in media interviews and on their websites about the confusion created.

> "Some action by the Legislature was necessary to fill the firearms licensing vacuum created when the Supreme Court struck down New York's unconstitutional restrictions on our citizens' right to

keep and bear arms.  But it did not need to be thoughtless,
reactionary action, just to make a political statement."[51]

81.  County Legislatures across the State of New York are passing "Resolutions" in opposition

to the complete package of ten Bills pushed through by Defendant Gov. Hochul and

targeting, in particular, NY Bill S.51001.  These "Resolutions" call out the animus and

actions of the Defendants, and include:  Albany County (dated September 22, 2022);

Cattaraugus County (dated August 30, 2022); Chemung County (dated October 12, 2022);

Columbia County (dated September 15, 2022); Dutchess County (dated October 11, 2022);

Essex County (dated July 5, 2022); Genesee County (dated September 29, 20202); Greene

County (dated August 18, 2022); Herkimer County (September 14, 2022); Livingston

County (September 28, 2022); Madison County (August 9, 2022); Niagara County

(September 14, 2022); Orleans County (July 27, 2022); Oswego County (September 15,

2022); Putnam County (September 29, 2022); Schuyler County (dated October 11, 2022);

Seneca County (dated August 23, 2022); Steuben County (September 26, 2022); Wayne

County (dated September 20, 2022); and, Yates County (October 11, 2022).

   a.  From Resolution No. 22-516, the Chemung County legislature criticized that the

       complete bundle of the ten new Bills "…are meant to erode the right of legal gun

       owners and punish the legal and legitimate businesses in the firearms industry."

---

[51] New York State Sheriffs Association website, "Statement Concerning New York's New Firearms
    Licensing Laws" (July 6, 2022) at https://nysheriffs.org/statement-concerning-new-yorks-new-
    firearms-licensing-laws/.

b. Columbia County Resolution 396-2022 condemned the new "gun control legislation" as "…requiring both New York State citizens and various permit issuing agencies to navigate new regulations that are riddled with cumbersome, confusing, and redundant barriers of compliance, and that requires multiple processes of recertification that will lead to further confusion and create additional record sharing between agencies."

c. And Dutchess County legislature, in its letter to Defendant Gov. Hochul called out: "Dueling legal interpretations have been issued by your office, legislative sponsors of the bills, and law enforcement agencies which has led to an unnavigable maze of compliance for law-abiding citizens."

82. The New York State Association of County Clerks published a "Memorandum Regarding New Gun Control Legislation," as well, calling S.51001 "both confusing and cumbersome to navigate for both the citizenry as well as the various agencies in charge of administering and implementing the new laws."[52]

83. Sheriffs, County Clerks, and Counties play a critical role concerning the Second Amendment vis-à-vis New York laws, such as those complained of herein. For example, with respect to concealed carry permits, each County autonomously creates the paper application, assigns personnel to manage, designs the operational processing system, awards/suspends/rescinds permits in coordination with County Court Judges, collects fees, posts and prints public education, issues the permits, and amends them. While concealed

---

[52] Official website of the Wayne County Clerk's Office, at https://web.co.wayne.ny.us/DocumentCenter/View/4559/memo-of-concern-final?bidId=.

carry is spoken of as a "New York law," home rule allows Counties the control over the direct connection to the individual permit holder. That individual license and coupons are a critical part of the lawful stream of commerce in firearms upon which Plaintiffs' businesses depend.

84. The same example can be made concerning the new "semi-automatic rifle license."

85. The same example can be made of the "State" licenses under which Plaintiffs are allowed to participate in commerce in firearms within NY. The "State" licenses to be dealers and gunsmiths and manufacturers literally issue bearing the emblem of the local County.

86. When the Counties and Sheriffs are unable to process applications for new licenses or renewals or issue coupons to amend licenses, individuals cannot become "customers" exercising their Second Amendment rights, and the Plaintiffs cannot operate their businesses.

87. It's not just the Plaintiffs who are filing suit. Multiple federal §1983 civil rights cases are already pending throughout New York, relating to various provisions impacting other individuals and businesses, including, alphabetically:

    a. *Antonyuk v. Nigrelli*, N.D.N.Y., case 1:22-cv-986[53] (Hon. Glenn T. Suddaby);

    b. *Bleuer v. Nigrelli*, N.D.N.Y., case 3:22-cv-1037 (Hon. Thomas J. McAvoy);

    c. *Christian v. Nigrelli*, W.D.N.Y., case 1:22-cv-695 (Hon. John L. Sinatra, Jr.);

---

[53] Prior, closed case: *Antonyuk v. Bruen* ("Antonyuk I")*,* case 1:21-cv-734, concluded with Decision and Order (Suddaby, J., August 31, 2022) (doc. no. 48).

    d.   *Corbett v. Hochul,* S.D.N.Y., case 1:22-cv-5867 (Hon. Lorna Gail Schofield);

    e.   *Goldstein v. Hochu*l, S.D.N.Y., case 1:22-cv-8300 (Hon. Vernon S. Broderick);

    f.   *Hardaway v. Nigrelli,* W.D.N.Y., case 1:22-cv-771 (Hon. John L. Sinatra, Jr.); and,

    g.   *NYSRPA II v. Nigrelli,* N.D.N.Y., case 1:22-cv-907 (Hon. Mae D'Agostino).

88. The right "to keep" is being infringed by the Defendants, while everyone from the individual to the federal judiciary is trying to stem the fall-out of the Defendant's new laws.

### VII.  Defendant Gov. Hochul's Anti-Civil Rights Agenda & Her Animus Against Gun Owners, as a Class.

89. Defendant Gov. Hochul stands defiant in her opposition to this historical moment of the *NYSRPA v. Bruen* Decision.  She has repeatedly, publicly declared herself the marshal of a parade of "experts" and "leaders" in opposition to the *NYSRPA v. Bruen* Decision, as well as declaring herself – a licensed attorney – to be superior to the rule of law and basic jurisprudence.  She vehemently refuses to accept or even to respect the authority of the United States Supreme Court in matters of constitutional interpretation and the role of that Court in the protection of individual civil rights in our dual roles as federal and state citizens.  Defendant Hochul is at war against a class of people, namely, the Plaintiffs and those who support and work in relationship to the Second Amendment.

90. Defendant Hochul, literally and repeatedly flanked by Defendants Nigrelli, Rosado, and James, conducted a public relations campaign across the state since May 2022 to denounce

the United States Supreme Court and to use that angle as the fulcrum to justify her "common sense gun laws" that are illegal and unconstitutional.

91.    In her campaign, Defendant Hochul makes clear that she is working in concert with a "team" of people inside and outside the state government to achieve her ends, including, but not limited to named attorneys from "Every Town for Gun Safety" and the "Giffords Law Center."  Defendant Hochul refers to herself as "joined at the hip" with these two lawyers. [54]  Defendants Hochul and James use their official New York State websites to promote these two NGOs through quotes and hyperlinks directly to their sites.  And the Defendants, collectively, rely upon messaging and promoted concepts from these organizations to shape their narrative.  These organizations began appearing in the above-named federal lawsuits at the earliest possible stage, as it became clear that the new laws are "…doomed to the fate of the statute[s] in Heller,"[55] in other words, to being declared unconstitutional.

92.    In anticipated and actual retaliation to the *Bruen* Decision, Defendant Hochul has caused or created to be caused a group of new laws that threaten to and will put Plaintiffs and similarly situated dealers in firearms and gun shows, out of business.  If Defendant Hochul achieves her goal, the Second Amendment will be smothered, and no one in New York will receive the benefit of their federally-protected, fundamental rights under the Second and

---

[54] In reference to "Everytown for Gun Safety," at a press conference on August 31, 2022 in Syracuse, New York, Defendant Gov. Hochul describes herself as "joined at the hip with Everytown" in preparation and drafting of the new laws, including credit to Samuel Levy, Senior Counsel to "Everytown for Gun Safety" and Dave Pucino, Deputy Chief Counsel at the "Gifford Law Center." Video of the press conference is available on ABC News (Syracuse) https://www.localsyr.com/news/state-news/watch-live-governor-hochul-makes-a-public-safety-announcement-in-nyc/ beginning at 2:00.

[55] *Antonyuk I, supra,* Decision and Order, p. 57.

Fourteen Amendments.  There will be no licensed dealer in firearms left from which to purchase a firearm in the lawful stream of commerce.

93.   The Defendants are using their state powers to discriminate against gun owners, as a class, and are doing so through a coordinated attack on those who engage in the lawful stream of commerce in firearms and on the individuals they serve.

94.   On June 23, 2022, in reaction to the issuance of the *NYSRPA v. Bruen* Decision, Defendant Hochul stood at a podium bearing the emblem of the State of New York to broadcast her official 'reaction-to' press conference in a room full of reporters, holding a stack of papers in a spring clip as visual prop she claimed to be a print-out of the *NYSRPA* Decision, but from which she was unable to locate any quotes from which to read, gushing:

> "Today,[56] the Supreme Court struck down a New York law that limits who can carry concealed weapons.  Does everyone understand what a concealed weapon means?  That you have no forewarning that someone can hide a weapon on them and go into our subways, go into our grocery stores like stores up in Buffalo,[57]

---

[56] Official website of the Governor of New York, "Governor Hochul Issues Response to Supreme Court Ruling Striking Down New York's Concealed Carry Restriction" (June 23, 2022) at https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-issues-response-supreme-court-ruling-striking-down.

[57] *N.B.:*  This is an affirmative misrepresentation by Defendant Hochul of New York law and of the facts, as alleged by the Erie County District Attorney, the NYS Grand Jury, and the U.S. Department of Justice.  The Defendant in the murders and hate crimes committed on May 14, 2022 at the Tops store in Buffalo (NY) is not alleged to have had a concealed carry permit or to have used a handgun (the only type of firearm relevant to the legal term "concealed carry") to commit the crimes.  It was reported that he used a modified semi-automatic rifle, and was also in possession of a shotgun and a bolt-action rifle.  *See,* U.S. Department of Justice, "Federal Grand Jury Indicts Accused Tops Shooter on Federal Hate Crimes and Firearms Charges in Buffalo, New York" (dated July 14, 2022) at https://www.justice.gov/opa/pr/federal-grand-jury-indicts-accused-tops-shooter-federal-hate-crimes-and-firearms-charges.  *See, also, People of the State of New York v. Payton Gendron,* Grand Jury Indictment (returned June 1, 2022), including charge for possession of "an assault weapon" under NY Pen §265.03(3), as available through WKBW News (Buffalo) at https://www.wkbw.com/news/local-news/buffalo-mass-shooting/buffalo-mass-shooting-suspect-arraigned-on-25-count-indictment-faces-life-without-parole-if-found-guilty.  *And, see,* Boburg,

New York, where I'm from, go into a school in Parkland[58] or Uvalde.[59]

"This could place *millions* of New Yorkers in harm's way. And this is at a time when we're still mourning the loss of lives as I just mentioned. This decision, isn't just reckless, it's reprehensible. It's not what New Yorkers want. We should have the right of determination of what we want to do in terms of our gun laws in our state.

"If the federal government will not have sweeping laws to protect us, then our states and our governors have a moral responsibility to do what we can and have laws that protect our citizens because of what is going on – *the insanity of the gun culture that has now possessed everyone all the way up to even to the Supreme Court*." (emphasis added)

95.   Continuing, in the same public speech on June 23, 2022, Defendant Hochul said:

"We are reading the language as we speak. We've been preparing, but we have been working with a **team of experts**, **legal experts from all over this country and organizations like Everytown**, **true leaders**, to make sure that we are prepared.

---

Shawn, "I lied to them for months," The Washington Post (May 17, 2022) at https://www.washingtonpost.com/investigations/2022/05/17/payton-gendron-parents-buffalo-shooting/.

[58] *N.B.:* the shooter at Parkland Elementary School (FL) on February 14, 2018, Nikolas Cruz, who plead guilty, was not presented at sentencing as having a concealed carry permit, nor using a handgun in the commission of the murders. The firearm used in the crime was also a long gun. *See, e.g.,* Spencer, Terry, "Florida school shooter's AR-15 rifle shown to his jurors," AP News (July 25, 2022) at https://apnews.com/article/education-florida-fort-lauderdale-parkland-school-shooting-60791bdf38785f494400c43b90a97c39. This is also an affirmative misrepresentation by Defendant Hochul.

[59] *N.B.:* the Defendant in the recent murders committed at the Uvalade Elementary School (TX) and at the gunman's house, Salvador Ramos, did not have a concealed carry permit, nor did he use a handgun to commit the crimes. *See, State of Texas, County of Uvalde,* "Search Warrant: Return and Inventory" (Docket #22-05-25, duly sworn June 1, 2022), as available through KENS News (San Antonio, Texas) at https://www.kens5.com/article/news/special-reports/uvalde-school-shooting/uvalde-school-shooting-how-much-firepower-di-the-gunman-have/285-4c0f39a4-72e2-4f16-b8f9-3baa6a05fee5. This is an additional, affirmative misrepresentation by Defendant Hochul.

"I'm prepared to call the legislature back into session to deal with this." (emphasis added)

96.  And, in the same public speech on June 23, 2022, Defendant Hochul said:

"…[the *Bruen* Decision] is only minutes old…"  "*Shocking, absolutely shocking that they have taken away our right to have reasonable restrictions*.  We can have restrictions on speech.  You can't yell fire in a crowded theater, *but somehow there's no restrictions allowed on the second amendment*." (emphasis added)

97.  Defendant Hochul is an attorney, licensed by the State of New York.  She knows better.  Her words and actions are intention.  Holding public office does not insulate or excuse her from standards of preserving public confidence in the judiciary and accurately presenting the law.

   a.  New York lawyers are required to assist in maintaining the integrity and competence of the legal profession in accordance with Canon 1 of the New York Lawyer's Code of Professional Responsibility.[60]

   b.  New York lawyers are required to avoid even the appearance of professional impropriety, including "…to uphold the integrity and honor of the profession; to encourage respect for the law and for the courts and the judges thereof…" *Id.,* Canon 9; EC 9-6.

   c.  Under Canon 2, although speaking to advertising, states, "Of course, all communications by lawyers, whether subject to the special rules governing lawyer advertising or not, are governed by the general rule that lawyers may not engage in

---

[60] New York Lawyer's Code of Professional Responsibility, available on-line through the New York State Bar Association at https://nysba.org/app/uploads/2020/01/LawyersCodeDec2807.pdf.

conduct involving dishonesty, fraud, deceit or misrepresentation, nor knowingly make

a material false statement of fact or law." *Id.,* Canon 2; EC 2-6.

98. Defendant Hochul misrepresents "concealed carry;" misrepresents the criminal allegations

against the defendant in the Buffalo Tops murders; misrepresents the lack of limitations

placed upon persons exercising Second Amendment rights; misrepresents the holding in

*NYSRPA v. Bruen*, including that it will place "millions of New Yorkers in harm's way."

99. Defendant Hochul's public references to the holding in *NYSRPA v. Bruen,* from her podium

as the highest official in New York, generated a false narrative that the public will

erroneously rely upon in forming their own opinions.  It is also one upon which members of

the Legislature, rushed into Emergency Session at the Governor's behest, will also have

erroneously relied upon.

100. The United States Supreme Court did not hold that there can be no restrictions on the

Second Amendment.  The false legal depiction by Defendant Hochul of the U.S. Supreme

Court decision in *NYSRPA* reveals the depth of her animus against gun owners and those

who engage in the stream of commerce in firearms, as a class.

101. There was a rush by Defendant Hochul to the microphone on June 23, 2022, to characterize

the ruling as a "dark day."  She concluded the speech by threatening, "Stay tuned.  Stay

tuned.  We're just getting started here."

102. The anti-gun agenda of Defendant Gov. Hochul began even before the U.S. Supreme Court

announced its Decision in *NYSRPA v. Bruen*.  Anticipating the ruling, Defendant Hochul,

head of the Executive Branch of the New York State government, started charging the

Legislature through a series of, *en toto,* ten bills, using what she called a "confluence"[61] of events to declare an emergency to justify Executive Orders and Proclamations, to suspend the routine legislative process known as "the 3-day desk rule," to summon the Legislature into Emergency Session, and to bring about passage of the Bills complained of herein.

