IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**Nadine Gazzola**, individually, and as co-owner, President, and as BATFE Federal Firearms Licensee Responsible Person for **Zero Tolerance Manufacturing, Inc.**; *et al.*

   *Plaintiffs*

  *v.*

**KATHLEEN HOCHUL**, in her Official Capacity as Governor of the State of New York; *et al.*

   *Defendants*

<u>Civ. No.: 1:22-cv-1134 (BKS/DJS)</u>

# DECLARATION OF PLAINTIFF
# NICHOLAS AFFRONTI – EAST SIDE TRADERS LLC

1. I am Nicholas Affronti and I make this Declaration under penalties of perjury. These statements are true to the best of my knowledge, and are based upon my personal knowledge and experience unless otherwise specified.

2. I oppose all laws complained of in this case. I submit this "Declaration" to highlight certain of my background, credentials, employment, licenses, and relevant experience. I reserve the right to submit such further declarations, testimony, and exhibits as may be necessary to support our claims.

3. Footnotes within this document that provide citation of law are inserted by Counsel. I attest that I am generally, as a layman, familiar with the laws stated, discussed, and argued herein. Legal citations in footnotes are provided by Counsel to the Plaintiffs as a courtesy to the Court due to the complexity of this case.

4. I am not a "disqualified person," as this term is defined under 18 U.S.C. §922(g).

5. I work for "East Side Traders," a New York business founded in 2015. The business premises is located in the town of Ontario, Wayne County, New York.

6. I am the Responsible Person for a Federal Firearms License, Type-02, "Pawnbroker." This federal license was first issued in 2015, has since been renewed, and is current.

7. I have a comparable license from New York State, issued through Wayne County, as "Dealer in Firearms/Gunsmith."

8. East Side Traders also has a NYS Sales Tax number for the collection and reporting of sales tax.

9. I own several firearms, including pistols and semi-automatic rifles.[1]

10. And, I have, since 2017, had an unrestricted concealed carry permit issued by Wayne County. It is a correct and current inventory of my handguns.

11. I have used firearms since I was 8-10 years old and I started skeet shooting, although I didn't buy my first firearm until I was around age 30.

12. **East Side Traders.** The FFL-02 pawnshop is a rarity in New York. There are only about ten of us left, as per the statewide listings in the most recent ATF license database.[2]

---

[1] Attorney of Record note: I am not providing the detail level in these public documents as is available from the Co-Plaintiffs in the interest of their personal safety.

[2] BATFE, "Report of Active Firearms Licenses – License Type by State Statistics," downloadable for rough 2021, as well as for partial year 2022 at https://www.atf.gov/firearms/listing-federal-firearms-licensees.

13. Our business is in unassuming building in a small town in a rural county that borders Lake Ontario. People in the community were expressing a need for a pawnbroker, a gun shop, and an indoor range, and we decided to build exactly that business.

14. The firearms and ammunition retail space involves locked displays of items available for purchase. The shop is also occasioned by ATVs, snowblowers, power tools, a diamond necklace, coins, or silver bars and whatever seems interesting to us.

15. The indoor range is an eight-lane, 25-yard set-up, designed to take impact as strong as .308 caliber. It has electronic targets to facilitate for handgun practice. I am proud to have designed and created it.

16. We carry an inventory that is largely dependent upon a person walking through the door with a firearm they are either selling outright, or, are using as collateral for a loan they sign a loan agreement evidencing their intention to repay. That's the "acquisitions" side of the A&D Book.

17. We hold firearms for a period of up to approximately two weeks, waiting for any notification of the gun being a "trace" firearm, meaning, it is reported to the ATF as lost or stolen. After that period, the firearm is offered for sale to our customers.

18. I would say the average loan is only about $100 to $200. Approximately 50% of people do reclaim their property by paying off the loan, plus interest. About 50% do not.

19. The dispositions side of our "A&D Book" as a Type-02 pawnbroker is also somewhat different from the Type-01 FFL retailer in that a person can retrieve their firearms or other property from us if they meet the loan terms in a timely manner. However, a completely

different individual may walk in and decide to purchase the firearm and satisfy the contract owed against it.

20. The disposition back to owner must follow the same protocol as if the owner was a stranger. A NICS background check must be conducted. The disposition record must be entered. It is not simply a matter of the person coming back in, paying off the loan, and leaving with the firearm.[3]

21. In an average year, the firearms inventory at East Side Traders might be approximately 40% AR/AK/"tactical" firearms; 40% traditional long guns; and, 20% handguns.

22. Approximately 70% of the annual gross revenue of the business is from firearms sales. Another 20% of revenue is ammunition sales. The final 10% is a mix.

