# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

---

**Nadine Gazzola**, individually, and as co-owner, President, and as BATFE Federal Firearms Licensee Responsible Person for **Zero Tolerance Manufacturing, Inc.**; *et al.,*

                Plaintiffs

   *v.*

**Kathleen Hochul**, in her Official Capacity as Governor of the State of New York; *et al.,*

                Defendants.

Civ. No.: 1:22-cv-1134

Hon. Brenda K. Sannes

---

# PLAINTIFFS' MEMORANDUM OF LAW

# TABLE OF CONTENTS

SUMMARY ….. 1.

I.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS AND DEFENDANTS AS PROPERLY ALLEGED TO SATISFY FED. R. CIV. P. 12(b)(1) …... 4.

    A.   THE STATE'S MOTION IS UNTIMELY UNDER FED. R. CIV. P. 12(b)(1) ….. 5.

    B.   THE SECOND CIRCUIT FOUND PLAINTIFFS HAVE STANDING TO MAKE DERIVATIVE SECOND AMENDMENT CLAIMS ON BEHALF OF THEIR LAW-ABIDING CUSTOMERS AGAINST STATE LAWS THAT MIGHT OTHERWISE APPEAR PRESUMPTIVELY LAWFUL ….. 7.

    C.   PLAINTIFFS MADE NECESSARY ALLEGATIONS OF VALID LICENSES, COMPLIANCE OBLIGATIONS, EXPOSURES TO CRIMINAL CHARGES AND AN ASSOCIATED LEGAL CASCADE OF DAMAGES DIRECTLY RELATED TO THE NEW COMPLIANCE OBLIGATIONS ….. 9.

        1.   Plaintiffs Possess the Requisite Credentials to Pursue the Novel Claim Presented ….. 10.

            a)   Plaintiffs as New York State-Licensed "Dealers in Firearms" ….. 11.

            b)   Plaintiffs as New York Concealed Carry Licensees ….. 12.

            c)   Plaintiffs as Federal Firearms Licensees ….. 12.

            d)   Plaintiffs' New York business premises ….. 13.

            e)   Plaintiffs, as engaged in the business of lawful commerce in firearms ….. 14.

        2.   Plaintiffs are Obligated to Fulfill Compliance Mandates, Including on Behalf of the State Relative to the Individual ….. 15.

            a)   Plaintiffs are obligated to come into operational compliance under NY Gen Bus §875 (2022) dealer in firearms mandates ….. 15.

            b)   Plaintiffs are obligated also to performance compliance under the CCIA (2022) dealer in firearms mandates ….. 16.

        3.   Plaintiffs are Now Exposed to Criminal Charges for Any Violation of the New Mandates ….. 16.

4.    Defendants NYSP and OAG are Advancing Enforcement Against Plaintiffs, Witnesses, and other Licensed Dealers Statewide ….. 19.

    a)    NYSP JTTF Officers start going on-site to Dealers beginning July 25, 2023 ….. 20.

    b)    NYSP 2023 inspections report to the Governor and NYS Legislative Leadership asserts state dealers are "<u>Not</u>" in compliance ….. 22.

    c)    The NY OAG is pursuing dealers via extra-judicial subpoena, resulting in two cases in state court on behalf of three licensed dealers in firearms ….. 22.

5.    Criminal Charges against Plaintiffs would result in a legal cascade of damages, including loss of individual Second Amendment rights ….. 24.

D.    PLAINTIFFS POSSESS STANDING TO CHALLENGE THE CONCEALED CARRY TEACHING REQUIREMENTS THROUGH ALLEGATIONS OF BUSINESS OPERATIONS, DEFICIENCIES IN REGULATORY RESPONSIBILITIES BY THE NYSP AND DCJS, AND A CORRESPONDING LOSS OF BUSINESS REVENUES ….. 24.

E.    PLAINTIFFS POSSESS INDIVIDUAL STANDING ….. 28.

F.    DEFENDANTS ARE PROPERLY BEFORE THE COURT ….. 29.

II.  PLAINTIFFS PLEAD PROPER CAUSES OF ACTION, WHICH SATISFY FED. R. CIV. P. 12(c) AS EVALUATED VIA 12(b)(6) ….. 34.

A.    "UNCONSTITUTIONAL REGULATORY OVERBURDEN" IS A DISTINCT AND NOVEL CLAIM UNDER THE SECOND AMENDMENT  ….. 39.

1.    The Future Standard Will Differ From *Bruen* – There is No "History or Tradition" of licensing Dealers in Firearms Before 1968 ….. 41.

    a)    Standard Factor 1: The Federal License, serves as a model of more than fifty years of federal regulatory oversight and partnership ….. 42.

    b)    Standard Factor 2:  Process used to pass new laws ….. 43.

    c)    Standard Factor 3:  Actual implementation of new laws ….. 44.

    d)    Standard Factor 4:  Micro-economic analysis of forced expenditures under the new laws, whether or not performed ….. 45.

    e)    Standard Factor 5:  Macro-economic analysis of industry impact fairly traceable to the new laws ….. 48.

B.      SECOND AMENDMENT DERIVATIVE CLAIMS UNDER *BRUEN* ….. 49.

      1.      The Ammunition Background Check Fails Under *Bruen* ….. 50.

      2.      The SAR License Requirement Fails Under *Bruen* ….. 51.

C.      GOVERNOR HOCHUL'S CONDUCT CLEARLY VIOLATES ESTABLISHED CONSTITUTIONAL RIGHTS UNDER THE SECOND AMENDMENT ….. 51.

III.  PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED IN THE FORM OF A PERMANENT INJUNCTION AGAINST ENFORCEMENT BY NYSP AND OAG ….. 53.

IV.  ADDITIONAL ARGUMENTS – COUNTS AND ANCILLARY RELIEF ….. 56.

V.  PLAINTIFFS SHOULD BE PERMITTED TO FILE AND SERVE AN AMENDED COMPLAINT, IF NEEDED …..58.

# TABLE OF AUTHORITIES

**U.S. FEDERAL CONSTITUTION**

U.S. Const., art. III, §2 ….. 5, 17.

U.S. Const. amend II ….. 2, *passim*.

U.S. Const. amend V ….. 3, 4, 19.

U.S. Const. amend XIV ….. 2, 5, 11, 29, 35, 39, 57, 58.

**FEDERAL STATUTES**

Bipartisan Safer Communities Act, Pub. L. 117-159 (June 25, 2022), 136 Stat. 1313, *inter alia,* 18 U.S.C. §§932-934 …. 14.

Brady Handgun Violence Prevention Act ("The Brady Act"), Pub. L. 103-159 (Nov. 30, 1993), 18 U.S.C. §§921-922, §925A ….. 14.

Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308 (Apr. 10, 1986), 18 U.S.C. §921, *et seq.* ….. 14.

Gun Control Act of 1968, Pub. L. No. 90-618 (October 22, 1968), 82 Stat. 1213-1222, 18 U.S.C. Ch. 44 §§921, *et seq.* ….. 14, 42.

18 U.S.C. §921(a)(2) ……15.

18 U.S.C. §921(a)(11) ……13.

18 U.S.C. §921(a)(21)(C) ……15.

18 U.S.C. §922(g)(1) ….. 19, 26.

18 U.S.C. §923 ….. 11, 43.

18 U.S.C. §923(a) ….. 13.

18 U.S.C. §923(d)(1)(E) ….. 14.

18 U.S.C. §923(d)(1)(F) ….. 25.

18 U.S.C. §923(e) ….. 25.

18 U.S.C. §1985(3) ….. 52.

**FEDERAL REGULATIONS**

27 CFR 478.11 ….. 13.

**STATE STATUTES – NEW YORK**

NY Exe §63(1) ….. 25.

NY Exe §63(2) ….. 31.

NY Exe §63(3) ….. 31.

NY Exe §63(8) ….. 31, 32.

NY Exe §63(12) ….. 24, 25.

NY Exe §71 ….. 25.

NY Exe §228 ….. 17, 59.

NY Exe §235 ….. 26, 27.

NY Exe §837(23)(a) ….. 26, 27.

NY Gen Bus, art. 39-BB ….. 16.

NY Gen Bus §875 ….. 2, *passim.*

NY Gen Bus §875-a(1) ….. 16.

NY Gen Bus §875-b ….. 16, 21, 45, 46, 58.

NY Gen Bus §875-b(1) ….. 46.

NY Gen Bus §875-b(1)(a) ….. 46.

NY Gen Bus §875-b(1)(b) ….. 46.

NY Gen Bus §875-b(2) ….. 46, 58.

NY Gen Bus §875-c ….. 46.

NY Gen Bus §875-e ….. 46.

NY Gen Bus §875-e(3) ….. 46.

NY Gen Bus §875-f ….. 46, 47, 58.

NY Gen Bus §875-f(1) ….. 46.

NY Gen Bus §875-f(2) ….. 46.

NY Gen Bus §875-f(3) ….. 46.

NY Gen Bus §875-g ….. 21, 34.

NY Gen Bus §875-g(1)(b) ….. 47.

NY Gen Bus §875-g(2)(a) ….. 45, 47.

NY Gen Bus §875-g(2)(b) ….. 23, 55.

NY Gen Bus §875-h ….. 16, 21, 45, 47.

NY Gen Bus §875-i ….. 18, 21, 42.

NY Pen §70.15 ….. 18.

NY Pen §70.00(2)(e) ….. 18.

NY Pen §265.00(9) ….. 12, 14.

NY Pen §265.20(3-a) ….. 27.

NY Pen §265.65 ….. 17.

NY Pen §265.66 ….. 17, 19.

NY Pen §400.00 ….. 2, 9, 10, 12

NY Pen §400.00 … 1, *passim*

NY Pen §400.00(1) ….. 27.

NY Pen §400.00(1-a) ….. 12.

NY Pen §400.00(2) ….. 15, 16.

NY Pen §400.00(3) ….. 12, 13.

NY Pen §400.00(5) ….. 12, 13.

NY Pen §400.00(7) ….. 51.

NY Pen §400.00(8) ….. 17.

NY Pen §400.00(9) ….. 17.

NY Pen §400.00(11) ….. 25.

NY Pen §400.00(19) ….. 26, 27.

**FEDERAL COURT CASES – U.S. SUPREME COURT**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ….. 54.

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ….. 36, 37, 38.

*Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289 (1979) ….. 18.

*Bell Atlantic Corp. v. Twombly,* 559 U.S. 544 (2007) ….. 36, 37, 38, 39.

*Carey Gov. of New York v. Pop. Svcs., Int'l,* 431 U.S. 678 (1977) ….. 50.

*Carney v. Adams,* 592 U.S. _____, 141 S.Ct. 493 (2020) ….. 52.

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013) ….. 7.

*Cummings v. MO,* 71 U.S. 277 (1866) ….. 9.

*District of Columbia et al. v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) ….. 1, 8, 10, 29, 35, 39, 40, 52.

*Edelman v. Jordan,* 415 U.S. 651 (1974) ….. 30.

*Ex Parte Young,* 209 U.S. 123 (1908) ….. 30, 31.

*Hayes v. U.S.,* 390 U.S. 85 (1968) ….. 18.

*Idaho v. Coeur D'Alene Tribe of Idaho,* 521 U.S. 261 (1997) ….. 30, 31.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ….. 7.

*Luis v. United States,* 578 U.S. 5 (2016) ….. 51.

*McDonald v. City of Chicago,* 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ….. 1, 8, 10, 29, 35, 39.

*MedImmune, Inc. v. Genentech, Inc.* 549 U.S. 118 (2007) ….. 18.

*N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) ….. 1, 8, 10, 29, 32, 35, 40, 42, 50, 51, 58.

*Papasan v. Allain,* 478 U.S. 265 (1986) ….. 38.

*Pennhurst State School Hosp. v. Halderman,* 465 U.S. 89 (1984) ….. 30.

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ….. 37.

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014) ….. 10, 11, 18, 41.

*Teamsters v. United States,* 431 U.S. 324 (1977) ….. 52.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) ….. 38.

*Trump v. Anderson,* 601 U.S. _____, p. 9 (2024) *(per curiam)* ….. 50.

*Trump v. Mazars U.S., LLP,* 140 S. Ct. 2019, 207 L. Ed. 2d 951 (2020) ….. 9.

iv

*U.S. v. Rahimi,* No. 22-915, p. 17, 602 U.S. _____ (June 21, 2024) ….. 39.

*United States v. Texas,* 599 U.S. 670 (2023) ….. 7, 50.

*Verizon Md Inc. v. PSC,* 535 U.S. 635 (2002) ….. 31.

*Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197 (1975) ….. 11.

*Whole Woman's Health v. Jackson,* 595 U.S. _____, 142 S.Ct. 522 (2021) ….. 26, 40.

## FEDERAL COURT CASES – 2ND CIRCUIT COURT OF APPEALS

*Antonyuk v. Chiumento,* 89 F.4th 271 (2d Cir. 2023) ….. 18, 34, 53, 60.

*Brokamp v. James,* 66 F.4th 374 (2d Cir. 2023) ….. 12.

*Cayuga Nation v. Tanner,* 824 F.3d 321 (2d Cir. 2016) ….. 18.

*Columbrito v. Kelly,* 764 F.2d 122 (2d Cir. 1985) ….. 52.

*Gazzola v. Hochul,* 88 4th 186 (2d Cir. 2023) ….. 1, 7, 8, 10, 40, 51.

*Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842 (2d Cir 2021) ….. 31, 37, 38.

*Picard v. Magliano,* 42 F.4th 89 (2d Cir. 2022) ….. 10, 18.

*Simmons v. Abruzzo,* 49 F.3d 83 (2d Cir. 1995) ….. 37.

*Vitagliano v. Cnty. of Westchester,* 71 F.4th 130 (2d Cir. 2023) …. 10, 18.

*Wiggins v. Griffin,* 86 F.4th 987 (2d Cir. 2023) ….. 55.

## FEDERAL COURT CASES – OTHER – CIRCUIT COURTS

*Burgess v. Costco Wholesale Corp.,* 7:21-cv-5178 (S.D.N.Y., Sep. 27, 2024) ….. 55.

*Heller v. Dist. Of Columbia* ("*Heller III*"), 670 F.3d 1244 (D.C. Cir. 2011) ….. 51.

*Preterm-Cleveland v. McCloud,* 994 F.3rd 512 (6th Cir. 2021) ….. 18.

*Teixeira v. Co. of Alameda,* 873 F.3rd 670 (9th Cir. 2017) ….. 9.

## FEDERAL COURT CASES – DISTRICT COURT – NEW YORK

*Conmed Corp. v. Fed. Ins. Co.,* 590 F.Supp.3d 463 (N.D.N.Y. 2022) ….. 35, 36.

*Foskey v. Northrup,* No. 20-cv-0504, 2021, WL 1146217, at *5 (N.D.N.Y. 2021) ….. 52.

