*Paloma A. Capanna*
*Attorney & Policy Analyst*

---

| | |
|---|---|
| 106-B Professional Park Drive | P. O. Box 495 |
| Beaufort, North Carolina 28516 | Keene Valley, New York 12943 |
| (252) 515-6737 | |
| (315) 584-2929 mobile | |

*Admitted to practice in NY, N.D.N.Y., W.D.N.Y.,
 2d & 4th Cir., U.S. Supreme Court*

---

October 17, 2023

Hon. Brenda K. Sannes
United States District Court
Northern District of New York
100 South Clinton Street          *via CM/ECF*
Syracuse, New York 13261

Re:  *Nadine Gazzola, et al. v. Gov. Kathleen Hochul, et al.*
     Case No. 1:22-cv-1134 (BKS/DJS)

To the Hon. Brenda K. Sannes:

This letter is written at the invitation of the Court. ECF-136, p. 42-43.

Question 1. The Court dismissed Defendants Hochul and Rosado, and dismissed Counts One through Six of Plaintiffs' Complaint. The Second Amendment individual and derivative claims were expressly dismissed. The Decision and Order at ECF-136 reads that "the State's motion to dismiss and motion for judgment on the pleadings are otherwise denied" (p. 42). It would be of assistance if the Court would please provide clarification of what cause of action the Court intended or did allow to survive against the NYSP Superintendent and the NY Attorney General? Thank you.

Question 2. The Decision and Order at ECF-136 offer submission of this letter brief within 21-days, followed by a responsive period for the State of 14-days. This combination exceeds the 30-day statutory limit for Plaintiffs to file a Notice of Appeal to the Decision and Order at ECF-136. Fed. R. App. P. 4(a)(1)(A). The Decision and Order does not provide an extension of time. It does not state whether an eventual ruling on the letter exchange would (or will) result in an amendment of the Decision and Order, or, issue separately. Was the Court expecting this letter be accompanied by a motion under Fed. R. App. P. 4(a)(5)? Again, thank you.

Comments, Walking Into the Letter Briefing. The cleanest form of communication to the Court is the outline of a proposed amended complaint that follows. It has taken three years of litigation in five cases, dominated by the record in *Gazzola*, and shows the Court what can be

October 17, 2025
Page 2

established through admissible evidence on two primary claims. It brings the allegations current. I am not making the myriad of cites to the case records that would make this difficult to read. I draw largely from the *Gazzola* Complaint, the full length of the TRO/PI, and the full Cross-Motion. I have noted several cases, throughout, particularly in discussion of the 2023 Second Circuit decision in *Gazzola*.

I simplify by stating the two core claims that Plaintiffs can establish, as follows:

1. that the 2022 laws complained of infringe the ability of individuals – freely and through lawful federal means – to exercise their fundamental rights under the Second Amendment, as guaranteed to them via the Fourteenth Amendment Equal Protection Clause, including for the core purpose of self-defense, as pursued through the purchase of handguns, semi-automatic rifles, and ammunition, at and/or through the federally-licensed dealer in firearms, in a scheme that amounts to the "unconstitutional regulatory overburden" of the "state license," including under threat and enforcement of criminal penalties and other punishments for "violations" of performance and operational mandates; and,

2. that the 2022 laws complained of are a novel scheme designed to evade judicial review to put federally-licensed dealers in firearms out-of-business through an abuse of the "state license" concept by attaching to it an overburden of performance and operational compliance mandates associated with criminal and licensing penalties without Due Process of Law under the Fourteenth Amendment.

