UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

Nadine Gazzola, individually, and as co-owner, President, and as BATFE Federal Firearms Licensee Responsible Person for Zero Tolerance Manufacturing, Inc., et al.

*Plaintiffs*,

-against-

STEVEN G. JAMES, in his Official Capacity as the Superintendent of the New York State Police; and LETITIA JAMES, in her official capacity as Attorney General of the State of New York.

*Defendants*.

1:22-cv-1134
(BKS/DJS)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED R. CIV. P. 12(c)

LETITIA JAMES
Attorney General of the State of New York
Syracuse Regional Office
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, NY 13202

By:     Aimee Cowan, Esq.
        Assistant Attorney General, of Counsel
        Bar Roll No. 516178
        Telephone: (315) 448-4800
        Fax: (315) 448-4853
        E-mail: Aimee.Cowan@ag.ny.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS…………………………………………………………...2

            A.  New York's Ammunition Background Check System………………………2

            B.  New York's Licensing Requirement for Semiautomatic Rifles………………4

STANDARD OF REVIEW…………………………………………………………5

ARGUMENT………………………………………………………………………..6

**POINT I:**     **PLAINTIFFS' DERIVATIVE SECOND AMENDMENT CHALLENGE TO THE AMMUNITION BACKGROUND CHECK SHOULD BE DISMISSED………………………………………………………………...6**

            A.  Under the Second Circuit's Decision in <u>NYSFA</u>, The Ammunition Background Check Does Not Implicate The Second Amendment's Text……6

                1.  Under <u>NYSFA</u>, Plaintiff's Facial Challenge Fails………………………..8

                2.  Plaintiffs Have Not Pled an As-Applied Challenge, and <u>NYSFA</u> Would Render Any Such Challenge Meritless………………………………...9

                3.  <u>NYSFA</u> Holds That The Background Check Fee Is Not A Constitutional Violation……………………………………………………………..10

            B.  Background Checks In Connection With The Purchase of Ammunition Are Consistent With American Law And History………………………………11

                1.  The Supreme Court Has Recognized the Constitutionality of Background Checks…………………………………………………………………12

            C.  Nominal Fees To Support The Background Check System Are Constitutional………………………………………………………………..16

                1.  Plaintiffs' Factual Assertions Are Unsupported And Contradicted By NYSP's Data………………………………………………………………17

**POINT II:**     **PLAINTIFFS' CHALLENGE TO LICENSING FOR SEMIAUTOMATIC RIFLES FAILS AS A MATTER OF LAW……………………………………18**

A. The Semiautomatic Rifle Law Is Constitutional Under Supreme Court And Second Circuit Precedent…………………………………………18

  1. Shall-Issue Licensing Laws Do Not Infringe The Plain Text of The Second Amendment……………… …………………………………………18

    a. The Semiautomatic Rifle Law Is a Presumptively Constitutional Condition On Sale……………………………………………………………19

    b. Licensing of Semiautomatic Rifles Is Consistent With American History……………………………………………………………21

B. The Data Show That The Semiautomatic Rifle Law Is Functioning Effectively……………………………………………………………23

CONCLUSION..........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Antonyuk v. James,*
 120 F.4th 941 (2d Cir. 2024)………………………………………….....2, 21, 22, 23

*B&L Prods. v. Newsom,*
 104 F.4th 108 (9th Cir. 2024)………………………………………………………..21

*Bianchi v. Brown,*
 111 F. 4th 438 (4th Cir. 2024)…………………………………………….19, 22, 23

*CONMED Corp. v. Fed. Ins. Co.;*
 590 F. Supp. 3d 463 (N.D.N.Y. 2022)…………………………………………5, 6

*Cox v. State of New Hampshire,*
 312 U.S. 569 (1941)………………………………………………………...16

*Desmarattes v. Equifax,*
 No. 22CV3330KAMTAM, 2023 WL 8473362 (E.D.N.Y. Dec. 7, 2023)…………..……6

*District of Columbia v. Heller,*
 554 U.S. 570 (2008)…………………………………………………………2, 7, 20

*Frey v. City of New York,*
 157 F.4th 118 (2d Cir. 2025)……………………………………….....……..1, 18, 19, 21

*Gazzola v. Hochul,*
 88 F.4th 186 (2d Cir. 2023)………………………………………….7, 11, 17, 20, 21, 25

*Gazzola v. Hochul,*
 No. 22 Civ. 1134, 2025 WL 2771835 (N.D.N.Y. Sept. 26, 2025)……………………7, 17

*Giambalvo v. Suffolk County,*
 155 F.4th 163 (2d Cir. 2025)………………………………………1, 9, 10, 11, 18, 19, 21

*Hayden v. Paterson,*
 594 F.3d 150 (2d Cir. 2010)…………………………………………………………..6

*Heller v. District of Columbia,*
 801 F.3d 264 (D.C. Cir. 2015)……………………………………………………16

*Higbie v. James,*
 795 F. Supp. 3d 307 (N.D.N.Y. 2025)………………………………………………18

*Jacoby & Meyers, LLP v. Presiding Justices,*
    852 F.3d 178 (2d Cir. 2017)……………………………………………………………..9

*JBCHoldings NY, LLC v. Pakter,*
    931 F. Supp. 2d 514 (S.D.N.Y. 2013)……………………………………………..…..23

*Jones v. Cuomo,*
    542 F. Supp. 3d 207 (S.D.N.Y. 2021)……………………………………………….…..18

*Koons v. Platkin,*
    Civ. No. 22-7464, 2023 WL 3478604 (D.N.J. May 16, 2023)………………..……….16

*Kwong v. Bloomberg*,
    723 F.3d 160 (2d Cir. 2013)……………………………………………….…..10, 11, 16, 17

*L-7 Designs, Inc. v. Old Navy, LLC,*
    647 F.3d 419 (2d Cir. 2011)……………………………………………………………6, 24

*Libertarian Party of Erie Cty. v. Cuomo,*
    300 F. Supp. 3d 424 (W.D.N.Y. 2018)……………………………………………..…..8

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)…………………………………………………………………....20, 23

*McGregor v. Suffolk County*,
    No. 23 Civ. 1130 (E.D.N.Y. Dec. 22, 2025)………………………………………21, 22, 23

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024)…………………………………………………………12, 21

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose,*
    No. 22-cv-501, 2023 WL 4552284 (N.D. Cal. July 13, 2023)…………………….…..16

*Nat'l Ass'n for Gun Rights v. Lamont,*
    153 F.4th 213 (2d Cir. 2025)……………………………………………………….…..22

*New York State Firearms Association v. James,*
    157 F.4th 232 (2d Cir. 2025)…………………………………………………1, 7, 8, 9, 10, 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022)……………………………..…..7, 8, 9, 11, 12, 13, 14, 18, 19, 20, 21

*O'Connell v. Gross,*
    Civ. No. 19-11654, 2020 WL 1821832 (D. Mass. Apr. 10, 2020)………………..…..16

*Ore. Firearms Fed'n, Inc. v. Brown,*
    644 F. Supp. 3d 782 (D. Or. 2022)……………………………………………………19

*Simeone v. T. Marzetti Co.,*
    No. 21-cv-9111, 2023 WL 2665444 (S.D.N.Y. Mar. 28, 2023)……………………………6

*Singleton v. Fifth Generation, Inc.,*
    No. 15-cv-474, 2016 WL 406295 (N.D.N.Y. Jan. 12, 2016)………………………………6

*Toth v. New York City Dep't of Educ.,*
    No. 21-CV-4245, 2024 WL 703053 (E.D.N.Y. Feb. 21, 2024)…………………………..6

*United States v. Daniels,*
    566 F. Supp. 3d 191 (E.D.N.Y. 2021)……………………………………………………..18

*United States v. Rahimi,*
    602 U.S. 680 (2024)………………………………………………………....8, 12, 13, 21

