**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

---

**Nadine Gazzola**, individually, and as co-owner, President, and as BATFE Federal Firearms Licensee Responsible Person for **Zero Tolerance Manufacturing, Inc.**; *et al.,*

Civ. No.: 1:22-cv-1134

Plaintiffs

*v.*

Hon. Brenda K. Sannes

**Kathleen Hochul**, in her Official Capacity as Governor of the State of New York; *et al.,*

Defendants.

---

**MEMORANDUM OF LAW**

**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**PLAINTIFFS' SECOND AMENDMENT CLAIMS**

**RELATING TO AMMUNITION AND SEMI-AUTOMATIC RIFLES**

# TABLE OF CONTENTS

OVERVIEW….. 1.

I.    DEFENDANTS ARE ON NOTICE THAT PLAINTIFFS ARE MAKING SECOND AMENDMENT CLAIMS UNDER *BRUEN* THAT WILL ENTITLE THEM TO RELIEF …… 5.

    A.    Plaintiffs Satisfy the Pleading and Notice Requirements to Defeat a Motion to Dismiss Their Second Amendment Claims  ….. 5.

    B.    Plaintiffs' Second Amendment Claims are Sufficiently State and Developed Across Three Years of Active Litigation at All Court Levels ….. 7.

II.    PLAINTIFFS' SECOND AMENDMENT CLAIMS WILL BE EVALUATED UNDER *NYSRPA v. BRUEN* ….. 10.

    A.    Plaintiffs' Complaint Correctly Identified *Bruen* for the Evaluation of Their Second Amendment Claims ….. 11.

    B.    The Second Circuit Adopted and Expressed the Contours of Individual Conduct Protected by the Second Amendment Through the 2023 Decision in This *Gazzola* Case …..11.

    C.    The State (Again) Tries to Advance an Incorrect Reading of History, Already Rejected by SCOTUS ….. 14.

        1.    Historic Laws Requiring Small Arms and Ammunition  Ownership and Proficiency in a Time of War Support Plaintiffs' Claims ….. 16.

        2.    *Heller* Rejected Disarmament on the Basis of Religion ….. 17.

        3.    *Rahimi* Rejected "Historical Evils" as Repugnant to a *Bruen* Analysis ….. 18.

        4.    *Rahimi* Rejected Loyalty Oaths as Irrelevant to a *Bruen* analysis ….. 19.

        5.    *Heller* Equated Nuisance Laws to "Jaywalking" in a *Bruen* analysis ….. 21.

        6.    *Heller*, *McDonald*, and *Bruen* Resoundingly Rejected Any "Judge-Empowering Interest-Balancing Inquiry" ….. 22.

    D.    Congress Repealed as Unconstitutional a Limited Federal Ammunition License and Recordkeeping Requirement for FFLs. …..23.

E.    Plaintiffs in California Won Rulings That Ammunition Background Check is Unconstitutional ….. 24.

    1.    The California 2019 Ammunition Background Check System Was Found Unconstitutional Under *Bruen*, and is on Appeal ….. 24.

    2.    Four States Require Ammunition Licenses, Are Being Sued ….. 25.

III.    THIS *GAZZOLA* CASE IS READILY DISTINGUISHED FROM *N.Y.S. FIREARMS ASSOC. V. JAMES* ….. 26.

IV.    THE STATE'S ARGUMENT OF "BURDEN" IS A FALSE FLAG TO DISTRACT THE COURT FROM THE *BRUEN* ANALYSIS ….. 27.

A.    Ammunition Background Check System Highlights ….. 28.

    1.    Disqualifiers and Databases are Undefined at Law ….. 28.

    2.    Computer Code for Any Non-Proceed Response is Unknown ….. 29.

    3.    NY Law Does Not Require a Response to a Background Check Request Made at a Point-of-Sale ….. 30.

    4.    NY Law Does Not Create a 30-day Waiting Period, Nor Does It Apply to Rifles, Shotguns, or Ammunition Purchases ….. 32.

    5.    Appeals are Sparce and Difficult to Pursue ….. 33.

B.    SEMI-AUTOMATIC RIFLE LICENSE HIGHLIGHTS ….. 34.

    1.    There is No Statewide SAR License Approved by the Superintendent of the NYSP ….. 34.

    2.    The NYSP is Approving County-Level Amendments" to Concealed Carry Permits ….. 34.

CONCLUSION ….. 35.

# TABLE OF AUTHORITIES

**U.S. FEDERAL CONSTITUTION**

U.S. Const. amend II ….. 1, 10.

**FEDERAL STATUTES**

Brady Handgun Violence Prevention Act ("The Brady Act"), Pub. L. 103-159 (Nov. 30, 1993), 18 U.S.C. §§921-922, §925A ….. 24 n.27, 30.

Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308 (Apr. 10, 1986), 18 U.S.C. §921, *et seq.* ….. 23.

Gun Control Act of 1968, Pub. L. No. 90-618 (October 22, 1968), 82 Stat. 1213-1222, 18 U.S.C. Ch. 44 §§921, *et seq.* ….. 23.

18 U.S.C. §921(a)(3)(A) ……3 n.4.

18 U.S.C. §921(a)(5) ….. 3 n.6.

18 U.S.C. §921(a)(7) ….. 3 n.7.

18 U.S.C. §921(a)(17) ……3 n.4.

18 U.S.C. §921(a)(30) …… 3 n.5.

18 U.S.C. §922(d) ….. 31 n.44.

18 U.S.C. §922(g) ….. 29.

18 U.S.C. §922(g)(8) ….. 14, 15.

18 U.S.C. §923(a) ….. 23.

**FEDERAL REGULATIONS**

25 CFR §25.2 ….. 31 n.44.

28 CFR §25.11 ….. 24.

28 CFR §25.6(a) ….. 24.

28 CFR §25.6(c)(1)(iv)(B) ….. 31 n.43.

28 CFR §25.6(d) ….. 24.

28 CFR §25.6(c)(1)(iv)(B) ….. 31 n.44.

**STATE STATUTES – NEW YORK**

2022 N.Y. Laws ch. 371, NY S.51001 ….. 1, 28, 31.

NY EXC §228 ….. 2.

NY EXC §228(3) ….. 29.

NY EXC §228(6)(c) …..31 n.43.

NY EXC §228(8) ….. 31 n.44.

NY GBL §898(2) ….. 31 n.43.

NY PEN §265.00(3) ….. 3 n.4, 32.

NY PEN §265.00(3)(a) ….. 3 n.5.

NY PEN §265.00(9) ….. 2 n.1.

NY  PEN §265.00(11) ….. 3 n.7.

NY PEN §265.00(12) ….. 3 n.6.

NY PEN §265.00(17) ….. 28.

NY PEN §265.00(22) ….. 3 n.8.

NY PEN §265.00(24) ….. 2 n.1.

NY PEN §265.65 ….. 2.

NY PEN §265.66 ….. 2.

NY PEN §400.00(1) ….. 28.

NY PEN §400.00(2) ….. 1 n.1, 2.

NY PEN §400.00(3) ….. 2.

NY PEN §400.00(6) ….. 2.

NY PEN §400.00(7) ….. 2.

NY PEN §400.00(8) ….. 2.

NY PEN §400.00(10)(c) ….. 2.

NY PEN §400.00(12) ….. 32.

NY PEN §400.00(14) ….. 2.

NY PEN §400.02 ….. 2 n.2.

NY PEN §400.02(2) ….. 2.

NY PEN §400.03 ….. 2, 2 n.2.

NY PEN §400.03(1) ….. 2 n.1.

NY PEN §400.03(2) ….. 2.

NY PEN §400.03(8) ….. 2 n.2.

NY PEN §400.06(2) ….. 2 n.2.

## STATE LAWS – OTHER

Conn. Gen. Stat. §29-38n ….. 25 n.29.

Conn. Gen. Stat. §29-38o ….. 25 n.29.

Ill. Comp. Stat. 430 ILCS 65/2(a)(5) ….. 25 n.30.

Ill. Comp. Stat. 430 ILCS 65/6 ….. 25 n.30.

Mass. G. L. ch 140, §131(a) ….. 25 n. 31.

Mass. G. L. ch 140, §131(o) ….. 25 n.31.

N.J. S.A. 2C:58-3.3 ….. 25 n.32.

N.J.S.A. 2C:58-4(f) ….. 25 n.32.

## FEDERAL COURT CASES – U.S. SUPREME COURT

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ….. 6.

*Bell Atlantic Corp. v. Twombly,* 559 U.S. 544 (2007) ….. 6.

*Berk v. Choy*, 607 U.S. _____, _____ S. Ct. _____, 2026 WL 135974 (Jan. 20, 2026) ….. 6.

*District of Columbia et al. v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) ….. 3, 4, 10, 11, 12, 15, 17, 18, 21, 22, 27.

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023), *cert.* denied 144 St.Ct. 2659 (Mem, June 17, 2024) ….. 8, 11, 14, 15.

*Gazzola v. Hochul*, Second Circuit Case No. 20-3068, doc. 103 (Sep. 8, 2023) (unreported), *cert. denied* 144 S.Ct. 274 (Mem, Oct. 10, 2023) ….. 9.

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) ….. 12.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ….. 6.

*McDonald v. City of Chicago,* 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) …..
10, 11-12, 12, 14, 22, 23.

*Muscarello v. United States*, 524 U.S. 125 (1998) ….. 11.

*N.Y.S. Rifle & Pistol Assoc., Inc. v. Bruen,* 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387
(2022) ….. 3, 5, 7, 9, 10, 11, 13, 14, 19, 22, 23, 24, 25, 26, 27, 28, 30.

*Snope v. Brown*, 605 U.S. _____, 145 S.Ct. 1534 (Mem) (June 2, 2025) ….. 3, 4, 23.

*Texas v. Johnson*, 491 U.S. 397 (1989) ….. 23.

*Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748 (2005) ….. 16.

*United States v. Rahimi,* 602 U.S. 680 (2024) ….. 10, 11, 14, 15, 18, 19, 20-21.

*Whole Woman's Health v. Jackson,* 595 U.S. 30, 142 S.Ct. 522 (2021) ….. 27.

## FEDERAL COURT CASES – 2ND CIRCUIT COURT OF APPEALS

*Gazzola v. Hochul,* 88 4th 186 (2d Cir. 2023) ….. 4, 5, 8, 10, 12, 13, 14, 15.

*Knight v. City of New York*, _____ F.4th _____, 2026 WL 89228 (Jan. 16, 2026) ….. 5.