103. Defendant Hochul's next step on the day of June 23, 2022 was to convene a meeting of Mayors of Albany, Buffalo, New York City, Rochester, Syracuse, and Yonkers, concerning which she issued photographs and a statement. The statement[62] refers to the *Bruen* decision as "reckless" and "reprehensible" and stated:

> "**My team** has been preparing for this decision and exploring every possible action, and we are in discussions with the legislature about our legislative options. *We are not powerless, and we will do everything in our power to protect New Yorkers.*" (emphasis added)

104. The next day, June 24, 2022, Defendant Hochul issued a signed "Proclamation"[63] to force the Legislature to reconvene, and her corresponding public announcement[64] repeated, again:

---

[61] *Id.*

[62] Official website of the Governor of New York, "Statement from Governor Kathy Hochul Following Meeting with Mayors of New York's Largest Cities on Supreme Court Concealed Carry Decision" (June 23, 2022), available at https://www.governor.ny.gov/news/statement-governor-kathy-hochul-following-meeting-mayors-new-yorks-largest-cities-supreme.

[63] Official website of the Governor of New York, "Proclamation" (June 24, 2022) at https://www.governor.ny.gov/sites/default/files/2022-06/Proclamation_Extraordinary_Session_June_2022.pdf.

[64] Official website of the Governor of New York, "Governor Hochul Announces Extraordinary Session of the New York State Legislature to Begin on June 30" (June 24, 2022), available at https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-begin-june-30.

> "*The Supreme Court's reckless and reprehensible decision* to strike down New York's century-old concealed carry law <u>puts lives at risk here in New York</u>."

105. On June 29, 2022, the day prior to the start of the extraordinary legislative session, Defendant Hochul gave a speech[65] that launched what has become her on-going campaign for a police state authority ahead of the rule of law:

> "**And I thank the State Police for being so aggressive in their approach** in making sure that we protect citizens, *but then you have the Supreme Court of the United States of America that think that they have more power than a governor does when it comes to protecting the citizens of our state*." (emphasis added)

106. In the same announcement, Defendant Hochul, reiterated her false narrative about the NYSRPA decision, including: "*They removed our limitation on who can carry concealed weapons in our state.*"[66]

107. That day, Defendant Hochul made multiple, legal misrepresentation of Decision in *NYSRPA v. Bruen* decision, falsely claiming that:

> "…we have the Supreme Court of the United States of America tells us that <u>we now have to repeal, repeal a law</u> that's been on the

---

[65] Official website of the Governor of New York, "Governor Hochul Unveils New Gun Seizure and Crime Data Showing Progress in Combating Gun Violence Epidemic" (June 29, 2022), available at https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-unveils-new-gun-seizure-and-crime-data.

[66] *Id* (emphasis added).

books for over 100 years back when probably Teddy Roosevelt was President of the United States."[67,68] (emphasis added)

108. It is this speech on June 29, 2022 when Defendant Hochul began a language palette of remarks that accelerates and intensifies her denigration the Justices of the U.S. Supreme Court while elevating her unnamed "team" and "leaders."  The first such example of the attack posture was:

> "And I want to say if six Supreme Court Justices want to take us *backwards*, we have a legislature full of duly elected representatives <u>who actually speak for the people of this state</u> and want to protect a law that's been on the books for over 100 years. And so we all collectively, the legislature, myself and all others, our law enforcement individuals, I just spoke to a few minutes ago. They all want us to make sure we have <u>smart</u>, <u>sensible</u>, <u>gun safety</u> legislation."

> Continuing:  "The Supreme Court decision was a *setback* for us, but I would call it *a temporary setback*, because we are going to marshal the resources, **the intellect**, we've been talking to **leaders in this industry**, and **academics** and **people in think tanks** to find out what we can do legally, constitutionally, *to make sure that we do not surrender my right as Governor, or our rights as New Yorkers to protect ourselves from gun violence.*"  (emphasis added)

109. The wind-up, created through a blur of public speeches by Defendant Hochul, surrounded by her Co-Defendants, in appearances across the State, is an aggressive assertion of the power of a Governor.  She pitches that she is not only stronger, but smarter, than that of the federal U.S. Supreme Court Justices.

---

[67] *N.B.:*  nothing about the *NYSRPA v. Bruen* Decision directed the State government to "repeal" the standard by which concealed carry permits are issued.  The U.S. Supreme Court declared it to be unconstitutional.

[68] Theodore Roosevelt's Presidential term ran from September 14, 1901 to March 4, 1909 (see, https://www.whitehouse.gov/about-the-white-house/presidents/theodore-roosevelt/).  The NY "Sullivan Act" took effect in 1911 (see *NYSRPA v. Bruen,* Opinion, p. 2).

110. On July 1, 2022[69], by her own description mere "minutes" after the NYS Senate passed

S.B. 51001, Defendant Hochul again went public with what she termed an "update" on the

progress of the Extraordinary Session of the Legislature.  She had, by her own words, "at

2:00 a.m.," "in the middle of the night" on this date, issued a second "Proclamation"[70] for

the Extraordinary Session to also deal with abortion in the face of another U.S. Supreme

Court Decision, *Dobbs v. Jackson Women's Health Organization*, issued the same week.

111. In that July 1, 2022 speech, Defendant Hochul, again, sought to bolster those around her,

while, in the same breath, insulting the Justices of the U.S. Supreme Court:

> "So, over this last week, I mentioned round-the-clock,
> **extraordinary team**, extraordinary hard work, in preparation of an
> extraordinary session, **my team** has been working with **our**
> **partners** to craft gun safety legislation.  And as a result of our
> quick work and **collaboration** with **my partners**, again, Majority
> Leader Andrea Stewart-Cousins, Speaker Carl Heastie, our state
> will continue to keep New Yorkers safe from harm, *even despite*
> *this setback from the Supreme Court*." (emphasis added)

> Further on, Defendant Hochul mentions even "**outside**
> **consultants**, whatever's going to be necessary to get this done."
> (emphasis added)

112. And, Defendant Hochul, again, on July 1, 2022, in the same speech, sounded the drum of

her power as a state governor to the public and the media:

---

[69] Official website of the Governor of New York, "Governor Hochul Updates New Yorkers on
Extraordinary Session" (July 1, 2022) available at https://www.governor.ny.gov/news/video-audio-
photos-rush-transcript-governor-hochul-updates-new-yorkers-extraordinary-session.

[70] Official website of the Governor of New York, "Governor Hochul Announces Extraordinary Session of
the New York State Legislature to Enshrine Equal Rights into the New York State Constitution"
(July 1, 2022) available at https://www.governor.ny.gov/news/governor-hochul-announces-
extraordinary-session-new-york-state-legislature-enshrine-equal with link to Tweet of the
"Proclamation" document.

> "The Supreme Court's decisions were certainly *setbacks*.  But we view them as *only temporary setbacks*, <u>because I refuse</u>, as I've said from day one, <u>I refuse to surrender my right as Governor to protect New Yorkers from gun violence or any other form of harm</u>.  We're not going backwards.  They may think they can change our lives with the stroke of a pen, but we have pens too, I give out a lot of pens.  And that draws from the office of the Governor of the State of New York.  And <u>I intend to fully exercise those rights</u>, working with our partners in the legislature to protect our freedoms and *to keep New Yorkers safe*." (emphasis added)

113.  Later the same day, July 1, 2022[71], Defendant Hochul gave a second speech, this time, upon

her execution of S.B. 51001, the so-called "Concealed Carry Improvements Act,"

repeating:

> "A week ago, the Supreme Court issued a *reckless* decision removing century-old limitations on who is allowed to carry concealed weapons in our state – *senselessly sending us backward* and <u>putting the safety of our residents in jeopardy</u>.  Today, we are taking swift and bold action <u>to protect New Yorkers</u>.  After a close review of the *NYSRPA vs. Bruen* decision and extensive discussions with **constitutional and policy experts**, **advocates**, and **legislative partners**, I am proud to sign this landmark legislative package that will strengthen our gun laws and bolster restrictions on concealed carry weapons."

114.  Def. Gov. Hochul does not even accurately speak about the content of the new laws.  For

example, on August 31, 2022 at a press conference, Def. Hochul stated that "all" handgun

permit applications not granted prior to September 1, 2022 would be subject to the new

laws contained in S.51001.  One of those new laws expressly states that the new permit

application requirements do not apply to permits filed by August 31, 2022.

---

[71] Official website of the Governor of New York, "Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision" (July 1, 2022) available at https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions.

Defendant Gov. Hochul stated:  "It's who has a permit on the date. Not that you've applied."[72]

S.51001 states: "…the amendments to subdivision 1 and subdivision 4-b of section 400.00 of the penal law made by section one of this act shall apply only to licenses for which an application is made on or after the effective date of this act [September 1, 2022]…"[73]

115. On August 31, 2022, at a press conference, this one in Syracuse, NY, headed by Defendant

Hochul, then First Superintendent of the New York State Police, Steven Nigrelli, spoke up,

aggressively asserting the NYS Police intention to enforce the new gun laws, including:

"I don't have to spell it out more than this – we'll have zero tolerance.  If you violate this law, you will be arrested.  Simple as that.  Because the New York State Troopers are standing ready to do our job to ensure…all laws are enforced."[74]

116. Defendant Nigrelli's comment was broadcast through the media, including, but not limited

to The Buffalo News[75] and Newsday.[76]  Defendant NYS Police has followed through on his

threat, the NYS Police issuing a Press Release on October 26, 2022 touting what appears to

---

[72] Becker, Maki, "Hochul: Last-minute pistol permit seekers may be too late to avoid NY's new gun requirements," The Buffalo News (August 31, 2022; updated September 2, 2022), on line at https://buffalonews.com/news/local/crime-and-courts/hochul-last-minute-pistol-permit-seekers-may-have-waited-too-long-to-avoid-nys-new/article_ad5100a0-2943-11ed-af06-cbe41e631955.html

[73] S.51001, §26(a), p. 21.

[74] YouTube Channel of Governor Kathy Hochul, "Governor Hochul Delivers a Press Conference on Gun Violence Prevention" (August 31, 2022), at https://www.youtube.com/watch?v=gC1L2rrztQs

[75] Becker, Maki, "Hochul: Last-minute pistol permit seekers may be too late to avoid NY's new gun requirements," The Buffalo News (August 31, 2022) at https://buffalonews.com/news/local/crime-and-courts/hochul-last-minute-pistol-permit-seekers-may-be-too-late-to-avoid-nys-new-gun/article_ad5100a0-2943-11ed-af06-cbe41e631955.html.

[76] Gormley, Michael, "New 'concealed-carry' laws begin Thursday; gun-free zones created," Newsday (August 31, 2022), at https://www.newsday.com/news/region-state/concealed-carry-gun-laws-new-york-state-kathy-hochul-eric-adams-gun-free-zones-xbo19fl5

be the first arrest under the new gun laws, that of a 77-year-old man for allegedly failure to store three long guns pursuant to the new laws.[77]

117.   Defendant Nigrelli's threat was found by the Hon. John L. Sinatra[78] to constitute credible threat of prosecution, as follows:

> "These public statements show that New York residents –
> including Hardaway and Boyd – face "threatened enforcement of a
> law" that is "sufficiently imminent."" Citing to *Susan B. Anthony
> List,* 573 U.S. 149, 158-59 (2014) and *Cayuga Nation v. Tanner,*
> 824 F.3d 321, 331 (2d Cir. 2016), quoting "credible threat of
> prosecution exists when Defendant has "announced its intention to
> enforce the [law] against the [plaintiffs]"".

> Justice Sinatra continued "Further, given the recency of the law –
> and lack of any indication that it will be repealed – the Court is and
> should be "willing to presume that the government will enforce"
> it."  Citing *Picard,* 42 F.4th 89 (2d Cir. 2022).

118.   The threat is no longer "imminent."  The arrests under the new laws have begun in a publicity-seeking way, via Press Release from Defendant NYS Police.

119.   There is no better example with which to remind the Defendants through this lawsuit of the necessary respect for the authority of our federal U.S. Supreme Court than to include the words "Little Rock 9" in this Complaint.  The Plaintiffs would urge reflection on the analogy that we find ourselves, again in this moment, of the Defendant Hochul, standing

---

[77] Official website of the NYS Police Newsroom, "Keeseville, NY male arretsed (*sic*) for Failure to Safely Store firearms (*sic*)" (dated October 26, 2022).

[78] Sinatra, J., Decision (October 20, 2022) in *Hardaway v. Nigrelli,* W.D.N.Y., case no. 22-cv-771.

now in the shoes of then Democratic Governor of Arkansas Orval Faubus, who on

September 4, 1957 delivered a "Speech on School Segregation,"[79] including these excerpts:

> "…I was not elected Governor of Arkansas to surrender all our
> rights as citizens to an all-powerful federal authority."

> "It was with a heavy heart that I found it necessary to sign the bills
> of the Extraordinary Session of the General Assembly…"

> "The Supreme Court shut its eyes to all the facts, and in essence
> said – integration at any price, even if it means the destruction of
> our school system, our educational processes, and the risk of
> disorder and violence that could result in the loss of life – perhaps
> yours."

> "…the school board has the right and the authority under a law that
> has been on our statute books for 83 years…"

120. It took not one, but two, Decisions from the U.S. Supreme Court,[80,81] along with a call

from the Mayor of Little Rock, Mr. Woodrow Wilson Mann, to the President of the United

States, Dwight D. Eisenhower, to achieve the Presidential Executive Order 10730 to put the

Arkansas National Guard under federal authority and for deployment of 1,000 U.S. Army

troops from the 101st Airborne Division to gain the necessary protection of the judicially-

recognized Civil Rights of nine girls and boys to open the school doors that lead this nation

to desegregated public education. The following day, it was President Eisenhower who

said, "Mob rule cannot be allowed to override the decisions of the courts."[82]

---

[79] "Orval Faubus Speech, September 18, 1958," on Learning for Justice, a project of the Southern Poverty Law Center, available at https://www.learningforjustice.org/classroom-resources/texts/orval-faubus-speech-september-1958.

[80] *Brown v. Board of Education of Topeka* ("Brown I"), 347 U.S. 483 (1954).

[81] *Brown v. Board of Education* ("Brown II"), 349 U.S. 294 (1955).

[82] Website of the President Dwight D. Eisenhower Presidential Library, "Text of the Address by the President of the United States, Delivered from His Office at the White House, Tuesday, September 24, 1957, at 9:00 P.M. EDT" at

121. It is the uncompromised history of this nation that we mature our democracy and respect, if ultimately, decisions of the U.S. Supreme Court that overturn long-standing laws and even its own prior decisions, to advance the Civil Rights of all, including in our capacities of state citizens. *Brown v. Board of Ed.,* 347 U.S. 483 (1954, "Brown I") overruled *Plessy v. Ferguson,* 163 U.S. 537 (1896, allowing public accommodations that were "separate but equal"). *Loving v. Virginia,* 388 U.S. 1 (1967) overruled *Pace v. Alabama,* 106 U.S. 583 (1883, banning inter-racial marriage). *Gideon v. Wainwright,* 372 U.S. 335 (1963) overruled *Bets v. Brady,* 316 U.S. 455 (1942, rejecting any right to assigned counsel for the indigent). And on.

122. Plaintiffs, instead, ask this Court to tie a knot in that thread bit one gets when one is just finished of sewing and clipped. The quilt is woven as of June 23, 2022 in an historic day that carried this nation from 1791 to 2022 and the realization of a fully-integrated Bill of Rights, applicable to the States through the Fourteenth Amendment. The Second Amendment is the modern civil rights movement.

123. The Plaintiffs ask for a ruling to protect them from the focused march of the Defendants to shut them down and take Second Amendment rights away with it.

124. Defendant Hochul makes clear that <u>no</u> guns should be sold in New York, including, but not limited to, the following public statement, made on July 14, 2022[83]:

---

https://www.eisenhowerlibrary.gov/sites/default/files/research/online-documents/civil-rights-little-rock/1957-09-24-press-release.pdf.

[83] Official Website of the Governor of New York, "Governor Hochul Announces $13.6 Million to Fight Gun Violence, Aid Victims and Survivors, and Bolster State Response to Public Health Crisis"

"Also, $15 million for crime analysis centers. Why does this matter? Because people are bringing guns here from other states. I mean, where are they coming from? <u>I'll tell you right now, they're not being sold on our streets. Legally in a store, I mean. There's no gun stores here. They're coming in from other states.</u>" (emphasis added)

Continuing: "We're not through yet. We're not even close to being done. We're not done until the last person holds a gun in their hands and shoots somebody in the city, in the state."