23. We do offer complimentary products which are purchased by us to offer new to customers, including holsters, cases, bows, and trigger locks., locking long gun hard-side cases, and TSA-compliant long gun hard-side lockable cases.

24. Prior to September 1, 2022, we dealt only rarely with body armor. We are no longer doing so because the new laws are too vague to interpret and because the Defendants have failed to fulfill their responsibilities under the laws on point.

25. **Working Relationship with the ATF**. The ATF Field Agents make clear that our job is the first line of security against illegal firearms purchases, such as straw purchases, and against burglary, larceny, or theft of firearms.

---

[3] ATF Rul. 76-15, "Certain reporting and recordkeeping requirements of pawnbrokers are explained" at https://www.atf.gov/firearms/docs/ruling/1976-15-acquisition-and-disposition-pawned-firearms/download.

26. One tool I am aware the ATF uses to help FFLs is "FFL Alert." During an "FFL Alert" the ATF notifies FFLs via telephone and email if a licensee in a defined geographic area has experienced a robbery or burglary.

27. One responsibility we and all FFLs have is report theft or loss of a firearm within 48-hours. It is a punishable offense to fail to do so.[4] The steps are contact local law enforcement. Contact the local ATF office. Contact the ATF's Stolen Firearms Program. Complete and submit ATF Form 3310.11, the "Federal Firearms Licensee Firearms Inventory Theft/Loss Report."

28. There is a difference – in industry speak – between a "stolen firearm" and a "lost firearm." The "stolen firearm" is one taken from the lawful owner, for example, during a robbery.[5] A "lost firearm" refers to a firearm "whose disposition in unknown, but for which there is no evidence of theft."[6]

29. Of course, it is illegal to steal a firearm from an FFL.[7]

## Business Impact as of September 1, 2022:
## (1.) Non-Existent Semi-Automatic Rifle License

30. I don't want to sound critical of the Wayne County Clerk's Office or the Sheriff's Department. I communicate with them. We have regular interaction with each other, especially for customers purchasing or selling handguns. They're hard-working. Deputies

---

[4] See 18 U.S.C. §923(g)(6) and 27 CFR §478.39(a). The first step is ATF notification and the completion of the mandatory form. The ATF can then begin working with local law enforcement.

[5] See 27 CFR §478.11.

[6] *Id.*

[7] See 18 U.S.C. §922(u).

come in to talk about what I'm learning about laws and share what they're thinking. They use the range.

31. This is just an overwhelming circumstance.

32. We all knew that September 1 was going to spell disaster. The new laws were shoved through in Albany by the Defendants. We tried to grab them as fast as they were coming off the printing press, but everything was so scrambled across so many Bills and Proclamations and seemingly endless TV appearances that it was difficult even to define what we were looking at. Most people reached for the "CCIA." We dealers started getting the drift that there was something going on affecting us. And as we counted down the days to September 1, the Defendants failed to issue guidances, offer any training, or publish any of the materials required of them under the laws. Two "memos" showed up on the Internet and an FAQ.[8] But that was about it.

33. As of September 1, 2022, everything fell on the Counties to protect our Second Amendment rights – which, may I add, was only weeks prior, on June 23, said by the United States Supreme Court to be assured.

34. It took Wayne and Monroe Counties nearly two months to even decide what position to take, and I don't see how it squares to the law. I have no customers (zero) coming in with a stand-alone SAR license to purchase a semi-automatic rifle. I have rifles in inventory that I'm unsure whether to release if the owner returns to pay off the loan, even if the firearm was in inventory prior to September 1 (so clearly purchased by the owner before that date).

---

[8] Attached as Exhibits to this Motion.

35. I don't know if an amendment of a semi-automatic rifle to a concealed carry permit qualifies or not. Whether a County-level employee or law enforcement officer is indicating "green light," I have first to follow federal law, then state, in terms of the hierarchy. If federal is silent and County violates State, but I follow County, I'm assuming I lose my State license.

36. Equally concerning is that I, myself, am not able to purchase semi-automatic rifles. I do have a concealed carry permit, but I do not think that amending this permit is what the new laws require. For one, the renewal cycles are different. I can't risk my business licenses or face criminal arrest and prosecution. I have not purchased any SARs for personal use since September 1.

37. In the meanwhile, of trying to pursue this lawsuit, our sales are crashing for handguns and for semi-automatic rifles. Ancillary sales, like ammunition, are falling right alongside it. We need a TRO so that we can see thing case through.