*Myers v. Davenport,* No. 1:21-cv-00922, 2022 WL 3017367 (N.D.N.Y. 2022) ….. 30.

**FEDERAL COURT CASES – DISTRICT COURT - OTHER**

    ***Rhode v. Bonta****, case 3:18-cv-802, ECF-105 at 3 (S.D. Cal. Jan. 30, 2024), stayed pending appeal (Case 24-542, dkt. 8.1 (Feb. 5, 2024)) ….. 51.


**NEW YORK STATE COURT CASES – NY SUPREME COURT**

    *Blue Line Sports, LLC and Woods & Waters v. Letitia James, Attorney General of the State of New York,* Franklin County, Index No.: E2024-789 ("*Blue Line Sports II*") ….. 24, 25.

    *Bowman's Gun Shop v. NY Attorney General Letitia James,* St. Lawrence Co., Index No. EFCF-24-167057 ….. 24, 25.


**STATE COURT CASES – OTHERS**

    *Andrews v. State,* 50 Tenn. (3 Heisk.) 165 (1871) …... 9.


**FEDERAL – RULES**

    Fed. R. Civ. P. 8 ….. 5.

    Fed. R. Civ. P. 8(a) ….. 37, 38.

    Fed. R. Civ. P. 8(a)(2) ….. 29, 30, 37.

    Fed. R. Civ. P. 8(d)(1) ….. 37.

    Fed. R. Civ. P. 8(e) ….. 37.

    Fed. R. Civ. P. 12 ….. 5.

    Fed. R. Civ. P. 12(a)(1)(A)(i) ….. 6.

    Fed. R. Civ. P. 12(b)(1) ….. 5, 6, 7.

    Fed. R. Civ. P. 12(b)(6) ..... 36, 37, 38.

    Fed. R. Civ. P. 12(c) ….. 35.

    Fed. R. Civ. P. 12(d) ….. 36.

    Fed. R. Civ. P. 15 ….. 39.

    Fed. R. Civ. P. 15(a)(2) ….. 60.

Fed. R. Civ. P. 15(d) ….. 60.

Fed. R. Civ. P. 16 ….. 6.

Fed. R. Civ. P. 26 ….. 6.

Fed. R. Civ. P. 33 ….. 6, 33.

Fed. R. Civ. P. 34 …. 6, 33.

Fed. R. Civ. P. 56 ….. 4, 36.

Fed. R. Civ. P. 56(a) ….. 54, 55.

**STATE – RULES**

N.D.N.Y. L.R. 56.1 ….. 4, 36, 54, 55.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

---

**Nadine Gazzola**, individually, and as co-owner,
President, and as BATFE Federal Firearms Licensee
Responsible Person for **Zero Tolerance
Manufacturing, Inc.**; *et al.*,

                  Plaintiffs

   *v.*

**Kathleen Hochul**, in her Official Capacity as
Governor of the State of New York; *et al.,*

                  Defendants.

Civ. No.: 1:22-cv-1134

Hon. Brenda K. Sannes

---

## PLAINTIFFS' MEMORANDUM OF LAW

### – SUMMARY –

As a doctrinal extension of *Heller – McDonald – Bruen,* the Second Circuit made clear in *Gazzola v. Hochul* that it will not tolerate government schemes designed to evade judicial review: that which cannot be done *directly* to infringe an individual's civil rights under the Second Amendment cannot be done *indirectly* through a dealer in firearms to get to the individual. Plaintiffs seek a permanent injunction against a group of laws that target state-licensed dealers in firearms as a means to infringe the fundamental rights of individuals under the Second and Fourteenth Amendments. The Second Circuit Court of Appeals in *Gazzola v. Hochul* easily found Plaintiffs have standing to pursue derivative claims on behalf of their customers with respect to the Second Amendment. The appellate ruling left open the parameters of a new standard for review of Plaintiffs' novel theory ("unconstitutional regulatory overburden") until after discovery and an

evidentiary determination.   This case should be returned to active discovery status and the discovery stay should be lifted.

Plaintiffs are individuals with federal and state licenses who are engaged in the business of acquiring and disposing of firearms in the lawful stream of commerce on behalf of "ordinary individuals" who seek to exercise their Second Amendment rights, including, in New York, via the Fourteenth Amendment to the U.S. Constitution.  Plaintiffs' business premises are in New York. Some businesses are in the form of corporations, others are sole proprietorships.  Each Plaintiff has a concealed carry permit.  Each, personally, owns, buys, resells, or trades-in firearms and ammunition in the routine course of their lives, in addition to their business livelihoods.

Plaintiffs challenge a host of new laws enacted through three bills in 2022 that obligate them as state licensee "Dealers in Firearms" under NY Pen §400.00 through "operational compliance mandates" at NY Gen Bus §875 and through "performance mandates" as licensees responsible to perform customer input to the New York firearms and ammunition background check system (as well as manual transaction record-keeping) and approving customers' semi-automatic rifle licenses and concealed carry licenses.  Additionally, two Plaintiffs, as firearms instructors, have new credentials requirements and new student curriculum and testing to perform.

Even though the new laws are essentially regulatory in nature, penalties for non-compliance are criminal (misdemeanor A and/or felony E charges with term of incarceration) and punitive (loss of state and federal licensure as dealers in firearms and concealed carry permittees, loss of Second Amendment rights as a disqualified person, and loss of firearms).

On June 25, 2023, the NYS Police "Joint Terrorism Task Force" began conducting compliance inspections at dealers' business premises, using unofficial 31-question "checklists."

A NYSP annual report for 2023 represents that fifteen (15) out of fifty-five (55) state-licensed dealers were found "<u>not</u> in compliance" with "every" mandate under NY Gen Bus §875. Premises inspections are continuing against Plaintiffs, witnesses, and other dealers in firearms, statewide, into 2024 and 2025. No Plaintiff or witness has received results from their inspections, including dating back to 2023.

The NYSP Superintendent did not issue necessary regulations ahead of officers going on site. NYSP and DCJS both persistently failed for more than two years to issue regulations and regulatory materials called for by statutory effective dates. The NY OAG also started pursuing dealers through extra-judicial subpoenas.

Plaintiffs' businesses are suffering (1.) decreases in sales revenue; (2.) increases operating expenditures; and, (3.) looming operational compliance mandates that will require protection under the "Discovery Stipulation" and/or the Fifth Amendment, whether such non-compliance is financially, technologically, or ideologically driven. These impacts are fairly traceable to the new laws and Defendants' administration and enforcement of them, and threaten business viability.

Plaintiffs commenced this action November 1, 2022, after certain of the performance mandates had gone into effect on September 1, 2022, but before (a.) the rest of the performance mandates became effective on September 13, 2023; and, (b.) the operational (§875) mandates went into effect on December 5, 2022. Plaintiffs' Complaint and original affidavits gave preliminary sales impact data for September and October 2022 traceable to the onset of the first performance mandates. Those documents then used operational compliance projections traceable to the performance mandates based upon their industry experience, plus identification of remaining performance mandates.

Plaintiffs' second set of affidavits, now submitted January 16, 2025, offer examples from materials prepared for discovery, such as sales and expense data, along with corresponding customer behavior.

Plaintiffs also pursue these new compliance mandates under secondary theories for specific (itemized) statutory provisions, including federal field preemption, void-for-vagueness doctrine, and Fifth Amendment rights against self-incrimination.

The only element of this case appropriate for pre-discovery summary judgment is thus filed herewith under Fed. R. Civ. P. 56 with L.R. 56.1, specifically, a judicial order to enjoin Defendant NYSP Superintendent and DCJS Commissioner from belatedly issuing regulations and regulatory materials required to issue more than two years ago and from enforcing such provisions. This early ruling would eliminate one aspect of the power dynamic playing out by Defendants against the state's own licensees, would reduce confusion to help licensees properly perform public safety responsibilities, and would allow Plaintiffs to complete the rest of their compliance estimates ahead of discovery.

Plaintiffs ask the Defendants' Motion to Dismiss (ECF-104) be denied, that Plaintiffs' Cross-Motion for Partial Summary Judgment be granted (ECF 112), and for such additional relief as may be just.

## I.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS AND DEFENDANTS AS PROPERLY ALLEGED TO SATISFY FED. R. CIV. P. 12(b)(1).

Plaintiffs satisfy notice requirements under Fed. R. Civ. P. 8 and pleading requirements under Fed. R. Civ. P. 12, including for standing under Rule 12(b)(1). The State's motion is

untimely; it should have been filed prior to service of their responsive pleading in accordance with Rule 12(b)(1).  A review of standing begins with the prior Second Circuit ruling in this case, which had "no trouble concluding that Appellants have standing to bring such a [Second Amendment] derivative claim [on behalf of customers]."  Plaintiffs' state "Dealer in Firearms" license pulls them under the compliance mandates challenged herein; exposes them to on-going criminal charges for "any" non-compliance; and causes them to suffer articulable financial and constitutional injuries.

## I.  (A.)  THE STATE'S MOTION IS UNTIMELY UNDER FED. R. CIV. P. 12(b)(1).

Fed. R. Civ. P. 12(b)(1), "How to Present Defenses," says the "lack of subject-matter jurisdiction" defense must be set forth in a motion prior to service of the responsive pleading.  The timing of the 12(b)(1) motion is not optional; it is mandatory.  The language of the rule is "A motion asserting any of these defenses <u>must</u> be made before pleading if a responsive pleading is allowed." (emphasis added)  Indeed, as Defendants recently represented to the U.S. Supreme Court in their Opposition Brief, "Proceedings in district court are continuing apace.  [Defendants] filed an answer to [Plaintiffs'] complaint on March 21, 2024 and discovery has just commenced.  This Court should not grant certiorari while this case is still proceeding in the lower courts."[1]  It is Defendants who now stall out this case from "proceeding in the lower courts."

Defendants had sixteen months to bring a 12(b)(1) motion prior to filing their responsive pleading.  A defendant is normally required to serve an answer within "20 days after being served

---

[1] *Gazzola v. Hochul,* U.S. Supreme Court, No. 23-995, Brief in Opposition, NY Office of the Attorney General (filed May 13, 2024), p. 13-14.

with the summons and complaint." Fed. R. Civ. P. 12(a)(1)(A)(i). The Defendants filed their Answer to the Complaint on March 21, 2024 (ECF-79), only after their final request to stay all deadlines was denied (Text Order 78, 03/18/2024).

In fact, Defendants *did* previously file a timely motion to dismiss under Fed. R. Civ. P. 12(b)(1) (ECF-51, 02/28/2023) *prior to* the filing of their responsive pleading (ECF-79, 03/21/2024). The State spontaneously withdrew that 12(b)(1) motion ten months after filing it (ECF-64, 12/13/2023). The Defendants chose not to pursue their earlier motion. Equally, the Defendants chose not to cross-motion when Plaintiffs filed their original motion for TRO/PI.

For ten months following Defendants' withdrawal of their previous motion to dismiss, Defendants engaged with Plaintiffs and the case advanced. The Parties completed the Case Management Plan (rev.) (ECF-89, filed 06/26/2024); the Fed. R. Civ. P. 16 teleconference (text minute entry 07/02/2024); a voluntary and detailed "Discovery Stipulation" (ECF-98, filed 08/23/2024; as court approved ECF 99, 08/26/2024); the Fed. R. Civ. P. 26 exchange (on 08/23/2024 by Counsel); the first written discovery demand exchange under Fed. R. Civ. P. 33 and 34 (on 10/04/2024 by Counsel); and the shipment by Plaintiffs to Defendants of over two hundred documents in four installments (between August 23, 2024 and October 4, 2024 with a living index and large data sets on jump drives). The State has not released any documents to Plaintiffs from among Defendants' records.

On the eve of their first records response deadline, the State hit Plaintiffs with a Motion to Dismiss (ECF-104) and, a few days later, a Motion for Stay (ECF-106). The State won a blanket stay of discovery. ECF-111.

Alas, despite the plain language of Fed. R. Civ. P. 12(b)(1), a court may raise questions of

standing *sua sponte.*  The U.S. Constitution limits federal judicial power to resolutions under the Cases and Controversies Clause. U.S. Const. art. III, §2, cl. 1.  "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas,* 599 U.S. 670, 676 (2023), citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-561 (1992).  By ensuring that a plaintiff has standing to sue, federal courts "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013).

Plaintiffs ask the Court to deny Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) as untimely.  In the alternative, Plaintiffs request this Court follow the Second Circuit Court of Appeals regarding standing, as discussed in the next section.

### I. (B.)  THE SECOND CIRCUIT FOUND PLAINTIFFS HAVE STANDING TO MAKE DERIVATIVE SECOND AMENDMENT CLAIMS ON BEHALF OF THEIR LAW-ABIDING CUSTOMERS AGAINST STATE LAWS THAT MIGHT OTHERWISE APPEAR PRESUMPTIVELY LAWFUL.

The Second Circuit Court of Appeals in *Gazzola v. Hochul* found, "Appellants first claim that New York law is so onerous that it will put them and other firearms dealers out of business, and thereby threaten their customers' Second Amendment right to acquire firearms.  We have no trouble concluding that Appellants have standing to bring such a derivative claim." 88 4th 186, 194 (2d Cir. 2023).[2]  The Second Circuit expressly reversed this District Court's contrary finding that there was "…"no basis for their novel theory" that New York law violated their customers' right to acquire firearms by imposing too many burdens on them as commercial dealers." *Gazzola,* 88 4th, at 195.  "We conclude that there is a sufficient basis for that theory…" *Id.*

---

[2] The State did not appeal this ruling.

The Second Circuit expressly laid out that "the presumption of legality [of a law] can be overcome," in balance and accordance with the Second Amendment cases of *Heller*[3], *McDonald v. City of Chicago*[4], and *N.Y.S. Rifle & Pistol Assn. v. Bruen*[5]. The *Gazzola v. Hochul* Second Circuit decision thus laid the pathway for this case to advance, including:

> "It follows that commercial regulations[6] on firearms dealers, <u>whose services are necessary to a citizen's effective exercise of Second Amendment rights</u>, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Id.,* at 196.

> Continuing to the associated text footnote 6, "We have no present occasion to set out specific guidance as to how a trial court must assess evidence that a commercial regulation is stifling the individual right of access to firearms (assuming a plaintiff one day produces it). But whatever the standard is, a State cannot impose a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding, responsible citizens from possessing common-use weapons." *Id.*

The Second Circuit ruling establishes the Plaintiffs' argument that the services provided by licensed dealers in firearms "are <u>necessary</u> to a citizen's effective exercise of Second Amendment rights." *Id.* (emphasis added). The appellate court adopted the case cited by Plaintiffs that "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep

---

[3] *District of Columbia, et al. v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

[4] *McDonald v. City of Chicago,* 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

[5] *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).