The Second Circuit Court of Appeals reversed this Court in 2023, finding, as follows:

> "Without questioning Appellants' derivative standing, the district court held that there was "no basis for their novel theory" that New York law violated their customers' right to acquire firearms by imposing too many burdens on them as commercial dealers. *Gazzola*, 645 F.Supp.3d at 71. We conclude that there is a sufficient basis for that theory, but we hold that Appellants are not entitled to preliminary injunctive relief." *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir., 2023). The Second Circuit looked forward to evidence Plaintiffs "would suffer the type of burden that is required." *Id.*

In its footnote 6, the Second Circuit provided what Plaintiffs needed to advance their case *through* an Fed. R. Civ. P. 12(b) motion, specifically:

> "We have no present occasion to set out specific guidance as to how a trial court must assess evidence that a commercial regulation is stifling the individual right of access to firearms (assuming a plaintiff one day produces it). But whatever the standard is, a State cannot impose a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding, responsible

>       citizens from possessing common-use weapons." *Gazzola*,
>       88 F.4th, at 196, n.6.

The Second Circuit was not suggesting a class-action lawsuit needed follow, or that Plaintiffs had a burden to demonstrate themselves to be representative of a class of that manner. The Plaintiffs, by virtue of being required by New York to hold a state license, in addition to their federally-required license, are within the class of licensees subjected to the laws complained of.  See, e.g., NY GBL §875-a, defining "dealer" as used for every mandate within §§875-b through -h.

The Second Circuit was clear that Plaintiffs could bring claims derivatively (*Gazzola*, 88 F.4th, at 194-98), on behalf of customers, the corollary embedded in that derivatives concept is that customers have a right.  The Second Circuit then went too far in its casual and broad use language in the phrase: "threatens a citizen's right to acquire firearms." *Gazzola*, *id.*, 196.  It is how the Circuit Court ended up in a counting exercise of up from zero and down from 1,791 FFL-01/02 upon passage of the laws. *Id*.  The mere use of the words "threatens…[acquisition of] firearms" created an unsupported and unsupportable measure of a fundamental civil right.

The Second Circuit's wrongful reliance upon the pre-*Bruen* strict scrutiny standard used in *Teixeira* was a point I went after the full length of a Petition for Writ of Certiorari to the U.S. Supreme Court, which, unfortunately, was denied. Case 23-995.  *Teixeira* was also a 2017 9th Circuit Court of Appeals review of a zoning case that happened, incidentally, to involve a firearms shop. *Gazzola* involves core Second Amendment rights that successfully pulled forward the one proper precedent, which was *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."). *Gazzola*, 88 F.4th, at 196.

Allow me to distinguish *Gazzola* from the more than one dozen CCIA cases involving "restricted" and "sensitive" places.  If such a plaintiff properly conceal carries, no plaintiff is ever arrested unless probable cause is given to an officer.  As we have been saying: Plaintiffs and all other state-licensed dealers in firearms are in plain view of potential violations every day the physical building stands and the shop is open for business.  *Gazzola* was always going to be the most dynamic case of the 2022 challenges.  That's where numbers on costs, etc., and numbers on industry impacts, become relevant.  Not as a subjective, court-imposed, measure of limitation on how many miles to drive or how long of a commute on a clock before the right of the individual can be freely exercised when it is a Second Amendment right seeking to be exercised in a law-abiding manner through a federally-licensed dealer.

Three years ago, when this case was commenced, we did not know three critical pieces of information that we now know.  First, how enforcement would occur.  Second, whether the NYS Police, the DCJS, and the NY Attorney General would choose to perform the regulatory functions offered to the executive branch offices and division by the NYS Legislature.  What started as a facial challenge has become and is becoming an as applied challenge, as several *Gazzola* Plaintiffs and witnesses have been subjected to enforcement measures, and as plaintiffs in related cases have been subjected to additional enforcement measures.

Third, we did not have a fall-off rate. The September 2025 net fall-off rate for federally-licensed dealers in firearms is just shy of 20%, or, more than 350 dealers. (The number is net of loss versus gain of new licenses.) The absolute rate of fall-off for those federally-licensed dealers in firearms as of July 2022 compared to those who remain as of September 2025 is 30%, or, more than 525 dealers. The fall-off rate is persistent, month-over-month, with no discernable end point.