*United States v. Saleem,*
    No. 21-cr-86, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023)…………………………16, 19

*United States v. Vereen,*
    152 F.4th 89 (2d Cir. 2025)………………………………………………...7, 20

*United States v. White,*
    No. 23-CR-140, 2023 WL 6066201 (S.D.N.Y. Sept. 18, 2023)……………………..12, 16

*United States v. Young,*
    639 F. Supp. 3d 515 (W.D. Pa. 2022)………………………………………..…14, 16

*Zherka v. Bondi,*
    140 F.4th 68 (2d Cir. 2025)………………………………………………….……..14

## STATUTES

18 U.S.C. § 922(t)………………………………………………………………………3

28 C.F.R. § 25.2………………………………………………………………………...2

1775-76 Mass. Acts & Laws 31- 32…………………………………………………15

1776-77 N.J. Acts 90…………………………………………………………………15

1778 Pa. Laws 126…………………………………………………………………15

CPLR Article 63-A……………………………………………………………………..4

CPLR Article 78……………………………..………………………………………………..3

Fed. R. Civ. P. 12(b)(6)……………………………………………………………………….6

Fed. R. Civ. P. 12(c)……………………………………………………………………….5, 6

Fed. R. Civ. P. 12(d)……………………………………………………………………....17

Fed. R. Evid. 201(b)(2)……………………………………………………………………18

N.Y. Executive Law § 228……………………………………………………………….2, 6

N.Y. Executive Law §228(5)……………………………………………………………….17

N.Y. Executive Law §228(5)(a)……………………………………………………2, 11, 15

N.Y. Executive Law § 228(8)…………………………………………………………….....3

N.Y. Penal Law § 265.00(10). …………………………………………………………...…5

N.Y. Penal Law § 265.00(17)……………………………………………………………....4

N.Y. Penal Law § 400.00(1)……………………………………………………………...5, 21

N.Y. Penal Law § 400.00(2)…………………………………………………………….....21

N.Y. Penal Law § 400.00(3)…………………………………………………………………5

N.Y. Penal Law § 400.00(4)…………………………………………………………………5

N.Y. Penal Law §400.02(2)…………………………………………………………….1, 6

N.Y. State Fin. Law § 99-pp……………………………………………………………...17

N.Y. State Fin. Law § 99-pp(3)…………………………………………………………….3

N.Y. State Fin. Law § 99-pp(5)…………………………………………………………….3

Pub. L. No. 72-275, 47 Stat. 650 (1932)……………………………………………….23

**SESSION LAWS AND LEGISLATIVE MATERIALS**

2022 N.Y. Laws ch. 212……………………………………………………………..4

**MISCELLANEOUS**

1 Nathaniel B. Shurtleff, <u>Records of the Governor and Company of the Massachusetts Bay in New England 211</u> (1853)…………………………………………………………………………14

2 <u>Records of the Colony of Rhode Island and Providence Plantations</u> 561 (1857)………………15

VI John Broadhead, <u>Documents Relative to the Colonial History of the State of New-York</u> 254-55 (1855)…………………………………………………………………………………………14

VII William Waller Hennig, <u>A Collection of All the Laws of Virginia 35</u> (1820)………………15

An Act to Punish the Carrying or Selling of Deadly or Dangerous Weapons Within the District of Columbia, and for Other Purposes, 27 Stat. 116, 116–17, ch. 159 (1892)…………………………22

<u>Colonial Laws of New York from the Year 1664 to the Revolution</u> 40-41 (1894)………………13

George Staughton, et al., <u>Charter to William Penn, and Laws of the Province of Pennsylvania, Passed between the Years 1682 & 1700</u> 32 (1879)……………………………………………13

Edward Rawson, et al., <u>The General Laws and Liberties of the Massachusetts Colony</u> 74-75 (1679)…………………………………………………………………………………………14

https://tinyurl.com/2s35sxtw.....................................................................................................2

J. Hammond Trumbull, <u>The Public Records of the Colony of Connecticut</u> 79 (1850)…………14

Office of the New York State Attorney General, <u>Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022</u> at 9-10 (available at https://tinyurl.com/4r34ws58).....................................................................................................5

Statement of Senate Majority Leader Stewart-Cousins, N.Y. State Senate Stenographic Record, Regular Session at 5365:21-5366:12 (June 2, 2022)……………………………………………5

## PRELIMINARY STATEMENT

The Court's November 17, 2025 Text Order, ECF No. 143, identified two final provisions of New York state law still at issue in this case: "(1) New York's ammunition background check requirements" and "(2) New York's semiautomatic rifle licensing requirement." The constitutionality of both laws is now firmly established based on Second Circuit decisions issued in the past few months, and both laws are solidly grounded in American history and tradition.

Shortly after the Court's decision on the previous motion in this case, the Second Circuit issued its opinion in New York State Firearms Association v. James, 157 F.4th 232 (2d Cir. 2025) ("NYSFA"), unanimously upholding the ammunition background check both facially and as-applied. The Circuit held that the check system "is no doubt a commercial sale regulation," presumptively constitutional under Supreme Court jurisprudence, and that it does not "meaningfully constrain an individual's right to 'keep' and 'bear' arms so as to implicate the plain text of the Second Amendment." Id. at 245, 249-50. Because a mere background check does not implicate the Amendment's text, this court, like the Second Circuit, need not engage in a historical analysis. But if it were to do so, the history discussed below shows that measures keeping ammunition from falling into dangerous hands have been a part of American tradition for centuries.

Although the Second Circuit has not addressed the licensing of semiautomatic rifles in specific, it has released two opinions this year holding that shall-issue licensing laws like New York's do not implicate the text of the Second Amendment, absent excessive delays or procedural abuses. See Giambalvo v. Suffolk County, 155 F.4th 163, 181 (2d Cir. 2025); Frey v. City of New York, 157 F.4th 118, 140 (2d Cir. 2025). There is no reason that this holding would apply differently to semiautomatic rifles than to handguns, particularly when it is handguns, not semiautomatic rifles, that the Supreme Court recognizes as "the quintessential self-defense

1

weapon." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 629 (2008).  The historical sufficiency of licensing laws is also established by the Second Circuit's extensive analysis in <u>Antonyuk v. James</u>, 120 F.4th 941, 987 (2d Cir. 2024), which traced American history and found it "impossible to read out of our historical tradition the longstanding and established restriction of [firearm] licenses by those who present a danger to themselves or others."  <u>Id.</u> at 991.  And contrary to allegations in the Complaint, sources subject to judicial notice and Plaintiffs' own admissions demonstrate that semiautomatic rifle licenses are broadly issued and that the rifles remain available to purchase, including from Plaintiffs themselves.  Because both challenged statutes are constitutional as a matter of text, binding case law, and American history, the Court should issue judgment on the pleadings.

## STATEMENT OF FACTS

### A.  New York's Ammunition Background Check System

Since September 13, 2023, approximately a year after the Complaint was filed, a background check has been required with every purchase of ammunition in New York.  <u>See</u> Declaration of Michael Deyo ("Deyo Dec.") ¶¶ 5, 14; <u>see also</u> N.Y. Penal Law §400.02(2); N.Y. Executive Law § 228.  The NYSP has implemented a background check system to use for both firearm purchases, which involve querying the federal National Instant Criminal Background Check System ("NICS"), and for ammunition purchases, which do not.  <u>Id.</u> ¶¶ 5, 26.  For firearm purchases, New York is one of twenty "point of contact states" in which "a state or local law enforcement agency serv[es] as an intermediary between an FFL[1] and the federal databases checked by the NICS."  28 C.F.R. § 25.2; <u>see</u> https://tinyurl.com/2s35sxtw.  In a point of contact state, the law enforcement agency "will receive NICS background check requests from FFLs, check state or local record systems, perform NICS inquiries, determine whether matching records

---

[1] FFL stands for "Federal Firearms Licensee," a certified gun store or other dealer in firearms.

provide information demonstrating that an individual is disqualified from possessing a firearm under Federal or state law, and respond to FFLs with the results of a NICS background check." Id.; see generally 18 U.S.C. § 922(t) (laying out the federal-law background check requirements for firearm purchases); Deyo Dec. ¶¶ 28-31.