*Natl Assoc. for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir., Aug. 22, 2025), Petition for
Writ of Certiorari at No. 25-421 ….. 3 n.8.

*N.Y.S. Firearms Assoc. v. James*, 2025 WL 2921846 (2d Cir. Oct. 15, 2025) ….. 7, 8, 26-27.

*N.Y.S. Rifle & Pistol Assoc. v. City of New York*, 883 F.3d 45 (2d Cir. 2018), *vacated and
remanded on other grounds*, 590 U.S. 336 (2020) ….. 13.

*Singh v. Deloitte LLP*, 123 F.4th 99 (2d Cir. 2024) ….. 6.

*Trump v. Vance*, 977 F.3d 198 (2d Cir 2020) ….. 6.

## FEDERAL COURT CASES – OTHER – CIRCUIT COURTS

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3rd Cir. 2021), *abrogated on other grounds by
N.Y.S. Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1 (2022) ….. 13, 13 n.14.

*Ezell v. City of Chicago*, 651 F.3d 699 (7th Cir. 2011), *abrogated on other grounds by
N.Y.S. Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1 (2022) ….. 12-13, 13 n.13.

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), *abrogated on other grounds by N.Y.S. Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1 (2022) ….. 13, 13 n.15, 25.

*Rhode v. Bonta*, 145 F.4th 1090 (9th Cir. 2025), *rehearing en banc granted*, vacated by *Rhode v. Bonta*, 159 F.4th 1170 (9th Cir., Dec. 1, 2025) ….. 7, 24, 25.

*Teixeira v. Co. of Alameda,* 873 F.3rd 670 (9th Cir. 2017) (en banc), *abrogated on other grounds by N.Y.S. Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1 (2022) ….. 13, 25.

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), pending decision U.S. Sup. Ct., No. 24-1046 …. 11 n.11, 16, 22, 22 n.26.

## FEDERAL COURT CASES – DISTRICT COURT – NEW YORK

*N.Y.S. Firearms Assoc. v. James*, W.D.N.Y., case 6:23-cv-06524 ….. 27, 28, 29.

## FEDERAL COURT CASES – DISTRICT COURT - OTHER

*Rhode v. Bonta* at 713 F.Supp.3d 865 (S.D.CA 2024), stayed pending appeal (Case 24-542, dkt. 8.1 (Feb. 5, 2024)) ….. 24, 24-25, 25.

*Rhode v. Bonta*, (unreported), 2022 WL 17099119 (S.D.CA Nov. 17, 2022) ….. 24.

## STATE COURT CASES – OTHERS

*Andrews v. State,* 50 Tenn. (3 Heisk.) 165 (1871) …... 12, 14, 15, 25.

## FEDERAL – RULES

Fed. R. Civ. P. 8 ….. 5, 6.

Fed. R. Civ. P. 8(e)(1) ….. 5.

Fed. R. Civ. P. 8(e)(2) ….. 5.

Fed. R. Civ. P. 11(b)(3) ….. 5.

Fed. R. Civ. P. 12(b) ….. 6.

Fed. R. Civ. P. 12(b)(6) ..... 5, 6.

Fed. R. Civ. P. 12(c) ….. 5.

Fed. R. Civ. P. 26 ….. 9.

Fed. R. Civ. P. 56.1 ….. 10.

Fed. R. Civ. P. 65(a) ….. 8.

**RULES – OF THE NORTHERN DISTRICT COURT OF NY**

N.D.N.Y. L.R. 7.1(b)(3) ….. 9.

**OTHER MATERIALS – FEDERAL (OFFICIAL)**

Congressional Record – Senate (July 9, 1985), p. 18183 ….. 23.

Journals of the Continental Congress, 1774-1789, vol. IV (January 1, 1776 to June 4, 1776), U.S. Gov't. Printing Office (Washington, D.C., 1906), p. 18-22 (January 2, 1776) and p. 205 (March 14, 1776) ….. 20.

U.S. Dep't. State, Office of the Historian, Website, "Continental Congress, 1774-1781," accessed at https://history.state.gov/milestones/1776-1783/continental-congress ….. 20 n.20.

U.S. Federal Bureau of Investigation, "NICS 2024 Operational Report," accessed at https://www.fbi.gov/file-repository/2024-nics-operational-report.pdf/view ….. 30 n.40.

U.S. House of Representatives, Website, "King's Proclamation for Suppressing Rebellion and Sedition" (Aug. 23, 1775), accessed at https://history.house.gov/HouseRecord/Detail/25769822301?current_search_qs=%3FCurrentPa%26PreviousSearch%3DSearch%252cAll%252c%252c%252cTitle%26CurrentPage%3D9%26SortOrder%3DTitle%26Command%3D9 ….. 19 n.22.

U.S. Senate, Cmte on the Judiciary, Rpt. 98-583 (Aug. 8, 1984) ….. 23.

U.S. National Archives, Website, "The Declaration of Independence," accessed at https://www.archives.gov/founding-docs/declaration ….. 20, n.24.

*Wolford v. Lopez*, U.S. Sup. Ct., No. 24-1046, transcript Jan. 20, 2026 ….. 13, 22.

**OTHER MATERIALS – STATE (OFFICIAL)**

Division of NY State Police, Form P-12, "Notification of Pistol Purchase" (rev. 2/01) ….. 35.

Division of NY State Police, "NYS NICS New Application Process for Dealers, User Guide" (undated) ….. 31

Division of NY State Police, Form PPB-3, "Pistol/Revolver License Application; Semi-Automatic Rifle License Application" (rev. 08/22) ….. 35.

Division of NY State Police Form PPB-5, "Pistol/Revolver License Amendment: Semi-Automatic Rifle License Amendment" (rev. 08/22) ….. 35.

Division of NY State Police, "New York is Now a "Point of Contact" State," (undated).

## OTHER MATERIALS – RESEARCH RESOURCES

British Royal Proclamations Relating to America (1603-1783), Clarence S. Brigham, A.M., Ed., Burt Franklin (New York, 1911) ….. 18, 19, 19 n.22

Carr, Marianne, "Anne Hutchinson: A Threatening Daught of Eve to the "City Upon a Hill"," Locus (Vol. 6, Art. 4) ….. 17 n.20.

Holy Bible (The) (known as "the King James Bible") (Cambridge, 1611) accessed at https://www.kingjamesbibleonline.org/1611-Bible/ ….. 17 n.17.

Linder, Douglas, "Famous Trials," Univ. Missouri-Kansas City School of Law, accessed at https://www.famous-trials.com/hutchinson/2397-the-examination-of-anne-hutchinson-november-1637, see History of the Province, Appendix ….. 17 n.16., 18 n.21.

Linder, *supra*, Order of Excommunication [of Anne Hutchinson] (Mar. 22, 1638) ….. 17 n.18.

Piccolo, Anthony, "Anne Hutchinson: Puritan Rebel and Westchester Pioneer," The New York Times (Oct. 7, 1990) ….. 17 n.19.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

---

**Nadine Gazzola**, individually, and as co-owner, President, and as BATFE Federal Firearms Licensee Responsible Person for **Zero Tolerance Manufacturing, Inc.**; *et al.*,

      **Plaintiffs**

   *v.*

**KATHLEEN HOCHUL**, in her Official Capacity as Governor of the State of New York; *et al.*,

      **Defendants.**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**

Civ. No.:  1:22-cv-1134 (BKS/DJS)

---

Defendants bring a motion at ECF-144 to dismiss Plaintiffs' claims under the Second Amendment to the U.S. Constitution regarding ammunition and semi-automatic rifle sales in New York as raised in their Complaint at ECF-1. U.S. Const., amend. II.  Specifically, Plaintiffs claims concern: (1.) (a.) the ammunition sales paper recordkeeping requirement and (b.) the ammunition background check requirement; and, (2.) the semiautomatic rifle license requirement. 2022 N.Y. Laws ch. 371; NY S.51001 at ECF 1-4 (commonly referred to as the "Concealed Carry Improvements Act," or, "CCIA").  Plaintiffs request the motion be denied.  These claims could be restored to active discovery status under a revised Case Management Plan.

As to ammunition, the new laws ban the commercial transfer of all ammunition in New York unless the sale is conducted, in person, by a state-licensed dealer in firearms[1], who is required

---

[1]  The "seller of ammunition" is distinguished. NY PEN §265.00(24).  All Plaintiffs are, at a minimum, state and federally-licensed "dealers in firearms," as the term is defined at NY PEN §265.00(9) and §400.00(2).  Plaintiffs are not required to register as "sellers of ammunition." NY PEN §400.03(1).

to validate a customer's identity via specified government photo identification, collect and input all requisite customer information, and pay a monetary fee to the NYS Police.  As of September 13, 2023 launch of the NYS Police Web-based background check system, a dealer may only sell ammunition if and when the NYS Police issue a "unique identification number" for the sale. NY PEN §400.02(2), §400.03, read with NY EXC §228; ECF 1-4, §7.  The manual ammunition sales recordkeeping requirement at NY PEN §400.03(2) became effective September 1, 2022. ECF 1-4, §8 and §26.  It requires dealers to keep sales records in a format approved by the Superintendent of the NYSP, including specified information collected from the purchaser.  The paper registry of purchasers of ammunition was not terminated when NYS NICS launched.

Second, the new laws prohibit the purchase or sale of a semiautomatic rifle unless an SAR license approved as to form by the Superintendent of NYSP is procured and used at the point of sale.  The SAR license is to function similarly to the concealed carry permit, including the use of coupons. NY §§400.00(2)-(3), 400.00(6)-(8), 400.00(10)(c), and 400.00(14), read with NY PEN §265.65 and §265.66.[2] ECF 1-4.  The requirements to obtain a CCP do not apply to the SAR license. The SAR license requirement became effective September 1, 2022. NY S.51001, §26.

The challenged laws impact all persons in New York who want to buy or sell ammunition, and all persons who want to buy or sell a semiautomatic rifle.  Ammunition[3] is the most common

---

[2] *N.B.*:  There is no discernable penalty under NY PEN §400.02 and/or §400.03 against a state-licensed Dealer in Firearms that does not perform the ammunition background check requirements.  There is a penalty demarcated for "sellers of ammunition" who fail to keep the paper ammunition sales records, pursuant to NY PEN §400.03(8) (from NY S.51001, ECF 1-4, §16).  Separately, there is a penalty for failure of a "dealer in firearms" to comply with requirements of the firearms background check, pursuant to NY PEN §400.06(2) (from NY S.51001, ECF 1-4, §20).