125. Whether Defendant Hochul was speaking about "no gun stores" in Yonkers (where she was standing) or in New York, either way she is wrong. There are FFLs throughout New York. If her comment was referring only to Yonkers, there are FFL dealers and manufacturers in Yonkers, most notably Kimber Manufacturing – a company whose firearms are chosen by organizations like the USA Shooting team in their quest for Olympic gold.

126. Defendant Gov. Hochul intends to shut down the firearms industry in New York, turning Plaintiffs into "…a highly selective group inherently suspect of criminal activities." *Albertson v. Subversive Activities Control Board,* 382 U.S. 70, 79 (1965). "This is not a belief countenanced by the Second Amendment to the United States Constitution." *Antonyuk I, supra,* p. 60.

127. Defendant Hochul and Defendant Nigrelli are unswerving in their public pronouncements of "zero tolerance," and "only just getting started." According to Defendant Hochul, she would be "happy to go back to muskets."[84] The Defendants are so motivated by their

---

(July 14, 2022) available at https://www.governor.ny.gov/news/governor-hochul-announces-136-million-fight-gun-violence-aid-victims-and-survivors-and-bolster.

[84] Hochul, June 23, 2022, *supra.*

animus and agenda against those exercising or seeking to exercise fundamental rights under the Second and Fourteenth Amendments that perhaps they do not realize that no background check is required for the purchase of an "antique firearm."[85]

128. The position of the Defendants has naught to do with public safety and everything to do with a singular determination to crush fundamental those who support the Second Amendment into something *lower than* "a second class citizen." Fortunately for the Plaintiffs, the United States Supreme Court has already twice ruled against such an invidious classification. *NYSRPA v. Bruen, supra,* at 62, citing *McDonald, supra,* at 780 (plurality opinion).

129. The critical path for the Plaintiffs is a court-ordered injunction with accompanying compensatory and punitive damages to halt the Defendants' malicious or reckless indifference to the federally-protected rights of the Plaintiffs.

## VIII. FEDERAL PRE-EMPTION & FIFTH AMENDMENT CHALLENGES: DEFENDANTS' NEW LAWS MANDATE PLAINTIFFS ENGAGE IN ACTIVITY ILLEGAL UNDER FEDERAL LAW.

130. Eight (8) specific of the new laws – <u>which will become effective December 5, 2022</u> – are pre-empted by federal law. U.S. Const. art. VI, cl. 2. Certain of the new laws expressly

---

[85] "Antique firearm" is defined at 18 U.S.C. §921(a)(3), (a)(16). A muzzle-loading weapon is not a firearm, making it lawful for a prohibited person to receive or possess black powder designed for use in an antique firearm. *See* 18 U.S.C. §845(a)(5). See, also, from the ATF Official Website, Resource Center, "Top 10 Frequently Asked Firearms Questions and Answers," question 1, "Can a person prohibited by law from possessing a firearm acquire and use a black powder muzzle loading firearm?," p. 2, available at https://www.atf.gov/resource-center/docs/0501-firearms-top-10-qaspdf/download.

otherwise violate federal prohibitions under 18 U.S.C. §§926 and 927. Others fail under implied pre-emption through conflict impossibility and obstacle.

131. These new laws are listed here, sequentially:

 a. **NY Gen Bus §875-b(1)** – directing Plaintiffs to design a "security plan," including "firearms in shipment";

 b. **NY Gen Bus §875-b(2)** – mandating Plaintiffs hire a "security alarm operator licensed by the State," which third-party vendor is permitted by NYS law to employ persons under the age of 21 years and who have a criminal record;

 c. **NY Gen Bus §875-f** – mandating Plaintiffs semi-annual submission of their A&D Book to the Defendant NYS Police;

 d. **NY Gen Bus §875-f(2)** – mandating preparation of monthly firearms inventory reconciliation reports by Plaintiffs for the Defendant NYS Police;

 e. **NY Gen Bus §875-f(3)** – forcing access to Plaintiffs' A&D Books and other federal compliance records by any and all "law enforcement agencies and to the manufacturer of the weapon or its designee";

 f. **NY Gen Bus §875-g(b)(1)** – mandating Plaintiffs sign and submit an annual certification of compliance with all new laws to the Defendant NYS Police; and,

 g. **NY Exec §228** – transferring the federal NICS background check to the Defendant NYS Police as the Point of Contact ("POC") for every firearms purchase transaction, without limitation of data collection, data housing, data siloing, data security, access

to data, data oversight, and misuse of data from the NICS background check system.[86]

132. Any failure of the Plaintiffs to comply with any of the NY General Business Law §875 provisions itemized above is separately chargeable by the Defendant NYS Police and the Defendant Atty.Gen. James against the Plaintiffs with a Class A Misdemeanor.  NY Gen Bus §875-i.

133. It is expressly prohibited by federal law for any government – federal, state, or local – to seek to compile records created and maintained by FFLs, such as the Plaintiffs, that could result in the building of a government registry of firearms, firearms owners, or firearms transactions.  This includes, but is not limited to, the data contained in the federally-mandated Book of Acquisitions & Dispositions (herein, "the A&D Book"), in which Plaintiff FFLs record every firearm acquired and brought into inventory and the disposition of every firearm disposed out of inventory.  It also includes ATF Form 4473 paperwork, which includes the NICS background check forms.

   a. Under 18 U.S.C. §923(g), **no** FFL may be required to submit to the U.S. Attorney General reports or information or even partial records[87] from among that which is required for federal compliance record-keeping purposes, except and unless pursuant to a warrant in a "*bona fide*" criminal investigation of a person not the licensee or during a compliance inspection.

---

[86] See, e.g., 28 CFR §25.9, "Retention and destruction of records in the system."

[87] "Records," are those included in definitions provided under 27 CFR §478.121(a), §478.124, and §478.125, including, but not limited to the ATF Form 4473.

b. Under 18 U.S.C. §926:

> "**No** such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, **nor** that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. (emphasis added)

134. Further, it is illegal to use the NICS background check system for any purpose other than the FFL, including Plaintiffs, during individual firearms purchase background check involving an individual customer, including shuttling the records of the NICS background check system, including, but not limited to the ATF Form 4473, to anyone other than BATFE.

   a. 28 CFR §25.6(a), specifically, "FFLs may initiate a NICS background check only in connection with a proposed firearm transfer as required by the Brady Act. FFLs are strictly prohibited from initiating a NICS background check for any other purpose." (emphasis added)

   b. 28 CFR §25.11(b), specifically that it constitutes "misuse" or "unauthorized access" for "State or local agencies, FFLs or individuals [to] purposefully [use] the system to perform a check for unauthorized purposes." (emphasis added) The prohibited activity is proscribed by a $10,000 fine and cancellation of NICS inquiry privileges.

135. The reason for the prohibition is simple: no gun registry may be amassed by government, on any level, whether federal, state, or local. 18 U.S.C. §926.

136. The Defendants' new laws at **NY Exec §228** will inject the State in between the Plaintiff dealers in firearms and pawnbroker and BATFE each and every time a customer seeks to purchase a firearm.  Below, in this Complaint, is the broader discussion of the problems with this positioning by the State.  For this challenge of violation of federal law requiring pre-emption, Plaintiffs point to the new laws as the Defendants devising a scheme to grab firearms background check information and to retain the records, share the records among Executive Branch offices and agencies, and to use the records for purposes beyond the firearms purchase background check defined at federal law.  The new law also fails to demonstrate even a basic appreciation for the depth of what went into and has built from the point of origin of "The Brady Law."  The new law does not contain reference to data housing, data security, data retention and destruction, data management, data silos, limiting of purpose to the firearms purchase background check, mis-use of NICS system and data, lack of discipline of agency access for unrelated purposes, and privacy and Due Process considerations.  Instead, the new law demonstrates the Defendants' intention to convert each firearm purchase into a background check akin to a full-bore licensing or permitting scheme, and allowing up to 30-days per transaction.

137. **NY Gen Bus §875-b(1)** – <u>effective December 5, 2022</u> – directing Plaintiffs to design a "security plan," including "firearms in shipment," expressly contradicts federal firearms compliance law.  The responsibilities and liabilities for firearms in shipment is already addressed at federal law.

   a.  Under federal law, the shipping FFL is liable for the firearms shipment through the point of delivery. The shipper determines the shipping company, makes payment to

the shipper, and bears responsibility for all reporting requirements to local and federal authorities in the event a shipment is lost or stolen in transit. The shipping FFL also bears responsibility to report the loss/theft within 48-hours and to complete the ATF Form 3310.11. 18 U.S.C. §923(g)(6) and 27 CFR §478.39(a).

b. Only the shipping FFL has personally examined the firearm to ensure that all firearm markings are what is recorded in the A&D Book. Those markings are required to be inserted onto the Theft/Loss Report to the ATF.

138. **NY Gen Bus §875-b(2)** – <u>effective December 5, 2022</u> – mandating Plaintiffs hire a "security alarm operator licensed by the State," expressly contradicts federal firearms compliance law.

> "NY Gen Bus §875-b(2). The dealer's business premises shall be secured by a security alarm system that is installed and maintained by a security alarm operator properly licensed pursuant to article six-D of this chapter."

139. The new section is from the new NY General Business Law, Article 39-BB, titled "Preventing the Unlawful Sale of Firearms, Rifles, and Shotguns to Individuals with a Criminal Record." The new laws mandate hiring "security alarm operator" companies, which are permitted to hire employees with criminal records, including felony criminal records, including those as young as 18 years of age. NY Gen Bus §875-b(2), read with NY Gen Bus, art. 6-D.

140. A careful reading of NY Gen Bus §69-o(2) reveals that an applicant to become a New York "security alarm operator" is not disqualified for misdemeanor convictions, felony charges pending, a conviction vacated and replaced by a youthful offender finding, a conviction

expunged or sealed, a conviction for which a certificate of relief from disabilities or a

certificate of good conduct has been issued, or for any other felony conviction not involving

fraud, bribery, perjury, or theft. A literal reading of the licensing criteria demonstrates that

a person could be disqualified from the ownership, use, or possession of firearms,

ammunition, and destructive devices under 18 U.S.C. §922(g), but could still get a license

in New York as a "security alarm operator."

141.    Under federal law, an FFL is not permitted to hire an employee with a criminal record -

*period.* Federal law makes no exceptions. 18 U.S.C. §922(h). It cannot. Otherwise, the

FFL would be in a situation of having a "disqualified person," not permitted to possess,

acquire or use a firearm working inside an FFL.

142.    The Defendants' new laws at **NY Exec §875-f** – <u>effective December 5, 2022</u> – require the

Plaintiffs to copy and transmit their federal A&D Book to the Defendant NYS Police. The

A&D Book is a federal firearms compliance tool and firearms tracing tool which may not

be taken from the Plaintiffs or any other FFL. Not even BATFE has complete copies of the

A&D Books[88] of Plaintiffs or any other FFL.

    a.    The A&D Book may only be accessed in two specific circumstances: (1.) pursuant to

        a warrant in a criminal investigation of a person other than the licensee; and, (2.)

        upon visual inspection during a routine inventory reconciliation compliance check,

        where if any pages be copied by BATFE, the pages must also be furnished to the

        FFL-01 for their records.

---

[88] 18 U.S.C. §923(g)(1)(A).

    b.   Otherwise, the records may be requested to be reviewed by the FFL to respond to a trace by serial number request by BATFE.

143.   The Defendants' new law at **NY Gen Bus §875-f(2)** – <u>effective December 5, 2022</u> – require the Plaintiffs to prepare a monthly firearms reconciliation report for the Defendant NYS Police.  The provision is a duplicate of the semi-annual copy and transmission of the federal A&D Book found at NY Gen Bus §875-f.  The A&D Book is the inventory reconciliation record.  It cannot be required to be transmitted for the same reasons.

144.   As far as the Defendants' new law at **NY Gen Bus §875-f(3)** – <u>effective December 5, 2022</u> – written to force Plaintiffs to open their A&D Book to any and all state law enforcement agencies and to the manufacturer of the weapon or its designee, Plaintiffs assert that this, too, is a violation of federal law.  The A&D Book is required for the specific purpose of BATFE being able to have their Field Agents go to the physical premises of the dealer in firearms and to manually compare the firearms stated to be in inventory and the firearms stated to have gone through inventory (e.g., to a customer, returned to manufacturer, transferred to an out-of-state FFL) as against the firearms shown to be on-site at the dealer premises.  The A&D Book is not available for inspection or use by any other federal office or agency outside of the ATF.  The limited rights of access are not extended or assigned at the federal level to any other office or agency.  It certainly is not available for perusal by civilian third parties, even including any other FFL, such as a manufacturer.

145.   Finally for this section, as to the Defendants' new law at **NY Gen Bus §875-g(b)(1)** – <u>effective December 5, 2022</u> – requires the Plaintiffs to provide annual certification of

compliance with all State laws, the Defendants are mandating the Plaintiffs and other NYS dealers in firearms admit to breaking federal firearms compliance law. Quite literally: the Defendants are mandating that the Plaintiffs commit one or more federal crimes in relaxing their guardianship of federal firearms compliance records to give access and copies to a host of offices, agencies, and third parties...and then sign a confession of having broken federal law. This is a plain violation of the Plaintiffs' Fifth Amendment rights to not be compelled to be a witness against himself in any criminal case. U.S. Const. amend. V.

146. The Defendants have designed "...an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime." *Albertson, supra.*

147. The State Defendants are, as the new laws read, themselves actively preparing to and/or are right now committing intentional violations of federal law. The Defendants are thus exposed to monetary fines by the federal government and to losing access to the NICS background check system, altogether.

148. The Defendants' new laws mandate the Plaintiffs to aid and abet their new gun control and registry scheme, putting the Plaintiffs at risk of loss of their Federal Firearms License, of federal criminal charges, and of significant fines all in violation of their Fifth Amendment rights. U.S. Const. amend. V.

149. The Defendants' new laws directly contradict federal law, such that they must be immediately enjoined and struck down. 18 U.S.C. §927 and 28 CFR §25.11(b).

150. The Defendants are literally mandating, through their new laws, that the Plaintiffs become their cohorts in crime.

151. Plaintiffs are law-abiding individuals and business owners, and refuse to be put in a position of being compelled to commit federal crimes at the behest of the Defendants.

152. The Defendants' new laws create demands upon the Plaintiffs that cannot be reconciled with existing federal firearms laws and regulations, such that they must be immediately enjoined and struck down. 18 U.S.C. §927.

### IX. FIFTH AMENDMENT DUE PROCESS "VOID-FOR-VAGUENESS" CHALLENGES: NEW LAWS ARE INSUFFICIENTLY CLEAR, DELEGATE EXCESS AUTHORITY, AND WILL LEAD TO ARBITRARY PROSECUTIONS.

153. Numerous of the Defendants' new laws, which carry criminal penalties ranging from misdemeanor to felony charges, are so vague "that men of common intelligence must guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391 (1926). These new laws are void-for-vagueness not only as to the interpretation, but also as to the application and will lead to arbitrary prosecutions. U.S. Const. amends. V and XIV. The new laws harken back to Federalist, No. 62, penned by James Madison, warning of the "calamitous" results if laws are "so incoherent that they cannot be understood…"

154. Further, the Defendants to whom the extensive and open-ended regulatory authority was delegated is too open-ended. It appears the responsibilities are so onerous and far-reaching that even the Defendants, themselves, do not know how to proceed. And so they have

failed, repeatedly and in an on-going manner, to fulfill their responsibilities to Plaintiffs as individuals, as business owners, and as licensees engaged in the lawful stream of commerce.

155. Oddly, for all of the failures of Defendants to meet their responsibilities as set out particularly in this section, Defendant NYS Police found the time to prepare and participate in a 90-minute NYS Bar Association "Continuing Legal Education" program for lawyers, written materials, on the topics of new "Red Flag & Conceal Carry law Changes." This program is not available to the Plaintiffs or the general public.