**Business Impact as of September 1, 2022:**
**(2.) Chaos Over Concealed Carry Training**

38. It's a very similar situation with the new training mandates. I, too, will have to renew my permit and that will require the "certificate" that I've completed a proper course. I read it as a "curriculum" provided by the Defendant NYS Police and DCJS to achieve a statewide, uniform standard. The Defendants failed to turn in their homework, so-to-speak, which has resulted in no classes, which means no new concealed carry or renewed concealed carry permits.

39. Prior to the new laws, Wayne County accepted the 4-hour NRA safety training course, which I've taken. It's adequate to get a person started.

40. There's no clear objective discernable from the statute. The topics are diverse. It would take a faculty to teach. I don't see how a single instructor will have the knowledge to do so, even if there is a standard curriculum. People generally teach firearms safety courses because they're passionate about firearms, are experts in handling them, might have military or law enforcement background or be retired from, and have a love of introducing new people to the shooting sports and self-defense.

41. Taking just one subject, I don't see how the Defendants have demonstrated any core competency in federal firearms compliance law to be in a position to write a curriculum for that module, but I guess we'll see – if they ever fulfill their obligations under their own obligations.

42. I would like to see any law where the Defendants haven't fulfilled their obligations be struck down. It's impossible to comply with a ghost.

## Impending December 5, 2022 Impact:
## Federal Pre-Emption and Fifth Amendment Necessitated TRO

43. The ATF doesn't have it. Congress didn't let the ATF have it. And Congress said no state or subdivision locality could have it either. And yet, five of the new laws by the Defendants mandate a taking of it.

44. I'm talking federal firearms compliance records that are maintained *only* by the Federal Firearms Licensee as mandated by the Brady Act of 1993. The NICS background check records like the ATF Form 4473. I'm talking the "Book of Acquisitions & Dispositions"

(the "A&D Book"). I'm talking about the Defendants want to build through the new laws in terms of an illegal registry of every firearms owner in New York, at the same time as taking over the NICS background check system and compiling those records, too.

45. If you take the time to read what the Defendants are presenting as a superior approach to background checks is really the Defendants creating a system through which they can control the purchase of every firearm, as well, taking up to thirty days (30-days) to decide their response to a firearms background check inquiry to a dealer.

46. This was all clearly spelled out and prohibited by Congress and President Reagan through the "Firearm Owners Protection Act," as follows:

> "No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the <u>United States</u> or any <u>State</u> or any political subdivision thereof, **nor that any system of registration of <u>firearms, firearms owner, or firearms transactions or dispositions</u> be established**."
> (emphasis added)

47. Defendant NYS Police want gun shop owners to send them copies of the A&D Book every six months, including the make, model, serial number, caliber and who sold or collateralized the firearm and who bought or collected back the firearm.[9] Firearm databases are illegal under federal law.[10]

48. The new laws mandate FFL gun dealers in New York commit federal crimes with their firearms compliance records and then pay for the Defendants to build their Frankenstein

---

[9] NY Gen Bus §875-f.
[10] 18 U.S.C. §926 and 28 CFR §25.6(a); penalties 28 CFR §25.11(b).

"Point of Contact" system. The statutory language is clear: "databases."[11] Plural and vague. No limits on what is swept up into it. No siloing of data used by it. No limits on the purposes it is to be used for going forward. No even any security protocols, as there are in the Brady Act,[12] to state where the data will be housed and what technology will be used to protect it. Just an unfettered data grab of an individual's most personal information, from Social Security Number to eye color to firearms serial number.[13]

49. And the kicker is two-fold. First, Defendant Hochul makes a big public deal about keeping New York crime data from the FBI. Second, Defendant Hochul's refusal to share New York crime data with the FBI/ATF for the federal NICS background check system means that it's not available to them or any other state when a background check is run at an FFL anywhere in the U.S., including in New York.

50. The singular flaw in the Brady Bill, if the aim was to create a truly lasting national background check system, was the option offered the states whether or not to contribute their state criminal data to the system. I'm not willing to waive my Fifth Amendment rights.

51. The Brady Act NICS system build was 1993 (passage) to 1998 (system going live). To put it in context, those were the days of large-scale data systems outside the U.S. military.

52. Fast forward to at least the past fifteen years and there's just no excuse for New York to be refusing to submit state crime data to the feds. NICS is a well-oiled machine that is offered free to the public and FFLs to use as a crime prevention tool.

---

[11] NY Exec §228.
[12] Title 28 CFR.
[13] Reference here is to the ATF Form 4473, which is an Exhibit to this Motion.