[6] *N.B.:* linguistically within this Memorandum, specifically, and the field of federal firearms compliance law, generally, the word "regulation" is that which is issued by the ATF as a result of statutory authority conferred by Congress. See, 18 U.S.C. §926(a) ("Prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter.") Because this submission includes a cross-motion focused upon the absence of regulations legislatively-authorized under the state statutes challenged, caution is urged to read the Second Circuit use of the word "regulation" as meaning "statute."

them in repair." *Id.,* citing *Andrews v. State,* 50 Tenn. (3 Heisk.) 165, 178 (1871) (emphasis added). The Second Circuit added that "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without <u>the ability to acquire arms</u>." *Id.*, citing *Teixeira v. Co. of Alameda,* 873 F.3d 670, 677 (9th Cir. 2017) (emphasis added).[7]

The Second Circuit expressly applied U.S. Supreme Court rulings to endorse Plaintiffs' argument that what cannot be done *to* the law-abiding individual seeking to exercise fundamental civil rights cannot be done *through* the licensed dealer in firearms. The Second Circuit wrote, "It is indeed a fundamental principle of constitutional law that "what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *Cummings v. State of Missouri,* 71 U.S. 277, 325 (1866); *accord Trump v. Mazars, U.S., LLP,* 140 S.Ct. 2019, 2035 (2020) (explaining that "separation of powers concerns are no less palpable…simply because the subpoenas [for the President's information] were issued to third parties.")." *Id*.

Defendants did neither appeal nor cross-petition any aspect of this ruling.

### I. (C.) PLAINTIFFS MADE NECESSARY ALLEGATIONS OF VALID LICENSES, COMPLIANCE OBLIGATIONS, EXPOSURES TO CRIMINAL CHARGES AND RESULTANT LEGAL CASCADE OF DAMAGES DIRECTLY RELATED TO THE NEW COMPLIANCE OBLIGATIONS.

The plaintiffs of *Heller – McDonald – Bruen* were "ordinary, law-abiding adult citizens." *Bruen,* 597 U.S. at 31, and 15-16; *McDonald,* 561 U.S. at 750; *Heller,* 554 U.S. at 575. The Plaintiffs of *Gazzola v. Hochul* are that – and more. They are multi-dimensional plaintiffs who reflect the Second Amendment like facets of a diamond.

Plaintiffs meet their pleading burden to show their on-going injuries are "concrete and

---

[7] Additional citations and quotations on point are found in *Gazzola,* 88 F.4th at 194-195.

particularized" and are traceable to the new compliance mandates, making it likely that their injuries "will be redressable by a favorable decision." *Vitagliano v. Cnty. of Westchester,* 71 F.4th 130, 136 (2d Cir. 2023), citing *Picard v. Magliano,* 42 F.4th 89, 97 (2d Cir. 2022), quoting *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 157-58 (2014).

The Plaintiffs are New York state-licensed "Dealers in Firearms" under NY Pen §400.00. This state "Dealer in Firearms" license causes Plaintiffs to be subject to compliance mandates enacted and effective since 2022. The mandates arise from three NYS Bills, namely, NYS S.4970-A (ECF 1-3); NYS S.51001 (ECF 1-4); and, NYS S.9458 (ECF 1-2). Violation of any one (1) or more of the new dealer mandates expose the Plaintiffs to criminal liability, and, if charged and/or convicted, to an additional legal cascade of damages from loss of Plaintiffs' state and federal licenses as Dealers in Firearms, to loss of Plaintiffs' individual civil rights, including under the Second and Fourteenth Amendments, and to the loss of Plaintiffs' businesses and livelihoods.

### I. (C.) (1.) Plaintiffs possess the requisite credentials for standing to challenge the new compliance mandates.

The new state laws cause Plaintiffs to pursue novel claims. The 2022 state laws, plus this case, plus two state cases (discussed herein) are creating an entirely new field of law, which is New York *state* firearms compliance law. The yardstick against which this new field of state law will be measured, in part, is the well-established field of *federal* firearms compliance law.

Plaintiffs possess the credentials to define a person or business with "a personal stake in the outcome of the controversy." *Susan B. Anthony List,* 573 U.S., at 158, citing *Warth v. Seldin,* 422 U.S. 490, 498 (1975). Plaintiffs are eligible to pursue claims against new laws arising from the three bills, as follows: (1.) a valid state license as a "Dealer in Firearms" under NY Pen §400.00; (2.) a valid federal firearms license under 18 U.S.C. §923, *et seq.*; (3.) a valid state

individual concealed carry permit (also under NY Pen §400.00); (4.) a NY business premises; and, (5.) a livelihood engaged in the business of acquiring and disposing of firearms.  It is these credentials that trigger obligations under and continuous exposure to "a risk of real and concrete injury as necessary for standing." *Brokamp v. James,* 66 F.4th 374, 381 (2d Cir. 2023).

### <u>Credentials:  (1.)</u>:   Plaintiffs as New York State-Licensed "Dealers in Firearms" under NY Pen §400.00.

Plaintiffs are licensed dealers in firearms by profession.  Plaintiffs hold various, relevant licenses, including as "Dealers in Firearms" in accordance with NY Pen §400.00, as issued and administered by the county government of their business premises. ECF-1, ¶15, ¶19; *also,* Gazzola, N., ECF 13-2, ¶15 (Columbia Co.); Hanusik, ECF 13-9, ¶7 (Greene Co.); Ingerick, ECF 122-7, ¶10 (Livingston Co.); Martello, ECF 13-6, ¶15 (Monroe Co.); Mastrogiovanni, ECF 13-5, ¶6 (Onondaga Co.); Serafini, ECF 13-4, ¶7 (Schenectady Co.); Affronti, ECF 13-7, ¶7 (Wayne Co.).[8]

The definition of a "dealer in firearms" is found at NY Pen §265.00(9), being "any person, firm, partnership, corporation or company who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any assault weapon, large capacity ammunition feeding device, pistol, revolver, or semiautomatic rifle[9]."  The state license is necessary only if the dealer with a federal license intends to engage in acquisitions and dispositions of such firearms enumerated at NY Pen §265.00(9).

---

[8] Production of Plaintiffs' state and federal licenses as particularly referenced throughout this Section, was in process of BATES numbering (000834, *et seq.*) when the State filed the motions to dismiss/stay. ECF 122-1, ¶17.  Preparation of the form of business with NY Department of State website pages for confirmation of current business were also tracking to Defendants' Demands under Fed. R. Civ. P. 33 and 34 when the State filed the motions to dismiss/stay. *Id.*

[9] The definition of "Dealer in firearms" was amended as part of NYS S.9458, p. 6:42-46.

NY Pen §400.00(1-a) states license application requirements. EFC 16-1 (dealer license application). County officials handle the initial application, license issuance, and renewal. NY Pen §400.00(3), (5). A state dealer license can issue to a person, firm, partnership, or corporation. *Id.*

**Credentials: (2.): Plaintiffs as New York Concealed Carry Licensees.**

Plaintiffs, as individuals, are concealed carry licensees under NY Pen §400.00, as issued and administered by the county government of their residence. ECF-1, ¶15, ¶19; *also,* Gazzola, N., ECF 13-2, ¶17 (Columbia Co.); Hanusik, ECF 13-9, ¶9 (Greene Co.); Ingerick, ECF 122-7, ¶14; Martello, ECF 13-6, ¶9 (Livingston Co.); Mastrogiovanni, ECF 13-5, ¶7 (Onondaga Co.); Serafini, ECF 13-4, ¶9 (Schenectady Co.); Affronti, ECF 13-7, ¶10 (Wayne Co.).

**Credentials: (3.): Plaintiffs as Federal Firearms Licensees.**

At federal law at 18 U.S.C. §921(a)(11), a "dealer" means, "(A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. Also, 27 CFR §478.11. Under 18 U.S.C. §923(a), no person shall "engage in the business of…dealing in firearms…until he has filed an application with and received a license to do so from the Attorney General."

Plaintiffs are Federal Firearms Licensees ("FFLs") in accordance with 18 U.S.C. §921, *et seq.*, as issued and administered by the U.S. BATFE. ECF-1, ¶15 through 18, incl. subpara. Plaintiffs refer in this case to their federal licenses of Type-01, the "Dealer in Firearms Other Than Explosive Devices," and, Type-02, the "Pawnbroker in Firearms Other Than Destructive Devices." ECF-1, ¶16; *also,* Gazzola, N., ECF 13-2, ¶¶11-12; Gazzola, S., ECF 13-3, ¶14; Hanusik, ECF 13-9, ¶6; Ingerick, ECF 122-7, ¶9; Martello, ECF 13-6, ¶¶13-14; Mastrogiovanni, ECF 13-5,

¶6; Serafini, ECF 13-4, ¶6; Affronti, ECF 13-7, ¶6.  Petitioners are also the "Responsible Persons" for their federal license administration. *Id.*

Federal law requires that if an FFL has a business premises situated in a state that requires a state dealer license, then the federal licensee must maintain a state license. 18 U.S.C. §923(d)(1)(E); *see, also,* ATF Form 7 (original appl.) at ECF 24-4[10]; and ATF Form 8 (renewal)[11].

Plaintiffs operate under federal firearms compliance laws, arising out of the Gun Control Act,[12] the 1986 Firearm Owners Protection Act,[13] the 1994 Brady Act,[14] the Bipartisan Safer Communities Act,[15] and associated ATF regulations.[16]  These laws uniformly blanket all fifty states and U.S. territories.

Plaintiffs could legally operate in New York on only the federal license, if they refrained from selling the limited types of firearms restricted to sale through the state license. NY Pen §265.00(9), above.

### <u>Credentials:  (4.):   Plaintiffs' New York Business Premises.</u>

Plaintiffs' business premises for purposes of their firearms dealer licenses are in New York.

---

[10] BATES 000188-199.

[11] The ATF Form 8 renewal is transmitted directly from the ATF to a licensed FFL in accordance with federal law at 27 CFR ¶478.45, including specific pre-filled data.  A blank renewal form is unknown to be published.  The event of the renewal of the Zero Tolerance Manufacturing, Inc. license was documented to the Second Circuit, case 22-3068, ECF-68, attached at ECF 122-5, p. 28-34.

[12] Gun Control Act of 1968, Pub. L. No. 90-618 (October 22, 1968), 82 Stat. 1213-1222, 18 U.S.C. Ch. 44 §§921, *et seq.*

[13] Firearm Owners' Protection Act ("FOPA"), Pub. L. 99-308 (Apr. 10, 1986), 18 U.S.C. §921, *et seq.*

[14] Brady Handgun Violence Prevention Act ("the Brady Act"), Pub. L. 103-159 (Nov. 30, 1993), 18 U.S.C. §§921-922, §925A.

[15] Bipartisan Safer Communities Act, Pub. L. 117-159 (June 25, 2022), 136 Stat. 1313, *inter alia,* 18 U.S.C. §§932-934.

[16] Plaintiffs with SOT-2 are also bound by the National Firearms Act of 1934, Pub. L. 73-474, 48 Stat. 1236, at I.R.C. ch. 53, §5801, *et seq.*

ECF-1, ¶6 (Gazzola/Zero Tolerance), ¶7 (Hanusik/"AGA Sales"), ¶8 (Ingerick/"Avon Gun"), ¶9 (Martello/"IKKIN Arms"), ¶10 (Mastrogiovanni/"Spur Shooters Supply"), ¶12 (Serafini/Upstate Guns & Ammo), and ¶13 (Affronti/East Side Traders).

Plaintiffs' businesses that are corporations are registered with the NY Department of State, Division of Corporations. Gazzola, Nadine and Seth (Zero Tolerance Manufacturing, Inc.; Jim Ingerick (Ingerick's, d/b/a "Avon Gun and Hunting Supply"); Christopher Martello (Performance Paintball, Inc., d/b/a "IKKIN Arms"); Craig Serafini (Upstate Guns and Ammo, LLC); Nicholas Affronti (East Side Traders, LLC). The NYS Division of Corporation website listing bears no relationship to the financial health of a business or even whether a business is open to the public. ECF 112-1, ¶28.

### Credentials: (5.): Plaintiffs, as Engaged in the Business of Lawful Commerce in Firearms.

Federal law requires any person "engaged in the business" of interstate or foreign commerce in firearms attain a Federal Firearms License (an "FFL"). See, 18 U.S.C. §921(a)(21)(C) for definitions of "engaged in the business" ("regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms") and §921(a)(2) for "interstate or foreign commerce" ("any place in a State and any place outside of that State, or within any possession of the United States or the District of Columbia," excluding intrastate commerce).

Plaintiffs were engaged in the business of commerce in firearms and ammunition prior to the effective date of the new laws complained of. ECF-1, ¶¶15-17. Plaintiffs continue to engage in the business of commerce in firearms.

### I. (C.) (2.)  BECAUSE OF SAID CREDENTIALS, PLAINTIFFS ARE OBLIGATED TO FULFILL COMPLIANCE MANDATES, INCLUDING ON BEHALF OF THE STATE RELATIVE TO THE INDIVIDUAL.

The second prong of standing is that the Plaintiffs are subjected to and required to abide by the laws complained of.  By virtue of possessing the credentials necessary for standing, the Plaintiffs are required to fulfill operational compliance mandates under NY Gen Bus, art. 39-BB, containing, *inter alia,* §875-b through §875-h.  Plaintiffs are thus <u>also</u> obligated to perform compliance mandates on behalf of the State as the state-customer interface for the (1.) firearms and ammunition background check systems through the NYSP; (2.) perform manual recording of ammunition transactions; as well as (3.) review the SAR license and the concealed carry permit at the point of sale.  ECF-1, sec. IV, ¶¶27-31 and with subpara 31(a) through 31(r) with notes.

#### a)       Plaintiffs are obligated to come into operational compliance under NY Gen Bus §875 (2022) dealer in firearms mandates.

Because Plaintiffs have a NY "Dealer in Firearms" license, they are subject to the mandates of NY Gen Bus Art. 39-BB.  NY Gen Bus §875 is applicable through §875-a(1), which defines "dealer" for purposes of the article as "…a gunsmith or dealers in firearms licensed pursuant to section 400.00 of the penal law."  This new article was part of NY S.4970-A. ECF 1-3.  It became effective 180-days, thereafter. NYS S.4970-A, §5; ECF 1-3, p. 7:28-32 (bill)). ECF-1, sec. IV, ¶¶27-31 and with subpara (b) through (m) with notes.

What is referenced herein as "operational compliance mandates" are the new statutory requirements under NY Gen Bus §875.  The operational compliance mandates are most simplistically characterized as effecting daily operations, primarily through increased time, complexity, and costs of doing business.  Statutory impact analysis delineates costs required, even if not incurred.