With all of that in mind, I respectfully submit that the Plaintiffs claims come together as follows as a Second Amendment Claim and as a Due Process Claim. This would leave for criminal and licensing defense purposes the arguments of pre-emption on individual subdivisions, void for vagueness, similarly. Plaintiffs would continue to pursue the Fifth Amendment claim. And would also pursue their claim against the ammunition background check under *Bruen* and in accordance with *Rhode v. Bonta*. These two claims I do not detail, herein, because those are straightforward matters.

### I. State-Licensed Dealer in Firearms Claims Under the Second and Fourteenth Amendments.

**A.   The right of the individual to self-defense is "the central component" of the Second Amendment, as guaranteed to state citizens.**

The individual rights guaranteed under the Second Amendment to the U.S. Constitution are extended to state citizens through the Fourteenth Amendment Equal Protection Clause. U.S. Const., amend. II and amend. XIV, §1; *McDonald v. Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Self-defense is "the central component" of the Second Amendment right. *Heller*, 554 U.S. at 599. "This right applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family."" *McDonald*, 561 U.S., at 767, citing *Heller*, *id.*, at 628-629; see, also, *id.* at 628 (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense).

The U.S. Supreme Court has also recognized semi-automatic rifles as "both widely legal and bought by many ordinary consumers. (The AR-15 is the most popular rifle in the country. See T. Gross, How the AR-15 Became the Bestselling Rifle in the U.S., NRP (Apr. 20, 2023.)" *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (June 5, 2025). The nation's high court also characterizes the semi-automatic rifle is "the most popular rifle in America." *Snope v. Brown*, 605 U.S. \_\_\_\_\_, 145 S.Ct. 1534, 1535 (June 5, 2025) (Thomas, J., dissenting from denial of certiorari). Once an arm is in common use, its mere possession cannot be infringed or forbidden by the Legislature." *Andrews*, 50 Tenn., at 179; see, also, *Heller*, 554 U.S., at 628-29.

And the Second Circuit Court of Appeals has established that ""[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and

to purchase and provide ammunition suitable for such arms, and to keep them in repair.'" *Gazzola*, 88 F.4th, at 196, citing *Andrews*, 50 Tenn., at 178.

### B. Since 1968, the federal government has largely required inter-state commerce in firearms be conducted by individuals through federally-licensed dealers.

In 1968, the U.S. Congress enacted the Gun Control Act. ("GCA") PL 90-618, codified at 18 U.S.C., ch. 44, §921. It was introduced by a Democrat from New York, Emanuel Celler. Through the GCA, Congress delegated authority to private businesses, via federal license, to balance the individual's exercise of Second Amendment rights as restricted by the constitutional public policy choices of government.

For simplicity of this letter, I limit remarks to the FFL-01.

That 1968 federal licensing system has grown, nearly uninterrupted by any lawsuit, over more than fifty years, through more than five major acts of Congress and the creation, expansion, and maturing of the U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives ("BATFE" or "ATF").

For simplicity of this letter, I limit remarks to the purchase of a firearm through a federally-licensed dealer and do not discuss exemptions.

Two key features supporting the perpetuation of the federal system illustrate how the federally-licensed dealer is the fulcrum of balance of the right of the individual and the enforcement of public safety. It is a duality exhibited neither by the individual, nor any government office or agency. (1.) The background check system, particularly as concerns termination by a dealer of a requested purchase by a disqualified person; and, (2.) Firearm trace using records created by and in possession of a dealer, particularly in the law enforcement context. The federally-licensed dealer in firearms is an inextricable part of a federal system serving both individual and government, whilst guarding against the excess of either or both.