When an ammunition sale is made, a dealer contacts NYSP directly. Id. ¶ 28. NYSP then performs searches against New York State data sources to determine if the purchase is subject to any federal or state disqualifier. Id. If there are no potentially disqualifying State records identified, the transaction is approved and a "proceed" response is transmitted to the dealer. Id. If any potentially disqualifying records are identified, the transaction is "delayed," and an examiner employed by the State Police reviews the application by hand. Id. The examiner will review the response, conduct any additional research required, and ultimately adjudicate the transaction as either a "proceed" or "deny."[2] Id.

The background check system is supported via a fee paid by dealers, see N.Y. Executive Law §228(5)(a), which is $2.50 for background checks with an ammunition purchase. Id. ¶¶ 6, 7. The money collected from background check fees is used only to support the background check system, as the governing statute requires that "all revenues" in connection with background checks are placed in a "background check fund," which may be used only "for the direct costs associated with background checks." Id. ¶ 45; N.Y. State Fin. Law § 99-pp(3). If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." Id. § 99-pp(5); see generally Deyo Dec. ¶ 27.

---

[2] If the individual is denied, s/he can appeal the decision to the NYSP, which must explain the reason for the denial. N.Y. Executive Law § 228(8); see Deyo Dec. ¶¶ 42, 43. If the applicant disagrees with the reason given, he may appeal to the Attorney General, id.; see Deyo Dec. ¶ 44, and can subsequently challenge any decision in New York State court by filing a special proceeding under CPLR Article 78.

Recent Data From The Background Check System

The system for ammunition background checks became operational on September 13, 2023, Deyo Dec. ¶¶ 5, 14, 28, and has since been operating without issue. Id. ¶ 32. From September 13, 2023, to December 15, 2025, the State Police processed 806,782 ammunition transactions, of which 801,346 (or 99.33%) were approved. Id. ¶ 33. During the same period, only 4,532 ammunition transactions were denied, (0.56% of all checks), while 904 checks, or 0.11% of the total, were "delayed" while further human review was performed to determine whether the prospective purchaser may legally take possession of ammunition. Id. ¶¶ 35, 36. As of December 17, 2025, only 2,024 people appealed the denial of their background check, with 175 of those appeals ultimately being overturned. Id. ¶ 37. Of the 1,849 appeals upheld, 702 were for mental health-related issues, 503 were based on state statutory disqualifiers (either a conviction for a "serious offense" under N.Y. Penal Law § 265.00(17) or an active Extreme Risk Protection Order under CPLR Article 63-A), and 381 were for a prior felony conviction. Id. ¶ 39. Like any other database, the background check system may need to be down at times for scheduled maintenance, unexpected power outages, or other events beyond NYSP's control. However, there has been no significant downtime since the system went live, as evidenced by the number of transactions processed. Id. ¶ 46.

**B. New York's Licensing Requirement for Semiautomatic Rifles**

In June 2022, the New York State Legislature enacted a law requiring anyone seeking to purchase or take ownership of a semiautomatic rifle to obtain either a semiautomatic rifle license or a semiautomatic rifle endorsement on an existing pistol license. See 2022 N.Y. Laws ch. 212. The law was enacted in response to the May 2022 mass shooting in Buffalo, when a shooter motivated by white supremacist ideology used a recently-purchased semiautomatic rifle to kill ten

people and wound three others. See 2022 N.Y. Laws ch. 212; see also Office of the New York State Attorney General, Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022 at 9-10 (available at https://tinyurl.com/4r34ws58).  At the time of the Buffalo shooting, there was no statewide license requirement for persons wishing to purchase a semiautomatic rifle. Accordingly, the purpose of the law was "to close loopholes that directly address the gaps in our laws exposed by these horrific shootings in Buffalo . . . and around the country." Statement of Senate Majority Leader Stewart-Cousins, N.Y. State Senate Stenographic Record, Regular Session at 5365:21-5366:12 (June 2, 2022).

The application process for a semiautomatic rifle license is functionally identical to the application for a license to possess a pistol or revolver, and subject to the same standards.  See N.Y. Penal Law § 400.00(1), (3). In New York State, investigations of license applications are conducted "by the duly constituted police authorities of the locality where such application is made," N.Y. Penal Law § 400.00(4), and licensing decisions are made by a statutorily defined "licensing officer," which is a police commissioner or sheriff in New York City and Long Island, and a locally-based state judge elsewhere. Id. § (1); see N.Y. Penal Law § 265.00(10).  Between September 4, 2022, and approximately March 4, 2025, there were approximately 26,117 new firearm licenses issued throughout the State that include the authority to purchase/possess semiautomatic rifles, and during the same time period there were approximately 47,875 firearm license amendment transactions throughout the State that involve licenses which include the authority to purchase/possess semiautomatic rifles. Deyo Dec. ¶ 50.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." CONMED

Corp. v. Fed. Ins. Co., 590 F. Supp. 3d 463, 468 (N.D.N.Y. 2022). A motion for judgment on the pleadings is governed by "the same standard" as a motion to dismiss under Rule 12(b)(6). Id. at 468-69. When deciding a 12(c) motion, "the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" CONMED Corp., 621 F. Supp. 3d at 283 (citing L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (quotation omitted). If a pleading is contradicted by a document either attached to that pleading or otherwise "made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." Toth v. New York City Dep't of Educ., No. 21-CV-4245, 2024 WL 703053, at *3 (E.D.N.Y. Feb. 21, 2024) (quotation omitted)); see also Desmarattes v. Equifax, No. 22-CV-3330, 2023 WL 8473362, at *8 (E.D.N.Y. Dec. 7, 2023). Additionally, when considering a 12(c) motion, the court may take judicial notice of, and consider, "matters of public record," including agency decisions, documents issued by an agency, and other information and material retrieved from an agency's official website. Singleton v. Fifth Generation, Inc., No. 15-cv-474, 2016 WL 406295, at *2-*3 (N.D.N.Y. Jan. 12, 2016) (collecting cases); Simeone v. T. Marzetti Co., No. 21-cv-9111, 2023 WL 2665444, at *1-*2 (S.D.N.Y. Mar. 28, 2023).

## ARGUMENT

**POINT I:     PLAINTIFFS' DERIVATIVE SECOND AMENDMENT CHALLENGE TO THE AMMUNITION BACKGROUND CHECK SHOULD BE DISMISSED**

### A.     Under the Second Circuit's Decision in NYSFA, The Ammunition Background Check Does Not Implicate The Second Amendment's Text

Plaintiffs' Complaint challenges New York Executive Law § 228 and New York Penal Law § 400.02(2), to the extent that they require a background check for ammunition purchase purposes. ECF No. 1 ¶ 181. In the Court's Decision regarding Defendants' original motion for judgment on the pleadings, the Court declined to address the claim without complete briefing but

noted that the ammunition background check provision had been briefed, argued and was awaiting decision by the Second Circuit. Gazzola v. Hochul, No. 22 Civ. 1134, 2025 WL 2771835, at *16 n.15 (N.D.N.Y. Sept. 26, 2025) ("Gazzola III").

The constitutionality of the ammunition background check has now been decided. On October 15, 2025, nearly three weeks after the Court's decision in Gazzola III, the Second Circuit issued its opinion in NYSFA, unanimously affirming the denial of a preliminary injunction against the same ammunition background check provision challenged by Plaintiffs here. The Second Circuit concluded that the ammunition background check provisions do not implicate the plain text of the Second Amendment, and so a Second Amendment challenge fails under step one of the Bruen/Rahimi framework. See NYSFA, 157 F.4th at 245.