[3] *N.B.*:  the term "ammunition" is not defined at New York law.

form of projectile used in firearms[4], whether handguns,[5] shotguns,[6] or rifles[7]. Without ammunition a firearm is rendered <u>useless</u>. As such, the reach of the ammunition laws challenged in *Gazzola* well eclipse the "licensing scheme" that effected those who want to "have or carry concealed upon his person…any pistol, revolver or other firearm..."as struck down in *NYS Rifle & Pistol Assn v. Bruen*, 597 U.S. 1, 11-12 (2022); and, the "total[] ban [on] handgun possession in the home" struck down in *District of Columbia v. Heller*, 554 U.S. 570, 628-635 (2008).

The semi-automatic rifle laws challenged in *Gazzola* equate to the categorical prohibitions struck down in *Bruen* and *Heller* that effected handguns as "an entire class of 'arms.'" *Heller*, 554 U.S., at 628. Both the SAR and the handgun are classes or types of firearms, in common use, including for self-defense in the home. *Heller*, 554 U.S., at 629; *Snope v. Brown*, 605 U.S. _____, 145 S.Ct. 1534, 1534 (Mem) (June 2, 2025) (Kavanaugh, J., dissenting the denial).[8]

One citizen may prefer a handgun for home defense (*Heller*, 554 U.S., at 629), while another may require a custom fitted SAR (Gazzola, Seth, ECF 13-3, ¶45). ""[A] prohibition of an

---

[4] "Firearms," as defined at federal law under 18 U.S.C. §921(a)(3)(A), that subdivision for purposes of this motion being "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Under federal law at 18 U.S.C. §921(a)(17), "ammunition" is defined as "ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm." In NY, PEN §265.00(3), the term "firearm" is highly stylized and is not equivalent to federal law.

[5] "Handgun," as defined at federal law at 18 U.S.C. §921(a)(30). In NY, PEN §265.00(3)(a), a type of "firearm," meaning "any pistol or revolver."

[6] "Shotgun," as defined at federal law at 18 U.S.C. §921(a)(5). In NY, PEN §265.00(12).

[7] "Rifle," as defined at federal law at 18 U.S.C. §921(a)(7). In NY, PEN §265.00(11).

[8] Plaintiffs distinguish the NY law at issue concerning semi-automatic rifles from cases limited to a rifle in a configuration of parts and accessories that may fall under NY's "assault weapon" ban (NY PEN §265.00(22)), or, cases referencing an "AR-15" being a branded subtype of semi-automatic rifle (originally by ArmaLite). Gazzola, ¶41. The *Gazzola* claims effect a broader class of people than the recent Second Circuit decision in the *Lamont* case out of Connecticut. *Natl Assoc. for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir., Aug. 22, 2025), Petition for Writ of Certiorari at No. 25-421 (scheduled for conference Feb. 20, 2026).

entire class of 'arms' that is overwhelmingly chosen by American society for th[ese] lawful purpose[s]" falls outside the government's power.'" *Snope*, 145 S.Ct., at 1536 (Thomas, J., dissenting the denial), citing *Heller*, 554 U.S., at 628.

Plaintiffs have unique credentials and personal and professional experience from which to vault their claims as individuals, as business owners, as state and federal licensees, and derivatively on behalf of their customers. As individuals, plaintiffs are law-abiding citizens who purchase, possess, sell, and use firearms and ammunition of many variations (including the SAR) across the decades of their lives and business careers, and who want and continue to do so. Plaintiffs hold NY concealed carry licenses. Plaintiffs have more combined years of experience through their ATF Federal Firearms Licenses than this country has years. All are designated ATF "Responsible Persons." All Plaintiffs are FFL Type-01, except for Mr. Affronti who works under a Type-02 license. Several Plaintiffs have additional Type-07 licenses as manufacturers, and, Mr. Gazzola has also the SOT-2. And Plaintiffs hold county-issued "state" licenses, as dealers in firearms and, in some instances, as gunsmiths. Plaintiffs desire to maintain all licenses in good standing and to not become a "disqualified person" without Second Amendment rights, as that term is meant under 18 U.S.C. §921(g). *See*, generally, ECF-1, ¶¶6-21; ECF 125, pp. 9-16.

The Second Circuit already recognized the standing of Plaintiffs to pursue their claims, at the least, derivatively, on behalf of their customers. The Second Circuit held: "We have no trouble concluding that Appellants have standing to bring such a derivative claim," and, "We therefore hold that Appellants have derivative standing to pursue Second Amendment claims on behalf of their customer base." *Gazzola v. Hochul*, 88 F.4th 186, 194-195 (2d Cir. 2023).

The Second Circuit also held that commercial sales of ammunition and firearms implicate individual rights under the Second Amendment, as follows:

> "A State cannot circumvent those holdings by banning outright the sale or
> transfer of common-use weapons and necessary ammunition. As the
> Tennessee Supreme Court observed in 1871, "[t]he right to keep arms,
> necessarily involves the right to purchase them, to keep them in a state of
> efficiency for use, and to purchase and provide ammunition suitable for
> such arms, and to keep them in repair."

*Gazzola*, 88 F.4th, at 196 (citation omitted).

On January 16, 2026, the Second Circuit reaffirmed and expanded its holding in *Gazzola*,

stating: "the commercial availability of firearms is often "necessary to a citizen's effective exercise

of Second Amendment rights."" *Knight v. City of New York*, _____ F.4th _____, 2026 WL 89229,

*3 (Jan. 16, 2026), citing *Gazzola v. Hochul*, 88 F.4th, at 196.

As the Second Circuit had already made clear in 2023 in *Gazzola*: "…a State cannot impose

a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding,

responsible citizens from possessing common-use weapons." 88 F.4th, at 196.


## I.    DEFENDANTS ARE ON NOTICE THAT PLAINTIFFS ARE MAKING SECOND AMENDMENT CLAIMS UNDER *BRUEN* THAT WILL ENTITLE THEM TO RELIEF.


### A.    PLAINTIFFS SATISFY THE PLEADING AND NOTICE REQUIREMENTS TO DEFEAT THE MOTION TO DISMISS THEIR SECOND AMENDMENT CLAIMS.

Plaintiffs concur that an Fed. R. Civ. P. Rule 12(c) motion to dismiss a claim is evaluated

using a Rule 12(b)(6) standard. That analysis begins with Fed. R. Civ. P. Rule 8 on general rules

of pleading. Under Rule 8(e)(1) "Each averment of a pleading shall be simple, concise, and direct.

No technical forms of pleading or motions are required." Pivoting from Rule 8(e)(2) to

Rule 11(b)(3), factual allegations shall have, *inter alia*, "evidentiary support or, if specifically so

identified, will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery."

"Rule 8 gives the answer." *Berk v. Choy*, 607 U.S. _____, _____ S.Ct. _____, 2026 WL 135974, *3 (Jan. 20, 2026).  A plaintiff need file "only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the…claim is and the grounds upon which it rests."" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

To survive a motion to dismiss using an Fed. R. Civ. P. 12(b)(6) standard, a plaintiff's complaint should allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Trump v. Vance*, 977 F.3d 198, 207 (2d Cir. 2020), citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  See, also, *Twombly*, 550 U.S., at 570.  A complaint that meets the *Twombly* standard "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Id.*, at 556.

Further, "Rule 8 establishes "implicitly, but with unmistakable clarity," (citation omitted) that evidence of the claim is *not* required. (citation omitted)" *Berk v. Choy*, 607 U.S. _____, 2026 WL 135974, *1 (citation omitted).  A Rule 12(b) motion to dismiss on the pleadings "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l. Wildlife Fed.*, 497 U.S. 871, 889 (1990) (citation omitted).  All reasonable inferences must be drawn in the Plaintiffs' favor when undertaking this analysis. *Singh v. Deloitte LLP*, 123 F.4th 99, 93 (2d Cir. 2024).

### B.     PLAINTIFFS' SECOND AMENDMENT CLAIMS ARE SUFFICIENTLY STATED AND DEVELOPED ACROSS THREE YEARS OF ACTIVE LITIGATION AT ALL COURT LEVELS.

Plaintiffs filed a detailed, 126-page Complaint at ECF-1 that satisfies the Fed. R. Civ. P. Rule 8 pleading and notice requirements.  Plaintiffs' also supplied a 1-page diagram of their claims, clearly showing the Second Amendment claims under the *Bruen* standard in column B. ECF 35.

The Complaint stated with sufficiency and notice the structure and overarching factual allegations, challenged statutes, and governing precedents. The pleading gave Defendants notice of, *inter alia*, Plaintiffs' Second Amendment claims in Sections V (The Second Amendment Guarantees the Fundamental Right of the Individual "to Keep Arms," Meaning to Purchase and Possess Arms"; and VI (The Dealer is an Extension of the Individual, Occupying a Unique Intersection of Constitutional and Regulatory Law." ECF-1. The ammunition background check is highlighted at Section X(B)(7), the SAR license is found at Section X(C)(2). There is overlap of the ammunition and SAR claims as part of the claim against "unconstitutional regulatory overburden" because of the performance compliance mandates hoisted onto Plaintiffs. These claims also stand alone as Second Amendment claims. The allegations serve two purposes. They relate to Count One (§1983 claim) and to Count Five ("constitutional regulatory overburden," now on appeal).

This *Gazzola* case is distinguishable from *NYS Firearms Association v. James*, as discussed *infra*, for plaintiffs' credentials and experience as state and federally-licensed dealers in firearms, its depth of record, its Second Circuit 2023 decision, and its ability to carry the case through to a merits trial in the manner of *Rhode v. Bonta*. The *Rhode* case being is the West Coast litigation equivalent as California is the only other state in the country with an ammunition background check system. It, too, is discussed *infra*.

Defendant brings this third motion to dismiss Plaintiffs' claims more than three years downstream of a highly-litigated case. First, Defendants filed a motion to dismiss prior to service of their responsive pleading, but withdrew it *sua sponte*. ECF-51 (Feb. 28, 2023); ECF-64 (w/d Dec. 13, 2023). Defendants then filed their Answer at ECF-79 (Mar. 21, 2024). Defendants submitted their second motion to dismiss selected of the Plaintiffs' claims. ECF-104 (Oct. 25, 2024) and prevailed, that decision now on appeal. The Court granted Defendants' request to file a renewed motion to dismiss two more of Plaintiffs' claims, this time regarding "(1) New York's ammunition

background check requirements, based on *New York State Firearms Ass'n v. James*, No. 24-1290-cv, 2025 WL 2921846 (2d Cir. Oct. 15, 2025), and (2) New York's semiautomatic rifle licensing requirement." ECF Text Order, Sannes, J., Nov. 17, 2025.[9]

Plaintiffs have continuously put Defendants on increasingly detailed notice of their claims.