156. Multiple of the Defendants' new laws lack sufficient definiteness or specificity and/or hinge upon actions required to be performed by the Defendant NYS Police, Defendant DCJS, and/or such other offices or agencies, all of which are under the direct authority of the Defendant Governor, including, as follows:

   a. **NY Gen Bus §875-b(2)** – the "security alarm system" standards provision – <u>effective December 5, 2022</u> – which requires the Defendant NYS Police to "establish" "standards for such security alarm systems" and which requires the Defendant NYS Police to "approve" the "security alarm systems";

   b. **NY Gen Bus §875-e** – <u>effective December 5, 2022</u> – the "employee training" program and documentation, which "training" is to be "developed by the superintendent" and is to be "[made] available to each dealer," in accordance with minimum topics set out in **NY Gen Bus §875-e(2)(a)-(e) plus "(f)** such other topics the superintendent deems necessary and appropriate";

c.  **NY Gen Bus §875-e(3)** – <u>effective December 5, 2022</u> – the "employee training"
documentation, which "records of such training" shall be promulgated through
regulation by the Defendant NYS Police;

d.  **NY Gen Bus §875-f** – <u>effective December 5, 2022</u> – the semi-annual submission of
A&D Book copies, although the provision may confer authority for the Defendant
NYS Police to proscribe a book "in such form and for such period as the
superintendent shall require," which may differ from federal regulation format found,
*inter alia,* at 27 CFR §478.125(e);

e.  **NY Gen Bus §875-f(2)** – creation of a new monthly inventory reconciliation report
for the NYS Police;

f.  **NY Gen Bus §875-g(b)(1)** – the annual compliance certification required to be
signed by dealers – <u>effective December 5, 2022</u> – which "certification" "form and
content" shall be determined by regulation by the Defendant NYS Police;

g.  **NY Gen Bus §875-g(2)** – the periodic premises inspection – <u>effective December 5,
2022</u> – which "regulations requiring periodic inspections" at "the premises of every
dealer to determine compliance by such dealer with the requirements of this article"
shall be promulgated by the Defendant NYS Police;

h.  **NY Gen Bus §875-h** – <u>effective December 5, 2022</u>, granting Defendant NYS Police
a *carte blanche,* as follows: "The superintendent may promulgate such additional
rules and regulations as the superintendent shall deem necessary to prevent firearms,
rifles, and shotguns from being diverted from the legal stream of commerce;"

i.  **NY Pen §270.22** (read with **NY Exec §144-a**) – *effective June 30, 2022* – bans the sale of "body vests," excepting certain professions and individuals, who can then present proof of eligibility to the FFL was to have been promulgated through "rules and regulations to establish criteria for eligible professions requiring the use of a body vest" and a "process by which an individual or entity may request that the profession in which they engage be added to the list of eligible professions" and a "process by which individuals and entities may present proof of engagement in eligible professions when purchasing a body vest," none of which has been performed by Defendants NYS Sec. of St. "in consultation with," *inter alia,* the Defendant DCJS and Defendant NYS Police;

j.  **NY Pen §400.00(1) and §400.00(19)** (to be read with **NY Exec §837(23)(a)** and **NY Pen §265.20(3-a)**) – *effective September 1, 2022*, mandating classroom and live-fire training curriculum, testing, and certification scheme;

k.  **NY Pen §§400.00(2), 400.00(3), 400.00(6), 400.00(7), 400.00(8), and 400.00(10)(c)** – underline effective September 1, 2022, mandating a license for the purchase of a "semi-automatic rifle"; and,

l.  **NY Pen §400.02(2)** and **NY Pen §400.03(2) and (3)** – effective September 1, 2022 – new ammunition sales records and background check requirement.

157. There is no clear channel of communication between the Defendants and the Plaintiff FFLs and gun show.  There is no demonstrated federal firearms compliance acumen by the Defendants.  There is no substantive or timely compliance by the Defendants NYS Police

and DCJS with their responsibilities under the new laws.  No publication of proposed and adopted rules through a rule-making process like the State <u>Register</u>.  What there is, however, are threats of prosecution through the Defendant NYS Police Acting Superintendent Nigrelli and the Defendant AG James.  It is impossible for the Plaintiffs to comply with the new laws.

158. Additionally, regarding **NY Pen §270.22** (read with **NY Exec §144-a**), regarding the sale of body vests, because the Defendants failed to perform their responsibilities under the statute, effectively, no sales of body vests are legal in New York since June 30, 2022.

   a. Plaintiffs have one or more "body vests" in their store inventory, as that term is defined at NY Pen §270.20(2).  Since the law went into effect, such body vests are neither for sale to the general public, nor displayed as part of the available goods within the retail portion of the premises, nor are such body vests being sold to any person claiming to be "eligible" to make such purchase.

   b. Plaintiffs are unaware of any publication of either "eligible professions," the identifying document that an individual customer may present, or any available application process to which to refer a customer upon inquiry.

   c. The penalty for such a sale would be a class A misdemeanor for the first offense and a class E felony for any subsequent offense. NY Pen §270.22.

159. Additionally, concerning **NY Pen §400.00(1)** and affiliated statutes with respect to the mandatory training, live-fire, testing, and certification already in effect, Plaintiffs

emphasize that Defendant NYS Police and DCJS have yet to fulfill their statutorily-defined responsibilities.

a.  The Defendant Hochul's new laws clearly contemplate a "standardized firearms safety training" course, "which shall include the approval of course materials" by Defendants NYS Police and DCJS. NY Exec §§837(23)(a) and 235(1).

b.  On August 23, 2022, Defendant NYS Police and DCJS released a memo to the general public.  It is attached to this Complaint.

c.  It does not fulfill Defendants' responsibilities to issue 16-hours of classroom "course materials" (NY Exec §235(1)) as "curriculum approved" (NY Pen Law §400.00(19) and immediately repeated in §400.00(19)(a)) for a statutorily-itemized list of eleven (11) topics.  Because of the way the statute is written, it is arguable that the Defendants NYS Police and DCJS are also to produce the "written test" that relates to their curriculum.

d.  The August 23, 2022 NYSP memo essentially copies and pastes the topics set out in the new law at NY Pen §400.00(19)(a)(i)-(xi).   The four (4) pages do not constitute a "curriculum."

    i.  NY Pen §400.00(19)(a)(v), for example, says "(v) conflict de-escalation." The NYSP/DCJS memo 08/23/2022 says "5.  Conflict de-escalation tactics that include verbal and non-verbal strategies, including retreating, that are intended to reduce the intensity of a conflict or crises encountered." (p. 2) That's the full extent of the "curriculum" on "conflict de-escalation."

      ii.  As another example, NY Pen §400.00(19)(a)(viii) says "(viii) conflict

           management." The NYSP/DCJS memo 08/23/2022 says "9. Conflict

           management." (p. 2) Just the words of the statute and nothing more.

e. Defendant Hochul's new laws also clearly contemplate a "written test for the curriculum" with a passing mark being "eighty percent correct answers." NY Pen §400.00(19)(b).

f. The Plaintiffs are unaware of any additional training materials or any test being issued by Defendants NYS Police or DCJS. It is unclear who will grade the test and whether answers will need to be submitted, e.g., to the NYS Police or DCJS.

g. Effectively, as of September 1, 2022, there is no "firearm safety training course" because of the failures of Defendants NYS Police and DCJS to fulfill their statutory responsibilities.

h. Plaintiffs, several of whom were regularly teaching county-accepted NRA firearms safety training and pistol training courses prior to September 1, 2022, stopped offering such courses as of September 1, 2022 as being non-conforming to the new laws.

i. Plaintiffs have been waiting since September 1, 2022 for the Defendants to publish the 16-hour curriculum, to publish the corresponding test, and to indicate whether the Defendants will be the ones to administer and grade the tests. Plaintiffs want to teach handgun and firearms training courses and are unable to do so as a direct result of the Defendants' failures to fulfill their obligations under the new laws.

j.  Plaintiffs, as business owners, have also previously offered their premises for third-party instructors teaching firearms training courses.  None of the Plaintiffs are willing to share their business premises with third party instructors until and unless Defendants fulfill their obligations under the new laws.

k.  Plaintiffs are unaware of any third-party instructors, either for their own training or to refer customers to, since September 1, 2022.  All Plaintiffs have concealed carry permits.  Plaintiffs note the absence of such courses being advertised or offered in their areas.  Even if, hypothetically, such a course were to be advertised, Plaintiffs do not see how such a course *could* be in compliance with the new laws because of Defendants' failures.  None of them will be able to satisfy requirements of training prior to the expiration of their concealed carry permits[89] because of the failures of the Defendants to fulfill their obligations under the new laws.

l.  Defendant Hochul's new law requires new applicants for concealed carry permits to complete the training (NY Pen §400.00(1), referencing §400.00(1)(f)) <u>and</u> that an applicant is "required to complete the training required herein prior to the renewal of a license issued prior to the effective date of this subdivision."
NY Pen §400.00(19)(b).

m.  Equally, the Plaintiffs, as dealers in firearms and as a gunshow operator with FFL vendors, are caught over what to do if a customer presents what he or she claims is a concealed carry permit with an issue date on or after September 1, 2022, when the

---

[89] NY Pen §400.00(1).

Plaintiffs believe there is an unresolved issue of a lack of statutorily compliant training available.  Plaintiffs are prohibited from selling a handgun to any customer without a valid New York concealed carry permit.

n.  Plaintiff ESAC was also in September 2022 informed by the Monroe County Clerk's Office that it would not be present at this year's gun show to process handgun amendments as a direct result of ambiguities in the new laws.  A compromise was reached, and a limited presence was had, but it resulted in delays of processing of purchase amendments by days, where in the past, the same had been accomplished same-day.

o.  It appears that, in effect, the concealed carry permit system across the State of New York has stopped for all new concealed carry permit applications and renewals, and a serious problem for dealers in firearms has arisen over what to do with any "new" (dated on or after September 1, 2022) concealed carry permit presented to them for the purchase of a handgun.

160. Regarding the new license "to purchase or take possession of a semiautomatic rifle" in accordance with **NY Pen §400.00(2)** and affiliated statutes already in effect, Defendants have failed to fulfill their responsibilities under the new laws.  No semi-automatic license is known to have issued or to be available to request, resulting in a near total stoppage of the sale of all semi-automatic rifles in New York.  The exception occurs in Counties allowing existing concealed carry permit holders to add a semi-automatic rifle to their existing concealed carry permit.  Plaintiffs believe this violates the letter, if not the spirit, of the new

laws.  They are refusing to sell semi-automatic rifles to such customers for fear of being arrested for non-compliance and committing a crime.

a. Plaintiffs acknowledge that the NYS Police published an updated blank application PPB-5 (rev. 08/22) in relation to NY Pen §400.00(3).

b. However, the NYS Police PPB-5 form is titled "Pistol/Revolver License Amendment and Semi-Automatic Rifle License Amendment."  An "amendment" contemplates an original license already issued to an individual.  "Amendments" are separately dealt with under NY Pen §400.00(9), which allows a licensing officer to amend "his or her license to include one or more such weapons or to cancel weapons held under the license."  This form is adding to the confusion, not clarifying the new laws.

c. Further complicating matters, Defendants NYS Police and DCJS published a "Frequent Questions & Answers" document (dated August 27, 2022).  It says that a new semi-automatic license application must be made through the county/local licensing officer to purchase or take ownership from a dealer.  The August 27, 2022 NYSP/DCJS memo reads "Existing firearm license holders can add a Semi-Automatic Rifle to their firearm license through their local licensing officer."

d. This appears to be a wrongful instruction published by Defendants NYS Police and DCJS, which, being in only a "memorandum" format of FAQs, would not protect Plaintiffs from criminal prosecution under the new laws.

e.  Defendant NYS Police published position is not supported by the black letter of NY Pen §§400.00(1) and 400.00(6), which clearly contemplate that a unique SAR license will issue.

    i.  See, e.g., NY Pen §400.00(8), which reads "Every person licensed to purchase or take possession of a semi-automatic rifle shall have the license for the same on his or her person while purchasing or taking possession of such weapon."

    ii.  Renewals of the SAR license are on a different schedule than that of concealed carry permits and are in a different statutory provision, as well. NY Pen §400.00(7).

f.  Criteria, if any, and the process, if any, for obtaining a "license" to purchase or possess a semi-automatic rifle is not set out in the "Types of licenses" statute section at NY Pen §400.00(2).  It was written into the provision that includes the concealed carry license, giving an implication that there ought-to-be a licensing criteria and system defined, but none is given.

g.  Plaintiffs have in their inventories "semi-automatic rifles," as this term is now defined in a new law under NY Pen §265.00(21).  Since September 4, 2022, the Plaintiffs have been unable to engage in commerce of semi-automatic rifles because of the confusion created by the Defendants around the new laws.[90]  Plaintiffs' sales of semi-automatic rifles have plummeted and, along with it, general store inventory, as well.

---

[90] *N.B.:* the definition of "semi-automatic rifle" under the new laws differs from that of federal law. Under federal law, a "rifle" is defined under 18 U.S.C. §921(a)(7) and 27 CFR §478.11 as designed to be fired from the shoulder and "…to use the energy of an explosive to fire only a single projectile

h. Plaintiffs' premises are located in one county, from which they take guidance, but engage in commerce with customers who come into their stores from multiple counties.

i. Plaintiffs are unaware of any county licensing officer that is offering a separate SAR license to individuals otherwise without a concealed carry permit already on record. Only some counties are offering to add semi-automatic rifles to the concealed carry permit.

j. Plaintiffs are now caught in between the black letter of the law, the Defendant NYS Police "memorandum" of August 27, 2022 published on their website, and often conflicting positions from one county to the next. Plaintiffs are at risk of being charged with a class E felony if they mistakenly sell a semi-automatic rifle to a customer while following the guidance of either Defendant NYS Police or of a local county licensing officer. NY Pen §265.66.

k. Effectively, as of September 4, 2022, the sale of semi-automatic rifles has ground to a near halt in blatant violation of fundamental Plaintiffs' rights as individuals and business owners.

l. The semi-automatic licensing requirement and confusion had a powerful impact also upon Plaintiff ESAC and its member FFLs at the September gun show in Rochester,

---

through a riffled bore for each single pull of the trigger." The "semi-automatic rifle" is defined under 27 CFR §478.11 as "Any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."

New York.  FFL vendors were afraid to bring semi-automatic rifle inventory to the show.  Customer attendance was down by more than half.  Customers who were present were not purchasing firearms.  Vendors informed ESAC that unless the new laws could be struck down by the courts or repealed that they will not be participating in new year's show, if they stay open at all.  The semi-automatic rifle is the most popular firearm in America, and everyone from highly experienced dealers in firearms to average customers are confused to the point of dropping out of the marketplace for fear of accidentally committing a crime.

161. The new laws complained of herein do not include deadlines for the Defendants to produce the statutorily-mandated materials.  Several statutes have already gone into effect, as early as June 30, 2022 (body vest), September 1, 2022 (firearms safety training course), September 4, 2022 (semi-automatic rifle license) or are imminently about to go into effect on December 5, 2022 (balance of provisions).  The Defendants are missing one effective date after another.  The county-level implementation system is grinding to a halt.  Business is falling off.  And there is no relief in sight, plus Plaintiffs as individuals and as business owners and employees are at risk of prosecution if they make an honest mistake.

162. There is no (zero) lead time built into effectiveness of these new schemes and systems even if the additional materials are issued.  The first and second NYSP and DCJS memos were issued less than one week prior to the effective dates of the corresponding statutes.

163. Plaintiffs literally do not know when or how the Defendants NYS Police or DCJS will issue the materials required by their own new laws.  The definitions, standards, curriculum,

testing, certifications, processes, and approvals to be completed by these Defendants are extensive materials that could make or break the ability to conduct and afford to conduct daily operations of the Plaintiffs and all FFLs operating within New York.

164. The Plaintiffs have responsibilities as licensed business owners, which means that they have corresponding rights, particularly of Due Process rights.

165. In order to obtain their state licenses, Plaintiffs have provided the Defendants with their names, physical business address, telephone numbers, and e-mails. Plaintiffs are required to notify the NYS Police of any change of that information, and must recertify it every three years upon renewal of their licenses.

166. Plaintiffs ask this Court to understand that, even though each Plaintiff has a firearms dealer license through the State of New York for their business operations, no (zero) notifications are transmitted to the Plaintiffs or, upon information and belief, to any other FFL-01s from the State at any time concerning new laws, amendments, or additional rules or regulations.

167. Were it not for the fact of becoming organized to file this lawsuit, Plaintiffs would not have had an understanding of the number of Bills passed between May 31, 2022 and July 1, 2022, the "Proclamations," the "Emergency Orders," and the NYS Police Memorandums of August 23, 2022 and August 27, 2022. In New York, there is not even a singular website for Licensees that acts as a repository for vital legal information to ensure up-to-date operations.