53. It's a very bad combination: the Defendants' new laws violate federal law; the Defendants want me to certify I'm in compliance with the new Defendant mandates, which would admit to either a federal or state crime; and, the Defendants want me to pay for their take-over of the otherwise free NICS background check system.

54. It's so important that the Court grant a TRO and go ahead and strike down these state provisions.

### Constitutional-Regulatory Overburden as of December 5, 2022: (1.) The "Safety Plan" Mandates Cannot Be Carried Out

55. **Opposition to New Laws Safe Storage Requirements**. Our building is our "safe." It is a steel building with steel doors. It has blast proof windows. It has a 24-hour, 16-camera video surveillance system. We own the commercial property on which our business is situated.

56. Now, I'm trying to work my way through an estimate of safes for mandated storage. I used the variables of a 48-gun safe and a 24-gun safe, 5 bar, weighing 1,000-2,000 pounds/each. The two safes will require at least 6' x 20' of space. Even assuming that the floor joists could handle the added weight of the loaded safes, we don't have that size area to accommodate the safes. And that would mean that our inventory in firearms could not be any bigger than it is at the moment that I am running this estimate.

57. This would add about a $3,000 expense in safes.

58. That may not sound like a lot, but couple it with having to unlock and put away all of our long guns and handguns twice per day, and the owner time + employee time adds up.

59. Every time you move a firearm it could fall or get scratched. It devalues the firearms. Many of the firearms go back to their owners, who want their firearms returned in substantially the same condition as when they signed the loan agreement with us.

60. In the absence of this new mandate, there isn't a scenario where I'd be handling the entire inventory of firearms at once. The firearms have come in over time and go through an acquisitions protocol, before finding its place in the retail space of the shop.

61. If I was required to give the court an estimate, it would take an hour in the morning and an hour in the evening to put all firearms from the retail floor space into safes.

62. All day long myself or an employee is handling only one firearm at a time. The Defendants' mandate is to handle the entire inventory twice per day.

63. **Opposition to Camera System and 2-Year Storage Requirement**. As stated, we have already an alarm system in place that is suited to our needs and the building.

64. Our premises has nine exterior windows, three points of entrance/exit, and one overhead door. There are three points of sale. It would take sixteen monitors to reach all areas where firearms in inventory are displayed or stored, including wiring for motion and sound.

65. I would estimate having to spend an additional $25,000 in equipment to meet what I can figure out from looking at the statute.

66. The Defendant NYS Police has provided not additional materials to meet their legal obligations to us under this or any other of the new statutes.

67. I would estimate an additional service charge of $100/month, or, $2,400 for a 2-year contract.

68. Then, we come to the video monitoring and storage piece, and I can tell you we already have sixteen cameras, strategically positioned throughout our premises. If we had to reposition the cameras that's semantics.

69. But, our current system contains only two weeks of storage. We are disciplined in our use of the footage. If there is something to be reviewed, we review it. The reality is that when your business is a pawn shop, if you have trouble or a question, you know about it right away and you need to address it right away.

70. The two weeks of data storage feels so much less intrusive than two years. It is also much less expensive. Capitol expenditures have to be factored in to keep a business viable. Whether it's the data storage mandate, the added cameras, employee training – it all adds up to the same thing, which is a scheme by the Defendants to make it impossible to stay in business.

**Constitutional-Regulatory Overburden as of December 5, 2022:**
**(3.) Employee Training Cannot be Conducted Without Training Materials**

71. The Defendant NYS Police has failed to issue training requirements and the December 5, 2022 deadline for compliance is rapidly approaching. Unless it is hand delivered to us like an OSHA training for federal contractors, I don't see how we can comply. The employee training is not defined with any detail in the statute, certainly not enough to be a "curriculum." I, myself, would not want to guess at what should be taught for the content of any heading.

72. We do, already, provide considerable training to our employees, including the following:

    a. We discuss and inform about federal, state, and local applicable laws;

    b. We show only one firearm at a time to a customer;

    c. We do not leave a customer who is handling a firearm unattended;

    d. We return firearms to the rack or the locking display case before showing a customer another firearm;

    e. We do not leave the counter and/or any counter keys and leave a customer at the counter;

    f. We go over safety procedures on what to do if a crime is committed or discovered; and,

    g. We engage in conversation in the shop with law enforcement and ATF employees and staff and listen to the information they share with us about any suspicious persons or activity.

73. There is also additional training relative to the firearms purchase, including:

    a. We train employees on the proper completion of the TF Form 4473;

    b. We train employees on how to recognize a "straw purchase;"

    c. We train employees on how to submit the NICS background check;

    d. We train on what to do if there is a "DENY" or "DELAY;"

    e. We train on how to assist a customer to take his administrative appeal in the event of a denial;

    f. We train on how the ATF Form 4473 original paperwork must be filed and maintained.