**b)    Plaintiffs are obligated also to performance compliance under the CCIA dealer in firearms mandates.**

Also because Plaintiffs are state licensees as "Dealers in Firearms," they are required to perform certain functions on behalf of the State of New York. See, (1.) NY Exe §228 ("NY NICS" for firearms background checks); (2.) NY Pen §§400.00(8) and 400.00(9) with NY Pen §§265.65 and 265.66 (SAR license); (3.) NY Pen §400.02(2) (ammunition background check); and, (4.) NY Pen §400.03(2) (manual ammunition sales records). ECF-1, ¶31(p)-(r),¶156(k)-(l), ¶160; ¶217 with subpara; ¶¶287-289.

These provisions are referenced herein as "performance compliance mandates." These performance mandates can be characterized as effecting the daily operations of Plaintiffs' businesses at the customer interface level. These performance mandates drive down sales by negatively impacting and/or inhibiting customers from exercising their fundamental rights under the Second Amendment through a licensed dealer in firearms in New York.

### I. (C.) (3.)  PLAINTIFFS ARE CONTINUOUSLY EXPOSED TO CRIMINAL CHARGES BY THE NYSP FOR ANY VIOLATION OF LICENSED DEALER MANDATES.

Pre-enforcement challenges to criminal statutes, such as the compliance mandates herein, are cognizable under the Cases and Controversies Clause. U.S. Const., art. III, §2. Plaintiffs "…should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979). A plaintiff need not be sued before bringing a suit challenging the constitutionality of a law "threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128-129 (2007). A plaintiff "need not first expose himself to liability before bringing a suit to challenge…the constitutionality of a law threatened to be enforced." *Picard v. Magliano,* 42 F.4th at 97. Precedent "sets a low threshold

and is quite forgiving to plaintiffs seeking such pre[-]enforcement review, as courts are generally "willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Cayuga Nation v. Tanner,* 824 F.3d 321, 331 (2d Cir. 2016).

The U.S. Supreme Court and the Second Circuit have described a "three-prong test" to assess the existence of a cognizable injury-in-fact in the context of pre-enforcement challenges, as follows: "(1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the intended conduct is "proscribed by" the challenged law; and (3) that "there exists a credible threat of prosecution thereunder."" *Vitagliano, supra,* 136, citing *Susan B. Anthony List,* 573 U.S. at 159.  "In other words, "a plaintiff has standing to make a preenforcement challenge 'when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Vitagliano, supra,* citing *Cayuga Nation,* 824 F.3d at 331 (further citation omitted).

The Second Circuit set out in a related case, "A gun owner who alleges a prior visit to a venue, a reason or wish to visit again, and either a plan to do so (thereby subjecting himself to arrest) or a decision to forgo doing so for fear of prosecution will likely have adequately pled standing to seek a pre-enforcement injunction." *Antonyuk v. Chiumento,* 89 F.4th 271, 372 (2d Cir. 2023).

The new laws expose Plaintiffs to criminal charges for an array of mandates. ECF-1, ¶¶33, 55, 153, 160(d), 171, 173, and 321.  Performance requirement criminal charges as an E felony are governed by NY Pen §265.66 (SAR license at point-of-sale) and A misdemeanor by NY Pen §400.06 (ammunition background check using "NY NICS" system).  NY Gen Bus §875 is a first-in-form attack against legal businesses with state licenses as "dealers in firearms," such as

Plaintiffs. NY Gen Bus §875 outstrips the regulatory corpus of federal firearms compliance law. Criminal liability for a violation of "<u>any</u> provision of this article" is found at §875-i (emphasis added), as a class A misdemeanor. The class A misdemeanor sentencing is found at NY Pen §70.15, and includes incarceration. The class E felony sentencing is found at NY Pen §70.00(2)(e), and includes incarceration. The felony charge would render a Plaintiff a "disqualified person" under 18 U.S.C. §922(g)(1), which would entail a loss of individual Second Amendment rights in all fifty states and U.S. territories.

It is a "severe consequence" for a licensed professional to be exposed to criminal charges, punishable with incarceration and the revocation of a license, as well as additional damages." *Preterm-Cleveland v. McCloud,* 994 F.3d 512, 517 (6th Cir. 2021). The mandates turn "an essentially noncriminal and regulatory area of "inquiry" into "an area permeated with criminal statutes." *Hayes v. U.S.,* 390 U.S. 85, 99 (1968).

Plaintiffs, here and now, are perhaps the most vulnerable of Second Amendment plaintiffs by virtue of being in a fixed location for published hours with an open door, subject to the randomness of an officer walking through the door with a "checklist" in one hand and a Plaintiff affidavit or exhibit in another. It is difficult to balance putting in the *prima facie* proofs on the Second Amendment claims without waiving valuable Fifth Amendment rights.

When Plaintiffs heard threats of "zero tolerance" from Governor Hochul and a uniformed officer of the NYSP, they took it seriously. Gazzola, N., ECF 13-2, ¶36. As described by Seth Gazzola who has "lived with the constant threat of the Defendants for now more than two and a half years, on a daily basis," Troopers recently walking into the shop was enough that:

> "We thought that was it.  Everything we had worked for.  Our two daughters.  The conversations we've had with our parents and our daughters about what to do if we get arrested.  The conversations we had with our ATF Field Agent to understand whether a family member could take over as a Responsible Person for our business in the event of our joint arrest.  All of it." ECF 122-2, ¶129.

For Craig Serafini, "It has become a matter of economics at our family dinner table whether and how to continue to do business at the current location of Upstate with the risk of arrest over non-compliance." ECF 122-4, ¶109.  His affidavit last year to the Second Circuit described the change in him because of his first NYSP on-site, as "Since the encounter with the NYSP Counter Terrorism Investigator on August 9, 2023, my whole world is terrorized.  I don't know what's going to happen to me.  I fear that I could be arrested, at any time." ECF 122-4, p. 42, ¶35.

Michael Mastrogiovanni, an FFL of more than thirty years and an active competition shooter, submitted, "I would like the opportunity to decide with my wife and family when it will be the appropriate time to retire from this profession, not be chased out of it by threat of arrest for non-compliance with laws we have properly brought before this Court for a determination on the merits." ECF 122-9, ¶55.

### I. (C.) (4.)  DEFENDANTS NYSP AND OAG ARE ADVANCING ENFORCEMENT AGAINST PLAINTIFFS, WITNESSES, AND OTHER LICENSED DEALERS, STATEWIDE.

The NYSP published an "Annual Gun Dealer Inspection Report 2023" that found fifteen (unnamed) licensed dealers were "not in full compliance with Article 39-BB."  The NYSP Joint Terrorism Task Force started on-site visits to licensed dealers on July 25, 2023, including with an unofficial "checklist" parroting NY Gen Bus §875-b through §875-h. Plaintiffs and witnesses have experienced such site visits, but did not receive inspections results or a report.  Further, the NYS

Office of the Attorney General in 2024 launched extra-judicial subpoenas against three licensed dealers within the N.D.N.Y. jurisdiction, who are now in state court, challenging NY OAG authority to pursue firearms dealers under §875. The State, through the Defendants DCJS, NYSP, and OAG, have taken and are continuing to take concrete enforcement actions under the challenged statutes, including against Plaintiffs, witnesses, and other licensed dealers throughout the State. The threat is credible and sufficient for purposes of standing.

### a)     NYSP Joint Terrorism Task Force Officers Start Going On-Site to Dealers, Beginning July 25, 2023.

On July 25, 2023, Defendant NYSP started going on-site to licensed dealers. ECF 122-8, ¶¶10-23 (first such inspection). The NYSP was granted express and exclusive authority under NY Gen Bus §875-g to perform "periodic inspections" and, under §875-i to issue any charges. No NYSP regulations were issued in advance of these site visits, as required by NY Gen Bus §875-g.[17] There was no formal announcement. There was no statewide communication to licensed dealers. Officers started showing up at dealers with varying renditions of their reasons for being on-site. Officers carried in, and left or didn't leave, "checklists" of 31 questions in different formats, with or without their own notes written thereon. ECF 122-6 (Liuni), p. 48-49; ECF 122-8 (Sehlmeyer), p. 18-21; ECF 122-4 (Serafini), p 47-49 and p.58-58. No FFL received written or other communication from or by the NYSP following the site visit.

---

[17] The expiration of such legislatively-conferred regulatory authority being the subject of Plaintiffs' cross-motion, it is discussed in Section III. For a deeper discussion, see ECF 122-11, the Plaintiffs' L.R. 56.1 "Statement of Material Facts."

It is a live question of fact being withheld by the Defendants: who are the state-licensed dealers who have apparently been found by the NYSP to be "not" fully in compliance? The statewide posture of the officers are indicative of formal decision-making.

Witness Richard Sehlmeyer submitted his first affidavit to the Second Circuit during the emergency sub-motion. ECF 122-8, ¶¶4-9 (as attached, p. 18-21). Sehlmeyer is a retired NYSP officer. *Id.,* ¶17. Sehlmeyer was told by his NYSP colleague who conducted the inspection that it was the first one, and he gave Sehlmeyer the first known NYSP "checklist" (¶38 and p. 13, ¶¶11-13). Sehlmeyer relates that there is "no centralized messaging system from NYSP to the licensed dealers." *Id.,* ¶36. "It doesn't matter that any given NYSP Superintendent is tasked with issuing regulations or even a statewide standardized form: it is highly unlikely to happen. It is not the purpose of the Division of State Police to serve as a regulatory agency." *Id.,* ¶¶26-27.

> "The bad outcome of the 2022 laws extended beyond Division Headquarters into the unique space of the privately-owned business that is the federally-licensed dealer in firearms, positioned in between the individual with civil rights and the government with whoever is politically in office." *Id.,* ¶35.

Plaintiff Craig Serafini was subjected to two (2) "inspections" by two different sets of two officers of the NYSP Joint Terrorism Taskforce, and he was given two different NYSP "checklists." He was first inspected on August 9, 2023 (ECF 122-4, p. 46-49) and, again, on January 19, 2024 (ECF 122-4, ¶¶14-36). Serafini has no results of his inspections. *Id.,* ¶8 (first) and ¶35 (second).

Serafini was told by the inspecting officers that the NYSP JTTF were out because DCJS circulated an e-mail telling them to start the inspections, including the list of 31 questions, and that the officers were formatting those questions for portability. ECF 122-4, ¶10. (Sehlmeyer's general understanding is that someone said start the inspections by August 1st of 2023. ECF 122-8, ¶22.)

**b)    NYSP 2023 Inspections Report to the Governor and NYS Legislative Leadership Asserts Dealers are "<u>Not</u>" in Compliance.**

The NYS Police fulfilled a total of two requirements under NY Gen Bus §875, one being is the report to the Governor and the NYS Legislative Leadership required under §875-g(2)(b) for calendar year 2023. ECF 33-1. It is only one page, but the report is explosive. The NYS Police reported that in 2023 a total of fifty-five (55) inspections were conducted and fifteen (15) licensed dealers were found "<u>not</u>" in compliance with the new mandates under NY Gen Bus §875. ECF 122-6, p. 1 (emphasis in original). The standard defined by the report is violation of "<u>any</u>" mandate under NY Gen Bus §875. *Id.* (emphasis in original). The 2023 NYSP Report does not state who was inspected, who passed, who failed, and what, if any, enforcement action was taken against non-compliant dealers or will be taken against non-compliant dealers within the period of statutory limitations to charge. These are all live questions of fact created by Defendant NYSP administration of the new laws. This one question of fact, alone, should be sufficient to defeat any motion by the State to dismiss this case.

The NYSP 2023 report attached two pages of plain, white paper titled "Gun Dealer Inspection Criteria." *Id.,* p. 2-3. Craig Serafini compared those two pages against the "checklists" he received during the first and second on-site visits by the NYSP and found "these two "inspection criteria" pages differ from the four "checklist" pages." ECF 122-4, ¶9.

There is no known report for calendar year 2024.

**c)    The NY OAG is Also Pursuing Dealers Via Extra-Judicial Subpoena, Resulting in Two Cases, Also, in State Court on Behalf of Three Licensed Dealers in Firearms.**

The NY Office of the Attorney General, beginning March 21, 2024, issued extra-judicial

subpoenas against three state-licensed dealers in firearms with business premises within the Northern District Court of New York jurisdiction. All three dealers sued the NY OAG to quash the subpoenas, which demanded records relevant to NY Gen Bus §875.[18] This Court is asked to take judicial notice of *Bowman's Gun Shop v. NY Attorney General Letitia James,* St. Lawrence Co., Index No. ECF-24-167057, docs. 6 and 7 (ECF 122-1 at p. 37-46) and *Blue Line Sports LLC and Woods & Waters v. NY Attorney General Letitia James,* Franklin Co., Index No. E2024-789, docs. 5 and 7 (ECF 122-1 at p. 19-35).

These state court cases also highlight a difference between the Defendants' first motion to dismiss (withdrawn) and the pending motion. In this *Gazzola v. Hochul* case, the NY OAG, in its first motion to dismiss that was spontaneously withdrawn, asserted that this District Court had no jurisdiction over the NY OAG because NY Exe §63(12) was a statute of general authority, not conferring an ability for the State's Attorney General to pursue dealers under NY Gen Bus §875. ECF-51-2, p. 12-13 ("…the Attorney General … has no connection with the enforcement of [the statute at issue]…," nor does "…the Attorney General's general authority under N.Y. Executive Law §§63(1), 63(12), or 71 charge[] he with a particular duty to enforce [the challenged statute]...") The argument is conspicuously absent from the State's second (current) motion to dismiss. ECF-104. The NY OAG has apparently reversed its position on its own authority to go after dealers.

---

[18] NYS Police officers went to those three businesses in North Country with "checklists," as well, prior to the NY OAG subpoena transmissions. *Bowman's Gun Shop,* NYSCEF-1, ¶¶132-135, 140-147; Affd., Bowman, T., NYSCEF-4, *passim.*; *Blue Line Sports,* Affd., Rothamel, J., NYSCEF-3, ¶¶24-48; *Blue Line Sports,* Affd., Rothamel, M., NYSCEF-4, ¶¶11-33; Grimone, NYSCEF-6, ¶¶22-42. None of the three Petitioners received any results of the NYSP on-site visits, either.

### I. (C.) (5.) CRIMINAL CHARGES AGAINST PLAINTIFFS WOULD RESULT IN A LEGAL CASCADE OF DAMAGES, INCLUDING LOSS OF INDIVIDUAL SECOND AMENDMENT RIGHTS.