Plaintiffs do not challenge any aspect of the federal licensing system. Plaintiffs are the face of public safety and the front line of law enforcement. This is not hyperbole. Using just the two examples of federally-required performance mandates of dealers, it is the Plaintiffs who deny and delay firearms transactions at the counter at the direction of the ATF and the FBI during the background check. 18 U.S.C. §922(d), 27 CFR §478.99(c). And, it is the Plaintiffs who are required to respond to a trace request from the ATF or the FBI, using the ATF Form 4473 at their business premises, within 24-hours. 18 U.S.C. §923(g)(1)(A), 27 CFR §478.101, 27 CFR, Subpt. H ("Records"), and 27 CFR §478.121-478.134; 18 U.S.C. §923(g)(6), 27 CFR §478.39a; 18 U.S.C. §923(g)(1)(B), 27 CFR §478.23(b)(2)(ii). These performance mandates are completed under federal statutory and regulatory mandates with corresponding administrative and/or criminal penalties. 18 U.S.C. §922(t)(5).

Without federally-licensed dealers in firearms operating in all 50 States, Washington, D.C., Puerto Rico, and U.S. Territories, the public safety brakes surrounding the Second

Amendment are disabled. The country reverts to the 1963-1965 run-up to the GCA when a would-be assassins could mail order a firearm or go to a local hardware store.

New York State places so much value in the ATF and the national FFL-based trace program that the amendments that became the new laws complained of in this case were made to new statutory requirements for all law enforcement agencies in New York to route every recovered firearm through ATF trace. New York State Police and lesser county and municipal law enforcement since 2022 are required to route every firearm recovered through the ATF trace. The entire state is ATF-FFL dependent for law enforcement purposes.

### C.   The NY-Required License Impacts the FFL's Otherwise Lawful Ability to Sell Handguns, Semi-Automatic Rifles, and Ammunition.

New York law does not require a state-licensed dealer to be federally-licensed. Federal law uniformly requires the federal license to engage in the business of the acquisition and disposition of firearms in the lawful stream of interstate commerce.

The State of New York requires a state license <u>only</u> if a "dealer in firearms" is going to lawfully sell, *inter alia*, a pistol or revolver (NY PEN §400.00(1-a), (2); §265.00(3) and (9)) and, a semi-automatic rifle (see, also, NY PEN §265.00(21)).[1] The NYS requirement for the state license to sell a handgun and/or a semi-automatic rifle is the connection to the individual customer.

The State of New York also <u>requires</u> either a state license as a dealer or registration as a "Seller of Ammunition" in order to sell ammunition. The state-licensed dealer is "automatically registered by the New York State Police as a seller of ammunition and do[es] not need to take any further action." FFLs without a state dealer license must otherwise register as a "Seller of Ammunition." *See*, NYS Police website, "Ammunition Registration," at https://gunsafety.ny.gov/ammunition-registration. Sellers of ammunition must participate in the new ammunition background check system, as complained of, herein, as being unconstitutional under *Bruen* and in accordance with *Rhode v. Bonta*. The NYS requirement for the state license or registration to sell ammunition is connected to the individual customer.

The focus of the state licensing requirements are the three aspects of firearms ownership, possession, and use already defined by the U.S. Supreme Court and the Second Circuit to be core functions of the Second Amendment. *Supra*.

### D.   Defendants are Abusing the "State License" Concept to Impact the Individual's Ability to Freely Exercise Their Second Amendment Rights through the FFL.

I do not repeat herein the extensive list and detail of operational compliance mandates under NY GBL §875, nor the list and detail of performance mandates surrounding the

---

[1] Other firearms restricted from sale in the absence of a state license are not discussed, herein. Those firearms are not relevant to the operations of Plaintiffs' businesses.

ammunition background check, the SAR license check, the NYSP take-over of the entire firearms background check system in violation of state law limiting NY to a partial-POC state, and the vast expansion of NYSP background checks to include all firearms even, e.g., firearms exempted under federal law as qualifying as "antique" firearms. Those arguments have been detailed and would be structured in current form in an amended complaint.

Plaintiffs have offered specific micro-impact data that can contour the original complaint projections. Plaintiffs have also already offered customer impact data, and which is reflected through sales data examples. This, too, can contour the original complaint projections.

Even the State would likely concede: "A State cannot circumvent those holdings [*Heller* and *Bruen*] by banning outright the sale or transfer of common-use weapons and necessary ammunition." Gazzola, 88 F.4th, at 195.