The Circuit began by noting that "New York's background check regime is no doubt a 'commercial sale regulation' that imposes 'conditions and qualifications' on the ammunition retailer. Id. at 245 (quoting United States v. Vereen, 152 F.4th 89, 97 (2d Cir. 2025)); cf. Heller, 554 U.S. at 626-27 & n.16 (describing such measures as "presumptively lawful"). Accordingly, the court noted that the standard of review at the textual stage is "whether the challenged commercial regulations . . . meaningfully constrain an individual's right to 'keep' and 'bear' arms." Id. at 246 (citing, inter alia, Gazzola v. Hochul, 88 F.4th 186, 197 (2d Cir. 2023) ("Gazzola II"), cert. denied, 144 S. Ct. 2659 (2024)). The circuit had earlier explained, citing the previous appellate ruling in this matter, that "[a] law regulating the means of acquiring firearms and ammunition does not meaningfully constrain the right to possess arms unless it 'is so restrictive that it threatens a citizen's right to acquire firearms [and ammunition].'" Id. at 244 (quoting Gazzola II, 88 F.4th at 196). Items that "are part and parcel of ordinary regulatory measures," including "background checks and firearm safety courses . . . generally will not meaningfully

impair one's ability to acquire arms." Id. at 245. "Instead, a meaningful constraint must entail a much more substantial burden." Id. The ammunition background check law simply did not impose that kind of burden, and so the plaintiffs' challenge to the law failed at Bruen's first step.

      1.     Under NYSFA, Plaintiff's Facial Challenge Fails

The challenge in NYSFA failed on both a facial and as-applied basis. NYSFA, 157 F.4th at 246. As to the facial challenge – the kind that Plaintiffs raise in this case – the Second Circuit noted that a facial constitutional challenge is the "most difficult challenge to mount successfully, because it requires a [plaintiff] to establish that no set of circumstances exists under which the [challenged provision] would be valid." Id. (citing United States v. Rahimi, 602 U.S. 680, 693 (2024) (internal quotation marks and citation omitted)). Consequently, the Second Circuit held that a facial challenge fails because "where a background check system is designed to return 'a 'proceed' response immediately' for those who are not disqualified from purchasing ammunition, there are at least some circumstances in which the delay caused by the background check process is *de minimis*." Id.

The same outcome should result here. Plaintiffs' Complaint does not specify whether their challenge to the ammunition background check provisions is facial or as-applied, but the relief is clearly facial in nature, as Plaintiffs demand a declaratory judgment that the law "shall be struck down and denied of having any legal force or effect" and an "injunctive relief order restraining Defendants and their officers, agents, servants, employees, and all others from enforcing the law, rules and regulations complained of herein." ECF No. 1 ¶¶ 356, 357; see Libertarian Party of Erie Cty. v. Cuomo, 300 F. Supp. 3d 424, 439 (W.D.N.Y. 2018) ("A claim is facial if it challenges application of the law more broadly. A claim is as-applied if it is limited to a plaintiff's particular case."), aff'd, 970 F.3d 106, 118, 126 (2d Cir. 2020). NYSFA's discussion of "proceed" responses

is particularly apposite because the background check figures in this case, which are subject to judicial notice, demonstrate that 801,346 out of 806,782 total ammunition background checks, or 99.33%, result in a "proceed" response. See Deyo Dec. ¶ 33. Not only are there "at least some circumstances in which the delay caused by the background check process is *de minimis*," NYSFA, 157 F.4th at 246, that is the outcome in the overwhelming majority of checks.

2.    Plaintiffs Have Not Pled an As-Applied Challenge, and NYSFA Would Render Any Such Challenge Meritless

The NYSFA plaintiffs' as-applied challenge failed as well. The plaintiffs in that case had alleged that the ammunition background check system failed to function, "caus[ing] wait times that effectively prevent them from purchasing ammunition." NYSFA, 157 F.4th at 246. But under the Circuit's previous precedent, even waiting periods of up to thirty days are insufficient to constitute a "lengthy wait time[ ]." Id. at 246-47 (citing Giambalvo, 155 F.4th at 183-84). The only NYSFA plaintiff who had attempted to go through the ammunition background check process endured a waiting period of, at most, a single day, which the Circuit found "does not come close to the 'lengthy' delays under Bruen as understood by our own Circuit, as well as our sister circuits." Id. at 247. Ultimately, the court held that "the modest delays reflected in the record do not meaningfully constrain plaintiffs' ability to "keep" or "bear" arms." Id. at 247.

In this case, Plaintiffs do not appear to have pled any as-applied challenge to the ammunition background check. Nor could they, as the Complaint acknowledges that it was filed before the ammunition background check system went into effect. See ECF No. 1 at 19 n.26. The Second Circuit has established that a "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," is properly considered as a facial challenge. See Jacoby & Meyers, LLP v. Presiding Justices, 852 F.3d 178, 184 (2d Cir. 2017). And unlike in NYSFA, where the plaintiffs had pled that the requirement had

prevented them (temporarily) from buying ammunition, the Complaint here contains no such allegation. Instead, Plaintiffs in this case merely assert that the law will impose an administrative burden and require them to pay the associated fee.  See ECF No. 1 ¶¶ 217, 202, 289.

NYSFA establishes that even if these allegations of administrative burden were viewed as an as-applied challenge, that challenge would fail on the merits, since "modest administrative burdens . . . will not ordinarily be sufficient to overcome that presumption [of constitutionality]." 157 F.4th at 245.  And even if the administrative burdens were more than "modest" – which the Complaint does not allege – the burden on the seller would not give rise to a Second Amendment challenge unless it meaningfully affected *the public*'s ability to acquire a gun.  See NYSFA, 157 F.4th at 249 ("the retailer must demonstrate that the challenged regulation meaningfully constrains the *consumer's* Second Amendment right, not that it burdens the retailers' non-existent constitutional right to sell firearms.") (emphasis in the original)).

3.    NYSFA Holds That The Background Check Fee Is Not A Constitutional Violation

To the extent that the Complaint could be interpreted as claiming that the nominal fee[3] for each use of the state-provided background check system is unconstitutional, see ECF No. 1 ¶ 202, NYSFA establishes that the fee is constitutional.  Citing Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013), the Second Circuit explained that a government-imposed fee in the Second Amendment context is constitutional if the fees (1) "are designed to defray (and do not exceed) the administrative costs of regulating the protected activity," and (2) do not place "anything more than a marginal, incremental, or [ ] appreciable restraint" on an individual's Second Amendment rights. Id. The Circuit held that Kwong remains good law even after Bruen, id. (citing Giambalvo, 155 F.4th at 181-82), and concluded there was no likelihood of success on the merits in arguing

---

[3]  The fee had not yet been announced at the time of Plaintiffs' Complaint, see ECF No. 1 ¶ 205, but was later announced set at $2.50 per check, irrespective of the amount of ammunition purchased.  NYSFA, 157 F.4th at 240.

that the fee provision violated their Second Amendment rights. Id. at 248. A facial challenge failed because the fee is imposed on the seller, not on purchasers like the individual plaintiffs, and a seller's discretionary decision to pass that fee to the purchaser is not government action. Id. (citation omitted); cf. ECF No. 1 ¶ 202 (Plaintiffs in this case indicating that the fee will be paid by them, not their customers). The Second Circuit further held that, even assuming that plaintiffs could raise an as-applied challenge based upon the seller passing the fee onto them, their challenge would still fail under Kwong. First, "the fee is 'designed to defray (and do[es] not exceed) the administrative costs of" implementing and operating the background check system." Id. (citing Kwong, 723 F.3d at 165). In fact, the fee provision expressly requires that the "amount of the fee shall not exceed the total amount of direct and indirect costs incurred by [the NYSP] in performing [each] background check." Id. at 249, citing N.Y. Exec. Law § 228(5)(a). Second, plaintiffs failed to submit evidence, or seriously contend, that the $2.50 fee was exorbitant or prohibitively expensive. Id.