**(A.)** Within a week of commencement, Plaintiff filed for an emergency TRO/PI, including custom designed affidavits for each Plaintiff. Over a period of the next 18-months under their Fed. R. Civ. P. 65(a) ("TRO/PI") motion, litigation was extensive. ECF-13. *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023), *cert.* denied 144 S.Ct. 2659 (Mem, June 17, 2024).

**(A-1.)** During the TRO/PI motion appeal, word arrived on or after August 17, 2023 from the NYSP about a Web-based ammunition background check system. Emergency Motion, Decl. Jarrett Ford, pp. 3a-6a (letter postmark), *Gazzola v. Hochul*, 144 S.Ct. 274 (Mem, Oct. 10, 2023) (No. 23-A230); and, Decl. Nadine Gazzola, pp. 40a-43a[10]. At that moment, Plaintiffs were awaiting decision from the Second Circuit on the motion as deemed submitted on March 23, 2023. Case 22-3068. Plaintiffs immediately filed an emergency submotion to the Second Circuit for portions of that pending decision to seek at least a partial injunction against NYSP implementation of firearms and ammunition background checks. The Second Circuit denied the motion. Case 20-3068, doc. 103 (Sep. 8, 2023) (unreported). Plaintiffs appealed that submotion order for a stay to the U.S. Supreme Court. *Gazzola v. Hochul*, No. 23A230. Unfortunately, the application was denied. *Gazzola v. Hochul*, 144 S.Ct. 274 (Mem, Oct. 10, 2023). Defendants actively opposed Plaintiffs' requested relief at every stage, excepting the emergency submotion.

---

[9] Defendants did not file against Plaintiffs' claims concerning their ability to teach the CCIA course. This is the third of the three cross-over claims. ECF 35, Column B.

[10] See, also, ECF 122-5, ¶7 where such allegations were repeated and reaffirmed to incorporate into Plaintiffs' Cross-Motion of Jan. 2025 at ECF-122.

**(B.)**  A "Civil Case Management Plan" followed, as did a "Discovery Stipulation." ECF-83 (as amended ECF-89); ECF-99.  Counsel exchanged Fed. R. Civ. P. 26 responses.  Plaintiffs served upon Defendants more than eight hundred pages (800 pages) of systematically organized and BATES-numbered documents in admissible form. ECF-109, ¶52 (Capanna).  Numerous documents related to the ammunition and SAR claims (sample references to the BATES documents are illustrated herein).  Plaintiffs did not yet serve their "Tier 1" raw data because the State sought and obtained a court-ordered stay of all discovery. ECF-111.

**(C.)**  When the State filed its second motion for partial dismissal, Plaintiffs filed a Cross-Motion for Partial Summary Judgment, including a Statement of Material Facts under Fed. R. Civ. P. 56.1 (N.D.N.Y. L.R. 7.1(b)(3)). ECF-122.  Chief among the requested relief of the cross-motion was permanent injunctions against the NY Attorney General and the NYSP from enforcement of the statutory underpinnings of the paper ammunition recordkeeping, the Web-based ammunition background check system, and the SAR license. ECF-122; 122-11; see also ECF 33-1.  The cross-motion included more than five hundred pages (500 pages) of party and witness affidavits and exhibits, all in admissible form.  Defendants actively opposed this requested relief, including through an answer to the 56.1 Statement. ECF-130; 130-2 (Deyo).  Plaintiffs replied in full, including to the Defendants' 56.1 responsive Statement. ECF-133; 133-11.

Plaintiffs have articulated and argued their Second Amendment claims for more than three years in accordance with the *Bruen* standard set by the U.S. Supreme Court.  In the course of the first 18-months of litigation, the Plaintiffs petitioned and filed applications to SCOTUS four (4) times, including from two Second Circuit orders.  Defendants did not challenge the 2023 Second Circuit ruling in *Gazzola*.  They are well bound by it, and they are well aware of the claims.

## II.     PLAINTIFFS' SECOND AMENDMENT CLAIMS WILL BE EVALUATED UNDER *NYSRPA v. BRUEN*.

The Second Amendment guarantees, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In 2008, *Heller* articulated the individual right. 554 U.S., at 592.  The *McDonald* decision incorporated Second Amendment guarantees. 561 U.S., at 791.  The *Bruen* decision articulated the test by which government action that implicates the Second Amendment must be evaluated. 597 U.S., at 17.  The 2023 Second Circuit decision in this *Gazzola* case confirmed that regulations upon firearms and ammunitions implicate the Second Amendment. *Gazzola v. Hochul*, 88 F.4th, at 196.  In this new motion, Defendants could have acknowledged the 2023 *Gazzola* decision and spent the whole motion presenting historic analogues.  Instead, the NY Attorney General chose to "peddle a modern version of the government authority that led to those historic evils" that were expressly discredited in *Rahimi*, such as laws "disarming classes of people deemed to be threats, including…slaves, and native Americans." *United States v. Rahimi*, 602 U.S. 680, 775-776 (2024).

### A.     PLAINTIFFS' COMPLAINT CORRECTLY IDENTIFIED *BRUEN* FOR THE EVALUATION OF THEIR SECOND AMENDMENT CLAIMS.

The standard for judicial analysis of a Second Amendment claim is set forth in *New York State Rifle & Pistol Association v. Bruen*. 597 U.S. 1 (2022). ECF-1, ¶¶309; 34-39; 89, 92, 94, 96, 98-99, 102-103, 107, 107 n.67-68, 113, 128, 223.  Through *Heller* in 2008 and *McDonald* in 2010, the nation's high court found certain municipal laws unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Bruen*, 597 U.S., at 22, citing

*Heller*, 554 U.S., at 628-629.  *Bruen* was affirmed and applied in *United States v. Rahimi*, while this case has been pending.[11]

The binding, nationwide standard is simply this: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S., at 17 and "reiterate[d]" at 24.  Upon which, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearms regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."" *Id*. (citation omitted).  As affirmed, the Court wrote: "the Government [has] regulate[d] arms-bearing conduct," "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Rahimi*, 602 U.S., at 691 and *Bruen*, 597 U.S., at 19. See, generally, ECF-1, ¶¶35-39.

**B.    THE SECOND CIRCUIT ADOPTED AND EXPRESSED THE CONTOURS OF INDIVIDUAL CONDUCT PROTECTED BY THE SECOND AMENDMENT THROUGH THE 2023 DECISION IN THIS *GAZZOLA* CASE.**

The Second Amendment "codified a *pre-existing* right" that "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S., at 592 (emphasis in original); also, at 584 ("of being armed and ready for offensive or defensive action in a case of conflict with another person," quoting Justice Ginsburg in *Muscarello v. United States*, 524 U.S. 125, 143 (1998)).  The "central holding in *Heller* is that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."

---

[11] Another major decision is now pending decision at the U.S. Supreme Court on the prohibition against concealed carry of firearms on private property open to the public following oral arguments January 20, 2026.  It arises out of Hawaii through the Ninth Circuit. *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), pending decision U.S. Sup. Ct., No. 24-1046 (oral arguments, Jan. 20, 2026).

*McDonald*, 561 U.S., at 780.  "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller* we held that individual self-defense is "the central component" of the Second Amendment right." *McDonald*, 561 U.S. at 768, citing *Heller*, 554 U.S., at 599 (see, also, *id.*, at 628, that the "inherent right of self defense has been central to the Second Amendment right").

Moreover, "to bear arms implies something more than mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *Heller*, 554 U.S., at 617-618; adopted by *Gazzola v. Hochul*, 88 F.4th, at 196.  The Second Circuit expressly adopted Plaintiffs' argument to craft and define the contours of individual conduct that it recognizes as protected by the Second Amendment.[12]

> "A State cannot circumvent those holdings by banning outright the sale or transfer of common-use weapons and necessary ammunition.  As the Tennessee Supreme Court observed in 1871, "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v. State*, 50 Tenn. 165, 178 (1871)."

*Gazzola*, 88 F.4th, at 195-196.  Each delineated aspect of "necessarily involves" is as true as the statement "Gun ownership involves responsibility." Gazzola, ¶45; also, ¶46.

In reaching the 2023 *Gazzola* decision, the Second Circuit cited multiple, concurring Circuits.  Although these precedents are pre-*Bruen*, the threshold question of whether the Second Amendment was implicated by government action is a constant.  The Second Circuit cited to *Ezell v. City of Chicago* ("Ezell I"), 651 F.3d 699[13], 704 (7th Cir. 2011), *abrogated on other grounds by*

---

[12]  *Gazzola v. Hochul*, Second Circuit Case 22-3068, p. 37.

[13]  From *Ezell I*: "The plaintiffs have identified several provisions of the Ordinance that implicate activities integral to range training," *inter alia*, "8-20-080 (prohibiting the possession of ammunition without a corresponding Permit and registration certificate), 8-20-100 (prohibiting the transfer of firearms and

*Bruen*, 597 U.S. 1 (2022). ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use…"); *Drummond v. Robinson Twp.*, 9 F.4th 217[14], 227 (3rd Cir. 2021) (citing *Ezell I*), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022); *Teixeira v. County of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022) ("the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense") (citing *Ezell I* and *Jackson*, plus *Andrews v. State*); *Jackson v. City & County of San Francisco*, 746 F.3d 953[15], 967-68 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022) ("without bullets, the right to bear arms would be meaningless" and "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them") (citing *Ezell I*).  The Second Circuit also cited to their prior decision in 2020. *Gazzola*, 88 F.4th, at 196, quoting *New York State Rifle & Pistol Assoc. v. City of New York*, 883 F.3d 45, 58 (2d Cir. 2018), *vacated and remanded on other grounds*, 590 U.S. 336 (2020).

That ammunition and classes of firearms as sold through licensed dealers is protected by the Second Amendment is already established as relates to this *Gazzola* case.  The State is precluded from relitigating this established and binding holding in this current motion.

---

ammunition except through inheritance)" (at 709).  The circuit court characterized it as a ban on "certain…types of ammunition" (at 691).

[14] From *Drummond*:  the township's rule "forbids center-fire cartridges, but frees citizens to train with other forms of ammunition" (at 230), referencing later rim-fire ammunition (at 232).

[15] From *Jackson*: The city's rule banned certain types of ammunition (at 958).