168. Plaintiffs are unaware, for example, of any instance that the Defendants have issued even a "small business regulation guide" for dealers in firearms to "explain the actions a small

business may take to comply with a rule or group of rules, identify any sources of information or assistance available to facilitate small business regularly compliance," etc. NY SAP §102-a. Somehow, these Defendants managed to be exempted from the "State Administrative Procedures Act." NY SAP §102(1), "Agency," defined. It means there is no uniform or consistent approach to rulemaking, adjudication, or licensing processes in New York, as concerns the Defendants, which is the exact opposite of the State Legislative intent at NY SAP §100.

169. Nor are Plaintiffs aware of any published rule or regulation by the Defendant NYS Police to be found in the New York Codes, Rules, and Regulations, Title 9 ("Executive Department"), Subtitle K ("New York State Police").

170. It is of little to no comfort to the Plaintiffs that the National Shooting Sports Foundation ("NSSF") reports that it met with

> "…the governor's office and the N.Y. State Police to obtain guidance for implementation guidance but the only thing that was clear was the state's not ready. NSSF was told to advise member retailers that state police won't conduct inspections without proper guidance in place first and officials from the governor's office didn't want New York firearm retailers to spending (*sic*) their resources to comply until regulations are published. State police informed NSSF that a Frequently Asked Questions page will be created to assist retailers soon."[91]

171. As the U.S. Supreme Court pointed out in *Albertson,* "The representation that the information demanded is of no utility is belied by the fact that the failure to make the

---

[91] *See* NSSF blog by Larry Keane, Senior VP of Government and Public Affairs, Assistant Secretary and General Counsel (dated August 31, 2022) at https://www.nssf.org/articles/confusion-is-the-word-as-n-y-gov-hochuls-gun-laws-take-effect/

disclosure is so severely sanctioned." *Supra,* at 81.  The new laws require compliance or threaten state and/or federal criminal prosecution, incarceration, fines, and the loss of the license, the livelihood, and the business, in addition to the permanent loss of the individual Plaintiff rights under the Second Amendment.

172. As Plaintiffs describe herein, the Defendant NYS Police FAQ website page only contributes to the confusion.

173. Where the right threatened to be deprived involves a fundamental civil right, the notification must be conveyed through the best means available.  In the case of a potential Second Amendment or a criminal incarceration notice where the State is in possession of all current contact information of a potential Defendant within the territorial jurisdiction of the state, personal notification should be required.  Constructive notification through routes such as website postings to the general public should not be considered adequate.  The mandates do not concern "an essentially non-criminal and regulatory area of inquiry, but, an area permeated with criminal statutes." *Haynes, supra,* citing to *Albertson* at 79.

174. By contrast, Plaintiffs have excellent communication with and notification from the federal government.  BATFE is chartered to educate and assist FFLs of all types, including retailers, importers/exporters, manufacturers, gunsmiths, and collectors.  The goal is compliance.  The point is to achieve the highest standard of excellence in the delivery of the product in the marketplace.

175. The BATFE website is over-loaded with information, from the start of whether and how to apply for a license through all necessary forms to transparency reporting on the number of

NICS checks run, the number and by category of denials, and the records compiled from all sources, federal and state, into the NICS background check system.

176. BATFE also provides direct and published notifications of proposed rulemaking, individual and published guidance responses to industry questions, firearms examinations for compliance purposes, on-site premises review (both mandatory and voluntary), answers by employees to questions, and more.  In contrast to the guarded, law-enforcement-first positioning of the NYS Police, BATFE exists to assist FFLs, and Plaintiffs can attest to its usefulness and reassurance relative to federal laws and regulations.

177. The only way the Plaintiffs can see to even have a shot at compliance with the new laws complained of herein is to have legal counsel, on retainer, at great cost, which attorney would then be responsible for checking on a daily basis for the details from the Defendants, if any are forthcoming, and to provide immediate briefings to the Plaintiffs.  There is no way for a non-attorney, or, arguably, not even an attorney who is not a federal firearms compliance attorney, to figure out what-all just passed and what and when it all hits on an implementation level and at what cost.  The new laws appear to be the most complex, single-issue statutory melee in history.

178. The new laws do not afford even afford basic Due Process rights to the Plaintiffs in the form of clear and intelligible instructions on how to comply, such that they must be struck down as void-for-vagueness.

179. The new laws also do not afford administrative or regulatory Due Process in the sense of notification, a meaningful opportunity for compliance, an opportunity to be heard, or a

forum for redress of grievances, and must be struck down.  The new laws are too complex for the average firearms dealer to identify, comprehend, analyze, and apply to business operations.  And the new laws provide no redress for regulatory grievances.  The new laws must be struck down.

## X. CONSTITUTIONAL-REGULATORY OVERBURDEN CHALLENGES FACING THE PLAINTIFFS: DEFENDANTS REQUIRE PLAINTIFFS TO PAY FOR THEIR NEW GUN CONTROL SCHEME

180. Many of the new laws complained of will financially burden the Plaintiffs to a point that they will be forced out of business, <u>potentially as early as December 5, 2022</u>, if no immediate relief is had from the Court.  Since September 1, 2022, the Plaintiffs' businesses are losing money.  The Plaintiffs cannot financially afford to or cannot logistically perform all of the new mandates, including the "security plan," the safes, the "security alarm system," the third-party vendor, the security cameras, the security footage storage, the prohibition against under-age-18 entry into their shops, the employee training, the prohibition against employees under age 21, the creation of additional records, and records storage.

181. The Defendants have unjustly heaped costs onto the Plaintiffs, including the following:

   a. **NY Exec §228** – new NYSP background check division and system;

   b. **NY Gen Bus §875-b(1)** – new "security plan," including "secured and locked area on dealer's business premises;"

c. **NY Gen Bus §875-b(2)** – new "security alarm system," including installation and maintenance by a third-party vendor, as well as specified video recording device with feed storage;

d. **NY Gen Bus §875-c** – bouncer to prohibit entry into space by persons under the age of 18 years;

e. **NY Gen Bus §875-e** – mandatory employee training and records keeping;

f. **NY Gen Bus §875-f** – additional A&D Book requirements;

g. **NY Gen Bus §875-f(1)** – additional records storage requirements;

h. **NY Gen Bus §875-f(2)** – additional inventory reconciliation record requirements;

i. **NY Gen Bus §875-g(b)(1)** – new annual certification record requirements;

j. **NY Pen §400.00(1)** and **§400.00(19)** (to be read with **NY Exec §837(23)(a)** and **NY Pen §265.20(3-a)**) – the classroom and live-fire training curriculum, testing, and certification scheme;

k. **NY Pen §§400.00(2), 400.00(3), 400.00(6), 400.00(7), 400.00(8), and 400.00(10)(c)** – semi-automatic rifle license scheme; and,

l. **NY Pen §400.02(2)** and **§400.03(2)-(3)** – new ammunition sales record-keeping requirements and background check requirement.

182. The form of the costs to the Plaintiffs and all FFL dealers in New York, as further detailed herein, amounts to thousands of dollars per month, every month, in terms of capital expenditures, administrative time, employee time, training materials, third-party contractors, and more.

183. The new costs, estimated below through a "best guess" reading of the mandates, range from $200,000/year to approaching $1 million/year.   Plaintiffs are small business owners, ranging from self-employed solo proprietors to small to medium-sized retail shops with less than five employees.

   a.  None of the mandates adjust for business size or size of inventory or sales.

   b.  None of the mandates adjust for in-home businesses.

   c.  The Defendants offer no grants, tax credits, or funding to Plaintiffs for any of the mandates.

   d.  The Defendants offer none of the courses.

184. Extrapolating these mandate estimates to the 1,782 FFL Type-01s with a business premises in New York ranges from $400 million to $1.6 billion of industry hit.

185. The Defendants failed to calculate or disclose the cost of the new laws to the Plaintiffs, the industry, and the gun owner.  The Defendants failed during the mad rush of Defendant Gov. Hochul Bill drive to consider or to expose even one estimate of any of the dozens of costs generated by the new laws.

a. For Bills S.4970-A, S.9407-B, and S.9458 (three of the four Bills complained of herein), the "Sponsor Memo" reads "Fiscal Implications:  None."

b. For B.51001, which includes the State becoming the POC for the NICS background check, the "Sponsor Memo" reads "Budget Implications: State agencies can begin to implement changes with existing resources." (emphasis added)

186. The largest single cost in the new laws is that of the impending cost per background check run to be borne by the dealers upon launch of the new NYS-NICS-POC system.  It will replace the existing NICS system that operates a no cost ($0) to the Plaintiffs, customers, and taxpayers of New York, alike.

187. The costs imposed by the Defendants, "[w]hile [they] do not directly burden a law-abiding citizen's right to use a firearm for self-defense, they do directly burden a law-abiding citizen's right to acquire a firearm and the necessary ammunition for self-defense." *Guns Save Life, Inc. v. Ali,* 2021 IL 126014 (2021), p. 6, finding that a Cook County, Illinois tax of $25 per firearms purchase "…[imposed] a burden on the exercise of a fundamental right protected by the second amendment," citing *Heller, supra* at 635 and *McDonald, supra* at 778.

188. By contrast, Plaintiffs have access to the entire federal firearms compliance system run by BATFE at zero ($0) direct cost to themselves and their customers.  Through the federal firearms compliance system, the Plaintiffs have access to a massive trove of free compliance materials and ATF personnel plus the free NICS system.  There is simply no comparison, either on the money or on the quality of work product, between the federal

NICS system and the threat of a Defendant NYS Police launch of a NYS-NICS-POC system.

### XI.(A.)  The Defendants Choose Not Contribute Records to the Federal NICS Background Check System.

189.   Plaintiffs ask this Court, as a starting point, to understand that the Defendants choose not to voluntarily contribute New York criminal and other records to the FBI for inclusion in the NICS background check system.  The Defendants have a daily opportunity to actively participate in federal efforts to block the sale of firearms to disqualified persons, but they *choose* not to do so.

190.   The Bill jacket for S.51001 contains the peculiar posture on the Defendants' restriction against access to New York State criminal data, commenting that the FBI "…lacks access to crucial state-owned and local-owned records and databases that provide a fuller, more accurate assessment of an individual's background."  The FBI does not have access because the Defendants choose not to report that data, as detailed herein.

191.   The FBI maintains the databases searched during an ATF-administered NICS background check. 18 U.S.C. §922(g).  The FBI annually publishes the number of state records contributed, by type of disqualification.  The most recent FBI Criminal Justice Information Services/Division NICS Section report of active records in the NICS Indices as of December 31, 2021[92] shows:

---

[92] Official website of the FBI, "Active Records in the NICS Indices by State" available at https://www.fbi.gov/file-repository/active-records-in-the-nics-indices-by-state.pdf/view.

a. New York – 1 felony record.

b. New York – 1 person under indictment record.

c. New York – Zero ("0") fugitive from justice records.

d. New York – Zero ("0") unlawful user/addict of controlled substances record.

e. New York – Zero ("0") illegal/unlawful immigrant records.

f. New York – Zero ("0") dishonorable discharge from military service records.

g. New York – Zero ("0") renounced U.S. citizenship records.

192. In concrete terms, a person convicted in New York of a felony will not be returned as "DENY" if attempting to purchase a firearm at an out-of-state FFL dealer who runs a NICS background check. A convicted felon is a "disqualified person" and has lost his or her firearms, ammunition, and explosive device rights in all fifty states and U.S. Territories. The Defendants are aiding and abetting criminals in the purchase of firearms through the refusal – the outright, public, express refusal – of Defendant Gov. Kathy Hochul to contribute state criminal and other records to the FBI to include in the NICS background check system.

193. There are only two categories of data submitted by New York: (1.) Domestic violence protection orders and misdemeanor crimes of domestic violence records; and, (2.) adjudication of patients to mental institution records. These two types of records, only, are submitted because the State of New York gets paid by the federal government to do so through FY2022 through the "NICS Improvement Amendments Act of 2007."[93]

---

[93] P.L. 110-180 (2008), amended the Brady Handgun Violence Prevention Act, *supra*.

194. Defendant NYS DCJS has received ten grants totaling nearly $20 million between FY2015 – FY2020 from the federal Office of Justice Programs.   The Defendants have accepted financial inducements to report state records – they will not voluntarily contribute State criminal and other records.

195. The Defendant Gov. Hochul, the Defendant NYS Police, and the Defendant DCJS's choice not to contribute voluntarily criminal and other records means that these New York State records are not available to either the federal government or to forty-nine other state governments and any U.S. territorial governments which also use the NICS background check system to prevent unlawful transfers of firearms at an FFL.

196. Defendant Hochul brags about her intentional choice not to contribute records to the NICS:

> "So what's clear is, there's also <u>an opportunity for states that are serious about protecting their citizens like New York</u>, where we can say, we should be able to take this over.  *We don't need the feds to do the work.*  We will do it here in the state of New York <u>where we can have access to our state database</u> as well as the federal database." (July 1, 2022, signing ceremony of S.51001, complained of, herein) (emphasis added)

197. Plaintiffs do not want to go through the New York State Police (or other state intermediary, undefined, as the statute appears to allow) for the background check.  Plaintiffs want to continue to communicate – as several of them have done since inception in 1968 – directly with the ATF, using a proven system, run through a dedicated federal agency that has local offices and field agents, to meet their federal responsibilities to complete sales of firearms to only those permitted at federal law to make the purchase.

198. The statute at Exec.L. §228(3) attempts to define the records that will go into the system, but then leaves wide open that the new division "may create and maintain additional databases as needed." It appears the Defendants intend to merge records not only for the analysis of whether a customer is a disqualified person under 18 U.S.C. §922(g), but also any and all records that relate to the licensing process.

199. If the Defendants are permitted to blend the firearms purchase background check with the permit licensing scheme, the Defendants will, effectively, be making individual determinations of each firearms purchase using criteria far in excess of the objective federal disqualified person criteria. And they are giving themselves up to thirty days (30 days) to respond to each background check request.

200. If the Defendants are permitted to carry-out this plot, the Defendants will shift the firearms disqualification process from an objective set of federal criteria anchored to the Due Process Clause of the U.S. Constitution into a subjective system with less criteria than that of New York's now invalidated "Sullivan Act."

201. Unlike the NICS system, the NYS-NICS-POC build-out contains no parameters for priacy, data retention and destruction, data integrity, data security, or even something as simple as the address where the data will be housed. All of these topics are thoroughly covered in 28 CFR, which established the policies and procedures for implementing the Brady Handgun Violence Prevention Act. *Supra.*

202. Creation of this new state system anticipates it will pay for itself through fees that will be charged to the Plaintiffs and other FFL-01 dealers in firearms. This is not even a fee to the end-user, or, customer, like a cigarette or alcohol tax.

203. The new laws provide the tiniest insight to the costs the Defendants are running up to create this unnecessary and duplicitous system, under NY Exec §228(4)(a) and (c), as follows:

> "(4)(a)  The creation of a centralized bureau within the division to receive and process all background check requests, which shall include a contact center unit and an appeals unit. Staff may include but is not limited to: bureau chief, supervisors, managers, different levels of administrative analysts, appeals specialists and administrative personnel. The division shall employ and train such personnel to administer the provisions of this section."

> "(4)(c)  An automated phone system and web-based application system, including a toll-free telephone number and/or web-based application option for any licensed dealer requesting a background check in order to sell, deliver or otherwise transfer a firearm which shall be operational every day that the bureau is open for business for the purpose of responding to requests in accordance with this section."

204. Defendant Gov. Hochul wrote into the statute at NY Exec §228(5)(a) that

> "Each licensed dealer that submits a request for a national instant criminal background check pursuant to this section shall pay a fee imposed by the bureau for performing such a background check. Such fee shall be allocated to the background check fund established pursuant to section ninety-nine-pp of the state finance law. The amount of the fee shall not exceed the total amount of direct and indirect costs incurred by the bureau in performing such background check."

205. The "direct and indirect costs" of the duplicitous and unnecessary NYS POC system will be hoisted upon Plaintiffs and NYS dealers in firearms and ammunition. NY Exec §228(5)(a). The cost is neither specified, nor limited by statute. The only clue is that "the calculations

used to determine the amount of the fee imposed pursuant to this paragraph" will be reported annually on January 15 to "the governor, the temporary president of the senate, and the speaker of the assembly." NY Exec §228(6)(c).

206.  The projected cost for the start-from-scratch new division of the NYS Police is not disclosed in the Bill, the Bill jacket, or any press or other publicly-disclosed materials available to the Plaintiffs.  The FY2022 Executive Budget recommendation by Defendant Gov. Hochul recommended $1.0 billion in appropriations for the Defendant NYS Police.[94] The budget report does not contain sufficient detail to know whether and how much of that $1.0 billion budget was allocated for the new NYS Police NICS POC expenses.