74. We have three employees, including myself, and one owner, for a total of four people to be trained under the new mandate.

75. Hypothetically, a standard business compliance training course for one day costs approximately $695 for an estimated $2,800 in course fees.

76. Using an average wage of $20 per hour, without factoring in NYS Worker's Compensation Insurance, NYS Disability Insurance, and federal and state employer income tax contributions, that's roughly $420 in estimated wages + 7 hours of owner time.

77. The training would be estimated at $3,220 + 7 hours of owner time.

78. Specifically relating to firearms that may come into our pawnbroker inventory, we take added precaution that I check for a clear and unmolested firearms serial number with required additional markings as to manufacturer, location, gauge, and country of origin. We train employees on how to do this, but it is generally me who undertakes this security step. It is illegal to knowingly possess, transport, ship, or receive any firearm "that has had the importer's or manufacturer's serial number removed, obliterated, or altered" and we are required to report such a firearm to the nearest ATF office.[14,15] This marking information also goes into the A&D Book,[16] another reason to check for it.

---

[14] See 18 U.S.C. §922(k).

[15] Note: there are variances for pre-1968 firearms, meaning, prior to passage of the Gun Control Act of 1968 which set forth requirements for serial numbrs and other marking data. Generally, see, 18 U.S.C. §923(i) to be read with 27 CFR §§478.92(a)(1) and 478.112 (d)(2).

[16] See 27 CFR §§478.122-123.

**Constitutional-Regulatory Overburden as of December 5, 2022:**
**(4.) Unlimited NYS Police Discretion**

79. We FFL personality types thrive on compliance. We want to know what the law is so that we can meet it. Federal firearms compliance law and working with the ATF is very satisfying in that regard.

80. So now imagine us, sitting here, completely confused by a pile of new laws. Some already hit and hit our bottom lines. Now, we're looking at December 5 and we're still not seeing how to navigate the fall-out from September 1.

81. The provision granting Defendant NYS Police unlimited power to do, essentially, "whatever," is simply beyond what I'm hard-wired to comprehend could be allowable, especially after the *NYSRPA v. Bruen* decision. Regulations or laws? Let me take a look at it and I'm going to do my best to understand it, read about it, talk about it. But, this one provision – if no other – could not be more the opposite of how the ATF and the FBI treat us.

82. I'll just give you one quick comparison: just a couple days ago, the ATF circulated an e-mail, bringing us right into their office with notification that they are considering how to approach 18-20 year old attempted purchases of semi-automatic rifles in New York, so, for now, they're going to respond to every such request as "DELAY." This e-mail notification is attached to this Motion as an Exhibit.

83. I disagree with their approach. I'm in court. There are other lawsuits around the State.

84. But, here's the thing: I understand what they're doing as a first step and I can explain that to a customer if the situation presents itself. It's orderly. It's professional. And it keeps us

working in concert with the federal men and women, who, like me, like we FFLs, don't want to accidentally conduct an illegal transfer if it can be prevented in accordance with the law.

85. In this same line of argument, I place the open-ended power granted to the Defendant NYS Police to enter our property "no less than every three years"[17] for unspecified compliance purposes. This, too, must be struck down.

86. By contrast, the ATF audit is structured, serves a purpose, and is a discussion while the ATF Field Officer is on site. I don't want to give any misimpression that an ATF audit or inventory reconciliation is easy, it's not. But, it is a logical extension of what we do every day to remain in compliance with federal law.

## Conclusion.

87. East Side Traders is my dream. I care about the people in my community. When they need a little help making rent or a child support payment or having a special birthday party for their kid, I want to be part of the solution. Maybe it's one of our seasonal workers, especially in farming, and he is looking for some newer tools than the ones he's using, whether to sell, pawn, or to buy. Wayne County may be a large portion of Upstate New York, but it functions like a small town. It's gratifying to be part of this community. I don't want to lose this.

88. I guess if I could say just one thing to Your Honor, I would say I don't want to be thought of the way Albany paints us. I'm tired of it. We do have rights under the Second Amendment, including the defense of ourselves, our families and loved ones, and our

---

[17] NY Gen Bus §875-g(2).

homes and property. I am asking for the Defendants to respect us and the Court. If they can't or won't, then I am asking the Court to be the help we earn every day as we do our best to comply with the law.

Dated: November __7__, 2022

_____
Nicholas Affronti, individually
and as FFL Responsible Person for
"East Side Traders LLC,"
an FFL-02 Pawnbroker