Criminal prosecution of any dealer, such as a Plaintiff, would result in a legal cascade of damages.  A dealer, such as Plaintiffs, can lose their license for even one alleged non-compliance under NY Gen Bus §875. NY Pen §400.00(11) ("A license to engage in the business of dealer may be revoked or suspended for <u>any</u> violation of the provisions of article thirty-nine-BB of the general business law." (emphasis added)).  A loss of the state dealer license for cause would result in the loss of all federal FFL licenses. 18 U.S.C. §923(e), *read with* §923(d)(1)(F).  A criminal conviction would result in revocation of the state individual concealed carry permit. NY Pen §400.00(11). A conviction for a NY class E felony would result in the loss of Second Amendment rights in all states and U.S. territories as a "disqualified person." 18 U.S.C. §922(g)(1).

Running afoul of any operational compliance mandate within NY Gen Bus §875 or the other, performance mandates is "uniquely punitive." *Whole Woman's Health v. Jackson,* 595 U.S. 30, 65 (2021), Sotomayor, concurring in part and dissenting in part.

### I. (D.) PLAINTIFFS POSSESS STANDING TO CHALLENGE THE CONCEALED CARRY TEACHING REQUIREMENTS THROUGH ALLEGATIONS OF BUSINESS OPERATIONS, DEFICIENCIES IN REGULATORY RESPONSIBILITIES BY THE NYSP AND DCJS, AND A CORRESPONDING LOSS OF BUSINESS REVENUES

The Second Circuit decision in *Gazzola v. Hochul* spent time reviewing a pre-*Bruen* holding, as well as adopting a list of precedents, stretching back to 1871, that stand for the proposition that "[a] State cannot circumvent those holdings by banning outright sale or transfer of common-use weapons and necessary ammunition." 88 F.4th at 195.  The decision included incorporation of the principle that: "The right to possess firearms for protection implies a

corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.,* at 196, citing *Ezell v. City of Chicago,* 651 F.3d 684, 704 (7th Cir. 2011).

The CCIA expressly contemplated "standardization of firearms safety training. NY Exe §837(23)(a) ("standardization of firearms safety training"); NY Exe §235 ("standardization of firearms safety training").[19]   In their Reply Brief to the Second Circuit, the State's Counsel highlighted the NY Senate Sponsor's Memorandum language of "standardize training for license applicants," as follows:

> "Previously, some counties required handgun training for a concealed-carry license, but there were no statewide standards for such training. Penal Law §400.00(19) thus "**enable[s] the State to regulate and standardize training for license applicants.**" N.Y. Senate Sponsor's Mem. S.51001 (2022).  This provision came into effect on September 1, 2022. Ch. 371, §26, 2022 N.Y. Laws.  The Division of Criminal Justice Services and State Police have issued detailed guidance for this concealed-carry training (citing to Minimum Standards Memo 08/23/2022)."

Case 22-3068, doc. 75 (Reply Brief), p. 17 (emphasis added).

The NYSP "Minimum Standards" memo of August 23, 2022 is found at ECF 15-2.[20] Nadine Gazzola, whose undergraduate degree is in education and who is President of an Education Board (Questar III) for her local school district plainly stated, "A memo that largely plagiarizes the statute is not a "curriculum."  It is not even a "syllabus."" ECF 122-5, ¶¶54-55.

Plaintiffs Nadine and Seth Gazzola are NRA-certified firearms instructors who were engaged through their business prior to the September 1, 2022 effective date of the new concealed

---

[19] For a full discussion of this point, please refer to Plaintiffs' L.R. 56.1 "Statement of Material Facts."
[20] BATES: 000001-04.

carry permit training course. ECF 122-5, ¶92  The mandated new course is 16-hours, classroom style, with a statutory list of course content and a statutorily-conferred delegation of authority to the NYSP and the DCJS to "approv[e]…course materials" and "a "curriculum" with "a written test upon the curriculum" upon which the student "demonstrate[s] proficiency by scoring a minimum of eighty percent correct answers on a written test upon the curriculum." NY Pen §265.20(3-a), Pen §400.00(1) and §400.00(19), *read with* NY Exe §235, NY Exe §837(23)(a).

Neither the NYSP or the DCJS performed work assigned to them under the compliance bills introduced, pushed, and signed by Governor Hochul, including the CCIA.  *Accord,* below, This is part of the Plaintiffs' cross-motion for partial summary judgment, and is treated at length in ECF 122-11.

Witness Joe Liuni, General Manager at SafeShoot, took one look at the new statutes and his experience in the firearms training field told him the new laws were intended to "standardize" firearms safety training across the state "through "the approval of course materials" and "with curriculum approved by the division of criminal justice services and the superintendent of state police."" ECF 122-6, ¶24, ¶49.  Experience said the course would resemble decades-old NYS DEC hunter education course. *Id.,* ¶25[21].  Liuni also compared the statutes to the course he recently took by the Utah state government for their handgun licenses. *Id.,* ¶26[22].  Part of the problem, however, is "The NYS Police has no known history of training civilians." *Id.,* ¶27.

Liuni, "knew that if we didn't create a course that the concealed carry licensing process would grind to a halt for our customers across a large geography and concentrated population in

---

[21] See, Liuni, ECF 122-6, p. 31-43 attachments from NYS DEC website about the "Hunter Education Program" and their "Instructor Application.

[22] See, Liuni, ECF 122-6, ¶26 n. 3 and 4 for Utah course training deck and student materials information.

New York." ECF 122-6, ¶27[23].

When the Defendants were not forthcoming (ECF 122-6, ¶¶21-23), SafeShoot put multiple personnel and money into building a course on the "hope" it would be accepted (*Id.,* ¶20).  "It took approximately six people working for and with SafeShoot appropriately two hundred hours (200 hours) to rapidly develop the first iteration of the course," excluding Joe's time. *Id.,* ¶28.  Liuni estimated the cost to produce the first edition of the course was Ten Thousand Dollars ($10,000).  Liuni added, "We are continually working, as a team, on the training materials, including with additional stakeholders at the county and non-profit level.  I would not be able to estimate the added costs associated with this continual work on the course.  We are still missing additional stakeholders such as an attorney or a bar association to assist with the legal modules required for training." *Id.,* ¶28.

Liuni and his staff tried to find someone at NYSP and/or DCJS to talk to, but "[t]here was no clear point person or path of submission." ECF 122-6, ¶47.  "I took away the general impression that DCJS was pretty much going to leave it up to individual instructors, as long as they hit the points on the memo." *Id.*  Liuni then had to reapproach each of the fifteen counties were their courses were previously approved in order to get new county-level approvals, plus whatever additional county requirements were added in response to the CCIA. *Id.,* ¶¶48-50.  It is only through this incredible effort that more than 850 students have been able to achieve a certificate of

---

[23] Liuni, ECF 122-6, ¶¶18-19, including students from fifteen counties, "principally the five boroughs of New York City, Albany County, Columbia County, Delaware County, Dutchess County, Orange County, Rockland County, Saratoga County, Sullivan County, Ulster County, and Westchester County."  This includes students in the affected counties where renewal with mandated CCIA training

successful completion of the new, mandatory course for new applications and renewals in effected counties, about 40% of whom are women. *Id.,* ¶¶18-19, 31, 52.

Meanwhile, Seth and Nadine Gazzola haven't been able to teach, losing more than $48,000 to date. ECF 122-2, ¶89.  They are not in a position to develop a 16-hour written curriculum to teach students and to design and administer a written exam on that curriculum. *Id.,* ¶93.

> "Our expectation, based upon our reading of the new laws, was that the NYS Police and the DCJS would develop and release the training materials – much in the manner of the NYS DEC hunter safety course, which I have taken – and that we would then either undergo whatever state training of instructors would be offered by DCJS to teach that curriculum or [we] would have the curriculum to spring from." *Id.,* ¶98.

In the alternative, Seth asks why the NYSP and DCJS didn't "dial back the legislation" so that he and Nadine could go back to teaching, restore lost revenue, and "support that core function of the Second Amendment of training individuals interested in achieving their new concealed carry permit, becoming more proficient in their skills, and assisting those effected by the new renewal laws." *Id.,* ¶101.

## I. (E.)  PLAINTIFFS ALSO POSSESS INDIVIDUAL STANDING

The Plaintiffs sue with unique standing as state-licensed (and federally-licensed) dealers in firearms.  Their individual claims would be evaluated, just like any other person making a civil rights claim under the Second Amendment through the Fourteenth Amendment, including an evaluation under the *Heller – McDonald - Bruen* standard. ECF-1, ¶36.  Their allegations, under Fed. R. Civ. P. 8(a)(2) should be given its "plain natural meaning."  While much of Plaintiffs' discussion is industry specific, their use of and involvement with firearms and ammunition should be plainly understood.  To capture otherwise Plaintiff's individual interconnection to firearms and ammunition took approximately 65 paragraphs in largely boilerplate format.

As phrased by Nadine Gazzola:  "What we do personally, we do professionally, and vice versa, as follows.  When we say that we "regularly" and "routinely" purchase firearms, either for the inventory of our business or for research and development purposes or for ourselves, personally, we do mean that this is what we do seven days a week for our profession and our passion." ECF 122-5, ¶87.

## I.  (F.)  DEFENDANTS ARE PROPERLY BEFORE THIS COURT

Plaintiffs read Defendants' challenge to standing as only being made relative to Governor Hochul and DCJS Commissioner Rosado.  Note is made that while the Complaint did not use the Commissioner's surname, the pleading is replete with references to "DCJS."  In the same way "NYSP" or "NYS Police" includes the "Superintendent," allegations referencing "DCJS" includes the Commissioner.  Fed. R. Civ. P. 8(a)(2).  ECF-1, ¶24, ¶31 all footnotes of regulatory responsibility, ¶156 (likewise), ¶157, ¶159, ¶163, ¶194 (more general, funding), ¶195, ¶303.

"Our decisions repeatedly have emphasized that the *Young* doctrine rests on the need to promote the vindication of federal rights." *Pennhurst State School Hosp. v. Halderman,* 465 U.S. 89, 105 (1984) (citations omitted).  The prospective relief authorized by *Young* "has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely a shield, for those whom they were designed to protect." *Pennhurst, id.,* citing *Edelman v. Jordan,* 415 U.S. 651, 664 (1974).

Federal courts are permitted to grant prospective, injunctive relief against a state official who violates federal law under a narrow exception to the doctrine of sovereign immunity under *Ex Parte Young,* 209 U.S. 123, 155-56 (1908); *see also Idaho v. Coeur D'Alene Tribe of Idaho,* 521 U.S. 261, 269 (1997).  Suits seeking to enjoin an officer from violating federal constitutional

rights are not considered to be suits against the state. *Id.* at 160, 166. "[A]n unconstitutional enactment is "void" and therefore does not "impart to [the officer] any immunity from responsibility to supreme authority of the United States. *Id.,* at 160; *accord, Pennhurst State School Hosp.,* 465 U.S. at 102. An official "who acts unconstitutionally is "stripped of his official or representative character." *Id.,* 105, citing *Young.*

Several factors coalesce for *Ex Parte Young* to apply. The party must be seeking prospective (not retroactive) relief. *Coeur D'Alene Tribe,* 521 U.S. at 270. The violation of federal law must be on-going. *Verizon Md Inc. v. PSC,* 535 U.S. 635, 645 (2002). And, the state official must have "some connection with the enforcement of the act." *Ex Parte Young,* 209 U.S. at 157.

"Federal Rule of Civil Procedure 9(b) provides a relaxed standard for pleading intent or knowledge at the motion to dismiss stage." *Myers v. Davenport,* No. 1:21-cv-00922, 2022 WL 3017367, at *7 (N.D.N.Y., July 29, 2022). Therefore, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge, because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842, 864 (2d Cir. 2021) (citations omitted).

NYS law contemplates the Governor can prosecute through the NY Office of the Attorney General. Governor Hochul, under NY Exe §63(2) can "require" the State Attorney General to "exercise all the powers and perform all the duties" to investigate and, if warranted, prosecute unlawful acts or omissions or alleged unlawful acts or omissions, including the making of false statements including perjury. See, also, NY Exe §63(3) can "request" the State Attorney General to investigate, including matters under the responsibility of the NYSP or the DCJS, and to prosecute. Governor Hochul can also appoint a special prosecutor under NY Exe §63(2) and (8)

and confer prosecutorial authority. Governor Hochul has, previously, made such directions and appointments via Executive Order. See, Executive Order 7, Oct. 20, 2021.[24]

Further, Governor Hochul may "direct" the State Attorney General "inquire into matters concerning the…public safety…" under NY Exe §63(8). Governor Hochul has expressly invoked this statutory power to request NY AG James investigate online platforms relative to specific crimes committed using firearms (May 18, 2022)[25] which resulted in a 49-page NY OAG "Investigative Report" (Oct. 18, 2022) published through a joint press release.[26]

Complaint set out allegations at ECF-1, ¶¶89 through 129 to provide notice of some of the Governor's statements, publicly made, with animus against those who seek to exercise their Second Amendment rights. The Answer at ECF-79 admitted every statement made by Governor Hochul (excepting one with typographical error at ¶124).

Governor Hochul created one or more of the bills complained of, including, but not limited to the "Concealed Carry Improvements Act" (NYS S.51001). Hochul signed an Executive Order, reconvening the NYS Legislature, after conclusion of Regular Term, put the draft bill in front of them, and kept them in session until they voted in favor of the bill, using social media as a weapon on public shame to achieve her desired result. ECF-1, ¶95, ¶¶102 through 114. Hochul's "Proclamation" to reconvene the NYS Legislature said it would be "for the purpose of: Considering legislation I will submit with respect to addressing necessary statutory changes regarding firearm safety, in a way that ensures protection of public safety and health, after the

---

[24] NY Governor, website, Executive Order 7, available at:
    https://www.governor.ny.gov/sites/default/files/2021-10/EO_7.pdf

[25] BATES:000753-754.

[26] NY Office of the Attorney General, Press Release Oct. 18, 2022, at https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms.

United States Supreme Court decision in *NYS Rifle and Pistol Association, Inc. v. Bruen*." [27] (emphasis added)

Governor Hochul designed the new laws with help from Co-defendants, while "joined at the hip" with lawyers she named from Every Town for Gun Safety and Giffords Law Center, as well as other outside "experts." ECF-1, ¶89, ¶91 and with n.54, ¶95, ¶111, ¶113, ¶319.

Defendants' Motion to Stay (ECF-105) was filed on the eve of the Governor's first deadline to respond to Plaintiffs' demand for documents under Fed. R. Civ. P. 33 (ECF 105-2), including persons associated with bill development (#19[28] - #22, #34[29] - #44, each in reference to a unique public statement referenced in the demand).

Governor Hochul's animus is on-going and has been directed specifically at this case. In public press conference that was also streamed live on social media outlets like the official Facebook page of the NY Governor, Governor Hochul made negative references to this case.[30] In a formal press release after the U.S. Supreme Court denied our second application (third submission) in October 2023, Governor Hochul changed course 180 degrees from being anti-Supreme Court to pro-Supreme Court to suit her political agenda, publishing: "[t]he United States Supreme Court has sided with common sense," going on to wrongfully misstate Plaintiffs are trying to "block the law on firearms checks that we passed last year following the Buffalo massacre and the overturning of New York's century old gun safety laws. Public safety is my top priority,

---

[27] BATES:000668.