But, nor can the State turn the equation upside-down and inside-out by unduly burdening the right of the individual to participate in the lawful exercise of their Second Amendment rights through lawful means at an FFL by abusing the "state license" concept to drive the FFL out-of-business and off its core license functions. As the Second Circuit stated in Gazzola, 88 F.4th, at 196:

> "For example, when the Supreme Court recognized a right to abortion, it correspondingly recognized that a State could not circumvent the Fourteenth Amendment's prohibition on abortion bans by imposing unnecessary special regulations on abortion providers as a class that had "the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion"; such would constitute "an undue burden on the right." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 2309, 195 L.Ed.2d 665 (2016), as revised (June 27, 2016) (internal quotation marks omitted), abrogated by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022)."

Plaintiffs did not on a pre-discovery Fed. R. Civ. P. 12(b) motion contour 'how much' impediment would constitute infringement of the customer's ability to freely exercise their civil rights. It is respectfully submitted, consistent with the Complaint, that the state laws complained of are duplicitous of federal requirements, conflict with federal requirements, are incapable of compliance, are excessively expensive, and on. The Plaintiffs' allegations clearly meet the analogous situation of "unnecessary special regulations" placed upon targeted types of medical providers, albeit phrased by Plaintiffs as "unconstitutional regulatory overburden."

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) "The plausibility standard is not akin to a "probability requirement."" *Id.* Not every last detail of a case must be known at the beginning.

### E. Enforcement is Underway Through Statutory, Extra-Judicial, and Other Means, Against Plaintiffs, Witnesses, and Other FFL-State Licensees.

As Plaintiffs have consistently documented at all levels of Court, the NYS Police are pursuing on-site dealer "inspections." According to their annual reports, the NYS Police have failed Thirty-Nine Dealers in 2023 and 2024. ECF 122-6 (2023) and the 2024 report is on the NYSP searchable documents page at https://troopers.ny.gov/new-york-state-police-publications.

As Plaintiffs documented in detail in their recent Cross-Motion, the NYS Police, NYS AG, and the NYS DCJS chose not to timely publish or promulgate regulations. Among those failures was the opportunity for the NYSP to accept and dimension the regulatory authority to conduct "inspections" of state-licensed dealers in firearms.

Regardless, NYS Police officers started going on-site to dealers' business premises in 2023, 2024, and 2025 using various iterations of a prop in the form of a "checklist" with thirty-one (31) "yes/no" line items from NY GBL §875 to pass and fail dealers. The "checklist" is so defective on its face that it does not even include an officer assessment of whether a dealer was "knowingly" in violation of the law at the level of criminal *scienter* or an officer attestation.

The NYSP Superintendent has the power to charge a violation, to refer a violation to a county district attorney, or to make written request to the NY Attorney General concerning those dealers found to be in knowing violation of NY GBL §875, under NY GBL §875-i.

A criminal charge and conviction of a state-licensee would result in a cascade of legal damages to the dealer, as dimensioned throughout this case, straight down to the dealer's personal rights under the Second Amendment in all states and locations under ATF jurisdiction.

On July 18, 2025 in a media interview, an official spokesperson for the NYS Police took the public position that they have "no regulatory authority and cannot impose penalties upon firearms dealers." The article continues: "Instead, state police work with those dealers to help bring them into compliance with the regulations…" Hyman, Mel, "'Consequences Will Be Lethal': New York ATF Enforcement To Be Slashed Under Trump," <u>New York Focus</u> (July 18, 2025) at https://nysfocus.com/2025/07/18/trump-atf-new-york-cutbacks. This was an affirmative false statement of law and facts to the public. It was a public relations trick undertaken the same day the NY Attorney General took her worst actions, to date, against a dealer in firearms (below).