Plaintiffs in this case do not, either. In this case, as in NYSFA, "Plaintiffs have proffered 'no evidence [or plausible allegations] that [the fees] will impose such burdensome requirements . . . that they restrict protections conferred by the Second Amendment.'" Id. (citing Gazzola II, 88 F.4th at 197). NYSFA is binding precedent for the proposition that the ammunition background check is constitutional at Bruen's first step. 157 F.4th at 249-50. The Court's analysis can and should end there, as it did in NYSFA. See id. at 250.

## B.    Background Checks In Connection With The Purchase of Ammunition Are Consistent With American Law And History

While NYSFA is binding precedent, and there is no basis to move to the second step of the Bruen/Rahimi analysis, Plaintiffs' challenge would fail at that step as well because the ammunition background check is fully "consistent with the principles that underpin the Nation's

regulatory tradition." <u>Rahimi</u>, 602 U.S. at 681.  As the Supreme Court held in <u>Rahimi</u>, "The Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."  <u>Id.</u> at 693.  The ammunition background check disarms just such individuals: although the overwhelming majority of background checks instantly result in a "proceed" response, the categories of persons who fail the checks are all intimately tied to dangerousness, including 702 denials related to mental health, 503 denials due to NY state prohibitors (either a "serious offense" conviction under PL 265.00[17]) or ERPO), and 381 denials due to a felony conviction.  Deyo Dec. ¶ 39.  Law and history demonstrate that checks for such persons are fully constitutional.

### 1.  The Supreme Court Has Recognized the Constitutionality of Background Checks

Plaintiffs fail to plausibly plead a Second Amendment claim regarding the background check requirement because, as multiple federal courts have recognized that "[o]ur law is plain as can be that some amount of time for background checks is permissible."  <u>McRorey v. Garland</u>, 99 F.4th 831, 839 (5th Cir. 2024).  Even if the Plaintiffs' Complaint, as pled, could carry their burden at <u>Bruen</u> Step One, and even if the Supreme Court's repeated endorsement of background checks and conditions on the commercial sale of arms somehow did not apply, background checks pass constitutional muster because American history "offers compelling evidence of a tradition of barring those deemed dangerous from possessing ammunition." <u>United States v. White</u>, No. 23-CR-140, 2023 WL 6066201, at *6 (S.D.N.Y. Sept. 18, 2023).

Under <u>Bruen</u> and <u>Rahimi</u>, the government must adduce one or more historical analogues to show that a measure is "consistent with this Nation's historical tradition of firearm regulation." <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1, 24 (2022). To pass constitutional muster, an analogue need only be "relevantly similar" to the challenged law – "a well-established

and representative historical *analogue*, not a historical *twin*." Id. at 29-30 (emphasis in the original). A historical law "need not be a 'dead ringer'" for a modern statute, as American firearms law is not "a law trapped in amber." Rahimi, 602 U.S. at 691-92. Instead, all that is required is that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." Id. at 692. Plaintiffs' Complaint does not offer any historical analysis, other than asserting without any citation that "[h]istorically, there has not been an ammunition background check." See ECF No. 1 ¶ 216. In fact, the practice of verifying the background of persons seeking to buy ammunition is deeply grounded in history.

***Bars on Ammunition Sales To Outsiders, Foreign Powers, or Native Americans.***

Colonial Americans enacted laws prohibiting the sale of gunpowder or bullets to outsiders, or to groups perceived as threatening, because they understood the danger of ammunition being sold to dangerous persons. In 1664, New York enacted a law declaring "[n]o person shall sell, give or Barter directly or indirectly any Gun or Guns, Powder, Bullett, shott, [or] lead . . . Without Licence first had and obtained under the Governours hand and Seal, to any Indian whatsoever, nor to any person Inhabiting out of this Government." 1 Commissioners of Statutory Revision. Colonial Laws of New York from the Year 1664 to the Revolution 40-41 (1894), Declaration of Attorney Aimee Cowan ("Cowan Dec.") Ex. 1. Other colonies adopted substantially identical laws. See George Staughton, et al., Charter to William Penn, and Laws of the Province of Pennsylvania, Passed between the Years 1682 & 1700 32 (1879), Cowan Dec. Ex. 2; see also J. Hammond Trumbull, The Public Records of the Colony of Connecticut 79 (1850), Cowan Dec. Ex. 3; Edward Rawson, et al., The General Laws and Liberties of the Massachusetts Colony 74-75 (1679), Cowan Dec. Ex. 4. This practice of denying ammunition sales to potential enemies (and the Governor's oversight over such sales) continued into the Eighteenth Century, with New York

Governor George Clinton writing to London in 1744 that he had "issued [] Proclamations to forbid the Exportation of Gun powder, or the supplying the French with any kind of provisions, warlike stores, or mechandizes." VI John Broadhead, Documents Relative to the Colonial History of the State of New-York 254-55 (1855), Cowan Dec. Ex. 5.

### Colonial Disarmament Laws.

During the colonial era and at the time of the Founding, states passed laws disarming members of groups perceived to be dangerous—and the disarmament extended to possession of ammunition. In 1637, the Massachusetts Bay Colony, fearing a "suddaine irruption" of violence from followers of two dissident preachers, ordered that certain persons be disarmed of "all such guns, pistols, swords, powder, shot, & match as they shalbee owners of," with their arms to be returned if they appeared in person to swear an oath or were exempted by two magistrates.[4] 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England 211 (1853), Cowan Dec. Ex. 6; see United States v. Young, 639 F. Supp. 3d 515, 525 (W.D. Pa. 2022) (this law "demonstrates that it was not only firearms, but also ammunition and other associated accessories that had been historically regulated"). And then in 1677, shortly after the bloody conflict known as "King Philip's War," Rhode Island enacted a law authorizing "any inhabitant of this Island that shall meet any Indian or Indians with either gun or guns, or ammunition to take them from him or them." 2 Records of the Colony of Rhode Island and Providence Plantations 561 (1857), Cowan Dec. Ex. 7. In 1756, Virginia passed a similar law regarding Roman Catholics, based on a conclusion that "it is dangerous at this time to permit

---

[4] Several of the historical antecedents cited in this brief contain race-based or religion-based assessments of dangerousness that would never pass constitutional review in 2025. The unfortunate reality is that the early American laws to which Bruen directs the constitutional inquiry often codified prejudices that existed at the time. Like the Second Circuit, "[w]e cite them not as examples to be followed but rather, according to the analysis the Supreme Court has directed we undertake, as examples of a historical tradition." Zherka v. Bondi, 140 F.4th 68, 90 (2d Cir. 2025). Put another way, such laws if evaluated today would violate the Fourteenth Amendment, not the Second.

Papists to be armed," ordering that all Catholics be required to turn over "any arms, weapons, gunpowder or ammunition" unless permitted "by order of the justices of the peace at their court." VII William Waller Hennig, <u>A Collection of All the Laws of Virginia 35</u> (1820), Cowan Dec. Ex. 8. These laws generally allowed persons to reacquire the right to bear arms upon appearing in person to swear an oath or otherwise demonstrate that they did not pose a danger.