### C.    THE STATE (AGAIN) TRIES TO ADVANCE AN INCORRECT READING OF HISTORY, ALREADY REJECTED BY SCOTUS.

Historical analogues must "comport with the principles underlying the Second Amendment." *Rahimi*, 602 U.S., at 693. The State provided no laws to demonstrate "an enduring American tradition" of the laws they advance. Ref., *Bruen*, 597 U.S., at 69. The related affirmative defense in Defendants' Answer said only: "The challenged statutes are fully supported by law, history, and tradition." ECF-79, ¶371. This motion was Defendants' chance to put provide notice of the basis of the pleaded affirmative defense, whilst meeting the burden of the motion. The State missed the mark.

Oddly, in a footnote, the State labels horrendous, historic tragedies such as brutal massacres of Native Americans as "unfortunate reality." ECF 144-22, p. 22. Noteworthy, and consistent with that footnote, is the State's own characterization of those targeted: "outsiders" or "groups perceived as threatening" (*id.*, p. 21); "potential enemies" (*id*.) "groups perceived to be dangerous" (*Id.*); as regaining rights by "demonstrat[ing] that they did not pose a danger" (*id.*, at 23). Sadly, instead of disavowing such offenses, the State embraces them against the Second Amendment.

The U.S. Supreme Court has twice singled out New York for flipping the legislative presumption to all persons wishing to exercise Second Amendment rights are presumed to be too dangerous to be trusted. "What distinguished the regimes, we observed, was that the surety laws "presumed that individuals had a right to…carry," whereas New York's law effectively presumed that no citizen had such a right, absent special need." *Rahimi*, 602 U.S., at 699-700, citing to *Bruen*, 597 U.S., at 56.

Mr. Rahimi was a disqualified person under federal law 18 U.S.C. §922(g)(8), "a finding that such person represents a credible threat to the physical safety of such intimate partner or child, and thus ineligible to purchase, own, or possess firearms or ammunition." Disqualification under

18 U.S.C. §922(g)(8) applies "only once a court has found that the defendant "represents a credible threat to the physical safety" of another." *Rahimi*, 602 U.S., at 698-699. "That matches the surety and going armed laws, which involved judicial determination of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id*.

The U.S. Supreme Court has drawn the line against laws "disarming classes of people deemed to be threats, including…slaves, and native Americans." *Rahimi*, 602 U.S., at 775-776. These repugnant laws are the "cautionary tales" of history of the enduring importance of the individual civil rights guaranteed by the Second Amendment.

> "…the discriminatory regimes the Government relied upon are cautionary tales. They warn that when majoritarian interests alone dictate who is "dangerous," and thus can be disarmed, disfavored groups become easy prey."
>
> "The Government peddles a modern version of the governmental authority that led to those historical evils. Its theory would allow federal majoritarian interests to determine who can and cannot exercise their constitutional rights. While Congress cannot revive disarmament laws based on race, one can easily imagine a world where political minorities or those with disfavored cultural views are deemed the next "dangers" to society. Thankfully, the Constitution prohibits such laws. The "very enumeration of the [Second Amendment] right takes out of the hands of government the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.""

*Rahimi*, 602 U.S., at 776-777, citing *Heller*, 544 U.S., at 634 (parenthetical/emphasis in original).

The "cautionary tale" is, of course, that those who are targeted for disarmament can be targeted for murder. The *McDonald* decision included one such accounting from 1876: "[d]ozens of blacks, many unarmed," were "slaughtered" by "a rival band of armed white men." Ninety-seven white men were indicted for participating, of which only three were convicted, ironically including "depravation of constitutional rights, including the right to bear arms." Convictions that were overturned. *McDonald*, 561 U.S., at 757.

The State's arguments herein are akin those of Hawaii, made last week at SCOTUS, causing multiple Justices to make disbelieving utterances. As Justice Alito tried to explain to that state's attorney: "[T]hey wanted to disarm the black population in order to help the Klan terrorize them…" *Wolford v. Lopez*, oral arguments, U.S. Sup. Ct., No. 24-1046, TR 99:24-100:4 (Alito).

"The deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands," can still prove fatal to this day. Imagine being a mother, begging for police intervention, a "court order of protection" in her hands, believing the order required mandatory law enforcement response, but no response came for hours, proving too late to save the mother's three daughters. *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 761 (2005) (finding officers did not have a duty to respond, in spite of the clearly specified language on the face of the order – a language in common use in the courts in New York).

### 1. Historic Laws Requiring Small Arms and Ammunition Ownership and Proficiency in a Time of War Support Plaintiffs' Claims.

When this case began, the State submitted four historic laws that support Plaintiffs' claims. Laws directing men to report for militia duty with the arms of the day and ammunition in good working order, at their own expense, the failure to do so resulting in fines, and that arms might be given to those "too indigent." ECF 29-2 (p. 2, "Equipments"); 29-3 (p. 1, "How to be armed and accoutred"); 29-4 (p. 2, "Person enrolled to provide himself with equipments etc. and appear with ammo when called out"); 29-5 (p. 7, "Fines on officers and privates for non-attendance and for want of arms &c.").

These "special circumstances laws" were enacted during a time of war when there was a foreign army on our soil and every many was expected to join a militia. Martello, ¶8. "The historic loyalty oath reflected in these examples of historic laws from the Revolutionary War Era reflect a simple truth that endures: a soldier needs to know that the man or woman next to him on the

16

battlefield is fighting for the same cause." *Id.*, ¶9.  Martello equated the oath to the one taken upon being sworn in to the U.S. Armed Forces, save that his oath was to uphold the United States Constitution." *Id*.

### 2. *Heller* Rejected Disarmament on the Basis of Religion.

The State began its submissions in 1637 with what can only be called not a "law" but an "edict" against Anne Hutchinson. ECF 144-7.  Put into context, she was a woman expelled from a Colony by a Governor Winthrop for disobedience under the Fifth Commandment of the Bible[16] ("Honour they father and thy mother: that thy dayes may bee long vpon the lang, which the Lord thy God giueth thee.").[17]  Hutchinson was, the next year, excommunicated by the Church of Boston.[18]  She was a woman who, in 1643, was murdered in New York, alongside all her children save one, and her servants, in a time of armed conflict with Native Americans for lands in what would one day include a busy highway named in her honor.[19]  Even upon the tragedy of her death, Gov. Winthrop "perceive[d] this massacre of an indication of evil forces snuffing out a lesser evil through the work of God.[20]

It is in this context that the State holds up a list of men to be disarmed unless they recite

---

[16] Linder, Douglas, "Famous Trials," Univ. Missouri-Kansas City School of Law, accessed at https://www.famous-trials.com/hutchinson/2397-the-examination-of-anne-hutchinson-november-1637, see there History of the Province, Appendix, p. 483 (Mrs. H. What law do they tranfgrefs? Gov. The law of God and of the ftate."); *id*. ("Mrs. H.: What law have I broken?/Gov.: Why the fifth commandment.").

[17] Exodus, ch. 20, ver. 12, The Holy Bible (known as "the King James Bible") (Cambridge, 1611) accessed at https://www.kingjamesbibleonline.org/1611-Bible/.

[18] Linder, *supra*, Order of Excommunication (Mar. 22, 1638) ("I do deliver you up to Satan…").

[19] Piccolo, Anthony, "Anne Hutchinson: Puritan Rebel and Westchester Pioneer," The New York Times (Oct. 7, 1990).

[20] Carr, Marianne, "Anne Hutchinson: A Threatening Daught of Eve to the "City Upon a Hill"," Locus (Vol. 6, Art. 4), p. 7.

proscribed words.[21]  But the State conveniently omits that by 1689, the Declaration of Rights was codified as the English Bill of Rights, including against disarmament on the basis of religious affiliation.  "This right has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S., at 592-593 (citations omitted).

This is of no probative value, either to the State's motion or their affirmative defense.

### 3.    *Rahimi* Rejected "Historical Evils" as Repugnant to a *Bruen* Analysis.

No "historical evils" may be embraced as analogies. *Rahimi*, 602 U.S., at 776.  To emphasize and underscore "*why* and *how*" such Colonial actions are repugnant to our American civil rights (*Rahimi*, 602 U.S., at 681 (emphasis added)), one need look no further than the Royal Decree of 1630 against "Disorderly Trading with Savages."  The Colonial references offered by the State were undertaken upon His Majesty's royal authority. ECF 144-4 (1642), ECF 144-5 (1658), ECF 144-2 (1665), ECF 144-3 (1676), ECF 144-8 (1676).

The context which the State did not bring forward started with complaints from the newly-minted Massachusetts Bay Company in 1629.  From across the ocean, King Charles I issued the 1630 Royal Decree to encourage that Colonists deal with "savages" by limiting the sale of arms to government-licensed purveyors and reaffirming Colonists' authority to "proceede against the Offenders."  The King's greater concern, as expressed through the Decree, were the profits to be had by wresting those who traded arms with Native peoples from those "seeking only their present and private profit," so that "these Colonies, which being well governed may be of great use to this Nation…" Royal Proclamation of King Charles I of England issued Nov. 24, 1630, "Forbidding

---

[21]  Linder, *supra*, p. 485 ("Gov. … but I will fay that there was no meeting of women alone, but your meeting is of another fort for there are fometimes men among you./Mrs. H. There was never any man with us.")

Disorderly Trading with the Savages." <u>British Royal Proclamations Relating to America (1603-1783)</u>, Clarence S. Brigham, A.M., Ed., Burt Franklin (New York, 1911), [66].

The aims of commerce during imperialism is not relevant to a *Bruen* analysis.

### 4. *Rahimi* Rejected Loyalty Oaths as Irrelevant to a *Bruen* Analysis.

"The Government's smorgasbord of commentary [on loyalty oaths] proves little of relevance, and it certainly does not establish a "historical tradition that delimits the outer bounds of the right to keep and bear arms."" *Rahimi*, 602 U.S., at 759, citing *Bruen*, 597 U.S., at 19.

The State submits so-called "laws," scratched out by quill by rebels, calling for an uprising – *a revolution* – against The Crown, threatening law-abiding men, women, and children with "loyalty oaths," lest such persons be deemed disloyal "to the cause," disarmed, and expelled "behind Enemy Lines" with the express purpose of using such arms as usurped for their own seditious and treasonous purposes. ECF 144-6 (1755), 144-9 (1756), 144-10 (post-1776), 144-12 (1777), 144-11 (1778).

To King George III of England, it was a time, with his Privy Council, to issue "The Proclamation of Rebellion" on August 23, 1775, wherein he decreed his "subjects" as being "misled by dangerous and ill-desinging Men," who were "forgetting the Allegiance which they owe to the Power that has protected and sustained them" by "arraying themselves in hostile Manner to withstand the Execution of the Law."[22] "Rebellion" with a capital "R." The British military was deployed, not only to suppress, but "to disclose and make known all Treasons and traitorous Conspiracies which they shall know to be against Us, Our Crown and Dignity."