207.  In 2021, there were 464,575 NICS firearm background checks run in New York by all FFLs.  The term "all" in relation to this statistic refers to 1,791 FFLs of Type-01 + Type-02 and 2,109 of all other FFL Type Licensees.[95]  The new laws contemplate that "dealers," meaning FFL Type-001 only, will be responsible to bear the cost of their background checks.  The law doesn't contemplate a NICS background check being run by any other type of FFL, nor does it state whether such FFLs will even have access to the NYS-NICS-POC system.

---

[94] See, New York State, Division of the Budget, "Division of State Police" (FY2022 Executive Budget recommendations) at https://www.budget.ny.gov/pubs/archive/fy22/ex/agencies/appropdata/StatePoliceDivisionof.html#:~:text=The%20FY%202022%20Executive%20Budget,8.0%20million%20from%20FY%202021..

[95] The new laws reference only "dealers" for any of these provisions being discussed.  *N.B.* that federal firearms compliance law covers Federal Firearms Licensees who are dealers, gunsmiths, pawnbrokers, manufacturers, importers, exporters, and collectors to participate in and be required to use the NICS background check system for lawful transfers.

**X.(A.)(4.)  Defendants Have No Credentials to Qualify Them to
Run a Background Check System in Firearms or Ammunition.**

208. The State of New York has no demonstrated capability to perform firearms or ammunition
background checks.

209. For example, in 2013, as part of the "SAFE Act," then Governor Andrew Cuomo included a
provision for an ammunition background check to be performed using NICS or to otherwise
be created through the NYS Police.  The same provision appears in S.B. 51001, under now
Defendant Hochul.

210. Simply put: federal law prohibits NICS from being used for any purpose other than the
customer background check during a firearms purchase.  The Defendants should know that
as a fundamental point of federal firearms law.

211. Upon information and belief, Governor Cuomo admitted he was unaware of the same to
leaders of the Senate and Assembly, not long after passage of the "SAFE Act" in 2013.
Upon information and belief, the NYS Police then spent millions of dollars trying to create
an ammunition background check system, but were unable to do so.

212. It was this important legislative history that resulted, ultimately, in 2015 in the
"Memorandum of Understanding," signed by Operations Director Jim Malatras on behalf of
Governor Cuomo and Senate Majority Leader John Flanagan.

213.  Now, on July 1, 2022, as part of the signing ceremony, Defendant Hochul bragged about
shredding the "Memorandum of Understanding" to re-instate the ammunition background
check, whether through NICS or the NYS Police.  Her actions demonstrate her own lack of

knowledge even as to the reasoning behind the 2015 "MOU," signed, upon information and belief, in lieu of repeal by Democrats in the Assembly, to clarify the situation for FFL-01 retailers awaiting notification of the system, then past its statutory launch date.

214. On July 1, 2022, during the "update" to her television audience, awaiting passage of S.51001, *supra,* Defendant Hochul rambled:

> "Whatever happened to that ammunition database?  Could there be a background check for ammunition?  We're trying to find how to make sure we get things right here.  And in our review, we determined that there's actually an old MOU that was signed related to ammunition sales after laws were passed the decade ago. It was an administration document between the prior administration and the Senate Republicans.  And it blocked the State from taking critical measures to keep ammunition away from criminals.  So we are literally tearing it up and New York will now require and conduct background checks for all ammunition purchases."

215. Plaintiffs protest that there is no reason for the Defendants to expend the resources to try to make up its own background check system or to try to add an ammunition background check system – particularly not if it is the Plaintiffs who will bear the cost and that cost will drive them out-of-business from offering the very firearm that is protected by the Second Amendment.

216. Historically, there has not been an ammunition background check.

217. In the meantime, Defendant Hochul and Defendant NYS Police have the Plaintiffs and other dealers in ammunition manually making records of ammunition sales under Penal Law §400.03(2).

a. This record of ammunition sales is to be "approved as to form by the superintendent of the state police," however Defendant NYS Police has failed to promulgate such a "form."

b. The statute says the dataset shall include the "date, name, age, occupation and residence of any person from whom ammunition is received or to whom ammunition is delivered, and the amount, caliber, manufacturer's name and serial number, or if none, any other distinguishing number or identification mark on such ammunition."

c. Plaintiffs are writing this information down on plain paper, left to wonder whether this would actually comply with the law, if they were charged.

218. Plaintiffs point out that under federal law, the NICS background check includes recording the serial number of every firearm, which serial number must be engraved to exacting federal law standards, on every firearm. The FFL-01 must maintain those records. The FFL-01 must respond within 24-hours to any ATF officer at the National Tracing Center with any request for firearms trace information within the ATF Form 4473, completed at the time of purchase or denial of purchase of a firearm. 27 CFR §478.25a.

219. Plaintiffs are also, already, under federal mandate to report any firearms stolen from their business premises, as well as any firearms unable to be accounted for in their inventory, within 48-hours of such event. 18 U.S.C. §923(g)(6). The Plaintiffs are already under federal mandate to be prepared, every twelve months, for ATF inspection of their premises, records, and inventory. 18 U.S.C. §923(g)(1)(B)-(C) and 27 CFR §478.23. Plaintiffs already must maintain a "Book of Acquisitions & Dispositions" of all firearms received

into inventory and transferred out of inventory through sale or otherwise. 18 U.S.C. §923(g)(1)(A) and 27 CFR §478.121, §478.124, §478.125(e). Plaintiffs are already tightly restricted on how quickly those inventory entries must be made, whether as receipt of a shipment from a manufacturer, sale to a customer, a firearm that requires gunsmithing, etc. 27 CFR §478.125(e).

220. In addition, there are already several federal laws that make it a crime to alter or obliterate a firearm serial number.

221. New York State laws have, historically, failed to demonstrate an understanding of the level of federal requirements already being met by the FFL.

222. As another example of Defendants' animus, ESAC gun show points to a demand letter, sent by the Defendant AG James' office, dated September 2, 2022, requiring to be returned by September 19, 2022 to force gun shows to, *inter alia,* post signs that *the State of New York* required background checks prior to completing the purchase of a firearm.[96] The packet was designed to give the attending public the impression that *New York State* was the government body requiring the background check – that was already required under federal law. The mandatory sign language was to be posted at every entrance to the building at which the gun show was held, at ticket booths, a four or more additional locations on the grounds of the show, and every registered dealer at the show. Every FFL at the show was already required under federal law to perform a NICS background check prior to

---

[96] *N.B.:* the letter references "WHEREAS, the Attorney General Letitia James advocates a vigorous enforcement of the "Gun Show Law," General Business Law §§895-897" as the legal support for the "model gun show procedures" outlined.

completing the purchase of a firearm and to inspect any state licenses required, such as the concealed carry permit, and to instruct the person how to proceed to obtain the coupon if the purchase was of a handgun. Defendants' posture is to claim to be doing something, without regard to existing federal firearms compliance law, if it is an opportunity to put themselves before the public.

### X. (B.)  New "Security" Burdens Conceived and Mandated by Defendants Will Compromise Plaintiffs' Business Premises, Security, and Daily Operations, While Costing Them Excessive and Unnecessary Expenses

223. S.4970-A added a new Article 39-BB to the New York General Business Law. Its provisions become effective December 5, 2022. In addition to sections of these laws being illegal and unconstitutional, numerous of the provisions will make Plaintiffs' business operations and inventory less secure and will cost them excessive and unnecessary costs in the process. Multiple of the provisions have no historic basis and fail a *NYSRPA v. Bruen* analysis. Collectively, this group of statutes threaten to start shutting down Plaintiffs and similarly situated FFLs and gun shows, unless judicial action is taken.

### X.(B.)(1.)  NY Gen Bus §875-b(1)(a) and (b) – Mandatory Off-Hours Storage Configuration Defeats the Whole Purpose of Treating the Premises as The Safe.

224. NY Bus Gen §875-b(1)(a) and (b) mandates off-hours storage of firearms and ammunition into either "a locked fireproof safe or vault" or "a secured and locked area." Subsection (b) mandates storage of ammunition "separately" from firearms and "out of reach of customers."

225. Plaintiffs read the new law to mean that this storage configuration must be done at the close of every business day, which means that it would have to be reversed at the start of every business day. For shops open Monday through Saturday, this would equal twelve (12) firearms inventory transition periods per week.

226. Federal law and ATF guidance in writing and in person essentially define the FFL business premises as the vault. One of the most important ATF publications reflecting agency messaging, training, and Field Agent interaction with FFLs is "ATF Safety and Security Information for Federal Firearms Licensees," a 17-page guide that leads with "structural security," including the "physical characteristics of your business facility and its location."[97]

227. Plaintiff FFLs existing security considerations include wall construction of cement and cinder block or brick, bars on windows and doors, deadbolt door locks, two-way locking doors, interior locking doors, alarm systems, video camera monitoring, locked display cases and racks, and locked inventory either not on display, on customer hold, or in assembly or repair. Plaintiff FFL shops range in size from a single room in the residential property of the owner, to a 5,000 sq. ft. retail operation with multiple employees. Every Plaintiff is of the attitude and articulation that "the shop is the safe."

228. Plaintiff FFLs strongly object to being forced to handle and move every firearm twice daily. Their stores are arranged in similar fashion for a reason: safety first.

---

[97] ATF Publication 3317.2, available at https://www.atf.gov/firearms/docs/guide/safety-and-security-information-federal-firearms-licensees-atf-p-33172/download.

a.  Handguns are displayed in locked cases, those firearms often having individual trigger locks or case anchor cords, as well.  Display cases are locked.  Handguns and long guns are shown one-at-a-time to a customer by a single employee who remains at immediate physical proximity to the customer.  The display case remains locked during that single firearm review.  That one handgun is returned to its position prior to a different firearm being shown to the customer.

b.  Long guns are racked behind the counters, where they can be individually or in groups locked in place.

c.  Boxes for new firearms on display are stored systematically, in order to be able to match firearms with boxes upon sale.

d.  New firearms are reboxed upon sale.

e.  Some firearms are used and may not have a box, but may have a soft or hard case that accompanies sale.

f.  Handguns and long guns can be configured to include a scope or laser or other attachment, particularly if a used firearm is coming into inventory.

229. Plaintiffs are familiar with inventory operations of larger firearms retailers that use firearms inventory software including SKUs, bar codes, and even tracers on individual boxes to assist with larger inventories.  Such electronic systems generally rely on boxes and firearms remaining in static locations until sold.

230. Firearms inventories, on the numbers, for these Plaintiffs ranges from less than twenty firearms on premises to several hundred on premises.  Firearms premises range from in-home rooms to 5,000 sq. ft. of commercial retail space.

231. Any time a firearm is handled, it can be damaged, causing a loss in value.  Firearms with mounted scopes, lasers, or other attachments would either take more space than a single firearm or have to be stripped of these valuable accessories (e.g., a Leupold or Vortex medium range scope for $300) or a standard accessory (e.g., a Harris or Atlas mounted tripod for .308 caliber hunting for $100).

232. There is no point at which an entire inventory is reboxed or put into cases and put into safes.  Even the BATFE inventory reconciliation audit is conducted at the FFL premises.  18 U.S.C. §923(g)(1)(B).

233. The shuffling of firearms could also lead to error in boxing or repositioning on the floor, and could create easier opportunities for theft.

234. Further, as estimated by the smallest retailer among FFL Plaintiffs, it would consume more than one hour prior to opening and more than one hour after closing to even attempt to remove all firearms from their secure positions on the shop floor, to box or case, and to put into several, large gun safes for the night.  This Plaintiff would literally have to build another building adjacent to his shop to accommodate the large gun safes.  This analysis is without adding in the expense of purchase of the safes, the storage room required for the safes, the reinforcing to the floor(s) to accommodate the weight of the loaded safes, and any

other structural accommodations necessary for compliance with corresponding statutes such as the ADA to accommodate any employee special needs.

235. Trying to work through an estimate for the court of what vaults would be needed to try to comply with the statute as written, Plaintiffs estimate a twenty-five long gun safe could size at approximately 5' x 2-1/2' x 2' and weigh in at 1,000 pounds (depending on the fire duration rating, steel gauge, and number of locking bars).  Guns safes, generally, do not include any individual locking mechanisms once a safe is breached, and, generally, the safe design is for the naked firearm without any factory box or contents and/or without any hard or soft case.

236. For a 200 long gun inventory, requiring eight (8) such gun safes, equating to 8,000+ pounds, a standard retail space would not support that weight, particularly not concentrated in a single area.  Subfloor and flooring system would have to be reinforced and/or shored up to carry the load, in a wood-framed building.

237. Costs vary widely, but Plaintiffs arrive at an average cost over $5,000 for such gun safe, equating thus to a $40,000 expense to house a 200 long gun inventory.

238. Gun safes, as a general matter, are designed for owners and collectors and for installation into residences, not as firearms industry tools for day-to-day operations.  The cost of a medium to high-grade gun safe can outweigh the value of the firearms within it, for example, if one says that approximately 20%-25% of the long gun inventory is priced at less than $500/firearm.

239. The alternative of using a separate area is untenable.  Plaintiffs operate their businesses in buildings that either do not have sufficient space for subdivision into a separate room to be used only for off-hour storage purposes.  Moving firearms into a separate room, just for the sake of moving them into a separate room, would amount to less security than use of current display cases and wall racks, all of which are already individually locked or locked in small groups.

240. *Estimated financial impact – safes for inventory storage.*  Plaintiffs estimate this requirement could cost, given the various sizes of their inventories, from $20,000 - $500,000 for safes, plus construction costs ranging from $100,000 - $250,000.

241. This estimate does not include employee/owner wages/time to conduct the inventory relocation twice per business day.

**X.(B.)(2.)  NY Gen Bus §875-b(2) – Mandatory Hiring of Third-Party "Security Alarm Operators," who are permitted by the Defendants to have criminal records and be under-aged, and which gives them intimate access to Plaintiffs' business premises, security, and daily operations.**

242. NY Gen Bus §875-b(2) at the first through fourth sentences, read with NY Gen Bus, art. 6-D will force Plaintiffs to hire third-party vendors who are strangers to them, including those who have criminal records and who are under-aged.  The requirement gives these so-called "security alarm operators" access to the intimate details of Plaintiffs' business premises, security, and daily operations.  The new laws will make operations less, not more, secure.

243. The new section of the NY General Business Law, Article 39-BB, is titled "Preventing the Unlawful Sale of Firearms, Rifles, and Shotguns to Individuals with a Criminal Record." The new laws mandate hiring "security alarm operator" companies, which are permitted to hire employees with criminal records, including felony criminal records. NY Gen Bus §875-b(2), read with NY Gen Bus, art. 6-D.

244. As detailed above, NY Gen Bus §875-b(2) requires Plaintiffs and all other dealers in firearms – effective December 5, 2022 – to hire third party security companies to install security and video systems at their premises.  The *de minimus* licensing requirements to be a "security alarm operator" in New York include that vendor company employees may have a criminal record and may be as young as 18-years of age.

245. NY Gen Bus §69-o(2) details that an applicant to become a New York "security alarm operator" is not disqualified for misdemeanor convictions, felony charges pending, a conviction vacated and replaced by a youthful offender finding, a conviction expunged or sealed, a conviction for which a certificate of relief from disabilities or a certificate of good conduct has been issued, or for any other felony conviction not involving fraud, bribery, perjury, or theft.

246. A literal reading of the licensing criteria demonstrates that a person could be disqualified from the ownership, use, or possession of firearms, ammunition, and destructive devices under 18 U.S.C. §922(g), but could still get a license in New York as a "security alarm operator."

247. Under federal law, an FFL is not permitted to hire an employee with a criminal record - *period*. Federal law makes no exceptions. 18 U.S.C. §922(h).

248. A second collision occurs through the Defendants' own laws. Under the new laws, firearms dealers cannot sell handguns or semi-automatic rifles to a person without a license, which requires a minimum age of 21-years. NY Pen §400.00(1). However, NY Gen Bus §69-o(1) allows a person as young as 18 years of age to work as a licensed "security alarm operator." It appears contradictory to allow third-party vendors with young employees to work on site and inside FFL premises when they are not allowed to be customers of handguns or semi-automatic rifles. If one is consistent with federal law, the idea is not to employ or give intimate access to a gun store to one who is not otherwise eligible to be a customer.

249. A third collision occurs, also referencing the Defendants' own laws, in reference to the third-party vendor, which is that the new laws require FFL owner and employee mandatory training, but does not require the same for a licensed security company working for an FFL in New York. NY Gen Bus §875-e. These two statutory provisions cannot be reconciled.