[28] #19-#22, tied to ECF-1, ¶91; also, BATES:000655-658, BATES:000730.

[29] #34-#44, tied to ECF-1, ¶107 with BATES:000673-680; ¶111 with BATES:000684-690; and, BATES:000730.

[30] BATES:000746 and BATES:000747.

and I'm committed to working with law enforcement and leaders across New York to keep our communities safe." This press release remains part of Governor Hochul's official state website, as does all prior (admitted) remarks.[31]

In a related case, Governor Hochul was released as a co-defendant. But, the *Antonyuk v. James* complaint plead merely two paragraphs concerning her. 1:22-cv-986, doc. 1, ¶¶62-63. Even with that little, Judge Suddaby left the door open to revisit the decision, saying: "However, should evidence surface during the course of this litigation showing Defendant Hochul's personal involvement in the enforcement of the CCIA through the exercise of her authority under N.Y. Const. Art. 13, §13, the Court would revisit this issue and entertain a motion to amend the Complaint." Doc. 78, n.70. The *Gazzola* claims against Governor Hochul are much more thoroughly plead out, both as to chronology and as to ideology.

In this case, also, request is made the Court pay particular attention to the level of coordinated enforcement actions are being taken against dealers, *just short of an arrest*. Plaintiffs did not achieve the TRO/PI requested. The NYSP Superintendent did not issue the regulations required in NY Gen Bus §875-g prior to officers going out to the business premises of state licensees (that regulatory deadline having passed more than two years ago). No dealer, including Plaintiffs and witnesses, receives results from the inspections. The NYSP issue a report supposedly aggregating 2023 inspection data, but still does not notify dealers of inspection results. The demand to start the inspections reportedly from a Trooper to Plaintiff Serafini, came from DCJS.

---

[31] BATES:000752; NY Governor website, "Statement from Governor Hochul on Supreme Court's Rejection of Latest Attempts to Undermine New York's Nation-Leading Gun Safety Laws," accessed 01.16.2025, available at https://www.governor.ny.gov/news/statement-governor-hochul-supreme-courts-rejection-latest-attempts-undermine-new-yorks-nation.

The NY OAG begins an alternative pursuit of dealers via extra-judicial subpoenas on the day the Defendants are compelled by this Court to file their responsive pleading. All Defendants fail to issue regulations, regulatory materials, and other mandates upon them by the bills at issue. (ECF 33-1; ECF 122-11). No dealer is charged or arrested. No dealer license is revoked or noticed of being revoked.

There are too many questions of fact for any Defendant to be released from this case at this stage. The Defendants' motion should be denied and the case should be restored to the discovery calendar.

## II.  PLAINTIFFS PLEAD PROPER CAUSES OF ACTION, WHICH SATISFY FED. R. CIV. P. 12(c) AS EVALUATED *via* 12(b)(6).

The Fourteenth Amendment incorporation of "to keep and bear arms" restricts experimentation and local variations" and "the enshrinement of constitutional rights necessarily takes certain policy choices off of the table." *McDonald,* 561 U.S. at 790, citing *Heller,* 554 U.S. at 636. The U.S. Supreme Court has already rejected a computational role for the courts, "especially given their "lack [of] expertise" in this field." *Bruen,* 142 S.Ct. at 2130, citing *McDonald,* 561 U.S. at 790-791.

The standard to measure "unconstitutional regulatory overburden" will not be a formula. No judge measures civil rights in terms of "constitutionally-acceptable collateral damage." It's not 5% or 10% or 15% of a neighborhood that the government zones may sit in a pew on the Sabbath. Nor is it law enforcement ushering 20% or 30% of people off sidewalks into no-WiFi buildings when the opposition party president is scheduled to speak. "That sort of argument should be no less unimaginable in the Second Amendment context." *Ezell,* 651 F.3d at 697.

Defendants err to bring a motion under Fed. R. Civ. P. 12(c) for judgment on the pleadings. As Defendants accurately cite in their Memorandum (ECF 104-7, p. 19), "Judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c) is appropriate *where material facts are undisputed* and a judgment on the merits *is possible merely by considering the contents of the pleadings.*" (emphasis added, short-cited herein as *Conmed Corp. v. Fed. Ins. Co.*, 590 F.Supp.3d 463, 468 (N.D.N.Y. 2022)).   *Conmed* involved a question of whether defendant insurer was obligated to defend plaintiff's indemnitee in accordance with the terms of a contract, finding "…it remains possible that Plaintiff will be required to indemnify Sterigenics, and as such Plaintiff properly tendered a defense of Sterigenics pursuant to an insured contract." *Id.,* at 470, 471.  As Judge D'Agostino well stated, "Judgment pursuant to Rule 12(c) can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties' because "initial interpretation of a contract is a question of law for a court." *Conmed,* at 468 (citation omitted).

The Defendants' Answer handily defeats their own motion in that the Defendants' Answer denied or lacked knowledge and information sufficient to form a belief of nearly all allegations, except for public statements made by Gov. Hochul. ECF-79.  The Answer created paragraph after paragraph of issues of fact and controversies of law.

Note is made that Defendants appear to read a 12(c) motion as using an Fed. R. Civ. P. 12(b)(6) standard of evaluation. ECF 104-7, p. 8 ("A motion for judgment on the pleadings is governed by "the same standard" as a motion to dismiss under Rule 12(b)(6). (citation omitted)).[32] Defendants' motion includes attachments (ECF 104-2 through 104-6) and arguments outside the

---

[32] *C.f.,* Defendants' statement two pages later in the Memorandum that "A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(c) "is governed by the same standard that applies to a Rule 12(b)(1) motion…"." (citation omitted).

pleadings (ECF 104-7). Fed. R. Civ. P. 12(d) would convert the 12(c) motion into one for summary judgment under Fed. R. Civ. P. 56, giving both parties "a reasonable opportunity to present all the material that is pertinent to the motion." Local rules would also require statements of material fact. L.R. 56.1. With the one notable exception as cross-motioned, herein, this case was not designed to be decided on summary judgment motions.

Plaintiffs' answer to Defendants' motion labeled as "12(c)" is thus made using a Fed. R. Civ. P. 12(b)(6) standard of review. Plaintiffs agree on use of principle cases of *Iqbal* and *Twombly* (immediately, hereunder); *see* Defendants' Memorandum, ECF 104-7, p. 19-20.

To prevail against a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842 (2d Cir. 2021), citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 559 U.S. 544, 570 (2007). Such a motion may argue either or both of two grounds: (a.) a challenge under Fed. R. Civ. P. 8(a)(2) to the sufficiency of the pleading; or, (b.) a challenge to the legal cognizability of the claim. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the ground upon which they rest. … In addition, they state claims upon which relief could be granted…).

Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly,* at 555 (citation omitted). Wright & Miller phrase in the positive that Fed. R. Civ. P. 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented." *Twombly,* at 555, n.3.

"Each allegation must be simple, concise, and direct.  No technical form is required." Fed. R. Civ. P. 8(d)(1).  The pleading needs "only enough facts to state a claim to relief that is plausible on its face." *Twombly, id.,* at 570.

"Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).

"The principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Swierkiewicz,* at 514; *also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir. 1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.").  Wright & Miller, §1202, at 94-95 states Fed. R. Civ. P. 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented." *Twombly,* at 555, n.3.

Legal conclusions "can provide the framework of a complaint," where supported by factual allegations. *Iqbal,* 556 U.S. at 679.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*; *Kaplan,* at 854 ("In reviewing a Rule 12(b)(6) dismissal, we must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal,* at 678, citing *Twombly,* at 556; *Kaplan,* at 854.  The plausibility standard is not akin to a probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Judicial review of a motion under Fed. R. Civ. P. 12(b)(6) requires the court to read all allegations of the Plaintiffs' Complaint to be true and to draw all reasonable inferences in favor of the Plaintiffs. *Papasan v. Allain,* 478 U.S. 265, 283 (1986).

The proper question for the reviewing court is "whether there is a permissible relevant inference from "*all* of the facts alleged, taken collectively," not whether an inference is permissible based on "any individual allegation, scrutinized in isolation." *Kaplan,* at 854, citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) (citation to Wright & Miller omitted).

"…once a claim for relief has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly,* at 563. A plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely'." *Id.* at 556 (citation omitted).

The one prefatory comment, basis the motion, is that if there is a shortfall in the language of the "Counts," this should not distract from an evaluation of the allegations made. Plaintiffs otherwise request leave to submit a proposed amended complaint under Fed. R. Civ. P. 15, following the ruling on the motion/cross-motion, and to also reflect party and claim stipulations entered into in the interim. Plaintiffs were within their CMP deadline for permissive service of an amended complaint when Defendants' motion filed.

## II.  (A.)  "UNCONSTITUTIONAL REGULATORY OVERBURDEN" IS A DISTINCT AND NOVEL CLAIM UNDER THE SECOND AMENDMENT.

A civil right need not be judicially established before an individual can sue for violation of it.  The critical legal basis of this lawsuit is *McDonald v. Chicago*, which brought the Second Amendment to all state citizens via the Fourteenth Amendment.  The Second Amendment only underwent this selective incorporation in 2010 in *McDonald v. Chicago*.[33]  And, *McDonald* was decided just two years after *Washington, D.C. v. Heller.*[34]  Most recently, in *U.S. v. Rahimi,* the majority opinion identified at least three further topics in relation to the Second Amendment for a future decision, including the meaning of the term "responsible," status of citizens who were not "responsible," and an "exhaustive historical analysis." No. 22-915, p. 17, 602 U.S. _____ (June 21, 2024).  The Second Amendment is the new kid on the civil rights block, and still has training wheels on its bicycle.

Plaintiffs' theories for relief "face serious challenges but also present some opportunities." *Whole Woman's Health v. Jackson,* 595 U.S. at 51.  Plaintiffs possess specific credentials that make them "extra-ordinary." *Rahimi,* at 17 ("In *Heller*[35] and *Bruen,* we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right.") *Accord,* Section I, above (standing).  Defendants argue (in error) this is insufficiently distinct from an individual Second Amendment claim. ECF 104-7, p. 48.

Plaintiffs' Complaint provides the framework for the standard for eventual evaluation of evidence at trial, which will include the federal FFL-ATF-FBI model for cooperative government-

---

[33] *McDonald v. Chicago, supra.*

[34] *Washington, D.C. v. Heller, supra.*

[35] *Id.*

private approach to balancing public safety with civil rights, the demonstration of negative sales impact and increased cost expenditure upon Plaintiffs, specifically, and across the industry in New York, and the political environment giving rise to and then pursuing licensed dealers caused by Governor Hochel and the co-Defendants.

The Second Circuit in *Gazzola v. Hochul* did not subsume Plaintiffs' novel claim as licensed dealers into a unidimensional version of a Second Amendment claim. The appellate court treated the claim of Plaintiffs as licensed dealers in firearms as distinct from the individual, at the same time that it is on behalf of the individual. The Second Circuit acknowledged a standard will be set after there is admitted evidence in the record. In essence, the Second Circuit said: *interesting, come back with more.* Repeating one passage from the ruling:

> "It follows that commercial regulations[36] on firearms dealers, <u>whose services are necessary to a citizen's effective exercise of Second Amendment rights,</u> cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Id.,* at 196.

> Continuing to the associated text footnote 6, "<u>We have no present occasion to set out specific guidance as to how a trial court must assess evidence that a commercial regulation is stifling the individual right of access to firearms</u> (**assuming a plaintiff one day produces it**). But whatever the standard is, *a State cannot impose a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding, responsible citizens from possessing common-use weapons*." *Id.* (emphasis added)

In a surprising departure, the Second Circuit toyed around with what "unconstitutional regulatory overburden" might look like. What the appellate court found wanting on the motion

---

[36] *N.B.:* linguistically within this Memorandum, specifically, and the field of compliance law, generally, the word "regulation" is that which is issued by an agency or office as a result of statutory authority conferred by a legislative body. Because this submission includes a cross-motion focused upon the absence of regulations made under the statutes challenged, caution is urged to read the Second Circuit use of the word "regulation" as meaning "statute."

for TRO/PI ("anticipated costs"), the Second Circuit did not find fault with the framework, or even

the estimates of the Plaintiffs' Complaint.  Plaintiffs, as licensed dealers, are new to the courts, not

having to sue since the 1968 GCA, because only California has, "historically," been involved at

the state level.  Plaintiffs come into this motion with 27 months of data that dovetails into the

original estimates, having used the Second Circuit ruling as the standard to reach.

To get to that standard, the Court must not compel "a plaintiff who wishes to challenge the

constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony,* 573

U.S. at 163.  The Second Circuit sensed the opening of the new field and shared its ideas.  It did

not set a standard.  It did give Plaintiffs two points to include in their petition for cert, namely

(1.) that no civil right is measured like a formula of "how much" or "how little;" and, (2.) that the

derivative claims would also need to be measured using *Bruen.*  U.S. Supreme Court, No. 23-995,

Petition for Writ of Certiorari, p. 14 (filed Mar. 07, 2024).

### II. (A.) (1.)  The Future Standard Will Differ From *Bruen* – There is No "History or Tradition" of Licensing Dealers in Firearms Before 1968.

Breaking the compliance mandates into two types will largely dictate that one portion can

use *Bruen* as the standard, but the other portion would be ill-suited and require its own standard.

The performance mandates associated with a customer transaction can use gross sales data to

demonstrate the negative influence of the statute upon individual exercise of civil rights to

purchase the commonly used semi-automatic rifle and to purchase ammunition of any type.  The

SAR has neither history or tradition tied to a license; ammunition has no history or tradition that

involves a background check.  The State failed to produce even one statute in support of their

argument otherwise.  The ones filed give support to Plaintiffs' legal position.  The derivative claim

by Plaintiffs succeeds with more labor but with no less force than if the individual had filed the claim. This group of laws is aimed at the individual *through* the licensed dealer.

The operational compliance mandates, by contrast, are aimed *directly* at the licensed dealer. It is not as easy as saying it has been done this way since the Statute of Northampton. 2 Edw. 3, c. 3 (1328). With respect to licensed dealers in firearms, a court has only modern history since the 1968 Gun Control Act to examine.

The next step in *Gazzola v. Hochul*, being upon this Court, it is proposed that the standard will be factors, *not* a formula. Relevant factors to assess the "overburden" and the "unconstitutional" aspects of the claim include (1.) The "history" is the FFL relationship with the ATF, including good governance standards, regulatory processes, technical support, notification, and enforcement. (2.) Political process through which laws were adopted. (3.) Actual implementation by lesser government office, agency, or division. (4.) Micro-economic analysis of plaintiffs that measure actual cost, cost in relation to gross sales and net profit (loss). And, (5.) Macro-economic analysis of industrywide impact.