### II. State-Licensed Dealer in Firearms Claims Under the Fourteenth Amendment Due Process Clause.

Defendants are not only infringing the civil rights of individual customers, Defendants are doing so through means and methods that infringe the Due Process rights of Plaintiffs, witnesses, and industry members. A license, once issued, becomes a property right of the holder that triggers the Due Process Clause of the Fourteenth Amendment. Wrongful actions undertaken by Defendants are intentional and systematic, and come in waves. The actions evidence an intention to achieve goals against federally-licensed dealers. The systematic and

random attacks on state-licensed dealers has significantly heightened the fear of Plaintiffs to arrest, extra-judicial actions, public shaming via NY Attorney General press release and media coverage, and associated punishments. Actions being taken against dealers, including Plaintiffs and others in the industry include, but not limited to:

1.     No dealer has ever been notified by the NYS Police of results of any on-site visit by a NYS Police officer that is being characterized as an "inspection." No dealer has received any subsequent communication from on on-site follow-up by any officer who presented him or herself on their business premises with a "checklist."

2.     No dealer has been able to obtain answers to questions about the new laws from Defendants NYS Police and NY Attorney General. Uniformly, in all instances, the officers have pled ignorance of the law and of the operations of the licensed dealers, while asking them for "help" in dropping off "educational materials," completing the checklist, and "conducting a survey for the NY Attorney General," or other, similar words to this effect. During telephone calls, for example, officers refuse to give their names, and will only give numbers such as #326, or, more recently "operator #301."

3.     No dealer has received assistance to achieve operational compliance from Defendants NYS Police, NY Attorney General, and the NYS DCJS.

4.     The public-facing and ever-changing "official" website page of the NYS Police – pointed to repeatedly by Defendants and Counsel to the Defendants – contains misstatements of law and misrepresentations of actions being carried out by NYSP officers and Assistant Attorneys General. Specific items have been documented within Plaintiffs' litigation submissions, which have gone uncorrected.

5.     The official, mandatory employee "training materials" contain errors of law. Specific items have been documented within Plaintiffs' litigation submissions, which have gone uncorrected.

6.     The NYS Police has circulated information gathered concerning dealers to the NY Attorney General without legal authority and without written request of the NYS Police Superintendent.

7.     The "checklists" are showing up in NY Attorney General civil and extra-judicial proceedings against dealers, and are being submitted to courts as "evidence" of "violations" of NY GBL §875. The NY Attorney General has taken affirmative and public enforcement actions through extra-judicial means against at least three dealers, including the pending state court cases of those dealers to quash extra-judicial subpoenas and "findings" with "penalties."

8. The NY Attorney General has taken affirmative and public enforcement actions against at least one dealer, claiming to use the "checklist" and other records obtained from the NYS Police. That dealer is now suing the NY Attorney General and the NYS Police in federal court for libel *per se* and for 42 U.S.C. §1983 violations of his Second Amendment, First Amendment Free Speech Clause, and Fourteenth Amendment Due Process rights, as guaranteed

through the Fourteenth Amendment Equal Protection Clause. The "Press Release" of the NY Attorney General against the dealer was published on July 18, 2025, the same day an enforcement petition was filed against him under NY GBL §875 and NY GBL §898-b.

9. On July 18, 2025 – that same date and in the same article noted twice, above, a spokesperson for Governor Kathy Hochul "said New York State Police are already required to "complete rigorous inspections of licensed gun dealers across the State, and we will continue to follow the law." Hyman, *supra*.

The essence of the complaint is to provide notice of the claims intended to be proven. Nothing within the complaint factual allegations was off course. Plaintiffs are experts in their field, and, collectively engage in hundreds of transactions per week.

At this point, it is not discovery, but experience, which has taught us how Defendants are systematically operating under and even in excess of and around the new laws – as if the new laws weren't sufficiently bad and the fall-off out of fear and without need of criminal prosecution wasn't fast enough. Thank you for the opportunity to attempt to draw the Court more completely into how this case has developed and what an amended complaint can contain.

Respectfully submitted,

*Paloma A. Capanna*

Paloma A. Capanna


c.: Aimee Cowan, Esq., NYS Office of the Attorney General (via CM/ECF)