### *Revolutionary Loyalty Laws.*

Laws enacted at the same time as the Founding likewise demonstrate the constitutionality of measures preventing ammunition possession by dangerous persons. On March 14, 1776, the Continental Congress ordered each colony to disarm persons "who are notoriously disaffected to the Cause of America, or who have not associated and refuse to associate to defend by Arms these United Colonies." 1775-76 Mass. Acts & Laws 31- 32, Cowan Dec. Ex. 9. These measures explicitly extended to possession of ammunition as well. <u>See id</u>. at 32 (Massachusetts ordering seizure of "all such Arms, Ammunition and Warlike Implements, as by the strictest Search can be found in his Possession"); <u>see also, e.g.</u>, 1778 Pa. Laws 126, Cowan Dec. Ex. 10 (Pennsylvania law that persons not taking a loyalty oath may not "carry any arms about his person or keep any arms or ammunition in his house or elsewhere"); 1776-77 N.J. Acts 90, Cowan Dec. Ex. 11. These colonial and Revolutionary era laws amount to "compelling evidence of a tradition of barring those deemed dangerous from possessing ammunition." <u>White</u>, 2023 WL 6066201, at *6; <u>see also</u> <u>Young</u>, 639 F. Supp. 3d at 525 ("the statutory prohibition of felons possessing . . . ammunition . . . is consistent with this Nation's tradition of firearm regulation.").

### C.     Nominal Fees To Support The Background Check System Are Constitutional

As previously mentioned, Plaintiffs' Complaint simply contends in conclusory fashion that the background check requirement "unjustly heaped costs onto the Plaintiffs." ECF No. 1 ¶ 181.

It fails to elaborate as to what "costs" were "heaped" onto Plaintiffs. As explained in the accompanying declaration of Michael Deyo, N. Y. Exec. § 228(5)(a) requires licensed dealers to "pay a fee imposed by the bureau for performing such background check." Deyo Dec. ¶ 15. This fee is $2.50 for each ammunition transaction, no matter the volume. Id.

Like the law requiring background checks for ammunition sales, the practice of charging a nominal fee is amply supported by law and history. As the Second Circuit confirmed in NYSFA, the governing precedent is Kwong v. Bloomberg, supra, in which the Second Circuit upheld the constitutionality of New York City's $340 pistol license fee because it "is designed to defray (and does not exceed) the administrative costs associated with the licensing scheme." NYSFA, 157 F.4th at 246 (citing Kwong, 723 F.3d at 166). NYSFA also holds that the $2.50 fee at issue here for an ammunition background check is constitutional under the Supreme Court's fee jurisprudence. Id. at 247-249. The fee is "not a revenue tax, but one to meet the expense incident to the administration of the [background check law] and to the maintenance of public order in the matter licensed." Cox v. State of New Hampshire, 312 U.S. 569, 577 (1941). Additionally, the fees collected are directed only to the state background check fund, see N.Y. Executive Law § 228(5), and the money used is "allocated for the direct costs associated with performing background checks" and for no other purpose. N.Y. State Fin. Law § 99-pp. This fee is too small to constitute an "infringement," let alone the kind of "exorbitant" fee that implicates Bruen—particularly given the seller's option to pass the cost onto the buyer.

### 1. Plaintiffs' Factual Assertions Are Unsupported And Contradicted By NYSP's Data

Plaintiffs' Complaint is predicated on a host of dramatic assertions, contending that "Plaintiffs protest that there is no reason for the Defendants to expend the resources to try to make up its own background check system or to try to add an ammunition background check system—

particularly not if it is the Plaintiffs who will bear the cost and that cost will drive them out-of-business from offering the very firearm that is protected by the Second Amendment." ECF No. 1 ¶ 215. As previously discussed, judicially noticeable documents show that Plaintiffs' businesses still appear to be in business as FFLs, over three years since the passage of the statutes in question, and that New Yorkers continue to purchase guns without interference. See ECF No. 104-7 at 18-22; see also Gazzola III, 2025 WL 2771835 at *15 ("[e]ven crediting the eight Plaintiffs' allegations . . . . it would be little more than speculation to infer that these regulations would put the eight Plaintiffs, or any of the 1,700 firearms dealers in New York State out of business.").

The data shows that background checks are not providing any barrier to law-abiding gun owners obtaining ammunition.  Between September 13, 2023 and December 15, 2025, a period just over 27 months, NYSP processed 642,248 firearm transactions and 806,782 ammunition transactions, Deyo Dec. ¶ 33, with 99.33% of ammunition background checks resulting in approval to purchase without delay.  Id. ¶ 34. The Court can and should take judicial notice of these licensing figures, as federal courts will regularly take judicial notice of government-generated database information "from sources whose accuracy cannot reasonably be questioned."[5] Fed. R. Evid. 201(b)(2); see Jones v. Cuomo, 542 F. Supp. 3d 207, 211 n.1 (S.D.N.Y. 2021) ("the court may take judicial notice of documents retrieved from official government websites, or other relevant matters of public record.") (citations and quotations omitted)); United States v. Daniels, 566 F. Supp. 3d 191, 197 (E.D.N.Y. 2021). Consequently, any assertion that the ammunition background check and/or fee has the effect of "eliminating the ability of law-abiding, responsible citizens to acquire

---

[5] In the event the Court deems the database information in the Deyo Declaration to be outcome-determinative but not subject to judicial notice, Defendants do not object to the motion being converted to one for summary judgment pursuant to Fed. R. Civ. 12(d), without prejudice to filing a summary judgment motion at the close of discovery if necessary.

firearms" or is "so restrictive that it threatens a citizen's right to acquire firearms." <u>Gazzola II</u>, 88

F.4th at 196, is squarely contradicted by evidence subject to judicial notice.

**POINT II:    PLAINTIFFS' CHALLENGE TO LICENSING FOR SEMIAUTOMATIC RIFLES FAILS AS A MATTER OF LAW**

    **A. The Semiautomatic Rifle Law Is Constitutional Under Supreme Court And Second Circuit Precedent**

        1.  Shall-Issue Licensing Laws Do Not Infringe The Plain Text of The Second Amendment

Like Plaintiffs' challenge to the ammunition background check law, their challenge to the

Semiautomatic Rifle Law is foreclosed by recent published decisions of the Second Circuit, in this

case <u>Giambalvo v. Suffolk County</u>, 155 F.4th 163 and <u>Frey v. City of New York</u>, 157 F.4th 118.

<u>Giambalvo</u> and <u>Frey</u> build off the Supreme Court's <u>Bruen</u> decision, which endorsed "shall-issue"

licensing laws that "do not require applicants to show an atypical need for armed self-defense."

<u>Bruen</u>, 597 U.S. at 38 n.9; <u>cf.</u> <u>Higbie v. James</u>, 795 F. Supp. 3d 307, 339 (N.D.N.Y. 2025) ("As of

2022, New York has adopted a 'shall issue' licensing regime").  In <u>Giambalvo</u>, the Second Circuit

analyzed <u>Bruen</u>'s holding regarding shall-issue licensing regimes and explained that they "are not

constitutionally suspect because they 'are designed to ensure only that those bearing arms in the

jurisdiction are, in fact, law-abiding, responsible citizens.'" 155 F.4th at 181 (quoting <u>Bruen</u>, 597

U.S. at 38 n.9). The Court of Appeals expanded on the point in <u>Frey</u>, explaining that "shall-issue

licensing regimes are 'presumptively constitutional,'" and that a plaintiff "must initially surmount

this presumption by articulating what particular aspects of the challenged licensing regime are

unconstitutional and why."  157 F.4th at 140 (quoting <u>Giambalvo</u>, 155 F.4th at 180-81). The <u>Frey</u>

Court explained the kind of allegations that might overcome the presumption: "for instance, that the

permit is not granted on a shall-issue basis once an applicant satisfies the necessary requirements,

that the process is administered inappropriately, or that the process is too lengthy or costly."  <u>Id.</u> at

140-41; see Bruen, 597 U.S. at 38 n.9. But Frey also makes clear that simply having to obtain a license is not a constitutional harm: the plaintiffs in Frey objected to obtaining a separate license to carry a weapon in New York City, but the Second Circuit explained that having to "endure another application process to carry within the [New York] City limits," was insufficient to "overcome the presumption of constitutionality." Id. at 141.