---

[22] Website, U.S. House of Representatives, "King's Proclamation for Suppressing Rebellion and Sedition" (Aug. 23, 1775), at
https://history.house.gov/HouseRecord/Detail/25769822301?current_search_qs=%3FCurrentPa%26PreviousSearch%3DSearch%252cAll%252c%252c%252cTitle%26CurrentPage%3D9%26SortOrder%3DTitle%26Command%3D9.

Any "state" action was taken at the urging of the Continental Congress to the "United Colonies" through "The Tory Act" and "The Tory Resolution." Journals of the Continental Congress, 1774-1789, vol. IV (January 1, 1776 to June 4, 1776), U.S. Gov't. Printing Office (Washington, D.C., 1906), p. 18-22 (January 2, 1776) and p. 205 (March 14, 1776). "The Continental Congress was the governing body by which the American colonial governments coordinated their resistance to British rule during the first two years of the American Revolution."[23]

The formal response from the future United States was the "Declaration of Independence" on July 4, 1776. It did not begin "We hold these truths to be self-evident." It began:

> "When in the Course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the Laws of Nature and Nature's God entitled them…"[24]

The men began with "the Laws of Nature and Nature's God" because it reflected a break from what they were experiencing and a going into what they believed possible. And then, it continued:

> "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed. That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."[25]

Drawing from *Rahimi*, "Throughout these centuries, English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups. By the

---

[23] U.S. Dep't. State, Office of the Historian, "Continental Congress, 1774-1781," accessed at https://history.state.gov/milestones/1776-1783/continental-congress.

[24] Website, U.S. National Archives, "The Declaration of Independence," accessed at https://www.archives.gov/founding-docs/declaration.

[25] *Id*.

time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." 602 U.S., at 694, citing to *Heller*, 554 U.S., at 594-595, 600-603.

### 5.    *Heller* Equated Nuisance Laws to "Jaywalking" in a *Bruen* Analysis.

"The Government's remaining evidence is even further afield." *Rahimi*, 602 U.S., at 759. The State points to an assortment of post-ratification firearm regulations, covering everything from the noise occasioned when a pistol is discharged to the location of a shooting gallery or the storage of gunpowder. ECF 144-15 (1891), 144-17 (1892).  "They are all irrelevant for purposes of" an ammunition background check system or a semi-automatic rifle license. Quoted from *Rahimi*, *id*. "Again, the "central considerations" when comparing modern and historical regulations are whether they "impose a comparable burden" that is "comparably justified." (citations omitted)  The Government's evidence touches on one or *none* of these considerations." *Id*.

Pre-1911, the New York State Legislature conferred through individual municipal grants of authority the ability of a municipal legislative body to enact such laws as concerned the firing of a pistol on a street or sidewalk, the storage of gunpowder, and a permit for the concealed carrying of a pistol.  The State's submission at ECF 144-15 and 144-16 illustrate such laws.  *Heller* already disposed of laws in the nature of a nuisance as "akin to modern penalties for minor public-safety infractions like speeding or jaywalking." *Heller*, 554 U.S., at 633.

While Plaintiffs are "not obligated to sift the historical materials," Plaintiffs' Counsel undertook a survey of state-conferred authority to municipalities from 1891-1895.  There were no laws concerning commercial transactions in ammunition, nor any requiring a license to purchase a long gun.  The entire group of thirteen grants merely reflected permission from the State for municipalities to enact 'nuisance laws,' 'zoning laws,' and 'pistol permits.' Capanna, Affm., hereto.

Nuisance and zoning laws were deemed non-informative in *Heller*, *supra*. The latter, merely reflected the history of the common-law offense of bearing arms in a way that could spread "fear" or "terror" among people. *Bruen*, 597 U.S., at 49, 50.

Nuisance and zoning grants of authority do not advance a *Bruen* analysis.

**6.    *Heller*, *McDonald*, and *Bruen* Resoundingly Rejected Any "Judge-Empowering Interest-Balancing Inquiry."**

The trilogy of Second Amendment cases at *Heller*, *McDonald*, and *Bruen* expressly rejected three times over the use of any "judge-empowering interest-balancing inquiry." *Bruen*, 597 U.S., at 22. The State's submission includes a section using a modern crime to try to justify modern laws (ECF-144, p. 12-13); and inadmissible statistical claims (ECF 79-3, ¶5; ECF 130-2, ¶22; ECF 144-21, ¶50; ECF 145-1, ¶6.[26] To this genre of state argument, U.S. Supreme Court Justice Gorsuch literally remarked, "It's quite an astonishing claim to me," and Justice Alito similarly said, "So is it not the height of irony…"[27] Attorneys for New York Defendants submit substantially the same arguments as Hawaii in *Wolford*, as if the voice of the U.S. Supreme Court is on mute.

The State bears the burden of proof in the motion and at this point in the application of *Bruen* to Plaintiffs' Second Amendment claims relating to ammunition and firearms requirements under the challenged laws. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S., at 17. "Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt." *Bruen*, 597 U.S., at 23. "Thus, when *Heller* expressly rejected that dissent's "interest-balancing inquiry," 554 U.S., at 634 (internal

---

[26] *N.B.*: any Plaintiff allegations in the Complaint that relate to this heinous crime are quotes from Gov. Hochul, as probative of her inaccurate public presentations involving firearms and of her animus.

[27] *Wolford v. Lopez*, *supra*, oral arguments, U.S. Sup. Ct., Jan. 20, 2026, No. 24-1046, TR 97:15-16 and TR 100:56 (Alito).

quotation marks omitted), it necessarily rejected intermediate scrutiny." (footnote omitted). *Id*.

"[A]s Members of the Court have already explained, "[t]he right to keep and bear arms…is not the only constitutional right that has controversial public safety implications." *Bruen*, 597 U.S., at 17, n. 3, quoting *McDonald*, 561 U.S., at 783.  See, also, *Texas v. Johnson*, 491 U.S. 397, 420-421 (1989) ("The hard fact is that sometimes we must make decisions we do not like.  We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result.").

### D.    CONGRESS REPEALED AS UNCONSTITUTIONAL A LIMITED FEDERAL AMMUNITION LICENSE AND RECORDKEEPING REQUIREMENT FOR FFLS.

The *Bruen* decision included examples of an historical inquiry dating to the 18th century "if some jurisdictions actually attempted to enact analogous regulations…but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality. 597 U.S., at 26-27.  Plaintiffs, as state and federally-licensed dealers in firearms, have drawn for decades upon Congress and the ATF/FBI as their primary source of authority.  Plaintiffs note, the 1968 Gun Control Act originally licensed such FFL dealers as having firearms and ammunition responsibilities, including a paper log of ammunition sales. Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1214 (§921(a)(11)), 1220 (§922(d)), and 1221 (§923(a)).

But, the Firearms Owners Protection Act, Pub. L. 99-308, 100 Stat. 449 (1986), repealed the licensing of dealers for ammunition sales and responsibilities like manual ammunition sales recordkeeping.  Congress found that license has "no measurable crime-fighting value" and that the "paperwork burden is enormous." Congr. Rec. (July 9, 1985), p. 18183. The U.S. Senate Report that accompanied FOPA found that "…Congress can – and should – deal differently with long-guns than it does with handguns." U.S. Sen. Cmte. on the Judiciary, Rpt. 98-583 (Aug. 8, 1984), p. 32.

The new NY ammunition sales and records laws challenged herein look as though the repealed federal statutes were pulled out of an unemptied dumpster on The Hill labeled 'UNCONSTITUTIONAL' to see if they could get away with repeating it at the state level in 2022.

Enduring Congressional opposition to the ammunition background check is embedded in the prohibition against use of the federal National Instant Criminal Background Check ("NICS") system for any non-firearms background check – a prohibition that expressly applies to any "Point of Contact" state, such as New York.[28]  28 CFR §25.6(a), §25.6(d).  Penalties against a state or local agency include a fine and cancellation of NICS inquiry privileges. 28 CFR §25.11.

### E.     PLAINTIFFS IN CALIFORNIA WON RULINGS THAT AMMUNITION BACKGROUND CHECK IS UNCONSTITUTIONAL.

#### 1.     The California Ammunition Background Check System Was Found Unconstitutional Under *Bruen*, and is on Appeal.

Currently, the case challenging the California ammunition background check system is at the Ninth Circuit, pending rehearing en banc on March 23, 2026.  The Ninth Circuit panel decision, affirming the District Court decision finding it to be unconstitutional under *Bruen*, was vacated as part of the motion to grant rehearing en banc. *Rhode v. Bonta*, 145 F.4th 1090 (9th Cir. 2025), *rehearing en banc granted*, vacated by *Rhode v. Bonta*, 159 F.4th 1170 (9th Cir., December 1, 2025).  The lower court decision in *Rhode v. Bonta* at 713 F.Supp.3d 865 (S.D.CA 2024) is thus the governing order.  The S.D.CA 2024 decision followed remand for proceedings consistent with *Bruen*. *Rhode v. Bonta*, (unreported), 2022 WL 17099119 (S.D.CA Nov. 17, 2022).

The Ninth Circuit opinion (vacated) remarked that "California was the first state to require in-person background checks as a condition of each ammunition purchase, along with a fee."

---

[28]  Originating from Brady Handgun Violence Prevention Act, Pub. L. 103-159, as amended, Pub.L. 103-322, 103 Stat. 2074 (1993).

*Rhode*, 145 F.4th, at 1117.  The CA ammunition background check requirements went into effect July 1, 2019.  Like NY, CA requires "an automated background check every time [residents] need to buy ammunition." *Rhode*, 713 F.Supp.3d, at 870.  Implementation and operations differ between the two states. *Id*., at 871-872.

In contrast to NY, "The [CA] Attorney General agree[d] that the core right to possess a firearm for self-defense, "would include a 'corresponding right' to 'obtain bullets necessary to use' firearms for self-defense."" *Id*., at 873.  The CA district court also relied upon *Jackson*, *Teixeira*, and *Andrews*. *Id*., at 874-875.  The court held: "…assuming *arguendo* that there is a presumption in favor of a background check condition or qualification on the buying of ammunition, the presumption has been overcome." *Id*., at 876-878.  The CA district court conducted a *Bruen* historical analysis on "148 laws covering 535 years – from 1403 to 1938" submitted by the CA Attorney General.  The court found "no historical twins and no dead ringers," nor anything "particularly helpful." *Id.*, 880, see 878-884.  The CA district court concluded "The ammunition background checks laws have no historical pedigree and operate in such a way that they violate the Second Amendment right of citizens to keep and bear arms." *Id*., 887-888.[29]

### 2.     Four States Require Ammunition Licenses.

Four other states Connecticut[30], Illinois[31], Massachusetts[32], and New Jersey[33] require a

---

[29]  Worth noting is "The Supreme Court likewise has never approved an analogous restriction on obtaining a component of a firearm that is necessary to its operation." *Rhode*, 145 F.4th, at 1117 (vacated, pending en banc review).  Consider, Gazzola, ¶¶25-29 and 19-24; Mastrogiovanni, ¶¶33-40.