250. In terms of expense for the security system, the new law would likely require a set-up and equipment charge of several hundred dollars, as well as a monthly monitoring charge. It would likely require also a contract, typically for a business premises of at least one year.

251. *Estimated financial impact – alarm system*. Plaintiffs roughly estimate the cost to hire a third-party "security alarm operator" to install a "security alarm system," "capable of being monitored by a central station," to "standards…established by the superintendent in regulation," would cost a minimum of $1,200 - $3,500/year.

252. This "estimate" by Plaintiffs is limited.  Defendant NYS Police has not yet fulfilled its

duties and obligations under NY Gen Bus §875-b(2) to "establish standards by regulation"

to define the "security alarm system."  Until and unless that is done, Plaintiffs are unable to

obtain accurate estimates of the costs associated with this provision.  Even so, this one

provision is an estimated added $100 - $300/month.

**X.(B.)(3.)  NY Gen Bus §875-b(2) – Mandatory Video Recording Devices at Defined Premises Points with Concurrent 2-Year Video Storage.**

253. NY Gen Bus §875-b(2) at the fifth sentence, contains the mandatory video recording

devices at defined premise points with concurrent 2-year video storage.  The mandate is not

technologically feasible to implement and/or is too expensive to institute.

254. The new law reads at the fifth sentence:

> "The dealer location shall additionally be equipped with a video
> recording device at each point of sale and each entrance and exit to
> the premises, which shall be recorded from both the indoor and
> outdoor vantage point and shall maintain such recordings for a
> period of not less than two years."

255. It is technologically unfeasible to require Plaintiffs to store video for two years.  It would

require multiple terabytes of storage space, unless the video quality was lowered to a level

that a person's face couldn't be distinguished.

256. Plaintiff FFLs are already under federal requirements to report the loss or theft of a firearm

within 48-hours and to complete ATF Form 3310.11, "Federal Firearms Licensee

Theft/Loss Report." 18 U.S.C. §923(g)(6) and 27 CFR §478.39a.

257. Plaintiff FFLs use high quality settings to make the video feeds useable for facial recognition for law enforcement purposes, and they store video from fifteen to sixty days.

258. As for the Plaintiff gun show, it should be noted that none of the new laws differentiate the FFL-01 retailer from the gun show.  Gold standard across the shows in Rochester, Buffalo, Syracuse, Hamburg, and more is for the gun show to provide licensed security guards at all points of entry and exit, for the gun show to work with the host location, such as the New York State Fairgrounds to provide the video security, for each FFL to be pre-approved, including furnishing the gun show with a copy of a valid FFL and NYS license, for each firearm entering the facility to receive a tag from the gun show, and for each FFL to conduct the federal NICS check at their table under their license for the individual firearm being purchased.  The gun show, itself, does not perform the background checks; it oversees that dealers do perform such checks.  FFLs participating in a gun show would not be able to each place a camera at all defined points, nor would the gun show be able to do so.  The facilities of gun shows are municipally-owned or private party owned.  There is already a detailed security plan in place, including coordination with local law enforcement.

259. *Estimated financial impact – video recording and storage.*  A standard Dell one (1) terabyte external hard drive back-up unit costs approximately $1,350 plus $475 per removable hard disk cartridge.  A one terabyte drive holds approximately 500 hours of HD video.  One year is 8,760 hours.  Two years is 17,520 hours, or, at least 35 terabytes of storage, or, $16,644 plus the unit, equals $17,994.  This figure is per camera.  Using a standard retail space with one front and one rear entrance, requiring outside and inside cameras (4 cameras) plus one cash register, for a total of 5 cameras, that's $89,970/2-years.  In a medium-size retail space

with three entry-exit points and two cash registers, it's a total of eight cameras, or, $143,952/2-years.

260. Additional expenses associated with this mandate, but not factored into the cost estimate include space requirements for operating such a system, networking all cameras through a central server, firewalls and other systems security to protect the integrity of the data and the privacy of customers recorded on camera, and system and data maintenance.

261. Plaintiffs are unable to financially achieve this mandate. Even one camera with two years of video storage at over $17,500/2-years is more than $500/month.

### X.(B.)(4.)  NY Gen Bus §875-e – Mandatory Employee and Owner Training Through a Non-Existent NYS Police Curriculum.

262. The new laws at NY Gen Bus §875-e, "Employee training" require employee training. For existing employees as of December 5, 2022, the training must be completed within 90-days. For any new hires after December 5, 2022, the training must be completed within 30-days. Failure to train means an employee may no longer work at the shop. Records of training must be maintained by the dealer.

263. The new law also mandates that the training is to be provided "annually." NY Gen Bus §875-e.

264. The Defendant NYS Police has not fulfilled its responsibilities under the law to publish the "training course." The new law sets out basic topics (a) through (e) and includes "(f) Such other topics the superintendent deems necessary and appropriate."

265. The Defendant NYS Police has not fulfilled its responsibilities to publish "regulations setting forth minimum requirements for the maintenance of records of such training."

266. The new law does not state who is to perform the training.

267. The new law does not specify the duration of the training.

268. Plaintiffs reasonably fear that Defendant NYS Police will release no more details on employee training than it did through its memo of August 27, 2022 on firearms training.

269. In the meantime, if no such or inadequate materials are released by the Defendant NYS Police, Plaintiffs will be unable to hire new employees, effective December 5, 2022. The training requirement is to train all "new employees within thirty days of employment."

270. Equally, Plaintiffs will be unable to allow existing employees – no matter how experienced – to "participate in the sale or disposition of firearms" as of March 5, 2023. By operation of law, only the owner of an FFL would be allowed to be "untrained" and waiting on customers or handling firearms inventory. NY Gen Bus §§875-e(1), (3).

271. *Estimated financial impact – employee training.*  If the concealed carry permit course is any indication, Plaintiffs used a 16-hour course, a $30/hour wage plus employer taxes and insurances rate, a $1,000/day course trainer cost,[98] plus $150 per employee for owner oversight and records retention. This equates to a cost of $2,630 per employee, per year.

---

[98] The day rate range of $999 for a new FFL training course by the National Shooting Sports Foundation ("NSSF"), includes also the note that compliance industry experts may charge $200/hour. See, NSSF website, at https://www.nssf.org/retailers/starting-point-compliance-for-startups/.

**X.(B.)(5.)  NY Gen Bus §875-c – The Exclusion of Anyone Under 18-Years of Age from FFL Retail Shops Unless Accompanied by a Parent or Guardian.**

272.  The new law at NY Gen Bus §875-c would exclude anyone under 18-years of age from entering an FFL retail store or section of a store that displays firearms and ammunition. The Defendants' new law would exclude more than Twenty Percent (20%)[99] of New Yorkers from entering a gun store.

273.  The new law requires the FFL retail shop to prohibit anyone from walking through the door, unless that individual can prove he or she is over 18-years of age, or, is accompanied by a parent or legal guardian. NY Gen Bus §875-c.

274.  To be implemented, this law requires FFLs to literally ask for government photograph identification, certified copies of birth certificates, and/or court orders for a minor to be permitted to enter, and then the parent or guardian must accompany the minor.

275.  The provision does not define what identification documents a person must show to gain entry.  This provision is far more cumbersome than carding a person for age 21-years or older using a driver's license birthday.  This provision demands proof of legal relationship, either by birth or by court order.  And that's the adult half of the proof requirement.  What identification will the minor have to demonstrate that he or she is that actual child?  Further, how are the Plaintiffs to know if the court order of guardianship remains in effect?

276.  The provision requires an owner or employee to stand guard at the door, and to keep out any minors from the entire store, if it contains a firearm.  In the case of the larger, retail

---

[99] Age information taken from the 2020 Census at https://www.census.gov/quickfacts/NY.

FFLs such as Dick's Sporting Goods, it would require employees to rope off or erect walls around the "Sporting and Hunting Goods" section, to create a single point of entry.

277. Whether small or large, the new law creates a situation where the FFL-01 can no longer give entry to grandparents bringing in grandchildren to buy fishing rods and bait to use after Sunday dinner. It no longer allows boys and girls coming in with their first earnings from fast food, looking to buy bows and arrows. It disallows a woman stopping by after work and having picked up the kiddos from daycare from grabbing a pink camo hat for a stocking stuffer unless she happens to be carrying Birth Certificates in her purse. No more an employee keeping an eye on a shop kid if the owner (parents) steps out to go to the post office and bank.

278. In essence, the new law turns the Plaintiffs' shops into space more restricted than a gas station selling cigarettes, a grocery store selling alcohol, or a truck stop with slot machines. It turns the family-owned and Veteran-run gun shop into a "XXX" lounge to be gawked at on a drive-by with less rights than Larry Flynt.

279. There is no historical antecedent for government restriction against a minor entering a store where firearms or ammunition "are stocked or sold, unless such person is accompanied by a parent or guardian."

280. If the Plaintiffs are compelled to make an estimate for implementation of this provision:

a. For the sole owner/operator, signs will have to be posted at the outside of the door and then any transaction in progress will have to be halted if anyone who appears to be a minor enters the store in order for the business owner to expel the minor. This

will result in a loss of business, including, potentially, the customer(s) upon whom the owner was waiting when the potential minor entered the premises.  The owner-operated FFLs estimate that minors enter their retail premises weekly.  This will also diminish security, as the owner/employee will first have to recase or rerack a handgun or long gun, if displaying one to a customer, to step away and to go over to the door area to check identification documents.

b. For the owner with employees, likewise signs are advisable, but an employee will have to be assigned to eyes-on-the-door at all times, including the scrutiny of documents, if any are available.  Mid-sized Plaintiffs estimate minors enter their premises multiple times per week, which includes even the owner's children and employee's children.  This is estimated to take at least one employee several hours per week to monitor and enforce.  This will result in a permanent loss of business for these dealers, potentially exceeding the customers at issue with minors but, also, any and all other customers exposed to this distraction of focus.

281. The Plaintiffs estimate this provision of having to be a bouncer at the door of their premises could cost anywhere between five (5) and fifteen (15) or more hours per week.  Using the same $30/hour, this is an added cost of $150/week - $450/week, or, $7,800/year - $23,400/year.

**X.(B.)(6.)  NY Gen Bus §875-f, including subdivisions (1) and (2); also, §875-g(b)(1) – Federal Firearms Compliance Records and Annual Compliance Certification**

282. Above, federal pre-emption arguments were plead against NY Gen Bus §875-f, f(1), and f(2), as well as §875-g(b)(1).  Additionally, these new laws mandate new records be created

and maintained, which will require the time and expertise of the Plaintiffs and their employees to perform.

283. NY Gen Bus §875-f, requires Plaintiffs "establish and maintain" an acquisitions and dispositions inventory book in a "form and for such period as the superintendent shall require." Above, void-for-vagueness arguments were plead that Defendant Nigrelli has failed to promulgate such a "form" with compliance guidance. Plaintiffs do not know if such records will be the same as or deviate from federal firearms compliance records known as the A&D Book. Any deviation will require additional time by Plaintiffs and employees to comply.

284. What details are listed in paragraph 1, sentence 1 of §875-f of the new laws deviate from federal firearms compliance. FFLs follow a system of entries into the A&D Book, which deadline for entry can vary dependent upon the type of transaction. The Defendants' new laws require entry "not later than one business day after their acquisition or disposition." This is impractical and is either a conflict with federal law requiring pre-emption of it, or, an additional burden upon Plaintiffs and employees in their record keeping duties.

285. Subdivision 2 of §875-f mandates monthly inventory reconciliation reports be created. The federal A&D Book is the inventory status. The subdivision uses the words "inventory check," which does not have an industry meaning. It also does not specify the format or whether one will be dictated by Defendants. In the absence of clarification that a free-standing report of some description is to be made, Plaintiffs do not know if it will result in additional record-keeping responsibilities. If what is meant is a monthly "inventory

reconciliation" in a report format, separate and apart from the A&D book, that would be a time-consuming process for FFLs because it requires a manual check of physical firearms by serial number in comparison to the A&D Book.

286. NY Gen Bus §875-g(1)(b) mandates an annual compliance certification in a "form" to be dictated by Defendant NYS Police, which "form" has not been released. In addition to the Fifth Amendment arguments plead above, Plaintiffs do not know how much time such "form" will take to evaluate and undertake, in addition to performing what mandates may be legal and constitutional.

### X.(B.)(7.)  NY Pen §400.02(2), 400.03(2), and 400.03(3) – requiring Plaintiffs to perform a new ammunition background check scheme.

287. Above, constitutionality arguments were plead against NY Pen §400.02(2), 400.03(2), and 400.03(3).  Additionally, these new laws mandate Plaintiffs and their employees engage in an entirely-new system of ammunition background check.  It begins with the manual collection of data for each and every sale of ammunition without minimum number of rounds or dollar amount of sale.  It then progresses (or doesn't) upon the certification by Defendant Nigrelli that the ammunition background check system is "established."

288. Plaintiffs are thus mandated to indefinitely create ammunition purchase records by their own hand, until and unless Defendant NYS Police specifies a format or otherwise converts into an electronic system.

289. Any form of ammunition background check or sales record-keeping involves Plaintiff and employee time for creation and maintenance.

**X.(C.) As a Matter of Constitutional Regulatory Overburden,
Defendants' Requirements of Unavailable Training, Testing,
and Licensing Has Severely Depressed Sales of Handguns and
Semi-Automatic Rifles.**

**X.(C.)(1.)  NY Pen §400.00(1) and §400.00(19) to be read with NY Exec §837(23)(a) and
NY Pen §265.20(3-a) – Requirement of Unavailable Classroom and Live Fire Training and
Testing Has Deeply Impacted Handgun Sales and Stalled Handguns in Inventory.**

290.  Above, constitutionality and void-for-vagueness arguments were plead against

NY Pen §400.00(1) and §400.00(19) to be read with NY Exec §837(23)(a) and

NY Pen §265.20(3-a) as pertains to mandatory handgun permit training.  Additionally,

these new laws have deeply impacted Plaintiffs sales of handguns and have stalled

handguns in inventory.

291.  Individuals are unable to obtain new concealed carry permits and thus are not becoming

first-time handgun purchasers at Plaintiffs' shops and at gun shows.

292.  Individuals with concealed carry permits are required to renew those permits and cannot do

so, also negatively impacting sales at Plaintiffs' shops and at gun shows.

293.  Plaintiffs have handguns in inventory that would normally be turning over at a regular pace,

but which are now trapped in inventory due to a lack of customers and sales.

294.  Additionally, customers who have current concealed carry permits are not coming into

Plaintiffs' shops and gun shows because the new laws are complicated, confusing,

menacing, and starting to be enforced with Defendant NYS Police fanfare.

295. It is a crime for Plaintiffs to sell handguns to any customer who does not first present a valid concealed carry permit. NY Pen §400.00(12), punishable as a class A misdemeanor under NY Pen §400.00(15).

296. Plaintiffs' overall sales are impacted as a direct result of the diminishment of sales of handguns, including, but not limited to ammunition, handgun accessories, and general self-defense, sporting, and hunting supplies.

**X.(C.)(2.)  NY Pen §§§400.00(2), 400.00(3), 400.00(6), 400.00(7), 400.00(8), 400.00(9), 400.00(10)(c), and 400.00(14) – Requiring an Unattainable Semi-Automatic Rifle License to Purchase Such a Firearm Has Deeply Impacted SAR Sales and Stalled SARs in Inventory.**

297. Above, constitutionality arguments were plead against NY Pen §§§400.00(2), 400.00(3), 400.00(6), 400.00(7), 400.00(8), 400.00(9), 400.00(10)(c), and 400.00(14) requiring a semi-automatic rifle license for the purchase of such a firearm.

298. Individuals are unable to obtain new semi-automatic rifle licenses and thus are not purchasing such firearms at Plaintiffs' shops and at gun shows.

299. Plaintiffs have semi-automatic rifles in inventory that would normally be turning over at a regular pace, but which are now trapped in inventory due to a lack of customers and sales.

300. Additionally, customers who have previously purchased semi-automatic rifles from Plaintiffs are not coming into Plaintiffs' shops and gun shows because the new laws are complicated, confusing, menacing, and starting to be enforced with Defendant NYS Police against individuals.

301. It is a crime for Plaintiffs to sell semi-automatic rifles to any customer who does not first present a valid semi-automatic license. NY Pen §400.00(12), punishable as a class A misdemeanor under NY Pen §400.00(15).