### Standard Factor: (1.): The Federal License, serves as a model of more than fifty years of federal regulatory oversight and partnership.

Plaintiffs, as Federal Firearms Licensees, are subject to oversight by Congress, the U.S. Attorney General, and the ATF. 18 U.S.C. §923; 27 CFR §478.23 (right of entry and examination by an ATF officer). Rules and regulations governing federally-licensed dealers in firearms can only be made by the U.S. Attorney General and through the ATF. 18 U.S.C. §925.

Plaintiffs do not seek no regulations. Indeed, Plaintiffs raise no federal law challenges. Plaintiffs seek the agency-regulatory balance they have with the ATF. Plaintiffs' Complaint set out

that for more than fifty years, FFLs such as the Plaintiffs have developed and engaged in active relationships with the federal ATF and FBI agencies to protect and facilitate lawful commerce in firearms. ECF-1, ¶¶69-78, ¶¶174-176, ¶188, ¶191, ¶197, ¶¶218-219, ¶226, ¶232, ¶256. Plaintiffs' first affidavits brought forward their positive and active relationships with the ATF, including their Field Agents and for responsibilities such as firearms trace inquiries. For example:

> "We have free access to and a wealth of information from the ATF and the FBI that relate directly to our licenses, our manufacturing operations, the uncommon permissions we have under our SOT-Class 2 License, how to properly and timely do our A&D Book entries, strategies for efficient and accurate inventory control, pointers and videos on premises security, campaigns against straw purchases and how to recognize that potential, a 100% reliable "800" number with skilled employees to respond to questions during a NICS background check, materials to give to customers, including the NICS administrative appeals processing the event a customer is denied or delayed. I could go on." ECF 13-2, ¶39(a) (Gazzola, N.).

According to Nick Affronti, "The ATF Field Agents make clear that our job is the first line of security against illegal firearms purchases, such as straw purchases, and against burglary, larceny, or theft of firearms." ECF 13-7, ¶25. And Craig Serafini added:

> "The ATF is also prolific at publishing pamphlets, booklets, PowerPoint presentations, offering Webinars, building resources on its website, publishing statistics over the course of many years, even publishing the entire directory of every FFL in the U.S. All mandatory forms are available for free through their website. The website is set up well and runs well. The NICS background check functions in split seconds, and has a live person at the end of the "800" number who is a skilled operator. The Defendants do none of this." ECF 13-4, ¶71.

### <u>Standard Factor: (2.):</u>  Process Used to Pass New Laws.

Each of the major, federal statutes under which Plaintiffs operate as FFLs was years in the making. There is extensive legislative record, including numerous committee hearings, for each

bill.  The 2022 bills hit with force within a few day window.  Bill S.9470-A is a few pages of Assembly transcript.  The Bill S.51001 is a transcript conducted after dark, voted on in the wee hours of the morning, while Governor Hochul Tweeted on social media to publicly pressure legislators.  There were no public committee hearings on any of the three bills complained of herein, or, the full ten bill package.

### Standard Factor:  (3.):  Actual Implementation of New Laws.

Defendant Governor Hochul ran hot to get her bills passed, and now her co-defendants run hot obstructing their own laws.  The Plaintiffs' "Statement of Material Facts" painstakingly walks through ten statutory sections with legislatively-assigned regulatory functions to the NYSP Superintendent and DCJS Commissioner that were not performed. ECF 122-11.  Plaintiffs raised these failures from the outset, and published a 6-page chart on November 25, 2022 into the public PACER system that itemized the responsibilities, the bill number, the statutory equivalent, and deadlines. ECF 33-1.  The problem was raised during oral arguments on December 1, 2022, and, again, at least ten times in court filings over the next seventeen months. ECF 122-1, ¶24.

NYSP "Joint Terrorism Task Force" officers are going out to dealer premises, including Plaintiffs and witnesses, around the state, without regulatory authority to do so. ECF 122-11, ¶¶35-36; NY Gen Bus §875-g(2)(a).  No dealer is in receipt of inspection results.

The NYSP published a report stating a specific number of dealers were "not" in full compliance with NYS Gen Bus §875-b through §875-h.  The officers are using "checklists."  The report includes a "criteria" list.

The NYSP "provide no support in performance of these mandates," according to Jim Ingerick.

"I have tried on multiple occasions, to contact an operator at NYSP to get the answer to legal, technical, and user interface questions, while performing a background check for a customer and wile engaging in record-keeping. The response is always the same: "I can't help you with that." The response to the question for the operator's name, so that I can add it to my notes, is always the same; a number. The person says, "Operator #326," for example, the most popular number." ECF 122-7, ¶¶58-61, *also,* ¶¶62-65.

**<u>Standard Factor:  (4.):</u>  Micro-Economic Analysis of Forced Expenditures Under the New Laws, Whether or Not Performed.**

Damages to the retail, licensed dealer is "a predictable chain of events leading from the government action to the asserted injury." *Mills et al., v. NYC,* 23-cv-07460 (S.D.N.Y. Dec 4, 2024); *Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 385 (2024).

All mandates apply equally to all dealers, regardless their gross sales, zoning, retail footprint or home-based business premises, employees or not, existing security provisions, and so forth.  This is an over-simplified list of new operational compliance mandates:

[1.] individual shipping protocols (§875-b(1);

[2.] a "security plan," including secure storage for all firearms in a fireproof safe or vault or other secured and locked area on site at the close of each retail day (§875-b(1)(a));

[3.] storage of ammunition separate of firearms and out of reach of customers (§875-b(1)(b));

[4.] a security alarm system installed and maintained by a state-licensed security alarm operator to statutory "regulation" "established by the superintendent," *inter-alia*, "capable of being monitored by a central station" (§875-b(2));

[5.] installation of "a video recording device at each point of sale and each entrance and exit to the premises, which shall be recorded from both the indoor and outdoor vantage point;" (§875-b(2), sent. 5);

[6.] 2-years of video storage (§875-b(2), sent. 5);

[7.] exclusion of persons under eighteen years of age from firearms and ammunition sales area unless accompanied by a parent or guardian (§875-c);

[8.] NYS Police supplied employee training (§875-e);

[9.] maintenance of records of employee training in accordance with "regulations" (§875-e(3));

[10.] prohibition against employees under the age of twenty-one years (§875-e(3));

[11.] shadow books of the federally-required "Book of Acquisition & Disposition" of every firearm taken into inventory and its disposal "in such form and for such period as the superintendent shall require" (§875-f);

[12.] said shadow books to be reconciled monthly (§875-f(2));

[13.] said shadow books to be monthly placed in a "secure container" or "at the close of each business day" electronically s stored to "external server" or the "internet" (§875-f(1));

[14.] said shadow book data, including "identity of purchasers" and "serial numbers of firearms" with dates of transactions "shall be maintained and made available at any time to government law enforcement agencies and to the manufacturer of the weapon or its designee" (§875-f(3));

[15.] submission of copies of said shadow books of acquisitions and dispositions to the NYS Police "every April and October" (§875-f);

[16.] submission of an annual certification of compliance in a "form and content" regulated by the superintendent (§875-g(1)(b));

[17.] "superintendent shall promulgate regulations requiring periodic inspections of not less than one inspection of every dealer every three years" (§875-g(2)(a)); and,

[18.] "such additional rules and regulations as the superintendent shall deem necessary to prevent firearms, rifles, and shotguns from being diverted from the legal stream of commerce." (§875-h).

Now, twenty-seven months later of September 1, 2022, there is data. Seth Gazzola described well the power of a single box of ammunition. Not only does it win core Second Amendment value from the Second Circuit, it builds community, and it's profitable. ECF 122-2 (Gazzola, S.), ¶75.

Loss of ammunition sales as a symbol of resistance to the state government background check (it turns out) takes the slow, stead, $300 to $1,000 profit margin on a single item. *Id.* That box of ammunition, without which makes the firearm inoperable, can soar to the highest two weeks of sales at $44,458.58 when it's the two weeks before the launch of the ammunition background check. ECF 122-5 (Gazzola, N), ¶39.

Seth Gazzola (ECF 122-2) particularly walked through the costs associated with the operational compliance mandates at NY Gen Bus §875, ¶108, *et seq*., reaching the conclusion "It is not possible for every dealer to comply with every one of the operational compliance mandates." *Id.,* ¶112. For on-site storage, Seth involved a third-party IT company with whom they had already spent $20,000 earlier in 2022. The quote based upon the statute came back at nearly $55,000 + another $19,200/year for cloud-based storage. *Id.,* ¶116. He describes how last summer, he, Craig, and Nick undertook what should have been done by the NYSP Superintendent. *Id.,* ¶117. Seth then worked with a third-party for safe quotes that came back at over $45,000. The new expense quotes came in at over $120,000. Seth's costs, coupled with Nadine's $100,000 loss in annual gross sales in 2022, equates to a $250,000 spread - just at their one business in just the first two years on just those (not all) items.

Joe Liuni, General Manager at SafeShoot (ECF 122-6), which includes also an indoor range with twenty-four lanes (24), wrote that his company lost more than Two Hundred Thousand Dollars ($200,000) in ammunition sales since September 13, 2023. *Id.,* ¶59.

The affidavit of Craig Serafini, ECF 122-4, walks through the way the drop in SAR sales and ammunition sales effects the entire bottom line – a situation made worse by the non-stop user interface problems with the "NY NICS" and the lack of any meaningful help desk. ¶115 (semi-automatic rifles), ¶118 (ammunition).

Another affidavit is submitted by Nick Affronti, ECF 122-3, who gives specific examples, not only of quantified decreases in the bottom line, but also to the estimated costs to reconfigure the new construction in favor of the new specific camera locations, video feed, and two-year video storage at over $150,000 for the East Side Traders premises. ¶132)

John Hanusik and his wife, ECF 122-10, find themselves having to reimagine their retirement, after more than fifty years as an FFL. John's ammunition sales went from approximately 100 boxes/week down to three (3) boxes/week. *Id.,* ¶46, ¶¶63-64. The downturn in ammunition sales pushed down John's gross sales from 2022 to 2023 by approximately One Hundred Thousand Dollars ($100,000), thereby reducing his net by $50,000. *Id.,* ¶48. His affidavit is an education in the value of ammunition to a business just 400 sq. ft., run by a man with institutional knowledge of firearms and the public policy changes surrounding it, and even he says, "Business has been brutal." *Id.,* ¶49. Two weeks ago, John and his wife listed their Florida house for sale. "We can't afford to keep it as a result of the downturn in my business." *Id.,* ¶64.

### <u>Standard Factor:  (5.):</u>  Macro-Economic Analysis of Industry Impact Fairly Traceable to the New Laws.

When the fourth request went in to SCOTUS on *Gazzola*, we cited a statewide fall-off rate

of 150 FFL-01 federally-licensed dealers, or, a statewide decrease of 8.5%. *Gazzola v. Hochul*, No. 23-995, Petition for Writ of Certiorari, p. 31. That figure has risen to 17%. ECF 122-1, ¶44 and p. 17-18. When isolating the FFL-01/02s as of May 2022 as against current, the decrease jumps to Twenty-Five Percent (25%), or, 1 in 4 of the May 2022 FFLs is no longer federally licensed. ECF 122-1, ¶46.

## II. (B.) SECOND AMENDMENT DERIVATIVE CLAIMS UNDER *BRUEN*.

The Second Circuit ruling in *Gazzola* found "[Plaintiffs] have derivative standing to pursue Second Amendment claims on behalf of their customer base." *Supra*, at 194. Such a Second Amendment derivate claim can and should be measured by the same standard applied to the individual under *Bruen*. (When "…the plain text of the Second Amendment covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen,* 142 S.Ct. at 2126 and 2129-30. The government must then "demonstrate the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*) A derivative claimant stands in the shoes of its customers to defend the rights infringed by the government. See, e.g., *Carey Gov. of New York v. Pop. Svcs., Int'l,* 431 U.S. 678, 683-4 (1977).

The State has not identified any historical law or antecedent to support the new laws of the ammunition background check or the SAR license. "Such a lack of historical precedent is generally a "telling indication" of a "severe constitutional problem' with the asserted power." *Trump v. Anderson,* 601 U.S. _____, 144 S. Ct. 662, 669 (2024) (*per curiam),* quoting *United States v. Texas,* 599 U.S. at 677 (quotation omitted).

The State filed only four historical laws, none being an historical analogue, either "well-established" or "representative." Bruen, 142 S.Ct. at 2133; ECF 29-2 (Laws of NY, Ch. 55, p. 238 (3rd Sess., Mar. 11, 1780) and ECF 29-4 (1782); ECF 29-3 (Act of May 8, 1792, 1 Stat. 27131); and, ECF 29-5 (Laws of NJ, Ch. 187 (2nd Sitting, Mar. 11, 1806).

### II.  (B.) (1.)  The Ammunition Background Check Fails Under *Bruen*.

"The right to keep and bear arms…implies a corresponding right to obtain the bullets necessary to use them and to acquire and maintain proficiency in their use." *Luis v. United States,* 578 U.S. 5, 26 (2016) (Thomas, J., concurring).  The Second Circuit, in *Gazzola v. Hochul,* also adopted a definition of the Second Amendment that includes the right "to purchase and provide ammunition suitable for such arms." 88 F.4th, at 196.

Petitioners' derivative claims against the ammunition background check requirement should go through the same *Bruen* analysis as *Rhode II,* which permanently enjoined a comparable California requirement. *Rhode v. Bonta,* case 3:18-cv-802, ECF-105 at 3 (S.D. Cal. Jan. 30, 2024), stayed pending appeal (Case 24-542, dkt. 8.1 (Feb. 5, 2024)).  That district court defined ammunition as a core Second Amendment right: "…without bullets, the right to bear arms would be meaningless." *Id.* (citations omitted).  The California state list of "148 laws covering 535 years" was found by judicial analysis to contain "no historical twins and no dead ringers." *Id.* at 18-19. Specifically:

> "The Attorney General has not identified a single historical law that required a citizen to pass a background check in order to purchase ammunition.  Citizens were free in every state to buy ammunition at any time and without qualification." *Id.,* at 19 (emphasis added).

**II.  (B.) (2.)  The SAR License Requirement Fails Under *Bruen*.**

Petitioners' derivative claim against the SAR license relates to the restriction of the purchase (and sale) of an entire class of firearms.  To obtain an SAR license is akin to the process to obtain a concealed carry permit. See, e.g., *Heller v. Dist. of Columbia* ("*Heller III*"), 670 F.3d 1244, 1256 (D.C. Cir. 2011) ("Certain portions of the law that are more akin to licensing the gun owner than to registering the gun…" and thus "impinge" upon the "core lawful purpose" protected by the Second Amendment, citing *Heller I,* 554 U.S. at 630.