The same result is warranted here. Plaintiffs' Complaint does not attack any particular aspect of the Semiautomatic Rifle Law as unconstitutional. To the extent that they contend, factually, that licenses have not been issued or that regulatory confusion has prevented the sales of semiautomatic rifles, those assertions are not well-pled and are contradicted both by data subject to judicial notice and by Plaintiffs' own admissions, as explained in Point II(B), below. To the extent that Plaintiffs simply object to the existence of a licensing requirement for a semiautomatic rifle, see ECF No. 122-10, ¶ 12, "the additional [semiautomatic rifle] permit requirement merely imposes a brief delay on an individual's ability to carry [a semiautomatic rifle]. That does not amount to constitutional harm." Frey, 157 F.4th at 141. Nor is there anything inherent in the nature of semiautomatic rifles that would alter the legal analysis: if licenses can be required to carry a handgun, which the Supreme Court recognizes as "the quintessential self-defense weapon," Heller, 554 U.S. at 629, there is no reason why the analysis would be different for a semiautomatic rifle, which is considerably more dangerous.[6] See Bianchi v. Brown, 111 F. 4th 438, 456 (4th Cir. 2024) (discussing the lethality of semiautomatic rifles), cert. denied sub nom. Snope v. Brown, 145 S.Ct. 1534 (2025). The Court can and should dispose of Plaintiffs' challenge to the Semiautomatic Rifle Law at Bruen's first step.

---

[6] Several federal cases have found Bruen's endorsement of licensing laws to apply outside the handgun contest. Cf. Ore. Firearms Fed'n, Inc. v. Brown, 644 F. Supp. 3d 782, 806 (D. Or. 2022) (upholding "Permit-to-Purchase Provision" for sales of all firearms because it was "based on objective standards and is therefore presumptively constitutional under the holding of Bruen."); Saleem, 659 F. Supp. 3d at 689 n.9 (finding based on licensing language in Bruen that registration requirements of the National Firearms Act, which include short-barreled shotguns and short-barreled rifles, "are of the type that the Supreme Court in Bruen determined were permissible").

a.    The Semiautomatic Rifle Law Is a Presumptively Constitutional Condition On Sale

Alternatively, New York's semiautomatic rifle licensing requirement can be upheld as a presumptively constitutional "law[] imposing conditions and qualifications on the commercial sale of arms." Heller, 554 U.S. at 626-27 & n.26; accord McDonald v. City of Chicago, 561 U.S. 742, 786 (2010) (same); Bruen, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (same); see also Gazzola II, 88 F.4th at 195 (citing Heller and McDonald for the proposition that such regulatory measures are "presumptively lawful," and stating that "[n]othing in the Court's more recent decision in [Bruen] casts doubt on that understanding of the Second Amendment's scope."). Federal courts have routinely rejected constitutional challenges to such statutes without need for a historical analysis, reasoning that Bruen only "requires a historical showing by the government 'when the Second Amendment's *plain text* covers an individual's conduct.' The plain text covers plaintiffs' right 'to keep and bear arms.' And on its face 'keep and bear' does not include purchase." McRorey, 99 F.4th at 838 (quoting Bruen, 597 U.S. at 24) (emphasis in the original); see also B&L Prods. v. Newsom, 104 F.4th 108, 110 (9th Cir. 2024).

Here too, the relevant provisions of the challenged law impose a condition (or require a qualification) for the commercial sale of arms: as the Complaint describes it, the challenged law is a "restriction against the purchase of a semi-automatic rifle without a license." ECF No. 1 ¶ 31(p). The Second Circuit explored the contours of this doctrine recently in United States v. Vereen, explaining that when a law "regulates only the mode of acquiring firearms, it implicates the text of the Second Amendment only if it makes acquiring firearms sufficiently more difficult so as to meaningfully constrain individuals from keeping or bearing them." 154 F.4th at 96-97 (citing Gazzola II, 88 F.4th at 195-98). The record indicates that this simply is not the case, as the overwhelming majority of the Plaintiffs have averred in sworn declarations that they have obtained

20

semiautomatic rifle licenses.  See ECF No. 122-4 ¶ 49; ECF No. 122-2 ¶¶ 31, 33; ECF No. 122-3 ¶

24; ECF No. 122-5 ¶¶ 107, 109; ECF No. 122-9 ¶ 13.  Nor can the license application be a meaningful

constraint, since "[a] short delay does not violate an individual's Second Amendment rights."  Frey,

157 F.4th at 141 (quoting Giambalvo, 155 F.4th at 184).

      b.      Licensing of Semiautomatic Rifles Is Consistent With American History

If the Court were to reach the second step of the Bruen/Rahimi analysis, the Semiautomatic

Rifle Law should still be upheld as "consistent with the principles that underpin our regulatory

tradition."  Rahimi, 602 U.S. at 692.  The question is governed by the Second Circuit's decision in

Antonyuk v. James, which analyzed the history of American firearm regulation to conclude that New

York's substantive standards for issuing a firearm license (which are identical for handguns and

semiautomatic rifles, see N.Y. Penal Law § 400.00(1) & (2)) are facially constitutional.  See 120

F.4th at 981 ("Licensing that includes discretion that is bounded by defined standards, we conclude,

is part of this Nation's history and tradition of firearm regulation and therefore in compliance with

the Second Amendment.").  And the Semiautomatic Rifle Law was just upheld by U.S. District Court

for the Eastern District of New York, which described the issue as "straightforward" and "f[ound]

no genuine dispute of fact that the Rifle Bill comports with the United States' history of firearm

regulation."  McGregor v. Suffolk County, No. 23 Civ. 1130, Cowan Dec. Ex. 12, slip op. at 1, 5

(E.D.N.Y. Dec. 22, 2025).[7]

     "For as long as American jurisdictions have issued concealed-carry-licenses, they have

permitted certain individualized, discretionary determinations by decisionmakers."  Antonyuk, 120

F.4th at 987; accord McGregor, slip op. at 5 ("states have imposed licensing requirements on firearm

---

[7] The McGregor decision was issued at 11am on the day this memorandum of law was filed, and so the analysis of its holding is necessarily cursory.  Defendants respectfully refer the Court to Judge Gary R. Brown's full slip opinion, which is attached as Exhibit 12 to the accompanying declaration of Aimee Cowan.

usage dating back to the colonial era.").  Following the ratification of the Fourteenth Amendment, jurisdictions across the country adopted "firearm licensing schemes . . . that authorized local officials to issue permits in their limited discretion."  See id. at 987-88 (collecting examples).  "Indeed, the United States Congress enacted a similar scheme in 1892."  Id. at 988 (citing An Act to Punish the Carrying or Selling of Deadly or Dangerous Weapons Within the District of Columbia, and for Other Purposes, 27 Stat. 116, 116–17, ch. 159 (1892)).  These licensing laws were broadly enacted here in New York, as the Antonyuk court cited to examples from New York City, Brooklyn (still independent at the time), Elmira, and Buffalo.  See id. at 989; see also Cowan Dec. Exs. 13-19 (attaching historical examples from New York State).  "Th[e] widespread adoption by different and diverse localities under varying circumstances suggests that these policies enjoyed broad popular support and were understood at the time to be consistent with the Second and Fourteenth Amendments."  Id. at 990. "[M]oreover, these laws and ordinances did not merely exist—they appear to have existed without constitutional qualms or challenges."  Id.