[30]  Conn. Gen. Stat. §29-38n (2024), "Ammunition Certificate"; §29-38o, term of 5 years.

[31]  Ill. Comp. Stat. 430 ILCS 65/2(a)(5), "Firearm Owner's Identification (FOID)"; 65/6 term of 10 years.

[32]  Mass. G. L. c. 140, §131(a), "Firearm Identification Card"; §131(i), term of 6 years.

[33]  N.J. S. A. 2C:58-3.3, "Firearms Purchaser Identification Card"; 2C:58-4(f) term of 10 years, prior to July 5, 2022 is lifetime validity.

license to purchase ammunition.  The CT, IL, MA, and NJ ammunition licenses are analogous to multi-year, renewable concealed carry licenses.  These ammunition licenses are obtained at the state level through the state police departments, and result in a uniform card used statewide.

These state licenses are not analogous to the NY laws challenged, and are not briefed herein.

### III.    THIS *GAZZOLA* CASE IS READILY DISTINGUISHED FROM *N.Y.S. FIREARMS ASSOC. v. JAMES.*

Simply put, the *Gazzola* Plaintiffs are state and federally-licensed dealers in firearms who work full-time in their chosen profession in direct contact with customers, the ATF, the NYSP, Sheriffs, County Clerks, and Legislators.  No customer, not even a world-class competition shooter Ms. Kim Rhode would be able to analyze, develop proofs, and present evidence in admissible form like the Plaintiffs.[34]  Plaintiffs came into the new laws with a built-in compare/contrast barometer created and honed by their federal license and work, together, with the ATF.  The *Gazzola* Plaintiffs started this case at the perfect moment in history and studiously have submitted affidavits and exhibits in admissible form, as if they are war correspondents.  They already have one good decision from the Second Circuit, and they are on appeal to get the Second Circuit to set the standard for the evaluation of proofs on their claim of "unconstitutional regulatory overburden."  Plaintiffs are expert witnesses in their fields.  They work as a team fueled by the history of civil rights in America.

The pending *N.Y.S. Firearms Assoc. v. James* case (herein "*Borrello*") is thus distinguished. W.D.N.Y., case 6:23-cv-06524.  The *Borrello* plaintiffs are individuals and an organization. *Id.*, doc. 4 (Complaint), ¶¶5-9.[35]  The undersigned is not aware of any FFL being a named party in the

---

[34]  The *Rhode v. Bonta* case includes multiple co-plaintiffs that are Federal Firearms Licensees.

[35]  The use of "Borrello" herein is for ease of distinction, as the group name is quite close to "NYSRPA" (N.Y.S. Rifle & Pistol Association)"  NY Sen. George Borrello is the second named plaintiff therein.

case.  The *Borrello* motion for preliminary injunction was denied at 157 F.4th 232 (Oct. 15, 2025).[36]

Unfortunately, the Second Circuit decision is littered with mistakes.

For example, the *Borrello* Second Circuit decision at footnote 3 reads that plaintiffs made claim of a processing delay "from three hours to nine days."  The accurate range for a NYS NICS ammunition background check is a few moments to in excess of 30-days, with the NYSP directing dealers to resubmit as a "new transaction" if there is an unresolved "delay" (*infra*).

Another quick illustration is found at footnote 6.  It purports to compare to the *Rhode* decision, as follows: "The record in this case, by contrast, is bereft of such wide-scale and substantial implementation issues."  The affidavit of Former Acting Superintendent Chiumento submitted in the *Borrello* case was inadmissible and contains junk data (*infra*).  The 2024 *Rhode* district court decision followed a full trial on the merits.  The Chiumento affidavit cannot and should not have been admitted or weighed as evidence.

## IV.   THE STATE'S ARGUMENT OF "BURDEN" IS A FALSE FLAG TO DISTRACT THE COURT FROM THE *BRUEN* ANALYSIS.

The evaluation of an individual through the "NYS NICS" ammunition background check system is a black hole of a system that "aims to evade judicial review." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 63 (2021) (Sotomayor, J., concurring). So, too, the SAR licensing scheme.

This is what to master:  (1.) the laws are unconstitutional on their face, in the manner of *Heller*, or under *Bruen*; AND, (2.) the Defendant NYS Police are intentionally generating chaos by (i.) failing to perform their responsibilities to state-licensed dealers; (ii.) are operating the background check system in an unconstitutional manner, and (iii.) have through this group of

---

[36] *N.B.*: as of this filing I do not see an appeal of the Second Circuit order being taken, as visible on this date on the SCOTUS website.

affidavits present their transgressions of civil rights in a false light to achieve their desired outcome, namely the kind of court decision published in *Borrello*.

With that in mind, what follows is minimum analysis the *Gazzola* Plaintiffs provide for this motion.  Reference is made to the Deyo Declarations in this *Gazzola* case (ECF 79-3 (filed 03/21/24), ECF 130-2 (filed 03/20/25), ECF 144-21 (filed 12/22/25), and ECF 145-1 (filed 12/30/25)); and, the Chiumento Declaration in the *Borrello* case that was put before the lower court Judge Geraci at case 6:23-cv-06524, ECF 19-1 (filed 10/13/23).  To appreciate this Section, the Court may find useful to refresh using Plaintiffs' 2025 cross-motion, including the Statement of Material Facts (ECF 122-11) side-by-side to the Reply Statement (ECF-133).  Plaintiffs and Counsel remain, as always, available to travel to the Court for argument or testimony.

### A.     AMMUNITION BACKGROUND CHECK SYSTEM HIGHLIGHTS

#### 1.     Disqualifiers and Databases are Undefined at Law.

<u>On the law</u>.  No legal metric for disqualification from an ammunition purchase is specified within the ammunition background check laws at NY PEN §400.00(1).  The Bill NY S.51001 did not delineate the statute(s) or basis for evaluation of a requested ammunition purchase. ECF 1-4.  The NY ammunition background scheme does not contain "narrow, objective, and definite standards" to guide administering officials. *Bruen,* 597 U.S., at 38 (citation omitted).

One contrasting example at state law is carry permit application, disqualification for a felony or "serious offense," the latter term being defined at NY PEN §265.00(17).

<u>The Dynamic</u>.  Defendant NYS Police submitted a pair of affidavits from Michael Deyo, who states his credentials as "Counsel to the New York State Police." ECF 144-21, ¶1.  Mr. Deyo does not cite any statute or regulation used to "deny" an ammunition background check.  Mr. Deyo vaguely says (a.) "data sources to determine if the purchaser is subject to any of the federal

disqualifiers[37];" and, (b.) "potentially disqualifying New York State records." ECF 144-21, ¶29.

The NYSP official 1-page flyer hints at "Some Possible Prohibitors." The bullet point list language is recognizable as some federal disqualifiers under 18 U.S.C. §922(g) (not referenced as such).[38] No reference to any New York law is depicted.

On the Law. There is no definition (or limit) of the "databases" trolled for a record that may relate to said unspecified disqualifiers. The statute says only "records held by the division" and "any records it is authorized to request" from various other state and local entities, as well as to "create and maintain additional databases as needed." NY EXC §228(3).

The Dynamic. The five NYSP affidavits only reference once to "having a mental health disability or committed to a mental institution." ECF 144-21, ¶24. Although not a legally precise shorthand for 18 U.S.C. §921(g)(4), this is probably their way of referencing the 860,454 records[39] that New York has filed to the federal government as of 12/31/21 to win nearly $20 million in funding through the "NIAA." See, ECF-1, ¶193, 190-192, 194-196; ECF 16- and 16-5[40].

## 2.    Computer Code for Any Non-Proceed Response is Unknown.

The NYSP did not disclose the name of their external software vendor, which is referred to only as a "contractor." Deyo, ECF 144-21, ¶27. No affidavit was provided from "the contractor" about the contract terms (if any), specifications for systems operation used in the software design, or what is coded as the metric against which individual data entry is evaluated. Nor was an affidavit

---

[37] Mr. Deyo over-reaches with "The [federal] NICS Index contains records provided by local, state, and federal agencies about persons prohibited from receiving firearms under federal law." ECF 144-21, ¶23. New York does not report those convicted at the state and local level for, e.g., felonies and misdemeanors. See, ECF 16-4, pp. 5-6 for the FBI's overview of disqualifying factors.

[38] BATES: NYS – POLICE – 000054.

[39] BATES: U.S. – FBI – 000219-225.

[40] BATES: U.S. – DOJ-BJS – 000412-417 and 418-451.

provided from the contractor to define what criteria the code reflects to trigger a pop-out for manual review by a contractor employee or an NYSP employee. There is no indication that a person who is "deny" or other negative treatment by automated programming is audited by a human person at the contractor or the NYSP.

The "NYS NICS" should be evaluated against the federal NICS, the framework for which is set by Congress and the ATF through federal law/regulations. The operations of which is annually reported, including the total number of denials, denials by statutory disqualifier, and other items discussed in this Section.[41] The Brady Act contained a five-year NICS design and implementation period (1993-1998). ECF-1, ¶67.

### 3. NY Law Does Not Require a Response Be Given to a Request for Background Check Made at a Point-of-Sale.

The NYS Police affidavit admits that there are "904 ammunition transactions" pegged as "remain delayed."[42] Deyo, ECF 144-21, ¶36. The figure is worse for firearms transactions at "4,717." *Id.* That's a total of 5,621 without an outcome. Mr. Deyo does not state how "remains delayed"[43] is defined and what policies are in place for handling such individuals.

The time expired from transaction request to response is not stated or averaged, nor have those computations been qualified by the "remains delayed" parameter. The adjustment to all numbers for repeated entries for the same attempted purchase is not quantified. Whether entries purge after a specified time period is also not stated (which would effect, at a minimum the total

---

[41] For the FBI's NICS 2024 Annual Operational Report, see https://www.fbi.gov/file-repository/2024-nics-operational-report.pdf/view.