302. Plaintiffs' overall sales are impacted as a direct result of the diminishment of sales of semi-automatic rifles, including, but not limited to ammunition, rifle accessories, and general self-defense, sporting, and hunting supplies.

303. The Plaintiffs are stuck in a position of responsibility to enforce laws through the refusal of a sale without the ability to understand how or when the black letter of the law will be complied by the State of New York, specifically the Defendants DCJS and NYS Police. If the Plaintiffs' reading of the new statutes is correct, then all semi-automatic rifle sales in New York should have stopped as of September 1, 2022.

304. There is no prohibition at federal law to sell a semi-automatic rifle without a license. It is the most common firearm sold at their stores, and, upon information and belief, throughout the United States. It is lightweight. It is nimble and forgiving. It can be adapted to various strengths and sizes of persons, both male and female. It can be accommodated to persons with handicaps, even and including persons in wheelchairs and amputees. It is, for many, easier to handle than a handgun, and thus provides them with greater reassurance of defense from home invasion.

305. If the Plaintiffs are directed to stop selling semi-automatic rifles because their reading of the new laws are correct and no license has yet issued that is approved by Defendants DCJS

and NYS Police, the Plaintiffs will be out-of-business and will have lost their role in supplying customers with a basic tool of home self-defense.

## COUNT ONE:

### DEPRIVATION OF CIVIL RIGHTS
### U.S. Const., Amends. II, V, and XIV
### (42 U.S.C. §1983)

306. Plaintiffs incorporate by reference the foregoing paragraphs, as if fully set forth herein.

307. Defendants subject the Plaintiffs to conduct under color of state law, and their conduct deprived the Plaintiffs of rights, privileges, or immunities guaranteed them under the U.S. Constitution and/or federal law. Defendants' actions were intended to achieve this result.

308. The new laws complained of herein infringe Plaintiffs' fundamental federal rights as individuals and/or as business owners and/or as Federal Firearms Licensees and/or as State Licensees under the U.S. Const., Amends. II and XIV "to keep and bear arms" and under the U.S. Const., Amend. V against self-incrimination.

309. The Civil Rights of the Plaintiffs exist under the U.S. Const., Amends. II, V, and XIV, as well as through the cases of the U.S. Supreme Court under those provisions, including, but not limited to *Heller, McDonald,* and *NYSRPA v. Bruen, supra.*

310. The Defendants, acting under color of state law, through their statements, actions, and directions intended to and continue to intend to deprive the Plaintiffs of their Civil Rights.

311. As a direct result of the actions of the Defendants complained of herein, the Plaintiffs suffer an on-going deprivation of their Civil Rights in the form of a diminishment or loss of the exercise of their individual rights and of their rights to serve as lawful businessmen and women engaged in commerce involving firearms, through which law-abiding role they are a conduit for others seeking to exercise those same rights under the U.S. Const., Amends. II and XIV "to keep and bear arms."

312. The losses suffered by Plaintiffs as a direct result of the Defendants' actions complained of herein and requested to be awarded by the Court includes, but is not limited to, lost wages or income, lost future earnings, loss of the value of their businesses in whole or in part, loss of property value in whole or in part, and emotional pain and suffering.

313. The Plaintiffs further request the Court award punitive damages against the Defendants for the egregious nature of their reprehensible conduct, committed with intention or reckless or callous disregard for the Plaintiffs' rights.

## COUNT TWO:

### DEPRIVATION OF CIVIL RIGHTS
### U.S. Const., Amends. II, V, and XIV
### (42 U.S.C. §1985(2))

314. Plaintiffs incorporate by reference the foregoing paragraphs, as if fully set forth herein.

315. The statutes, rules, and regulations complained of herein infringe Plaintiffs' fundamental rights as individuals and/or as business owners and/or as Federal Firearms Licensees and/or

as State Licensees under the U.S. Const., Amends. II and XIV "to keep and bear arms" and under the U.S. Const., Amend. V against self-incrimination.

316. The civil rights of the Plaintiffs exist under the U.S. Const., Amends. II and XIV, as well as through the cases of the U.S. Supreme Court under those provisions, including, but not limited to *Heller, McDonald,* and *NYSRPA v. Bruen.*

317. Defendants, as complained of herein, engaged in conduct with each other and/or with one or more other persons, acting together, in a conspiracy, with an animus against those seeking to exercise their fundamental civil rights as guaranteed under the U.S. Const., Amend. II and XIV, as a class of persons and/or businesses.

318. Defendant Gov. Hochul, as complained of herein, did act in concert with one or more persons to draft legislation, to bring forward pending legislation, and to otherwise cause through various tactics such as public speeches, granting of moneys, personal communication, and Executive Orders and Proclamations resulting in so-called "emergency sessions" of the Legislature, to achieve her express goal of putting herself in a position to sign "legislation" designed by her or on her behalf to deprive the Plaintiffs of their fundamental Civil Rights, as complained of herein.

319. That in carrying out her plans, Defendant Gov. Hochul, as complained of herein, did act in concert with one or more persons, including, but not limited to, persons affiliated with the non-governmental organization publicly identified by her, such as "Everytown," "Gifford Law Center," "experts," "legal experts," "true leaders," and "think tanks." Further, in

carrying out her plans, Defendant Gov. Hochul, as complained of herein, did act in concert with one or more of the defendants.

320. That in carrying out her plans, Defendant Gov. Hochul, as complained of herein, did act in concert with one or more persons in positions of law enforcement authority to advance position(s) contrary to and in excess even of the laws complained of herein.

321. That the Defendants, particularly Defendant Gov. Hochul and Defendant NYS Police Acting Superintendent Nigrelli, through their widespread actions and statements, media events, and publications seek to intimidate Plaintiffs with threats of criminal prosecution for even the slightest failure to comply with the new laws, using phrases like "zero tolerance" and "there's no gun shops here."

322. That the intentional actions of the Defendants, particularly Defendant Gov. Hochul and Defendant NYS Police Acting Superintendent Nigrelli, catch the Plaintiffs in between having to violate federal law or having to violate state law to conduct routine business operations as of December 5, 2022, in blatant disregard for the Plaintiff's Fifth Amendment and other Civil Rights.

323. The actions of Defendant Gov. Hochul and her co-conspirators resulted in injuries to the Plaintiffs.

324. The losses suffered by Plaintiffs as a direct result of the Defendants' actions complained of herein and requested to be awarded by the Court includes, but is not limited to, lost wages or income, lost future earnings, loss of the value of their business in whole or in part, loss of property value in whole or in part, and emotional pain and suffering.

325. The Plaintiffs further request the Court award punitive damages against the Defendants for the egregious nature of their reprehensible conduct, committed with intention or reckless or callous disregard for the Plaintiffs' rights and to stop them from repeating this behavior.

## COUNT THREE:

### PRE-EMPTION BY FEDERAL LAW
### U.S. Const. Art. VI, Para. 2
### 18 U.S.C. §926 and 28 CFR §25.11(b)

326. Plaintiffs incorporate by reference the foregoing paragraphs, as if fully set forth herein.

327. Federal law is "the supreme Law of the Land," which includes over-ruling any contrary state law. U.S. Const. Art. VI., Para. 2. Federal law trumps conflicting state laws. Indeed, preemptive federal statutes routinely shape the regulatory environment for major American industries, including, but not limited to, pharmaceuticals and medical devices, banking, aviation, securities, automobiles, and tobacco. Congressional Research Service, "Federal Preemption: A Legal Primer" (July 23, 2019, R45825), p. 1.

328. While Defendants spout to the public that they are filling "gaps in the laws" as relates to firearms, they are not. In fact, Defendants, particularly Defendants Gov. Hochul and A.G. James demonstrate a lack of acumen of federal firearms law.

329. Federal firearms law expressly preempts state law, as complained of herein. 18 U.S.C. §926 and 28 CFR §25.11(b).

330. Federal firearms law, as set forth herein, and otherwise *en toto,* impliedly preempts the state laws complained of herein because its structure and purpose reflect Congressional intent to preserve and protect the fundamental civil rights guaranteed to American citizens "to keep and bear arms" under U.S. Const. Amends. II and XIV; "Firearm Owners Protection Act," Sec. 101.

331. The state laws complained of herein interfere with express and/or central provisions and principles of federal firearms compliance law.

332. The state laws complained of herein misrepresent and/or actively interfere with express limitations on federal gun law, including, but not limited to, the language of new state laws seeking to use the NICS background check system for purposes expressly prohibited at federal law, failure to house data, failure to secure data, failure to silo data, failure to maintain the privacy of data, failure to provide data retention and destruction; mandatory transfer of federal firearms compliance records, including, but not limited to the A&D Book; mandating forced entry onto Plaintiffs' business premises for "law enforcement agencies" and third-parties; mandating use of third-party vendors which are permitted to hire employees with criminal records and who would be disqualified from firearms ownership, use, and possession; and mandating Plaintiffs to sign an annual compliance certification for the NYS Police which would compel Plaintiffs to waive their Fifth Amendment rights against self-incrimination.

333. As complained of herein, Plaintiffs cannot reconcile the new laws, after they have already properly applied of federal firearms compliance laws to their business operations.

334. The laws, as complained of herein, create a tension between federal law and the new state laws that cannot be resolved on Plaintiffs' individual business operations level.

335. The new laws must be struck down in order to preserve and demonstrate the superiority of federal firearms compliance law, specifically so that, *inter alia,* the federal law, the BATFE, and the Plaintiffs can operate to protect and preserve fundamental federal civil rights under U.S. Const. Amends. II and XIV, including the lawful stream of commerce in firearms.

## COUNT FOUR:

### VOID FOR VAGUENESS DOCTRINE
### U.S. Const., Amend. V and XIV

336. Plaintiffs incorporate by reference the foregoing paragraphs, as if fully set forth herein.

337. The new laws complained of herein are void for vagueness and are unable to be understood by ordinary persons, such as the Plaintiffs, rendering them at fear of being prosecuted for unintentional actions, errors, or omissions as individuals, business owners and employees, and federal and state licensees.

338. The new laws complained of herein carry criminal penalties, including misdemeanor and felony charges, prosecution, and incarceration, along with monetary fines.  Plaintiffs may also be subject to a loss of federal and state licenses required to continue participation in the lawful commerce in firearms.  The new laws expose Plaintiffs to potential repercussions at the federal, state, and county levels.

339. The new laws complained of herein have Plaintiffs, as individuals, as business owners and employees, as Federal Firearms Licensees, and NY Licensees, caught between best efforts at compliance and their inabilities to reconcile federal law with the new state laws, interpret provisions that are unintelligible, and awaiting supposedly forthcoming rules, regulations, memoranda, curriculum, testing, certificates, and other written products from Defendants with no directions on when or how such materials will be available or put to the Plaintiffs' attention.

340. The new laws also must be struck because the Defendants are incapable of fulfilling their own responsibilities, considering the Defendants failures since May 23, 2022, to fulfill nearly one hundred percent of their responsibilities under the new laws, publishing just two "memos" that add little to nothing to the subject.

341. The words and phrases of the new laws complained of herein are so vague and impossible to implement that complaints are resounding also from the NYS Sheriffs Association, the NY Association of County Clerks, numerous County legislatures, and other individuals and businesses.

342. The new laws are so vague as to be incapable of execution from individuals to government to law enforcement, resulting in a lapse in fundamental Second and Fourteenth Amendment rights throughout the State. This lapse also directly impacts Plaintiffs' financial ability to continue to participate in the lawful stream of commerce in firearms due to the fall-off in sales, not only of firearms and ammunition, but all other inventory.

343. The new laws must be struck down and the pre-May 23, 2022 status restored in order to protect Plaintiffs' Civil Rights and business operations, as well as the orderly and stable functioning of Civil Rights under the Second and Fourteenth Amendments.

## COUNT FIVE:

### CONSTITUTIONAL-REGULATORY OVERBURDEN

344. Plaintiffs incorporate by reference the foregoing paragraphs, as if fully set forth herein.

345. The new laws thrust an impossible level of financial burdens upon the Plaintiffs through mandates with more anticipated as of December 5, 2022 and more becoming effective after that. Plaintiffs are unable to fulfill the Defendants regulatory mandates, whether codified in the new laws, given as authority to offices and agencies, whether or not Defendants have failed to meet their responsibilities. Plaintiffs face impending deadlines, even if the Defendants do not.

346. The Plaintiffs are unable to financially comply with the new mandates, which are not only too vague to understand, but not tailored to solo, small, or medium businesses like the Plaintiffs.

347. The Defendants threaten criminal charges for violations of the new laws, focused on prosecution, in an attack that is the antithesis of developing, supporting, and encouraging lawful commerce in firearms and the dealers, pawnbrokers, gunsmiths, and manufacturers who are part of the only industry to support a product guaranteed and protected by the Bill of Rights.

348. The Defendants offer no regulatory support, unlike BATFE, leaving Plaintiffs to struggle with cost estimates that are time-consuming and may prove fatally inaccurate, if and when the Defendants fulfill their regulatory responsibilities under the new laws.

349. The new laws, the Defendant Hochul's animus, Defendants public pronouncements that differ from the laws, and the ticking of the clock towards the regulatory deadline of December 5, 2022 when the primary wave of business regulations becomes effective – all of which may result in closing their businesses and surrendering their commercial licenses, if there is no relief from the Court in the form of injunctive and declaratory relief. Such closure(s) would result in the loss of their livelihoods, wages or income, business value, property value, and satisfaction and pride that comes from participation in the lawful stream of commerce in firearms. Even with that relief, Plaintiffs have already suffered financial and other losses.

350. The Defendants demonstrate no minimum competency in federal firearms compliance law, but have taken advantage of their governmental authority to overly burden this constitutionally-protected activity to the intended outcome of forcing businesses to close in order to diminish the ability of law-abiding gun owners from accessing firearms and ammunition in the normal stream of commerce.

351. The new laws must be struck down as overburden of a constitutionally-protected industry. Alternatively, or in addition, the Court must appoint a special referee or magistrate to monitor any actions by the Defendants and other associated offices and agencies as of the date of commencement of this case to monitor claims of future Defendant compliance with

their responsibilities under the new laws, to create a distribution channel of any such materials both publicly and directly from Defendants to NY-licensed FFLs, and to review any enforcement actions taken on an expedited basis.

## COUNT SIX:

### DEPRIVATION OF CIVIL RIGHTS
### U.S. Const., Amends. II, V, and XIV
### (42 U.S.C. §1988)

352. Plaintiffs incorporate by reference the foregoing paragraphs, as if fully set forth herein.

353. Because of the actions of the Defendants, the Plaintiffs have been compelled to hire an attorney to advise and represent them in this case.  The case involves claims under 42 U.S.C. §§1983 and 1985, U.S. Constitutional Amendments II, V, and XIV, and other, enumerated provisions of federal law.

354. Because of the actions of the Defendants, the Plaintiffs have been compelled to hire one or more expert witnesses to perform professional services for them in this case.

355. An award of attorney's fees and costs, plus expert fees and costs, would not be unjust in this case.

## PRAYER FOR RELIEF

The Plaintiffs pray for the following relief:

356. A declaratory judgment that all thirty-one (31) the new laws, rules, and regulations complained of herein shall be struck down and denied of having any legal force or effect;

357. An injunctive relief order restraining Defendants and their officers, agents, servants, employees, and all others from enforcing the laws, rules, and regulations complained of herein;

358. Alternatively, or in addition, on a temporary and/or as part of final relief, the appointment of a special referee or magistrate to monitor any actions by the Defendants and other associated offices and agencies as of the date of commencement of this case to monitor any claims of future Defendant compliance with their responsibilities under any and all new laws allowed to stand temporarily or by final order after all appeals have been exhausted, to create a distribution channel of any such materials both publicly and directly from Defendants to NY-licensed FFLs, and to review any enforcement actions taken on an expedited basis;

359. An award of Plaintiffs' attorney's fees and costs;

360. An award of Plaintiffs' monetary, punitive, and other damages; and,

361. All other, further, and different legal and equitable relief against the Defendants as necessary and appropriate to effectuate the Court's rulings and judgment, and/or as the Court otherwise deems just and equitable.

*Respectfully submitted this 1ᵗ day of November 2022.*

Attorney for the Plaintiffs

*Paloma A. Capanna*

Paloma A. Capanna, Attorney

Bar Roll No.:  2483469

106-B Professional Park Drive

Beaufort, North Carolina 28516

(315) 584-2929 mobile

(585) 377-7260

pcapanna@yahoo.com