The State failed to offer any historical law or analogue to meet its burden with respect to its new SAR license, any more than it did for the ammunition background check.  The State has never required an individual license for the purchase (or sale) of a long gun in common use.

Functionally, the NYS Police abuse the new SAR license to, in effect, obstruct all purchases and sales of such rifles by continuously failing to design, approve, and publish the format of the new license, as they are required to do under NY Pen §400.00(7).  The problem is traceable to the NYSP failing to perform a statutory responsibility. *Carney v. Adams,* 592 U.S. _____, 141 S.Ct. 493, 503 (2020), quoting *Teamsters v. United States,* 431 U.S. 324, 365-366 (1977).

**II.  (C.)  GOVERNOR HOCHUL'S CONDUCT INTENDS TO AND DOES DEPRIVE THOSE SEEKING TO EXERCISE THEIR FUNDAMENTAL CIVIL RIGHTS UNDER THE SECOND AND FOURTEENTH AMENDMENTS.**

Plaintiffs' Complaint, Section VII, sets forth in robust detail sufficient allegations to establish the basic civil rights claims against Governor Hochul, including notice sufficient to allow Defendant to prepare a defense. ECF-1, ¶¶89-12.  All quotations of the Governor were admitted, excepting one with typographical error (¶129).  Those statements include names of two attorneys

from external organizations she credits of being "joined at the hip with Everytown" while working up the bills that brought the statutes opposed herein. ECF-1, ¶91, including n.54. Those statements include a profusion of allegations of the many additional "experts" and "leaders" and organizations like "Everytown" with which she was working to develop the bills. *Id.,* ¶95, et seq. More than one hundred fifty pages (150) of BATES-numbered discovery documents were served upon State's Counsel.[37] And, a methodical demand for documents was served, pertaining to the Governor, containing specific questions, related to the Complaint and discovery documents produced. ECF 105-2.

Governor Hochul is properly before the court to answer claims under civil rights conspiracy theory because she colluded with one or more persons external to her government staff and legislative or judicial peers for the purpose of depriving, whether directly or indirectly, such class of persons as are ordinary New York residents seeking to exercise their Second Amendment rights as guaranteed to them through the Fourteenth Amendment. Defendant Governor Hochul took affirmative steps, not only to advance her legislative agenda but to push an anti-firearms owner and anti-firearms dealer agenda, including through public statements filled with legal and factual inaccuracies. She has not taken down or caused to be taken down any published materials complained of; these are on official government websites, translated into multiple languages, and relied upon by the press, at large, in writing articles in which she is quoted. Her animus extended twice to public comments concerning this case and these Plaintiffs.

"A conspiracy 'need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct" *Foskey*

---

[37] BATES:000635-810.

*v. Northrup,* No. 20-cv-0504, 2021, WL 1146217, at \*5 (N.D.N.Y. Mar. 25, 2021) (Kahn, J.). The

Second Circuit has stated that a plaintiff's §1985(3) action cannot be judged groundless" where

the plaintiff "stood a reasonable chance of inducing a court to find that [the defendant's] actions

were based on a [class-based] animus…" *Colombrito v. Kelly,* 764 F.2d 122, 130 (2d Cir. 1985).

### III.  PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED IN AGAINST THE NYSP SUPERINTENDENT AND THE DCJS COMMISSIONER DUE TO NON-PERFORMANCE OF REGULATORY RESPONSIBILITIES

Fed. R. Civ. P. 56(a) allows a party to move for summary judgment or partial summary

judgment where the movant shows "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Under N.D.N.Y. L.R. 56.1, a "Statement of

Material Facts" must accompany the motion, including "a short and concise statement of each

material fact about which the moving party contends there exists no genuine issue," with citation

to the record where the fact is established.  Also, in L.R. 56.1, "The record for purposes of the

Statement of Material Facts includes the pleadings, depositions, answers to interrogatories,

admissions, and affidavits."  The "Plaintiffs' Statement of Materials Facts in accordance with

N.D.N.Y. L.R. 56.1" is part of this cross-motion.

"Summary judgment is appropriate when, viewing the evidence favorably to the non-

movant, there is no genuine issue of material fact and the facts as to which there is no such issue

warrant the entry of judgment for the moving party as a matter of law." *Wiggins v. Griffin,* 86 F.4th

987, 992 (2d Cir. 2023), citing Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

248-50 (1986).

"A fact is material under Rule 56 where it "might affect the outcome of the suit under the governing law."" *Burgess v. Costco Wholesale Corp.,* 7:21-cv-5178 (S.D.N.Y., Sep. 27, 2024), p. 6-7 (2024), citing to *Anderson, supra,* at 248.

Plaintiffs move for partial summary judgment in the form of a permanent injunction against a list of statutory provisions, containing direction the NYSP and/or the DCJS publish regulations or otherwise perform regulatory functions.

As laid out in detail in the attached L.R. 56.1 "Statement of Material Facts," the provisions cross-motioned against originated in three bills signed into law between June 6, 2022 and July 1, 2022, specifically, NY S.4970-A, S.51001, and S.9458. These bills contained provisions, which were legislatively-conferred, time-sensitive regulatory authority. The authority to issue the regulations and associated regulatory materials either expressly or impliedly expired on the effective dates of the statutes between September 1, 2022 and December 5, 2022 or at later dates through September 13, 2023.

The regulations and regulatory materials seeking to be enjoined related to operational and performance compliance mandates as continuously expose Dealers in Firearms to criminal charges and other damages. Critical among those items is the failure of the NYSP Superintendent to issue regulations in advance of any on-site period inspections of licensed dealers in firearms, such as Plaintiffs and witnesses. Even without those regulations in place, officers are showing up at dealers' business premises with "checklists" that mimic the operational compliance mandates of NY Gen Bus §875. Those statutory provisions are contested by Plaintiffs under their novel theory of "unconstitutional regulatory overburden." *Accord,* Sections I and II of this Memorandum.

This argument by Plaintiffs "was not a sleeper, plead in a complaint and laying dormant." ECF 122-1, ¶23.  Counsel's affirmation lays out ten examples from the record on this point of regulatory failure. ECF 122-1, ¶24 with subpara.  The 126-page Complaint (ECF-1) was replete with notice of the same, see, e.g., ¶31 with subpara and footnotes.  See also each Plaintiff's prior affidavits. *See,* Gazzola, N., ECF 13-2, ¶¶40-42; Gazzola, S., ECF 13-3, ¶¶25-29; Serafini, ECF 13-4, ¶¶24-32; Mastrogiovanni, ECF 13-5, ¶¶2-28 and ¶¶32-34; Martello, ECF 13-6 at ¶48; Affronti, ECF 13-7, ¶¶38-42.  In summary of the 17-month course of active litigation over the Plaintiffs' request for a TRO/PI, the issue was repeatedly raised.

Without repeating either the above Sections or the "Statement of Material Facts," granting Plaintiffs' request for partial summary judgment to enjoin enforcement of the enumerated statutory sections with unfulfilled regulatory responsibilities of the Defendant NYSP Superintendent and DCJS/Commissioner would significantly advance this case.  Plaintiffs would be released from unauthorized, random officer inspections through the NYSP "Joint Terrorism Task Force" using a non-official "checklist" that produces no results for Plaintiffs, witnesses, or any other dealer.  The encounter is neither educational, nor advisory – neither of which would be authorized under §875, in any event.  Similarly, the encounter leaves the state-licensed dealer in a legal limbo of whether they passed or failed – a non-status further compounded by the NYSP publishing anonymous, numerical results to the Governor and Legislative Leadership, as well as to its website.

Granting the Plaintiffs' request would also release state-licensed dealers in firearms from exposure to arrest for failing to create and maintain manual records of ammunition transactions and other undefined "records."  It would also release state-licensed dealers in firearms from any responsibility to seek other than the county-issued SAR licenses and amendments/endorsements

to the concealed carry permits, which is the process used for concealed carry permits for more than one hundred years.

Although the costs necessitated to develop a 16-hour classroom curriculum may, ultimately, defeat Seth and Nadine Gazzola's intention to return to firearms training, enjoining the NYSP and DCJS from publishing or enforcing a proper 16-hour curriculum for instructors and students, including with a written test, clears the way for individuals to resume private instruction in accordance with county requirements, which, also, has been the *status quo* in New York since the advent of the concealed carry permit. Elimination of the non-existent pathway to DCJS-authorized instructor status will simply revert Plaintiffs to meeting county-defined standards for instructors, as has previously been the case.

## IV. ADDITIONAL ARGUMENTS – COUNTS AND ANCILLARY RELIEF

Counsel proposes to work with State's Counsel concerning these points on the structuring of Plaintiffs' Counts and the ancillary relief. A list is made herein as a placeholder, in the event such discussion does not resolve the formatting. Alternatively, Plaintiffs ask leave to amend their Complaint, following the ruling of the Court. (Plaintiffs also note additional Stipulations reached on the record and progressing to the record could be incorporated at that same time.)

**Count One: §1983 Deprivation of Civil Rights, U.S. Const. Amends. II and XIV**, considered along with Count Five. Plaintiffs concur that both claims are based upon the Second Amendment, via the Fourteenth Amendment. As articulated herein, there are two types of compliance mandates and two types of standards. In one, Plaintiffs articulate derivative claims on behalf of customers that relate to performance mandates under unconstitutional laws that fail under

*Bruen.* In the other, Plaintiffs articulate claims basis operational compliance mandates that fail under "unconstitutional regulatory overburden." Additionally, the claims of Nadine and Seth Gazzola, as firearms instructors, are more readily handled as derivative claims on behalf of their students, both for the curriculum, the test, and their authorization to teach, which then fail under *Bruen* as operating as a ban on firearms instruction mandated under the CCIA. Further, Plaintiffs are individuals with Second and Fourteenth Amendment rights who are, themselves, consumers of firearms and ammunition.

**Count Three: Pre-Emption**. Using the state license as a "Dealer in Firearms" under NY Pen §400.00 as the focus for standing of how Plaintiffs are required to comply with the challenged laws, the same allegations of the Complaint come into a straighter line of sight. The federal pre-emption argument should thus read as applying to those provisions where there is direct conflict of law, as articulated in the Complaint, and where discovery is necessary to resolve an issue of law.

The state statutory provisions alleged to present direct conflict to federal law, where federal law should prevail over the new state laws is thus: at ECF-1, ¶31(c) – NY Gen Bus §875-b(2) (security alarm operators as licensed by New York can include persons prohibited at federal law from being employed at a federally-licensed dealer); ¶31(g)(j) – NY Gen Bus §875-f (any access to all, part, transfer, or copies of federal records, including the ATF Form 4473 and the federal Book of Acquisitions & Dispositions)[38].

---

[38] If Plaintiffs prevail on their cross-motion and the secondary, or, "shadow" books requirements are enjoined, it may also terminate this request. Counsel for the Defendants has suggested that the law does not intend to effect any federally-mandated records of Plaintiffs in their capacity as federally-licensed dealers in firearms or has otherwise used the word "records" without specificity. See, *Gazzola v. Hochul,* Case 22-622, Brief for Respondents, p. 9.

There is a significant difference in how State's Counsel speaks about federal law and how the ATF and ATF Counsel, as well as FBI critical personnel, trains FFLs and attorneys. The casualness of State Counsel is neither reflected in federal law or federal personnel, and is going to require subpoenaed third-party deposition and testimony. Counsel has suggested no evidence of state misuse of the federal NICS system, including for ammunition background check purposes. *Cf.,* Declaration of Plaintiffs' Witness, Elijah Falkner (Sep. 15, 2023). *Gazzola v. Hochul,* No. 23A230, Second Supplemental Briefing to Application, p. 4-7.

The state statutory provisions alleged to present direct conflict to federal law, where discovery is necessary to resolve factual questions is thus: ECF-1, ¶31(a) – NY Exe §228 (transfer of the federal NICS background check to the Defendant NYS Police).

**Count Four: Void for Vagueness Doctrine**. If Plaintiffs prevail in their cross-motion for partial summary judgment, thus eliminating the premises inspection without regulations and advance notification, this claim becomes of less importance.

**Count Six: Attorney's Fees and Costs**. It is acceptable to remove Count Six and to amend ¶359 to state the request for "An award of Plaintiffs' attorney's fees and costs pursuant to 42 U.S.C. §1988 and any other applicable law."

## V.  PLAINTIFFS SHOULD BE GRANTED LEAVE TO FILE AND SERVE AN AMENDED COMPLAINT, IF NEEDED.

When Plaintiffs filed their Complaint on November 1, 2022 (ECF-1), it was in between the CCIA effective date of September 1, 2022 and the impending §875 effective date. One week later, Plaintiffs filed their motion for TRO/PI (ECF 13). That motion reached its terminal decision when

the U.S. Supreme Court denied certiorari in June 2024.  While the Complaint relied upon estimated sales and expense impacts, each item was separately calculated as an estimate.

Plaintiffs and two witnesses now caused to file a set of affidavits with exhibits to bring the narrative chronicled during the TRO/PI appeals process into defense against the motion to dismiss and in support of the cross-motion for partial permanent injunction through summary judgment. During this process, Plaintiffs made several notable adjustments with two plaintiffs withdrawing from the case and two claims withdrawn.

Plaintiffs identify guidance in Fed. R. Civ. P. 15(a)(2) "The court should freely give leave when justice so requires."  As also applies herein, Fed. R. Civ. P. 15(d) a court may permit service of a supplemental pleading "setting out any transaction, occurrence, or event that happened after the date of the [Complaint]."  Further, supplementation may occur "even though the original pleading is defective in stating a claim or defense."  If any claim or portion thereof be at risk of dismissal, Plaintiffs request the opportunity to amend their Complaint.  The current affidavits reflect well upon the Second Circuit decisions in *Gazzola* and in *Antonyuk*.

Under the Amended CMP, Plaintiffs were still within time to serve an amended complaint when Defendants served their motion to dismiss.

The Complaint continues to provide key allegations and the kind of structure that is needed. The challenge it would present to supplement would be the level of detail pouring into a revised pleading that has been answered seems more strategically invested into discovery.  The Parties can continue to stipulate to revise elements of the pleadings, subject to Court approval.  And through discovery, can work towards stipulated exhibits and matters of fact.

Dated:  Keene Valley, New York
         January 20, 2025

*Paloma A. Capanna*

Paloma A. Capanna, Attorney
Attorney for the Plaintiffs
106-B Professional Park Drive
Beaufort, North Carolina 28516
(252) 515-6737
(315) 584-2929 mobile
pcapanna@yahoo.com
N.D.N.Y. Bar Roll No.: 703996

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 20, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of New York by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


<u>*Paloma A. Capanna*</u>
Paloma A. Capanna