The only material difference between the Semiautomatic Rifle Law and the 19th-century licensing laws the Second Circuit examined in Antonyuk is the type of gun the license covers.  That is not surprising, given that semiautomatic rifles only became commercially available in significant numbers well into the 20th Century. See Bianchi, 111 F.4th at 469 (discussing the advent of semiautomatic firearms and how "[t]he upshot was that early 20th-century criminals gained access to weapons with firepower not seen before in civilian life.").  But legislatures did take action once these weapons began to proliferate, with 29 states enacting anti-machine-gun laws "and ten states restrict[ing] semiautomatic weapons between 1927 and 1934."  Id. at 470 & n.15 (collecting statutes); accord Nat'l Ass'n for Gun Rights v. Lamont, 153 F.4th 213, 245 (2d Cir. 2025) ("Twentieth-century regulation of automatic and semiautomatic weapons continued the relevantly

similar tradition of imposing targeted restrictions on unusually dangerous weapons after their use in multiple-fatality homicides and terror.").  So did Congress, which passed (with the backing of the National Rifle Association) a prohibition on possession in the District of Columbia of "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[8] Bianchi, 111 F.4th at 470 (citing Pub. L. No. 72-275, 47 Stat. 650 (1932)); see Antonyuk, 120 F.4th at 989 n.41.  And local licensing laws here in New York were not necessarily limited to pistols or revolvers: Albany and Troy, for instance, required permits for "any person . . .who has occasion to carry a loaded revolver, pistol, or firearm for his protection."  Cowan Dec. Exs. 17 & 19.  Licensing of semiautomatic rifles is fully consistent with "this Nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment," just as licensing of handguns is.  Antonyuk, 120 F.4th at 981; see McGregor, slip op at 8 (finding "historical support for imposing licensing and registration requirements on long guns.").

### B.  The Data Show That The Semiautomatic Rifle Law Is Functioning Effectively

The Semiautomatic Rifle Law is justified not only on the law, but on the undisputed facts as well.  Although the Complaint alleges that "[n]o semi-automatic license is known to have been issued or to be available to request, resulting in a near total stoppage of the sale of all semi-automatic rifles in New York," ECF No. 1 ¶ 160, the Court is not required to accept this allegation as true, particularly as it is contradicted by data sources subject to judicial notice and by  the Plaintiffs' own admissions.

To begin with, the Complaint does not allege that no semiautomatic rifle license was ever issued, only that no such license "is known to have been issued or to be available to request."  Id.  In other words, Plaintiffs did not plead that semiautomatic rifle licenses were unavailable, only that

---

[8] Congressional legislation and laws governing the District of Columbia and federal territories are particularly probative of the Second Amendment's meaning because those were the only areas where the Second Amendment applied directly and where a Second Amendment legal challenge was possible.  The Second Amendment would not be incorporated against the States until 2010.  See McDonald, 561 U.S. 742 (2010).

they were not aware of it. Cf. JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) (although Twombly "does not prevent a plaintiff from pleading facts on information and belief in appropriate circumstances, . . . such allegations must be accompanied statement of the facts upon which the belief is founded."). And the Complaint immediately contradicts itself, admitting that semiautomatic rifle licenses were, in fact, being issued, just not in the format that Plaintiffs prefer. ECF No. 1 ¶ 160 (discussing "[c]ounties allowing existing concealed carry permit holders to add a semi-automatic rifle to their existing concealed carry permit."); see also id. ¶ 160(j). The Complaint grudgingly acknowledges that Plaintiffs *did* continue to sell semiautomatic rifles even during the weeks immediately after the effective date of the license requirement. See id. ¶ 160 (alleging "a near total stoppage" of semiautomatic rifle sales); id. ¶ 160(k) (alleging "a near halt"). To the extent Plaintiffs' sales dropped after the law's effective date, the Complaint strongly indicates it was by choice: Plaintiffs "are refusing to sell semi-automatic rifles to [licensed] customers" due to their own interpretation of the law. Id. ¶ 160. The Court need not assume that semiautomatic rifle licenses have not been issued, as Plaintiffs have not made well-pled allegations to that effect.

Even if Plaintiffs had pled that no semiautomatic rifle license had ever been issued, the Court would not be required to accept that allegation because the viability of the licensing system is demonstrated by sources subject to judicial notice. See L-7 Designs, Inc., 647 F.3d at 422. Between September 4, 2022, and approximately March 4, 2025, 26,117 semiautomatic rifle licenses have been issued in New York State, and during the same time period there were approximately 47,875 firearm license amendment transactions throughout the State that involve licenses which include the authority to purchase/possess semiautomatic rifles. Deyo Dec. ¶ 50.[9] The ongoing issuance of semiautomatic rifle licenses is also evidenced in sworn declarations submitted by Plaintiffs in

---

[9] That figure is undoubtedly higher to date, but more current figures were unavailable. Deyo Dec. ¶ 50.

connection with their recent motion for partial summary judgment, averring that they and their colleagues have successfully obtained semiautomatic rifle permits.  See, e.g., ECF No. 122-4 ¶ 49 ECF No. 122-2 ¶¶ 31, 33; ECF No. 122-3 ¶ 24; ECF No. 122-5 ¶¶ 107, 109; ECF No. 122-9 ¶ 13. Semiautomatic rifle licenses are widely available, as Plaintiffs aver to receiving licenses in multiple counties across New York State.  See ECF No. 122-3 ¶¶ 24-25 (Wayne County); ECF No. 122-4 ¶ 49 (Schenectady County); ECF No. 122-5 ¶ 109 (Columbia County); ECF No. 122-9 ¶¶ 6, 13 (Onondaga County); see also ECF No. 122-7 ¶ 28 (discussing semiautomatic rifle licenses issued to others in Monroe County). Several Plaintiffs and declarants also stated that they had personally purchased semiautomatic rifles pursuant to their rifle licenses.  See, e.g., ECF No. 122-3 ¶ 33; ECF No. 122-2 ¶¶ 41, 44; ECF No. 122-4 ¶ 60.[10]  Likewise, several Plaintiffs and declarants averred that they or their businesses continue to sell semiautomatic rifles to licensed persons.  See, e.g., ECF No. 122-2 ¶ 39; ECF No. 122-4 ¶ 57; ECF No. 122-5 ¶ 41; ECF No. 122-6 ¶ 55; ECF No. 122-9 ¶¶ 18, 27.  There simply is no plausible allegation "that New York citizens" or any Plaintiff "will be meaningfully constrained – or, for that matter, constrained at all" in obtaining a semiautomatic rifle permit or buying a semiautomatic rifle with one.  Gazzola II, 88 F.4th at 197.

## CONCLUSION

Defendants respectfully request that the Court dismiss the remainder of Plaintiffs' Complaint in its entirety and with prejudice, and grant such other and further relief as it deems just and equitable.

Dated: Syracuse, New York
     December 22, 2025

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*

---

[10] While Plaintiff John Hanusik averred that he was unable to purchase a semiautomatic rifle, his declaration makes clear that the only reason that he lacks a semiautomatic rifle license is that he has chosen not to apply for one.  See ECF. No. 122-10 ¶¶ 11-12 ("I did not obtain a semi-automatic amendment or endorsement on my concealed carry permit" because "I continue to protest that a license be required for the purchase and possession of a semi-automatic rifle by an individual.").

300 S. State Street, Ste. 300
Syracuse, New York 13202

By: _s/**Aimee Cowan**_____
Aimee Cowan
Assistant Attorney General, of Counsel
Bar Roll No. 516178
Telephone: (315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 22, 2025, she filed Defendants' Motion for Judgment on the Pleadings by electronically filing with the Clerk of the Court herein, using the CM/ECF system, which is understood to have sent notification of such filing electronically to the following:

> Paloma A. Capanna, Esq.
> Attorney for Plaintiffs
> 106-B Professional Park Drive
> Beaufort, North Carolina 28516

Dated: Syracuse, New York
        December 22, 2025

> LETITIA JAMES
> Attorney General of the State of New York
> Attorney for Defendants
> 300 S. State Street, Suite 300
> Syracuse, New York 13202
> By: **_s/Aimee Cowan_____**
> Aimee Cowan, Esq.
> Assistant Attorney General
> Bar Roll No. 516178
> Telephone:      (315) 448-4800
> Fax: (315) 448-4853
> Email: aimee.cowan@ag.ny.gov