[42] Plaintiffs' use of raw data and other remarks from the affidavits of Mr. Deyo are not a waiver of their challenge of the capability of the witness to submit an affidavit(s), to challenge the data and other allegations therein, or to waive discovery. Any use of the Deyo affidavits, herein, are only for that which may constitute admissible hearsay as against the party's interest.

[43] *N.B.*: this term is not defined at law and does not appear in the NYS NICS "User Guide" at pp. 3-4.

number of transactions and all % rates derived therewith).

    <u>On the Law</u>. The ammunition background check as codified from NY S.51001 does not define a response deadline for each background check request.[44,45] According to the NYSP "NYS NICS New Application Process for Dealers User Guide" at pp. 3-4, "common statuses you will see are, and it lists proceed, delayed, expired, denied, pending, submission failed.[46]

    <u>The Dynamic</u>. According to Plaintiffs, responses vary and have little actual meaning. Affronti, ¶12; Hanusik, ¶11. At least one Dealer received additional remarks such as "No DQ's," "No remarks Approved," "no DQ's?," "No match." Liuni, Exh. hereto, ¶9  Mr. Liuni's own background check showed: "CHC reviewed.  Hit based on association only. No match found." *Id*.

    Continuously since launch of the NYSP ammunition background check, Dealers have received denials on ammunition purchases by persons with concealed carry licenses and/or SAR license "endorsements" or "amendments;" persons who receive split results on contemporaneous firearm/ammunition purchases. Affronti, ¶20; Hanusik, ¶20; Mastrogiovanni, ¶22.

    When the result "delay" appears on the computer screen, there is no subsequent notification from the NYSP to the Dealer when and if the result changes to "proceed" or "deny." Hanusik, ¶13; Liuni, ¶22; Mastrogiovanni, ¶15.  To discover whether or if there is a change in customer status, the Dealer must scroll up and down the transactional databank. Hanusik, ¶¶13-14; Liuni, *id*.;

---

[44]  There is a passing reference to a "proceed" response as part of an annual report to be submitted by the NYSP to the Governor and NY Legislative Leaders. NY EXC §228(6)(c).  The second of two "proceed" in the CCIA is that the NYS NICS should have issued a "proceed response" before the Dealer would complete the transaction or 30 calendar days shall have elapsed. NY GBL §898(2), Private sale or disposal of firearms, rifles and shotguns.  *By contrast*, 18 U.S.C. §922(d); 25 CFR §25.2, "Proceed," "Denied," "Delayed," and "Open [transaction];" 27 CFR §478.102; 28 CFR §25.6(c)(1)(iv)(B), where the "delayed' response expires upon three business days, exclusive of the day on which the query is made.

[45]  There is no reference to "deny," but there is to "denial."  It is in the context of a "denial of a background check" as a basis for appeal. NY EXC §228(8).

[46]  BATES: NYS – POLICE – 000033-53.  Available at https://nysnics.ny.gov/app/home/trainingguide.

Mastrogiovanni, ¶16.  Dealers "battle" to oversee the number of open transactions, including those that are NYSP non-responsive at the 30-day mark. Gazzola, ¶49(a.)(iv.)(1)-(2).  At SafeShoot, Mr. Liuni and his employees have been managing 25-30 open transactions per day for more than two years, or, 50% of daily transactions. Liuni, ¶22. (That rate is recently lessening to average 7-10 open transactions on a given day, or, approximately 25% of daily transactions. *Id*., ¶23.)  In the example of Mr. Liuni's ammunition purchase, the request went in on September 13, 2023 at 9:33 a.m. and was returned September 14, 2023 at 6:58 a.m.

> ### 4.    NY Law Does Not Create a 30-day Waiting Period, Nor Does It Apply to Rifles, Shotguns, or Ammunition Purchases.

Background on the Law.  The "30-day" thing kicking around is a 2019 law that came in through S.2374 to effectively buffer the federal "delay" response contorting the Congressionally-authorized 3-business day hold period (NICS "delay") into a NYS 30-day permitted investigation of a potential handgun purchaser.  That law, at NY PEN §400.00(12), expressly applies only to "a firearm," which, per NY §265.00(3) equates (plus or minus) to the federal definition of a "handgun."  It does not apply to an ammunition, rifle, or shotgun background check.

The Dynamic.  Mr. Deyo's raw data is that between 09.13.2023 and 12.15.2025 the NYSP processed "806,782 ammunition transactions." Deyo, ECF 144-21, ¶33.  This is a false.  At best, that number represents the request for an ammunition purchaser's background check.  A background check is not the equivalent of a transaction.  There is no indication how that number was derived and whether it eliminated duplicate transactions for 30-day rerun attempts entered as "new transactions" by dealers.  Reruns would boost NYSP transaction numbers and would constitute false data for the allegation made.

Plaintiffs have reported this problem directly to the NYS NICS help line and have received instructions to wait at least thirty days (30-days) and to rerun the ammunition background check

for the same customer on the same requested purchase. Gazzola, ¶49(a)(iv)(4); Hanusik, ¶17; Liuni, ¶18; Mastrogiovanni, ¶19.  There is no limit to the number of "new transactions" a dealer can request for the same customer and the same intended ammunition purchase.

Plaintiffs consistently report customers who do not wait for the results of the ammunition background check and those who submit a background check but then do not return to the store to complete the ammunition purchase. Gazzola, ¶63(b); Hanusik, ¶12; Liuni, ¶20; Mastrogiovanni, ¶14.  As described above, dealers are instructed to rerun persistently delayed customers.  This data can only come from Plaintiffs because they have the direct customer contact on a full-time basis.

### 5.     Appeals are Sparce and Difficult to Pursue.

Another gap occurs for individuals who are denied, but who may not appeal.  Mr. Deyo's raw data is "4,532 ammunition transactions were denied" and that "4,459 firearm transactions were denied." Deyo, ECF 144-21, ¶35.  He states "the NYSP received approximately 2,024 appeal requests." *Id.* at 37.  Assuming the appeals request to be a blended number, it suggests that out of an aggregate 8,991 ammunition and firearms background checks, only 2,024 persons appealed, or, 22.5% of persons appealed.

Mr. Deyo errs in his claim that persons whose denial was upheld at the NYSP level were "notified of the reason for denial." Deyo, ECF 144-21, ¶38.  Plaintiffs' customers can and do file appeals through a website page of the NYS Police, including via cell phone while standing at a Dealer.  A denial of an appeal placed through the NYS Police returns with "Reason for Denial: State Prohibitor."  Unlike the federal ATF denial of appeal letter, the NYSP provide no citation of law to the customer. Liuni, ¶13.

No data is supplied by the NY Attorney General's Office on the number of secondary appeals from an affirmed denial by the NYSP.

### B.   SEMI-AUTOMATIC RIFLE LICENSE HIGHLIGHTS.

### 1.   There is No Statewide SAR License Approved by the Superintendent of the NYSP.

Go back to ECF 33-1, the 6-page chart of Defendant responsibilities from the first oral argument to this Court in November 2022.  There is still no NYSP Superintendent-approved SAR license.  Plaintiffs repeatedly said since November 8, 2022 and repeatedly throughout this litigation that there is no statewide, uniform SAR license.  ECF 13-2, ¶59 (Gazzola, N.); ECF 13-3, ¶40 (Gazzola, S.); ECF-4, ¶62 (Serafini); ECF 13-7, ¶34 (Affronti); ECF 13-5, ¶28a (Mastrogiovanni). Plaintiffs even filed a cross-motion for partial summary judgment requesting, in part, a permanent injunction against enforcement against customers and dealers to create safe harbor for accepting the county-level CCP "amendments" and "endorsements" being issued to facilitate sales.

### 2.   NYSP  is Approving County-Level "Amendments" to Concealed Carry Permits.

There is nothing in the law that allows an endorsement or amendment for SAR purchases to go onto a concealed carry permit.  And yet: the Deyo affidavits contain admissions against the Defendants' interests that the NYSP is processing and approving county-level amendments on new CCPs and onto existing CCPs. ECF 144-21, ¶50; ECF 145-1, ¶6; ECF 79-3, ¶5.

The NY concealed carry permit requirements under the CCIA included an 18-hour training course, involving 16 classroom hours and 2 hours of live fire handgun training.  The CCIA did not impose the CCP requirements onto those who want to purchase an SAR.

The NYS Police published an application form, used statewide, to apply for an SAR license. It is printed on the same form that is used for the CCP application.[47]  The same is true for the "Semi-

---

[47]  BATES: NYS – POLICE – 000020-23 for NYSP PPB-3 (Rev 08/22).

Automatic Rifle License Amendment."[48]

The SAR license requirement does parallel the CCP license requirement for "coupons" to be used for each addition of a requisite firearm to the license and off the license.  No such requirement is known to be made at the county level.  While there is a P-12 form required to be completed and sent to the NYSP by a dealer upon sale of a handgun[49], the law does not require such a form to be completed for the SAR sale.

## CONCLUSION

The Complaint set out sufficient allegations to frame the cause of action under the Second Amendment. The Defendants' motion reflects an awareness of Plaintiffs' claims, three years into this litigation.  The legal standard for evaluation of Plaintiffs' Second Amendment claims will be *N.Y.S. Rifle & Pistol Assoc. v. Bruen*.  The 2023 *Gazzola* decision from the Second Circuit held Plaintiffs have standing to sue, at least for derivative claims, and that the commercial sale of firearms and ammunition implicates the Second Amendment.  Defendants did not meet their burden under the *Bruen* test to demonstrate historical laws that were analogues appropriate to inform an evaluation of the challenged laws.  Without that, the motion must be denied.

The challenged laws impact all ammunition, which impacts all individuals and all firearms. The challenged laws impact all semi-automatic rifles, which impacts a class of firearms.

Plaintiff state and federally-licensed dealers in firearms articulated their claims November 2022 and have rigorously developed the record and evidence in admissible form.  By contrast, the NYSP Superintendent and Counsel have submitted data that both supports Plaintiffs' claims and requires further investigation.  Plaintiffs should be permitted to move forward on these claims.

---

[48]  BATES: NYS – POLICE – 000024-25 for PPB-5 (Rev 08/22).
[49]  BATES: NYS – POLICE – 000032 (Rev 02/01).

Dated:  February 1, 2026

Respectfully Submitted,

*Paloma A. Capanna*
Paloma A. Capanna, Attorney
106-B Professional Park Drive
Beaufort, North Carolina 28516
Bar Roll No.: 2483469
(252) 515-3676
(315) 584-2929 mobile
Paloma@CapannaLaw.com